
Exhibit 10

REPORTER'S RECORD

VOLUME ___ OF ___ VOLUMES

TRIAL COURT CAUSE NO. 241-1251-08

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| | * | |
| VS. | * | OF SMITH COUNTY, TEXAS |
| | * | |
| DEMONTRELL LAMAR MILLER | * | 241ST JUDICIAL DISTRICT |

------------------------------

JURY TRIAL

NOVEMBER 3, 2009

------------------------------

On the 3rd day of November, 2009, the following proceedings came on to be heard in the above-entitled and -numbered cause before the HONORABLE JACK SKEEN, JR., Judge presiding, held in Tyler, Smith County, Texas;

Proceedings reported by Computerized Machine Stenography, Reporter's Record produced by Computer-Assisted Transcription.

Court Reporters: STEVE R. AWBREY, CSR
Official Court Reporter
D. KEITH JOHNSON, CSR, RDR, CRR
Deputy Official Court Reporter
241st Judicial District Court
Smith County Courthouse
Tyler, Texas 75702
(903) 590-1636

```
 1                  A P P E A R A N C E S
 2
     FOR THE STATE:
 3
            MR. D. MATT BINGHAM, III
 4          STATE BAR NO. 00787085
            SMITH COUNTY DISTRICT ATTORNEY
 5          MS. APRIL SIKES
            STATE BAR NO. 18348790
 6          FIRST ASSISTANT DISTRICT ATTORNEY
            SMITH COUNTY COURTHOUSE
 7          100 NORTH BROADWAY
            FOURTH FLOOR
 8          TYLER, TEXAS 75702
            (903) 590-1720
 9
10
     FOR THE DEFENDANT:
11
            MR. MELVIN THOMPSON
12          STATE BAR NO. 19950900
            ATTORNEY AT LAW
13          2108 S. WALL
            TYLER, TEXAS 75701
14          (903) 596-7856
15          AND
16          MS. LA JUANDA T. LACY
            ATTORNEY AT LAW
17          SBOT NO. 11810500
            2419 CECIL AVENUE
18          TYLER, TEXAS  75701
            (903) 592-8335
19
20
21                  REPORTER'S NOTE
22          Uh-huh = Yes - Affirmative response
23          Huh-uh = No - Negative response
24   Quotation marks are used for clarity and do not
25          necessarily indicate a direct quote.
```

241st Judicial District Court

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 3

1                          INDEX

2   PROCEEDING:                                    PAGE

3   STATE'S REBUTTAL WITNESS:

4        WITNESS              DX   CX   VD

5        HARRY WILSON, M.D.     7        103

                              104  108

6                             198       200

                              201  209

7                             215  220

8   STATE RESTS ON REBUTTAL...................... 222

9   BOTH SIDES CLOSE............................ 223

10  CHARGE CONFERENCE........................... 225

11  RECESS FOR THE DAY.......................... 228

12  COURT REPORTERS' CERTIFICATE................ 229

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                       STATE'S EXHIBITS INDEX

2    NO.  DESCRIPTION                        OFF'D  ADMT'D

3    209  Large photo of slide                 58     59

4    210  Large photo of slide                 58     59

5    211  Large photo of slide                 58     59

6    212  Large photo of slide                 58     59

7    213  8 by 10 autopsy photo                34     35

8    214  Chapter entitled "Pathology         102    104
          of Fatal Abuse"

9

     215  8 by 10 autopsy photo                34     35

10

     216  8 by 10 autopsy photo               199    200

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1                    P R O C E E D I N G S

2                    (Reported by Steve R. Awbrey, CSR:)

3                    THE COURT:  All right.  We're on the

4       record in Cause Number 241-1251-08, State versus

5       Demontrell Miller.  State and defense counsel are

6       present.  Defense counsel is present.  The defendant is

7       present before the Court.

8                    Mr. Bingham, I believe, your witness is

9       here, correct?

10                   MR. BINGHAM:  Yes, sir.

11                   THE COURT:  What's his name?

12                   MR. BINGHAM:  Dr. Harry Wilson.

13                   THE COURT:  We're outside the presence of

14      jury, of course, and I believe Mr. Thompson just said

15      something to the Court about needing a 705 hearing.

16                   MR. THOMPSON:  No.

17                   THE COURT:  You're not going to need a

18      705?

19                   MR. THOMPSON:  No.

20                   Are you ready for the jury then?

21                   MR. BINGHAM:  Yes, sir.

22                   THE COURT:  Ready for the jury,

23      Mr. Thompson?

24                   MR. THOMPSON:  We are, Judge.

25                   (The jury entered the courtroom.)

1            THE COURT:  Be seated, Ladies and

2    Gentlemen.  Thank you.

3            All right.  Mr. Bingham, if you would

4    call your next rebuttal witness.

5            MR. BINGHAM:  Dr. Harry Wilson.

6            (The witness entered the courtroom.)

7            THE COURT:  Dr. Wilson, if you could,

8    sir, raise your right hand for me, so I can swear you in

9    as a witness in the case.

10           You solemnly swear the testimony you will

11   give in the cause now on trial before the Court, will be

12   the truth, the whole truth, and nothing but the truth,

13   so help you God?

14           THE WITNESS:  Sir, I so affirm.

15           THE COURT:  Thank you, sir, very much.

16           If you'll come around and have a seat

17   right there in the witness stand.

18           If you could, Dr. Wilson, as you know,

19   you can move that microphone around and push it where

20   you can stay right up on it and speak right into it for

21   us.

22           THE WITNESS:  Could I ask for a cup of

23   water?

24           THE COURT:  All right.  Mr. Bingham, go

25   ahead.

 1                          HARRY WILSON, M.D.,

 2      having been first duly sworn, testified as follows:

 3                          DIRECT EXAMINATION

 4      BY MR. BINGHAM:

 5          Q    Dr. Wilson, how are you doing?

 6          A    Okay.  Thank you.

 7          Q    I know you flew in last night.  You're

 8      currently testifying in -- I guess you're on loan from

 9      the Federal court in El Paso?

10          A    I have a concurrent case, yes.

11          Q    So you flew in last night and got in what time

12      about 1:00?

13          A    Approximately, sir, yes.

14          Q    What we're going to do, we're going to start

15      off by kind of telling the jury first, what do you do

16      for a living?

17          A    My name is Harry Wilson.  I am a pediatric

18      pathologist who lives and works in El Paso, Texas.

19          Q    Who do you work for?

20          A    I work for Pathology Associates of El Paso,

21      which is the pathology group that supplies pathology

22      services to the Providence Memorial Hospital in El Paso,

23      a private community hospital.

24          Q    So you don't work for a county or a state

25      government?

1     A     No, I do not; although, I'm on the medical

2     staff of the county hospital, and I'm on the faculty of

3     Texas Tech School of Medicine in El Paso.  But both of

4     those are voluntary positions.

5     Q     So you will be -- so you will not be -- do you

6     charge to come down here and review documents and

7     testify?  If called, do you charge anyone?

8     A     Well, no, I make myself available to review

9     material on cases as a public service for my own

10    perspective.

11    Q     So there will be no -- you don't charge any

12    fee to do that?

13    A     No.  My expenses are met for plane tickets.

14    Q     We pay your way down or the defense would pay

15    your way down.  Whoever asks you to come testify, but in

16    other words, you don't work for like University of Texas

17    that will be submitting a bill, no bill at all will be

18    submitted other than plane tickets?

19    A     That is correct, sir.

20    Q     Where did you go to -- where did you grow up?

21    A     Well, I was born in Illinois and grew up in

22    the Washington D.C. suburbs in Maryland.

23    Q     Where did you go to undergraduate school?

24    A     I went to Harvard College and Cambridge Mass.

25    Q     Undergraduate degree?

1       A    Yes, sir.

2       Q    What was your undergraduate degree in Harvard?

3       A    History of science and specifically history of

4  biology.

5       Q    Where did you go to medical school?

6       A    I went to the University of Chicago in

7  Chicago.

8       Q    Did you do residencies, internships as a part

9  of the medical school?

10      A    Yes.  I actually did graduate work in

11  pathology.  I actually taught -- also taught college

12  biology while I was a pathology graduate student, and

13  then I did both pediatrics and pathology internships.  I

14  did pediatric residency and pediatric pathology

15  fellowships, so I had graduate work in pathology and

16  pathology internship and pediatric pathology fellowship

17  as well as my pediatric residency and pediatric heme

18  oncology residency or fellowship.  I ended up with five

19  board certifications from that training.

20      Q    What does it mean to be board certified?

21      A    By experience and examination and training,

22  you're qualified in a particular area of medicine to be

23  able to take care of patients and render diagnoses and

24  call yourself by that particular designation whether it

25  be a pathologist or pediatrician or a specific specialty

1   in those areas.

2        Q    What are your board certifications in the five

3   that you have?

4        A    Well, anatomic pathology, which is the study

5   of the structural problems related to disease.  Clinical

6   pathology, which is the study of laboratory issues

7   related to disease.  Pediatric pathology, which is the

8   study of diseases and death in children.  Pediatrics

9   which is the study and care, carrying for live children.

10  And pediatric heme oncology, which is the study and

11  evaluation and caring for children with cancer and blood

12  disorders.

13       Q    Is there a difference -- so you are a

14  pediatrician?

15       A    Yes, sir, and I moonlight as a pediatrician,

16  too, in an emergency clinic on Friday, Saturday, and

17  Sunday nights.

18       Q    So, you are a pediatrician?  You do not --

19  you're also a pediatric pathologist?

20       A    That is correct.

21       Q    And you have board certification in pediatric

22  heme oncology?

23       A    "Heme" stands for hematology.  Specialist in

24  blood disorders and issues related to blood and

25  coagulation.

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1        Q     Now, not working for -- some people say, well,

2    if you work for -- if you're a pathologist for a

3    governmental entity, say, you're a pathologist for SWIFS

4    or Dallas County Medical Examiner, then you are paid --

5    are you paid by that county if you work, say, for Dallas

6    County Medical Examiner or Galveston Medical Examiner,

7    right?

8        A     That would be correct, yes.

9        Q     You are a private pathologist?

10       A     That is correct.

11       Q     So you are not paid by a governmental entity

12   at all?

13       A     That is correct.

14       Q     We called you and asked you to -- how many

15   people -- in looking at five board certifications, do

16   you know how many physicians in the United States have

17   five board certifications?

18       A     No, sir, I do not.

19       Q     Is that -- I'm not asking you to toot your own

20   horn, but is that a lot for a physician to have five

21   board certifications?

22       A     Well, I guess it is.  In my case is because I

23   could not ever figure out what I wanted to do.  That's

24   still the case.

25       Q     Kind of what you want to be -- Mrs. Sikes

1    saying, kind of what you want to be when you grow up?

2        A    Yes.  I'm waiting to grow up and that's

3    important.

4        Q    What is the difference when you do forensic

5    pathology or do autopsies, you focus on children?

6        A    Okay.  Now, I'm not a forensic pathologist --

7    and when you use the term "forensics", you're talking

8    about the science related to evaluating death primarily

9    from nonnatural processes, and that's where forensics

10   come in.

11            This is where pediatrics and pediatric

12   pathology overlaps with forensic science, and that is in

13   the area of child abuse and nonnatural child death.

14       Q    Do you do autopsies in children to determine

15   if it is a homicide when you conduct an autopsy?  Are

16   you looking to see if it is a natural death and

17   undetermined death or a homicide?

18       A    This is one of the, to me, interesting

19   misconceptions about the practice of the hospital based

20   pathology versus medical examiner, office based

21   pathology.

22       Q    We talked about that.  Explain that to the

23   jury?

24       A    Hospital based pathology is really focused on

25   understanding disease and disease process and why

1    children die.  And it's very important to realize that

2    the vast, vast majority of children's death are due to

3    natural disease processes.  It's only a small proportion

4    that's due to nonnatural events.

5              By statute in every state the investigation of

6    nonnatural death is the responsibility of a coroner or a

7    medical examiner system, and in that sense, forensic

8    pathologists have that ultimate responsibility.

9              However, because a lot of children's death

10   that are natural are not known whether they're natural

11   or nonnatural until an investigation takes place, you

12   have this overlap of pediatric pathology looking at some

13   death that fall into the category of suspected natural

14   that can turn out to be nonnatural, and then you have

15   the forensic system looking at deaths that are suspect

16   possibly as being nonnatural, but turn out to be

17   natural.

18             And the ideal situation is where you have

19   active interaction between folks with, in a sense,

20   natural expertise, natural disease and death expertise

21   and nonnatural disease expertise, and that's where child

22   abuse comes in.

23             And both in my -- you didn't ask about my

24   training areas where I worked -- but I was at University

25   of Chicago hospitals for 13 years, Denver Children's

1    Hospital for 14 years, and I've been working at the

2    El Paso Community for about 18 years.  In my stint at

3    both in Chicago and Denver, especially in El Paso,

4    intermittently, I've been functioning in a collaborative

5    role and actually at times been given the title of

6    Deputy Medical Examiner -- I don't have that now -- but

7    I have functioned in that role to overlap with this area

8    of when you have a child death, is that death due to

9    natural causes or nonnatural events.

10            And so, it's a situation where this

11   interactive process becomes very important to be able to

12   come up with a proper conclusion about what has

13   happened.

14   Q    And so where a forensic pathologist is

15   focusing on manner and death and cause of death, trying

16   to determine those things, are you looking at natural

17   versus nonnatural events that result in death?

18   A    Well -- and trying to understand disease

19   processes, because that's the major focus of natural

20   death is what has occurred intrinsic to that child that

21   has brought about death.

22            Again, the one area where it crosses this

23   boundary is in child abuse, and that's where events from

24   caretakers and environmental circumstances provide an

25   explanation for a death, which is not explained by

1    natural means.

2         Q    So if you have a child that has died from a

3    nonnatural death, then the historical information on

4    functionality, what the child was doing and not doing

5    then becomes very important?

6         A    That's critical, and in general in pediatrics,

7    that's what the pediatrician deals with.  The two best

8    indicators that a child is doing okay is, is the child

9    growing appropriately and is the child functioning

10   appropriately, growth and function, and we talk about

11   function in terms of developmental stages.  So that a

12   child's functioning at 3 months of age is different than

13   at 3 years of age, different than at 13 years of age,

14   and knowing those differences and functional capability

15   is an important aspect of determining that a child is

16   doing okay.

17        So it's not just the objective growth

18   parameters but it's as importantly the subjective things

19   about behavior and responsiveness and milestones of

20   developmental achievement.

21        Q    Let me go back to kind of before I get to the

22   book that you contributed to.  At the University of

23   Chicago, the Denver Children's Hospital and where you

24   work in El Paso, was your primary focus then, children

25   and the deaths of children?

1      A    My primary focus has always been around

2  children.  Death of children has, as a particular issue,

3  I started getting involved in Chicago, but really when I

4  went to Denver, I got involved in a big way, and I was

5  part of an organization called the American Academy of

6  Pediatrics and based on my own background, I was very

7  interested in issues related to Native American children

8  care.

9           And the academy established a committee to be

10  as a resource for the Indian Health Service in Native

11  American community on the health of children and that

12  committee look at why children die on reservations, and

13  a model was established about how to review deaths of

14  children on reservations.

15           When I went to Colorado, I helped Colorado to

16  set up systematic state wide process of investigating

17  the deaths of all children, so that deaths were not just

18  said, oh, this child died.  It must be SIDS or it must

19  be some disease and have no investigation.

20           And what became clear from the Native American

21  experience is that unless you do an appropriate

22  investigation, you won't come to an appropriate

23  conclusion about why children are dying.

24           So Colorado was one of the first states with

25  my being involved at the beginning in helping set this

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    up to do systematic death review.

2              When I came to Texas, in 1993, I helped Texas

3    do the same thing, and we now have in Texas and I

4    contributed to this right from the beginning, a

5    systematic statewide death review where each regional

6    area has its own committee of collaborative experts from

7    child advocacy, from law enforcement, pathology,

8    pediatrics, specialist in child diseases and child abuse

9    information to review all of the deaths in El Paso.

10              We have about 150 children's death each year

11   and each one is reviewed by our committee, and I

12   actively participate in that to make sure that these

13   deaths are understood, because children are not expected

14   to die.

15              And when they do, you have to have a good

16   reason to say why this child is dead at that point in

17   time and in its life.

18       Q    And that's why when you're talking about

19   children, are not -- like you said, are not supposed to

20   die.

21              So the investigation to get the proper

22   conclusion as to why they did is then critical?

23       A    Absolutely right.

24       Q    How many autopsies have you conducted, would

25   you say on children?

     1        A     Well, I don't specifically keep track of that,

     2    but over a thousand, and many hundreds over a thousand.

     3        Q     Of just children?

     4        A     Of just children.  I do, do adult autopsies

     5    but obviously my primary interest and involvement is in

     6    children's autopsies.

     7        Q     The difference when you're conducting or when

     8    you're looking for conducting an autopsy on a child, you

     9    are looking for why this child died?

    10        A     That is correct.

    11        Q     Right?

    12        A     But not in the sense of what forensics is

    13    doing to make that determination is it natural or

    14    nonnatural in the sense primarily that in the context

    15    most of those deaths as I mentioned are natural deaths

    16    and in trying to learn what is it about the natural

    17    death of this child that could have been prevented and

    18    help other children.

    19            And that becomes very important, because if

    20    you don't expect children to die, and they're dying and

    21    you don't understand why, you need to investigate that,

    22    because there are other children that may potentially be

    23    at risk from whatever disease process or if it is

    24    nonnatural from whatever environmental or inflicted

    25    events that have brought about the death.

1      Q    When you're looking at the difference between

2    a forensic pathologist and you, as a pediatric

3    pathologist, you're looking at the same injuries.

4    You're looking at them from trying to explain this event

5    that has occurred and whether it's natural or nonnatural

6    and ultimately what caused the death; is that a fair --

7    I'm trying to follow you on that?

8      A    Right.  We use the word "injury".  And all

9    children get injuries.  And it's important to understand

10   the context of the injury and when you look at a child

11   who is dead.  It then becomes important to understand,

12   is this a child who is dead with an injury or dead from

13   an injury and just from that simple concept right there.

14   If it's death with an injury, the death is still is

15   going to be due to some natural cause.

16          If it's a death from an injury, then it's

17   going to be a nonnatural event and the three basic

18   categories of nonnatural circumstances, not natural

19   category of death are homicides, suicide, and accident.

20   And determining what that is, requires a very careful

21   investigation that is not done by the pathologist, but

22   it's done by the people who are trained; law

23   enforcement, Child Protective Services, the people who

24   are trained to go to scenes, understand context, do an

25   investigation that puts the medical findings, which are

1   merely autopsy findings or medical findings in the

2   context of what the environment has, what the story has

3   about where that child was, what happened to that child

4   at different points in time and so a determination of

5   ultimately a manner of death -- in other words, natural

6   or nonnatural.  If nonnatural accident homicide,

7   suicide, and of course one doesn't want to use suicide

8   unless you're at an age and developmental state

9   appropriate to that being a possibility and certainly

10  teen-agers, that is a possibility.

11         But the idea of being that unless you have

12  that overall investigation, again, by law enforcement

13  and the nonmedical aspect of the investigation, you

14  cannot make a proper manner determination.

15     Q   Okay.  So even with the forensic pathologists,

16  that historical information on functionality should be

17  important to them?

18     A   Yes.  Functionality is a piece of that,

19  because it's more than just in this case in that context

20  functionality, it's the narrative.  It's the physical

21  environment.  It's things about where the child was, who

22  was with the child, what's reported about what the child

23  was doing.  What was happening in the environment.

24         So if you have a child that has injuries and

25  you find out that that child was in a car crash, and the

1    car crash may well account for the injuries, and so you

2    can look at a child who has multiple bruises and

3    internal bleeding and stuff, and all of a sudden getting

4    that information that the child was in a significant car

5    crash with features of the car crash appropriate for

6    explaining those injuries, that makes sense.

7            And then you may or may not put it in a

8    category of accident depending on how that car crash

9    occurred.

10           But if you have a child that has similar

11   injuries, but you have no story of a car crash or a fall

12   or falling into a river and being hit by boulders as

13   you're going down a river, you have a child who has

14   these injuries which are unexplained, and that's with an

15   investigation saying, well, there's no story about why

16   these injuries are there.  One of my responsibilities is

17   to make sure that there's not a natural disease that

18   exist in that child that would occur to allow for what

19   looks like injuries to actually be natural disease

20   events.

21       Q    Got you.

22       A    And excluding that, with no story to account

23   for the injuries, you're left with the unfortunate

24   conclusion that somebody in that environment inflicted

25   something on that child to create those injuries, and

1    again, unfortunately, with child abuse related deaths,

2    that sometimes is a frequent context in which the

3    injuries are placed and that is we've got these

4    injuries.

5             We say that these injuries are related to the

6    death of the child without natural disease accounting

7    for the death, but we have no story that exists to

8    appropriately to accountant for those injuries,

9    therefore, someone in the environment had to have

10   inflicted these injuries to bring about this child's

11   death.

12        Q    In this case, were there injuries present on

13   the victim, Kelynn Pinson, that are not explained?

14        A    They're not explained by the story, that is

15   correct.  And that's a fundamental finding in a child

16   abuse related death or the way I like to put it in an

17   inflicted injury related death.  Not necessarily saying

18   that you understand what the actual event was per se,

19   but that you understand that this is a child who has

20   unexplained injuries, unexplained injuries that resulted

21   in the death and, therefore there was something in that

22   environment or something related to the caretaker of the

23   child in that environment that brought about those

24   injuries -- and I'm sorry to ask for this, but could I

25   have some more water?  Is that possible?

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1     Q     When you conduct the autopsies of children, do

2   you categorize their death?

3     A     This, again, is one of the differences between

4   a hospital based pediatric pathologist and medical

5   examiner corner system.

6           In Texas it's medical examiner, Justice of the

7   Peace system.  We actually don't have corners in Texas,

8   but most states in the United States do.

9           Here in Texas, the big cities have medical

10  examiners and the more rural areas have J.P.s, but in

11  both cases of J.P.s or medical examiners, the

12  responsibility of that system is to determine manner of

13  death.  The responsibility of the hospital based

14  pathologist like mine is not to determine manner of

15  death, but only to look at death within the context of

16  natural events.

17    Q     Right.

18          MR. THOMPSON:  Your Honor, may we

19  approach?

20          (Bench conference:)

21          MR. THOMPSON:  Judge, at that point --

22  and I realize -- I understand Mr. Bingham is just laying

23  a predicate, I guess, to get into the questions that

24  he's going to present to this doctor, but at this point,

25  I believe I've heard enough to raise an objection with

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 24

1    respect to the testimony that's being offered here,

2    because we're not -- we're plowing new ground and

3    replowing with respect to this witness.  This is not

4    rebuttal testimony.  This is information, new

5    information that he's presenting through this witness as

6    a part of his case in chief.

7              There's nothing that this witness has

8    said with response to any question asked so far that has

9    anything to do with the testimony that's been presented

10   before the Court in this case.  He's not rebutting any

11   opinions.  He's net rebutting any evidence offered.

12   We're talking about him examining bodies for the

13   purposes of determining disease.

14             THE COURT:  I understand all of that.  He

15   hasn't got down to asking -- I mean, I don't know.  I'll

16   overrule your objection at this point.  He hasn't got

17   down to asking him what his opinions are to review the

18   case and what his opinions are.  He's just going

19   through --

20             MR. THOMPSON:  Well, then I guess I

21   should request permission from the Court to take this

22   witness on voir dire outside the presence of jury,

23   because if -- the point is this.  Once -- the problem is

24   that once the questions have been asked and the

25   responses have been received, even if I object to them,

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    the jury has heard them, and if it's not rebuttal

2    evidence, it should be inadmissible at this phase of the

3    trial.

4                 THE COURT:  Mr. Bingham I'm sure --

5                 MR. BINGHAM:  Here's the thing, Judge,

6    what he's talking about now is the difference between a

7    pediatric pathologist and forensic pathologist then he's

8    going -- he just explained the difference between what

9    he does, then he will get in and rebut the opinions that

10   your expert offered.  I'm just letting him explain the

11   difference between pediatric and forensic pathologist.

12                THE COURT:  If this is some type of

13   objection to where -- I don't know whether to take this

14   as an objection.  Sounds to me like all of these type

15   expert situations, he's laying the groundwork explaining

16   what he does.

17                MR. THOMPSON:  Okay.  Well, I was making

18   an objection, but I'll reserve my objection.

19                THE COURT:  Okay.

20                MR. THOMPSON:  And then I'll wait to hear

21   what he has to say.  And then I guess the Court, if

22   necessary, can instruct the jury to disregard, if

23   necessary.

24                THE COURT:  Well, I can, if necessary.

25                (End of bench conference.)

1          THE COURT:  All right.  Go ahead,

2   Mr. Bingham.

3          MR. BINGHAM:  Thank you.

4   Q    (By Mr. Bingham) Have you contributed to a

5   book on child abuse?

6   A    Yes, sir.

7   Q    This book, Child Abuse Medical Diagnosis and

8   Management?

9   A    Yes, sir.

10  Q    And in this there's a -- talks -- there's a

11  Chapter 19 Pathology of Fatal Abuse?

12  A    That's correct.

13  Q    Robert H. Kirschner and Harry Wilson?

14  A    Yes, I'm the second -- Bob Kirschner is a

15  forensic pathologist who is based in Chicago.  He and I

16  knew each other when I was at the University of Chicago

17  in medical school.  He went onto become the Deputy

18  Medical Examiner for the City of Chicago.  He died a few

19  years ago of liver cancer.  He and I worked together on

20  many cases and many investigative issues.

21  Q    And one of those is determinations of manner

22  of death as part of this Chapter 19?

23  A    That is correct.

24  Q    In there now have a table that says, table

25  19.6 that says, sudden death in infants and children

1  determinations of manner --

2           MR. THOMPSON:  Your Honor, we're going to

3  object to counsel reading from a document that's not

4  introduced into evidence.

5           MR. BINGHAM:  That's okay.

6           THE COURT:  All right.  That's fine.

7      Q    (By Mr. Bingham) Let me show you State's

8  Exhibit Number 214, this a copy of an article that

9  you -- of that one page of this article right here that

10 deals with the importance of historical information as

11 to the functionality of a child when looking at

12 determinations into the manner of death and looking at

13 whether an unexplained death has a natural explanation?

14     A    Yes.  You said it in a little different way

15 than I would, but it's a chart that shows the importance

16 of context.

17          In other words, there are findings and then

18 there are context for that findings and then the

19 conclusions that you make has to be on what is the

20 context.

21          And so this chart has the autopsy, meaning

22 what the findings are from the autopsy.  The

23 investigation, meaning what is the context in which

24 those findings are present, and then the manner of death

25 which is what is assigned and that's a forensic concept

1    of manner of death.  And I've already made reference to

2    this whether it's natural or nonnatural, and if it's

3    nonnatural, is it homicide, suicide, or accident.

4         Q    And we'll talk about that in just a little bit

5    more in just a minute.  I'm going to give this book back

6    to you for just a second and take this from you and,

7    we'll come right back to it.

8              Did you have an occasion to do -- we

9    retained -- we didn't retain you.  We asked you to

10   become involved in this case -- because we haven't paid

11   you anything -- back in July, '09 and asked you to

12   consult on this case in July of '09?

13        A    That is correct.

14        Q    You went down to Southwest Institute of

15   Forensic Science or the Dallas County Medical Examiner's

16   Office, I believe, around September 16th and actually

17   viewed slides in the case of Kelynn Pinson?

18        A    Right.  That's the office where the body of

19   this two-and-a-half year old boy was taken for autopsy

20   and that's where the medical aspects of investigation

21   occurred.

22        Q    And did you travel down there and look at

23   those slides?

24        A    The slides and the file that they had the

25   complete file and went through the paperwork and the

1    reports.

2         Q    Okay.  Let's talk a little bit about -- let me

3    first -- do you disagree with the findings that this is

4    a homicide?

5         A    No, I do not.

6         Q    You believe it is a homicide?

7         A    Yes, I do.

8         Q    Do you believe that the injuries to Kelynn

9    Pinson were intentionally inflicted?

10        A    Well, you get to a word there that I don't get

11   involved in.  I believe that the injuries were inflicted

12   by a person, another human being on this child.  I

13   personally don't get into the concept of intent.

14        Q    Got you.

15        A    But homicide, as a forensic concept, doesn't

16   deal with intent.  Intent is what is dealt with in a

17   court of law.  Homicide just means in a medical

18   definition is what man does to man by omission or

19   commission to bring about death.  And it says nothing

20   about intent, and this is why the medical certification

21   of homicide is not the same thing as saying for

22   instance, murder.  It's a different type of

23   categorization.

24        Q    Got you.

25             So that's not something you personally get

1   into?

2       A    Well, no, no, except I review a lot of cases

3   like that.

4       Q    Okay.  In looking at this file, did you make

5   conclusions as to whether Kelynn Pinson was a battered

6   child?

7       A    Yes, I did make a conclusion regarding that.

8       Q    And what is your conclusion?

9       A    That this two-and-a-half year old boy indeed

10  based on the findings is what would be categorized in

11  pediatric child abuse context as a battered child, and

12  that has a specific definition that was actually

13  developed by a pediatrician that I knew fairly well.  He

14  was from Denver, called C. Henry Kemp and he coined the

15  term in 1961 "battered child", for exactly this type of

16  situation.

17      Q    Do you believe that he has -- I believe you

18  mentioned when I talked to you at one point a current

19  multi-focal injury?

20      A    Yes.  Well, concurrent.

21      Q    Concurrent.

22      A    Multi-focal injury, but also with evidence of

23  past injury.

24                (Reported by D. Keith Johnson, CSR:)

25      Q    Okay.  And why is that significant to you, the

1   evidence of past injury?

2       A      Well, that -- that battering was not just at

3   one point in time, but there is -- this child lived in

4   the context -- something in his environment, meaning

5   some person in his environment, he lived in the context

6   of having past unexplained injuries and then concurrent,

7   recent unexplained injuries that brought about his

8   death.

9       Q      Let me show you a couple of --

10             MR. BINGHAM:  May I approach the

11  evidence, Judge?

12             THE COURT:  Yes, you may.

13      Q      (By Mr. Bingham) Do you disagree that Kelynn

14  Pinson received multiple -- or -- that he had abdominal

15  trauma?  Do you think that Kelynn Pinson, when he died,

16  had abdominal trauma?

17      A      This little boy had evidence of multiple

18  abdominal blows, and it is most likely from a

19  pathophysiologic point of view that the abdominal trauma

20  to this point brought about his death.  In other words,

21  the findings are such that not only did he have fresh

22  abdominal trauma and multiple sites of abdominal trauma,

23  but that abdominal trauma was the precipitating cause

24  for him to be dead.

25      Q      Is it significant to you -- you reviewed the

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    photos of Kelynn Pinson, have you not, the autopsy

2    photos?

3         A    Yes, sir.

4         Q    Is it significant to you that he had multiple

5    bruises to his head, clavicle, back, abdomen, his arms

6    and hands, is the fact that they're all over his body

7    significant to you?

8         A    Yes.  That's significant for two reasons.  One

9    is if there is not an underlying medical reason for

10   having multiple bruises -- and there are disease

11   conditions that can result in multiple bruises.  But if

12   there is not an underlying medical reason for multiple

13   bruises, then that means there's been multiple sites of

14   inflicted trauma that have created those bruises.

15        Now, not every bruise on every child is due to

16   inflicted trauma.  I mentioned earlier that children get

17   injuries and children get bruises.  And one of the

18   things that pediatrics focuses on, the discipline is

19   trying to recognize what is an appropriate injury

20   developmentally for a child versus inappropriate

21   injuries.

22        And, for instance, if you've got a bruise to

23   the leg of a one-month-old baby, that's not an

24   appropriate injury.  But a bruise to the leg of a

25   one-month-old toddler is an appropriate injury (sic).

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1          And so the context --

2      Q    A one-month-old infant or one-month-old

3   toddler?

4      A    Sorry.  A one-month-old infant should not have

5   a bruise on the leg -- a one-year-old -- sorry -- a

6   one-year-old toddler having a bruise on the leg, that's

7   an appropriate finding, because toddlers do that.  They

8   run into things and get bruises on their legs.  And it's

9   that developmental context that becomes important.

10         But no two-and-a-half -- a

11  two-and-a-half-year-old will have bruises, but no

12  two-and-a-half-year-old should have multiple bruises in

13  multiple sites that are contemporaneous and significant

14  internal injury in this case on the abdomen related to

15  bruises on the belly.  And so that changes these from

16  being developmentally appropriate bruising to inflicted

17  bruising bringing about death, and that's the difference

18  between a homicide or a nonhomicide death.

19              MR. BINGHAM:  May I approach the

20  evidence?

21              THE COURT:  Yes, you may.

22      Q    (By Mr. Bingham) Let me show you -- let's

23  start right here with the body of Kelynn Pinson.  You've

24  seen that photograph before, have you not?

25      A    Yes, sir, I have.

1              THE COURT:  Mr. Bingham --

2       A    Yes, sir, I have.

3              THE COURT:  -- we're going to need to get

4    the microphone.  If you could, move that over where --

5       Q    (By Mr. Bingham) I'm going to scoot -- I'm

6    going to be turning you this way to look at the

7    photographs.

8              Let me show you two more photographs that you

9    recognize as coming -- you've seen these photographs

10   before, have you not?

11      A    Yes, sir.

12      Q    You know that these are photographs of Kelynn

13   Pinson taken at Dallas County Southwestern Institute of

14   Forensic Science, the medical examiner's office?

15      A    Yes, sir.

16      Q    Let me --

17             MR. BINGHAM:  I'm going to tender these

18   to defense.

19             (Counsel confer.)

20             MR. BINGHAM:  We'd offer 213 and 214.

21             MR. THOMPSON:  No objection.

22             THE COURT:  State's Exhibits 213 and 214

23   are admitted into evidence.

24             MR. BINGHAM:  Wait a minute.  I mismarked

25   it, Judge.  I already had a 214.  Let me make these

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1   pictures 213 and 215.

2                   THE COURT:  213 and 215, Mr. Thompson,

3   you don't object?

4                   MR. THOMPSON:  No objections.

5                   THE COURT:  213, 215 are admitted into

6   evidence with no objection.

7                   MR. BINGHAM:  One of these I've got to

8   show the -- can the witness step down, if I hand him the

9   microphone?

10                   THE COURT:  Sure.  If you would give him

11   the microphone that he could talk into it up in front of

12   the jury.

13       Q    (By Mr. Bingham) One of the things that I want

14   to --

15                   THE COURT:  You may step -- wherever you

16   need to go.  You can use the pointer.

17       Q    (By Mr. Bingham) Sure.  Because I want to

18   address you to this area -- see that line right there,

19   that discoloration -- not the red here, not these little

20   red, but this line right here (indicating)?

21       A    Sir, that's more than a line.

22                   THE COURT:  Doctor, I'm sorry to

23   interrupt you.  What I'm going to need you to do -- I

24   know you've only got two hands, but if you would hold

25   that microphone in one of them, and if you're going to

1    point, use the pointer in the other.

2              THE WITNESS:  I think I can do it seated.

3              THE COURT:  You're fine to step up there.

4    Just need you to take the microphone with you.  I need

5    to be sure the court reporters can hear you.

6         A    What -- what you are indicating here is an

7    area of discoloration.

8         Q    (By Mr. Bingham) Right.

9         A    And this is discolorations that has kind of a

10   purplish hue.  This is -- I mean, this is different from

11   these other bruise sites, which are red and have a fresh

12   appearance.  I mean, dating of bruises is somewhat of a

13   soft science, not a hard science, because what a bruise

14   is, is blood that has leaked out of the blood vascular

15   system into the tissues.

16             And when the blood is in the tissues, it

17   creates an appearance on the outside, based on how long

18   it's been in the tissues, how much is in the tissue, and

19   what the tissue consists of and how deep it is.  So a

20   recent bruise in different parts of the body can look

21   different, if there's different amount of blood, if it's

22   at a different level, and whether it's in skin, or skin

23   and fat, or fat, or fat and muscle.  It makes a big

24   difference in how it's going to appear.

25             These red bruises are bruises that by their

1   appearance look fresh.

2          This discoloration here is kind of a band --

3   not a line, but a band of discoloration, and this is a

4   common artifact that one sees with bodies that have been

5   cooled where the skin is against the edge of the liver.

6   And this is actually a liver discoloration artifact.

7          Q    It's not a bruise?

8          A    The only way you can know for sure whether

9   it's not a bruise is when you incise this and you see

10   whether or not there's blood there.

11          Q    So if the pathologist, Dr. Quinton, reflected

12   that skin and he says he saw no bruise and there was

13   nothing under the reflection, would that be a bruise?

14          A    No, then that is not a bruise.  This is what I

15   just call as the -- the discoloration from death of the

16   liver underneath.  The liver is a -- I mean, everybody

17   knows what liver looks like.  It's kind of a dark red,

18   brown organ.  And it gets darker with death, and it has

19   a lot of blood in it.

20          And you actually see the skin -- even with

21   some pigmentation, the skin is still a translucent

22   tissue, and you can see underneath of it, if you have

23   a -- a dark brown organ underlying the skin.  And the

24   edge of the liver is below the -- the costal margin, rib

25   margin, you see this -- it's a common discoloration that

1    one sees at death that has nothing to do with bruising.

2        Q    So what you're seeing on that line right

3    there, on Kelynn Pinson, you've seen before, it's very

4    common?

5        A    It's very common.  And, in fact, it's -- it's

6    an artifact of refrigeration and passage of time.

7        Q    Which he would be, when these pictures were

8    taken -- the autopsy, you know was conducted June 2nd at

9    7:00 a.m., so he has been refrigerated?

10       A    Right.  Because the events that occurred led

11   to his death on --

12              MR. THOMPSON:  Your Honor, is it the

13   testimony of the witness or Mr. Bingham's statement that

14   the body had been refrigerated?

15              THE COURT:  I don't know.  Is that an

16   objection?

17              MR. THOMPSON:  Yes.  We're objecting to

18   the question being leading and suggestive.

19              THE COURT:  I'll sustain the objection

20   and ask Mr. Bingham to rephrase the question.

21       Q    (By Mr. Bingham) Well, did -- when bodies are

22   sent to medical examiners' offices, do the medical

23   examiners receive the body and just leave them sitting

24   out, or do they refrigerate them before the autopsy is

25   conducted?

```
 1      A    Right.  I mean standard practice, of course,
 2  is refrigeration.
 3           Now, there's always issues of transport time
 4  and -- the whole basis for refrigeration -- and again,
 5  this is something that we all have common experience
 6  at -- and that is -- it's like buying meat in the
 7  supermarket, that tissues deteriorate more rapidly at
 8  room temperature than they do at refrigerated
 9  temperature.  But even at refrigerated temperature,
10  there are artifactual deterioration changes that occur.
11           And in this case, this is one of those, in a
12  sense, artifactual discoloration things that occurs,
13  because of the underlying liver.
14           But to -- your question, to validate that it's
15  not a bruise, the person who incised -- and the incision
16  that's done for the autopsy at this level on this
17  child's torso is a midline incision that's longitudinal
18  with the body.  And when you do that incision, you can
19  see blood that's leaked out of the blood vascular system
20  or not.  And so the -- the prosector, the person who did
21  the autopsy, makes that determination in that this
22  discoloration is not due to a bruise.
23      Q    Right.
24           MR. BINGHAM:  May I approach again,
25  Judge?
```

1              THE COURT:  Yes.

2      Q    (By Mr. Bingham) And in State's Exhibit 215,

3   do you see that same discoloration due to the cooling

4   and the liver right here, right?

5      A    Right.  And it's the color of the liver being

6   seen through the skin.

7      Q    Okay.  And, again, this is -- this is very

8   common?

9      A    It's common and -- and the longer time passes,

10   the more that becomes prominent.

11      Q    Let me show you -- let me show you State's

12   Exhibit 115.  What are these lines right here in the --

13   what is this right here, that I'm -- what is that

14   called?

15      A    Okay.  First of all, what we're looking at is

16   the opened torso of this dead child --

17      Q    Let me get you to talk --

18      A    -- and the -- and the open body.  And the head

19   is up in this direction, and this is -- these are the

20   legs on either side here.  And there's been a midline

21   incision that's been made here.

22          Here we have heart.  This is the chest cavity.

23   The breastplate has been removed so you actually see

24   where ribs have been cut to remove the breastplate and

25   you're seeing the shadow -- the outline of the heart.

1          This is the abdominal cavity.  These are

2     dilated intestines.  And this is what's known as

3     mesentery with fresh-appearing dark blood in the

4     mesentery.

5          What you were pointing out are dilated

6     intestines.  Now, these -- this is not the way the

7     intestines were in life on this child.  But one of the

8     things that happens is that because of the bacterial

9     flora that live in our intestines, when we die, gas is

10    formed and the intestines expand.  And so what we're

11    seeing is dilated loops of bowel, artifactually dilated

12    as a postmortem change.

13         What you're seeing here is the normal --

14    they're called stria -- the normal lines of fold and

15    expansion of the intestine, which are throughout the

16    intestine, and they're outlined, because there's kind

17    of -- kind of some bloody fluid that's gotten in there.

18         These, to me, are normal appearing intestines

19    in a postmortem effect.  But this linearity -- this

20    circumferential, meaning around, linearity, is not a

21    sign of disease or abnormality.  It's just the -- the

22    usual folds being accentuated by loose blood and fluid

23    that is present in the abdomen.

24         This child has significant hemorrhage into the

25    mesentery, which are the supporting connective tissue of

1    the intestines, and that hemorrhage and the blood that

2    is then free in the abdomen -- you can see that there's

3    some pools of blood in here.  That will act kind of like

4    as a shading effect to any changes in the smooth contour

5    of the bowel.

6            These are normal lines of the bowel where

7    there's a little bit of indentation, and so there's

8    blood from the surface.  Not because of bleeding -- not

9    because of bleeding at that site, but just because

10   there's loose blood in the abdomen.  It's kind of like

11   coloring so -- the Etch A Sketch thing, where you put

12   sand on something and you have a -- a little

13   discontinuity in the surface, and then you shake it and

14   then the sand rests at places where the discontinuity

15   is.  And in this case, the discontinuities are these

16   folds in the surface.

17           But that's not pathology.  That's just an

18   artifact of this being a dead child with dilated bowel

19   and these folds.

20           This is the pathology, the blood in the

21   mesentery.

22      Q    Are there some deaths that are immediate?

23   There's some trauma that results in immediate death?

24   Can that happen?

25      A    Well, absolutely.  And immediate death comes

1    from when the heart stops beating or the brain suffers

2    some immediate effect.  Absolutely, instantaneous or

3    very, very rapid deaths, yes.

4         Q    Was this an instant death?

5         A    No, this was not.

6         Q    Mesentery -- when you have a mesentery tear,

7    by definition, since it's not immediate, there has to be

8    some range of time.  Do you agree?

9         A    That is correct.  And the reason that you know

10   that there's been a time period is that there has been

11   some accumulation of blood.

12        The blood can only accumulate if the heart is

13   beating.  So, you know, if you want to technically

14   define death as cessation of heartbeat, actually more

15   technically the -- we don't have the information

16   regarding this particular child, but more technically is

17   when the brain is no longer functional.  In other words,

18   if you have brain death, you can still have heartbeat,

19   but you can be declared dead.

20        Q    Right.

21        A    But the traditional meaning of death is when

22   the heart stops beating.  Well, when the heart stops

23   beating, the blood stops circulating.  And when the

24   blood stops circulating, you can no longer bleed.  The

25   fact that you have free blood in the abdomen that was

1    measured, that says that this child survived after some

2    major event that led to tearing of vessels; in this

3    case, the vessels in the supporting mesentery and the

4    leaking of blood into the abdominal cavity.  So the

5    death was not an instantaneous death.

6         Q    Can children live for 24 hours or longer with

7    torn mesenteries?

8         A    The answer is yes.  There's several factors

9    involved in that.  If the death is from blood loss per

10   se, then it's losing a significant volume of blood where

11   you go into shock because of that blood loss.

12              Now, the amount of blood that was in his

13   belly -- and I worked this out -- about five percent of

14   his blood volume.  So he did not die from the blood loss

15   in his belly.

16              Now, there are other ways in which blood in

17   the belly can lead to death, and part of that is that

18   the blood doesn't all have to leak out of the vascular

19   system.  There's a reflexive response that can occur

20   when you have blood in the belly, is that the blood

21   vascular system in the abdomen can distend and blood can

22   pool in the vascular system.

23              So you don't just have to have blood in the

24   belly -- free in the belly, but you can have blood that

25   is pooled, and the word is used -- the splanchnic bed --

1    it just means the intestinal, vascular bed.  If those

2    vessels are dilated and the blood is accumulated there

3    and not circulating, then you go into shock because of a

4    lack of adequate blood volume.

5             We do know that he died slowly, because his

6    brain was significantly swollen, and it takes time to

7    get a swollen brain.

8             And just calculating what his brain weight

9    was -- and I take the organs and I put them on a --

10   their weights on a chart, his brain was, by weight, at

11   the size of an eleven-year-old.  And remember, he's

12   two-and-a-half years old.

13        Q    Right.

14        A    And he had accumulated excess fluid in the

15   brain called cerebral edema, and that took time for that

16   to happen.  And that does occur when you go into -- when

17   you have a gradual death in a state of prolonged shock.

18             So he was in shock not only from somewhat

19   blood loss in his belly, but more importantly from what

20   would be called the reflexive dilatation of the

21   splanchnic bed.  And I don't want to make that sound

22   complicated, but when you --

23        Q    No.  That --

24        A    When you get free blood in your belly, the

25   vessels in the belly dilate and blood gets pooled in the

1   belly and you go into shock.  And, of course, going into

2   shock means that you're not giving enough blood supply

3   to your most important organ, and that's the brain.

4        Q    Well, if -- if he goes into shock, then is he

5   going to be normal?

6        A    No, he'll be unconscious.

7        Q    Okay.  How long would you -- let me back up

8   before I even go into how long this -- this timeframe of

9   shock may be.

10            Is this -- when you look at mesentery tears,

11   is this a -- this will not be a medical term --

12            THE COURT:  Mr. Bingham, I apologize for

13   interrupting you.  We're going to take about a

14   10n-minute recess, break for the jury.

15            All rise for the jury.

16            (The jury left the courtroom.)

17            THE COURT:  Doctor, you may step down and

18   take a break if you like to.

19            (Bench conference:)

20            THE COURT:  I just want to take up the

21   matter that I believe Mr. Thompson started to make or

22   made an objection regarding the book.  And I think you

23   withdrew the question.  And I just want to -- if I

24   understand it, the doctor is the author -- one of the

25   authors of a book.

Page 47

```
 1                    MR. BINGHAM:  Of a chapter in the book.
 2                    THE COURT:  Of a chapter in the book,
 3    okay.  And I don't remember exactly what Mr. Thompson's
 4    exact objection was, but I think you withdrew the
 5    question at the time.
 6                    What was your objection at the time?
 7                    MR. THOMPSON:  He was reading from a
 8    book, in other words, that's not in the evidence.
 9                    THE COURT:  He was reading from the book
10    not -- I'm not sure you actually got the objection
11    out --
12                    MR. BINGHAM:  We're coming back to that.
13    We have a copy of the page -- of what he wrote for him
14    to talk about.
15                    THE COURT:  Well, I was going to say,
16    because I was just trying to remember Mr. Thompson's
17    objection.  If he wrote something and it was published
18    in a book, obviously he could read what he wrote.
19                    MR. BINGHAM:  It's his own statement.
20                    THE COURT:  I just didn't want to get --
21    I couldn't remember what Melvin's objection --
22    Mr. Thompson's objection was, and Mr. Bingham withdrew
23    it.  I just thought we might try to.
24                    (End of bench conference.)
25                    (Recess.)
```

1          THE COURT:  We're back on the record in

2    241-1251-08, the State versus Demontrell Miller.  The

3    State's counsel and defense counsel are present.  The

4    defendant is present before the Court.  The witness is

5    back on the witness stand.

6          Go ahead and ask Carleton to bring the

7    jury in.

8          (The jury entered the courtroom.)

9          THE COURT:  Be seated, Ladies and

10   Gentlemen.  Thank you.

11          Go ahead, Mr. Bingham.

12          MR. BINGHAM:  Thank you.

13   Q    (By Mr. Bingham) I think you were talking

14   about, Dr. Wilson, if there was enough blood loss, they

15   would go into shock?

16   A    That's one way to go into shock.  And that's

17   called hypovolemic shock.  In other words, you lose

18   blood.  There's not enough blood in the vascular system

19   to maintain blood pressure.  But there are other ways to

20   go into shock.

21   Q    What is the other way?

22   A    The other way is where you have a reflexive --

23   there are many ways, but another way, it is where you

24   have a reflexive dilation of the vascular system.  So in

25   effect, even though you may have enough blood by

1   quantity, you don't have enough blood by quantity for

2   the vascular system, which has gone into a reflexive

3   expansion.  And that happens when there can be pooling

4   of blood within the vessels of the abdomen.

5       Q    Can you give us an example of -- when you were

6   talking about children can live for 24 hours, maybe

7   longer, with a mesentery injury or an abdominal

8   injury -- I don't want to put words in your mouth.  But

9   a mesentery -- however you can give an example where the

10  jury can understand.

11      A    Well, each injury and each child makes a

12  unique situation and unique combination.  And

13  different -- different people respond differently to

14  injury.

15           Some people can have minimal blood loss but

16  have a blow or some type of effect that happens that

17  causes the vasculature to expand, and then if there's

18  not enough blood to fill the capacity of the blood

19  system, the heart cannot do its job and you go into a

20  situation of shock.  So you can have not enough blood to

21  fill the vascular system by a combination of losing

22  blood outside the vascular system or increase the

23  capacity of the vascular system.

24           And again, the terminology is splanchnic bed

25  vasodilation.  And to a much lesser extent -- but this

1    is why people that have -- that faint suddenly from some

2    type of shock to -- some type of mental shock, you might

3    say, a --

4        Q    An outside stimulus that --

5        A    Well, that -- that causes a reflexive dilation

6    of their splanchnic bed, their abdominal vasculature.

7    And they get pale and they keel over.

8            You know, we -- we call that fainting.  Well,

9    the way you treat that is you lie someone down, you

10   elevate their legs, and you get the blood to go back

11   from the splanchnic bed, from the abdominal vasculature,

12   back into the circulation.  But those type of reflexive

13   things with injury can occur and they can aggravate the

14   effect of the trauma itself.

15           And just having blood in the belly can be a

16   very irritating thing.  Blood is an irritating

17   substance, and the blood itself can cause dilatation.

18   Someone that has had abdominal trauma with bleeding is

19   not going to be normal.  I mean, their belly is going to

20   hurt; they're going to have some of these reflexive type

21   things, and they're going to be very -- it's going to be

22   very apparent that they're in distress.

23       Q    You obviously did not conduct this autopsy.

24   We all know that.

25       A    That is correct, sir.

1      Q    As you look at the photographs of the injuries

2    and you -- the documents you've reviewed, including -- I

3    mean, everything you reviewed in the case, is this a --

4    a very -- as far as mesentery injuries go, is this a

5    pretty bad one, if you're able to qualify it?

6      A    Well, with some types of blunt -- and this is

7    known as a blunt trauma injury.  And one of the things

8    that is a factor in blunt trauma to the belly, is that

9    because the belly is so soft and compressible, in many

10   ways it's hard to injure structures in the belly.

11   Because what happens is, with an event of a blow, the

12   structures actually move aside because there's a lot of

13   freedom of movement.  But one of the things that is

14   characteristic of blunt trauma to the belly is the

15   effect along the midline.

16          And the midline here -- this is the lower part

17   of the belly.  Here's where the heart is.  And so you

18   can draw a line right along this axis, and you can see

19   that this injury is symmetrical in the midline.

20          And the reason the midline concept is

21   important for belly injury is that when you have a blow

22   to the belly, the item in the body that acts like a

23   scissors with the blow is the backbone.  And the belly

24   is not a smooth surface in the back.  In fact, it has

25   two troughs on either side with a raise in the middle,

Page 52

1    and that raise in the middle is where the backbone is.

2    And the backbone is rigid and hard.

3            And so what happens with a blow to the belly,

4    the major sites of injury are where you have a sheering,

5    compressive effect between the backbone and the object

6    that's doing the blow.

7            So a fist to the belly in the midline results

8    in this type of tearing and sheering injury, whereas on

9    either side, the injury is -- is much less, because you

10   don't have that compressive, sheering effect.

11       Q    And that -- when you talk about a fist, in

12   this case, we can't pinpoint exactly what the object is.

13   You agree with that?

14       A    That -- of course, that is correct.

15       Q    It's consistent with -- you were using the

16   fist as an example, as something that can cause that

17   kind of compression against a hard object, like the

18   backbone, that can cause that symmetrical midline, that

19   sheering?

20       A    That sheering effect, yes.

21       Q    And I want to jump back a little bit.

22   I should have asked you this when we were talking about

23   bruising.

24            When you look at bruising to the abdomen, like

25   you see in Kelynn Pinson, those red bruises, is -- why

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 53

1    is it so hard to bruise in the abdomen?  Because you're

2    talking about that kind of now a little bit.

3         A     Right.  And I think it may have come up in a

4    prior question.  The way in which bruising occurs in

5    skin is by compressing the skin against a hard object.

6    And, again, with the head, with the trunk, with the

7    legs, with the arms, the hard objects are the bones

8    under the skin.  So you bump yourself, you compress the

9    soft tissue against the bone, and you get a bruise.

10             But in the belly, except for this issue of the

11   backbone, which goes along this linear axis from top to

12   bottom, there are no real hard objects.  And so things

13   can move aside and not sustain the same type of

14   compressive injury as you would get someplace else in

15   the body, except for the midline, where, again, it acts

16   like a scissors effect, a sheering effect, to cause

17   tears.

18             And so what we're seeing, these are -- the

19   abnormalities here are what are known as mesenteric

20   tears.  And mesenteric tears, the mesentery is the

21   supporting connective tissue which has blood vessels and

22   the fibrous tissue that holds the intestine in place.

23   These mesenteric tears are what has created the bleeding

24   here.

25             But these not large tears.  It's veinous

1    bleeding, so it -- it accumulates slowly over time.

2    And, again, it is not the blood that is causing this kid

3    to go down, but it's the -- the trauma itself and then

4    the body's response to trauma, as I described with this

5    pooling effect of blood within the vascular system in

6    the belly, which would then lead to shock.

7            And what shock is, is where there's not enough

8    blood circulating to meet the capacity of the vascular

9    system.  So you can either get into that situation by

10   losing blood -- but I mentioned -- this is only about

11   five percent of this kid's blood volume.

12       Q    Right.

13       A    Or by increasing that capacity, and that

14   reflexive increase in capacity is what led to this

15   child's shock, poor perfusion of the brain, and then

16   ultimately brain swelling.

17           Because when the brain is damaged, the brain

18   only knows one way to respond, and that is that it

19   swells, and that means when the brain swells, you lose

20   consciousness.  And this child's brain was very, very

21   swollen.

22       Q    Let me hit three areas real quick, and then

23   I'll come back to them.

24           Is this painful?

25       A    First of all, the injury itself is painful.

Page 55

1    In other words, the blow or blows involved.  And because

2    of -- because of the external markings, we have

3    footprints -- I don't mean to imply a foot -- but we

4    have prints of sites of impact.

5            So we have evidence of fresh bruising at

6    multiple sites with a belly that has blood and tearing

7    in it.  And those injuries -- this is a beating.  This

8    is where this child has been multiply struck, not only

9    in the belly, but at other sites.  But it's the belly

10   wounds that led to the death.

11           But in terms of pain, the pain is there at the

12   time of the impact.  But one of the things that

13   characterizes abdominal trauma and abdominal wounds is

14   that after the impact, the pain can go away.  But the

15   effect -- the bleeding effect can persist.

16           And children who have had these types of

17   abdominal bleeding, abdominal trauma with bleeding, can

18   then linger for hours to sometimes even days, depending

19   on what the actual effect was from the impact itself.

20           So the pain may diminish, but the effect will

21   not go away because the child is bleeding, the child is

22   no longer normally functional, and the child, in this

23   case, because of the brain swelling that would result,

24   would not even be conscious.

25       Q    How long do you think he -- looking at the

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1   size of the brain, the impacts, the injuries, how quick

2   do you think this child would go unconscious?

3        A    Well, the impact sites seem to be

4   contemporaneous, meaning that they all have a similar

5   appearance in terms of their freshness.  And it looks as

6   if, at least in the event that occurred, there was

7   several blows in a confined period of time.

8             The bleeding itself is not what led to the

9   child's shock, but it's the dilatation and then going

10  into shock.

11            But putting a range on that is a bit

12  difficult, because these things are more accurately

13  determined by functionality than by findings.

14            But what we do know is that the -- there is no

15  new iron deposition, which is about a 24-hour point,

16  that the -- the reactivity of the sites of bleeding

17  is -- is limited in terms of cellular response.  So I

18  would put this in a timeframe of less than four hours,

19  but probably on the order of one hour or so, somewhere

20  in that range, that it's fresh --

21        Q    You're talking about from point of

22  impact till --

23        A    Till the death of the child.

24        Q    Less than four hours?

25        A    Less than four hours.

1        And the reason there is that we don't have a

2   lot of tissue reactivity to what's going on.  Everything

3   is fresh.  There's not a lot of -- very little in the

4   way of secondary response.  And we certainly don't have

5   iron deposition, except in an area of prior injury.  And

6   I made reference to that, too.

7        But this finding is one of recent, not

8   prolonged, a few hours, and this child would have been

9   in a state of unresponsiveness during this time, and the

10  brain swelling goes along with it.  The brain swelling

11  is very significant and very severe, and probably what

12  was the terminal event for this child, in a sense, is

13  not the beating itself, but the secondary fact that the

14  brain, when it swells, it shuts down.  And then that's

15  what kills the child.

16              MR. BINGHAM:  May I approach?

17              THE COURT:  Yes, you may.

18       Q    (By Mr. Bingham) Let me show you -- these are

19  not offered into evidence.  I will show these to you --

20  and I will just hold them up and -- do you recognize

21  what is contained in State's Exhibit 209?

22       A    Yes.

23       Q    You took -- you took these photos -- or

24  photographs of the slides, the slides taken in Kelynn

25  Pinson's case?

```
1        A     Right.  I did that at the medical employer's
2   office in Dallas where I used a camera and the actual
3   slides from the autopsy and took the photographs with a
4   microscope using the autopsy slides with a camera that I
5   had.
6        Q     Same -- same true with 210?
7        A     Yes.
8        Q     211?
9        A     Yes.
10       Q     212?
11       A     Yes.
12       Q     All right.
13                   MR. THOMPSON:  Tender these to
14  Mr. Thompson.  And these have been provided previously,
15  but --
16                   THE COURT:  All right.
17                   MR. BINGHAM:  We offer 209, 210, 211 and
18  212.
19                   MR. THOMPSON:  May we approach?
20                   THE COURT:  Yes.
21                   (Bench conference:)
22                   MR. THOMPSON:  And our objection, again,
23  is that this is not rebuttal evidence.  This is new
24  evidence that's being introduced in the cases as if it
25  were part of the State's case-in-chief.  So we would
```

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    object on that basis.

2            THE COURT:  That is -- that objection is

3    overruled, and 209, 210, 211, 212 are admitted into

4    evidence.

5            (End of bench conference.)

6            THE COURT:  All right.  State's

7    Exhibits 209, 210, 211 and 212 are admitted into

8    evidence.

9            And you may publish.

10           MR. BINGHAM:  Thank you, Judge.

11   Q    (By Mr. Bingham) Can I start off with 209?

12   A    Okay.

13   Q    Where do you want to start in, because these

14   slides -- I might as well be looking at Swahili.

15           THE COURT:  Well, watch the --

16   Q    (By Mr. Bingham) These mean something to you,

17   so you tell me.

18           THE COURT:  Pass the microphone to the

19   witness, Mr. Bingham.

20   Q    (By Mr. Bingham) Let me just get this one.

21           You might want to hold this, and we can spin

22   around in the chair and -- might be easier.

23           Is this easier?  Is this okay to start with?

24           Okay.  Start with that one.  Okay.  We're

25   going to start -- I'm going to start with State's

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    Exhibit 212.  And, specifically, when you're looking at

2    the timeframe from impact -- the impact to Kelynn Pinson

3    that caused these injuries that resulted in his death,

4    looking from the time of impact until death, why is 212

5    significant to you?  What is it and why is it

6    significant?

7         A    Okay.

8         Q    Do you have a pointer?

9         A    Yes.

10        Q    Okay.

11        A    This is a photograph of a slide of rib, and

12   the rib had an old fracture and evidence of recent

13   hemorrhage at an old fracture site.

14             The reason that it was -- of an old fracture

15   is that there is reactivity on the surface of the rib

16   and there is reactivity regarding fibrous tissue at the

17   site where the rib is separated.  This is actually a

18   fracture.  This is bone.  And bone consists of here of

19   bony spicules and then the loose tissue within the

20   spaces of the bone.  And that loose tissue has been

21   replaced by fibrous reactivity.

22             So this is a rib that has evidence of what's

23   known as a healing callus.  The word for callus -- the

24   word "callus" means scar, but a scar in bone rather than

25   a scar in soft tissue.

1           An increase of the fibrous tissue on the

2      surface and reactivity of fibrous tissue within the bone

3      and a fracture site, which is an older site

4      (indicating).

5           What has happened to this bone -- and I think

6      it's the next picture --

7      Q    Okay.

8                MR. BINGHAM:  May I continue to approach?

9                THE COURT:  Yes.

10     Q    (By Mr. Bingham) Let me -- let me show you

11     State's Exhibit 211.

12     A    And what has happened to this bone -- and this

13     is a higher power at this old fracture site -- is that

14     it -- the callus is the body's attempt to heal a rib

15     fracture that's been there for a week or two weeks, but

16     at the same time, there's now fresh blood.

17     Q    Okay.  Point -- put that red dot on fresh

18     blood.

19     A    These are fresh red blood cells.

20     Q    Okay.

21     A    They're the cells that carry oxygen.  And so

22     this old fracture site has had a new bleed with it.  And

23     so that's an old injury with now a new injury

24     superimposed.

25           Now, of course, if you have a fracture of a

Page 62

1   rib and you're subjected to trauma and that rib fracture

2   site is not fully healed, it is going to be a weakened

3   point that is more vulnerable to a second event of

4   trauma.

5           So we have fresh trauma at an old healing --

6   still freshly healing fracture site.  And the reason

7   this is important is that it says that this child has

8   had past injury of some sort that caused a broken rib.

9   And this site of this rib is in the posterior aspect of

10  the child's chest.

11          So it -- it's a site that at -- whenever the

12  trauma occurred, the child would have been -- would have

13  screamed and then would have been irritable and then it

14  would have been healing.  And there would have been a

15  lump there in the site.

16      Q    So it's in the -- that rib is in the left

17  posterior -- back here?

18      A    Yes.

19      Q    Okay.  Like on the back of the left side here?

20      A    That's correct, yes.

21      Q    What can the fresh blood tell you about

22  timing?

23      A    Well, the timing here is a prior injury, a

24  week or two old, and which there is now a fresh injury

25  of just a few hours old.  So we have that overlap of old

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    injury, a more vulnerable site, and then a new

2    superimposed injury.

3        Q    Okay.  And so that red blood tells you that --

4    that the new injury that has brought the oxygen-carrying

5    red blood cells into this -- or blood into this injury,

6    tells you that it was refractured just a few hours?

7        A    That's correct.

8        Q    Okay.  Let's look at this next -- these two.

9    Which one would you want to go to next?

10            Okay.  This one.  Let me show you State's

11   Exhibit 210.  And, again, what is this and why is it

12   significant to you?

13       A    Okay.  One of the slides that was available at

14   the ME's office from the abdominal tissues from this boy

15   at death was a slide with a special stain for iron.  And

16   this is abdominal tissue in the mesentery.  In other

17   words, this is a particular site in that mesentery that

18   we were looking at in that gross photo.  And, again, the

19   mesentery is the supporting connective tissue of the

20   bowel.

21            And in that mesentery site, with a special

22   stain for iron in this one place in this mesenteric

23   site, there were these very prominent dark blue blobs,

24   which is the iron stain.

25            And this also in itself is evidence of old

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 64

1  trauma.  Just like the rib fracture showed evidence of

2  healing that was week or so, two weeks old, so also in

3  the mesentery, there's a focus -- an area that was

4  sampled by the pathologist that shows evidence of iron

5  deposition of old blood.  Old blood, once it gets

6  processed in the tissue, is turned into iron deposits

7  and it stains dark blue like this on the tissue

8  sections.

9         So the -- this wasn't the case through most of

10  the area that was injured, but it was the case in this

11  one focal area.  So just like we have an old injury site

12  to a rib, so we also have in the mesentery an old injury

13  site to a portion of the mesentery.

14              (Reported by Steve R. Awbrey, CSR:)

15  Q    And so the mesentery has been injured before?

16  A    That's correct.  That's what this residual

17  iron says.

18  Q    What does that tell you about timing or is

19  that the next slide?

20  A    The next slide would help with that.

21         But the timing on this, this degree of iron

22  accumulation and reactivity around it.  Again, you're

23  talking days to week.

24  Q    From the first injury which -- which injury

25  are we talking about?

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1      A     The past injury.  Days to week of past injury

2      of belly trauma, so what we've got is evidence in his

3      own body that he's had trauma before, trauma to a rib,

4      which there's no record of medical attention for the

5      broken rib and trauma to the belly.

6             There's no evidence of medical attention to an

7      issue of you know being hit in the belly or having some

8      fall impalement with a bike handle bar, no explanation

9      of a past event of injury.

10     Q     Let me show you then, as we look at the slides

11     dealing with the mesentery, you looked at other slides

12     as well?

13     A     The slides that were available in this case.

14     Q     In this case with Kelynn Pinson.

15            Let me show you State's Exhibit Number 209,

16     what's this a slide of?

17     A     Now, this is another area of mesenteric blood.

18     These slide corresponds to the area of blood that you

19     were pointing out in that open belly picture of this

20     child.

21            And this is blood now that's free in the

22     soft-tissues, the connective tissues of the mesentery.

23     In this field there's not the presence of iron, but

24     there's the presence of fresh red blood cells.

25            So the point is that just with as it was with

1   the rib, where there was evidence of a past injury and a

2   coexisting recent injury within a few hours, the same is

3   true of the belly.  There's evidence of a past injury

4   and then the majority of the belly injury is this recent

5   injury with fresh red blood cells.

6          The issue of fresh red blood cells without

7   iron deposition, is that the red blood cells are

8   normally formed.  They're not where they're supposed to

9   be.  They're supposed to be in the blood vascular system

10  within vessels.  They're normally formed, and there's

11  not the accumulation of iron.

12      Q    Well, again, on the page before it's got blue

13  dots on it, and that one has blue dots on it?

14      A    I'm sorry about that.  These are different

15  stains.  The one before, the stain is a special stain

16  for iron.  You notice how pale it was.  Everything else

17  is pale.  This is a standard stain where the blue dots

18  here are the nuclei of white blood cells.  And our blood

19  contains both red blood cells and white blood cells, so

20  this is blood that has leaked out into tissues

21  without -- it's only been there a short time.  The red

22  cells have not broken down and this location, there's

23  not the presence of iron as a sign that it's been there

24  for a period of time.

25      Q    The fact that there's blue dots on both

1    slides, they're not the same blue dots?

2        A    The other blue clumps.

3        Q    Clumps.

4        A    On the other slide were iron deposits.

5        Q    Okay.

6        A    The blue dots here are the nuclei of white

7    cells.

8        Q    So when you look at that photo and you see the

9    presence of red blood cells, then that tells you that

10   there's been an injury to that mesentery of less than

11   four hours?

12       A    Right, fresh injury, that's correct.

13       Q    Well, what if another doctor said that when he

14   does the microscopical examination that if you have the

15   movement of white blood cells into the gut, that means

16   that the injury is a minimum of 8 hours old?

17       A    There's two issues here.  First of all, we're

18   not in the gut.  We're on the outside of the gut.  This

19   is in the connective tissue on the outside of the gut,

20   so that's not what the slides show.

21            This is the supporting tissue.  The mesentery

22   is the supporting tissue of the gut.  This is not a site

23   in the gut at all.  And then when you bleed, you bleed

24   everything that is in the blood vessel, and that's a

25   mixture of red cells and white cells, so bleeding itself

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1   allows for white cells to go into where the blood is

2   accumulating.

3           What he's talking about is the separate

4   migration of red cells -- I'm sorry -- of white cells to

5   an area of injury and migration into an area of injury

6   is different from white cells that are present because

7   of bleeding.  So what we're seeing here is what cells

8   that are just part of the blood that has leaked out into

9   the tissue.

10      Q    Okay.  So when you have white cells that are a

11  part of the blood that has leaked into the tissue, he's

12  got that confused?

13      A    Well, I don't know if I would use the term

14  "confusion", but it's being misapplied, because

15  bleeding -- when bleeding occurs, which means that the

16  blood goes out of the blood vascular system, there's not

17  a selective bleeding of just red cells.  It's red cells

18  mixed with white cells.

19      Q    There's actually an article -- when they talk

20  about that this minimum of 8 hours, even though it's

21  been misapplied, there's actually an article, is there

22  not, when you rely on articles that people rely on

23  within this scientific community, there's an article

24  that talks about this three-hour window, is there not?

25      A    Well, right.  In fact, you start seeing

1   migration of the white cells within a matter of minutes,

2   can occur, but the white cells respond to the stimulus

3   of injury, but when you start seeing them accumulating

4   in an abnormal fashion, it's a matter of several, a few

5   hours.  That's correct.

6           And the work on that was actually done by a

7   man called John Rebuck who was interested in -- I just

8   happen to have his reference here, but he was interested

9   in looking at how white cells respond to injury where

10   they are attracted to a site of injury.

11           That's different from white cells that end up

12   in the tissue because you've been bleeding.  So if you

13   bleed and you have white cells there, it's just because

14   they're part of the blood that leaked out of the

15   vascular system, the blood composed of white cells, red

16   blood cells, platelets and liquid.

17           If you have a response to a site of injury,

18   then they migrate there, and so that's the difference

19   between migration and bleeding.  Bleeding brings white

20   cells.  This is bleeding.  Attraction in a few hours

21   allows for white cells to come there.

22           But these sites of bleeding have not been

23   there long enough to really have a secondary reaction.

24   In other words, this blood that's there is fresh, and

25   it's fresh of just a few hours of age.

1      Q      You were talking about functionality is

2      important.  We've talked about that.

3      A      The child's functionality.

4      Q      The child's functionality is important?

5      A      Yes.

6      Q      I know you've not seen State's Exhibit Number

7      199 before, but I'm going to show this to you.  It's in

8      evidence, but we have up here Friday, May 30th, '08.  We

9      have Saturday, May 31st, '08, and we have Sunday, June

10     1st '08.

11            Then we have certain times on all of these

12     days.  The child -- paramedics, I have marked on here,

13     I'll give you these and ask you kind of a question from

14     it.

15            It's in the record that at 12:56, paramedics

16     responded to this location, and they noticed that the

17     victim was cold.  He had a bloody stool.  He was not

18     responsive.  He had no heartbeat, and he never got

19     that -- they never is astolic?

20     A      Asystolic, yeah.

21     Q      And they try to work on him there.  They leave

22     a few minutes later.  They arrive at Trinity Mother

23     Frances at 1:12.

24            Dr. Anderson is unable to regain a heartbeat.

25     He's an ER trauma doctor.  He's unable to regain a

1    heartbeat.  At 1:15 the rectal body temperature is 91.1.

2           Now, let me go back some.

3           9:30 on Friday, May 30th, the testimony is

4    that this picture right here was taken of Kelynn Pinson.

5    I'll show it to you.  State's Exhibit Number 10.  Okay.

6           Does that look like a child that's had any

7    trauma resulting in the injuries that ultimately

8    culminated in his death?

9    A    No, sir, it does not.

10   Q    This photograph, to give you a point of

11   reference was taken about right here.

12          At 10:30, the testimony is the child is

13   normal, riding to McDonald's in a car with his dad who

14   is in that photograph right there.  Then throughout the

15   rest of the day, he is acting normal, happy.  He takes a

16   bath.  No one sees any bruising.  Nothing to indicate

17   that he's in any trauma at all.

18          At 5:30, he's at the Wal-Mart, and he's hiding

19   from his dad in some clothes.

20          Is this the type activity that you believe

21   would be -- that a child that's in -- that's received a

22   mesentery tear like Kelynn did that how they would act?

23   A    No way, sir.

24   Q    Okay.

25          At 6:00 -- this is give or take a few

1   minutes -- he's dropped off with his mom, Ceola Pinson.

2   That's where the mother and the defendant lived

3   together.  Kelvin Pinson is the father.  He's never been

4   married to the mother.  They live separately.

5            Saturday, May 31st, starting about 1:00, we're

6   not clear what happens in here.  But Saturday at

7   1:00 p.m., the defendant is going to go buy some

8   clothes.  They get up.  They go get something to eat.

9   They go to eat.  They go to restaurant to eat.  They

10  then go to a clothing store.  They go to a mall.  They

11  go to a relative's house.  The child, the testimony is,

12  does not eat as much as he usually does.

13           Then they go on -- they drop the child off

14  sometime 5 to 6:00 at a baby-sitter's house.  Present at

15  that house are Dakeidra Choice, Chasitie Ford, and

16  Fredrick Suell.

17           We know at that house Fredrick Suell gives the

18  child, he's wanting something to eat.  He wants

19  something to eat.  He gives him some cereal.  There's no

20  milk in it.  He hands him some cereal.  But the child

21  appears to be normal.  He's actually playing ball,

22  throwing the ball around.  And during this window of

23  7:15 p.m. to 9:30 to 10:00 p.m., he eats more cereal.

24  He eats some noodles.  He actually walks to the mailbox

25  holding hands with an adult.  There's like a community

1f7dcf3d-106b-4849-ad11-72cff9ac249a

 1    mailbox at the apartment complex where there's a bunch

 2    of individual mailboxes.

 3                 He actually gets on a Big Wheel scooter and

 4    sits on it and kind of pushes himself, scooting himself

 5    along the floor.  There's no signs at all to any of

 6    these people that he would be in any kind of distress at

 7    all.

 8                 Is there any indication -- I mean, is this the

 9    normal activity of a child who would be suffering from

10    these kinds of injuries?

11                 Is this something that he would do, scoot

12    around on a Big Wheel, play ball, walk to a mailbox?

13        A     Sir, with blood in your belly, with torn

14    mesentery, with trauma that is affecting not only how

15    you feel, but how you can function, he would not want to

16    move.  He would certainly not be eating, and if he took

17    in fluids at all, he would be vomiting, and it would be

18    the movement -- any movement that bent him over like

19    being on a bike or agitated his belly, blood, free blood

20    in the belly is a very irritating thing.

21                 And this is an experience that women have

22    during ovulation when there's a release of just a small

23    amount of free blood in the belly.  That can be a

24    painful thing, because of the blood itself.  Blood is an

25    irritating substance for the peritoneal cavity.  He

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    would be dysfunctional, in pain and not able to do any

2    of those things.

3            Eating, being an especial stress test affect.

4    He would not be able to eat or hold down food.

5        Q    At 11:00, they bathe him.  He's kind of dozing

6    off about 9:30 to 10.  This is a 2 year old.  It's about

7    9:30, 10:00 at night.  He starts getting kind of sleepy.

8    He doses off.  They wake him up, and give him a bath

9    sometime around 11:00, and he sits in the tub.  The

10   person bathing him, Dakeidra Choice, says she does not

11   notice any bruising.  He seems to be tired, but normal.

12           She takes him out the bathtub, and he goes

13   back to sleep.

14           Even bathing a child, would that be

15   inconsistent with trauma having occurred at this point?

16   I guess, you could bathe a child in this kind of trauma,

17   but the child would be?

18       A    Either in great distress or unresponsive.  I

19   mean, so you can, of course, bathe someone who is

20   unresponsive, and the distress would be such that there

21   would be an element of lethargy and poor responsiveness

22   associated with that, but just movement, just pressure

23   on the belly when you have free blood in the belly,

24   causes discomfort.

25       Q    Okay.

 1          At sometime around June 1st, the mother and

 2    the defendant show back up at the apartment.  They pick

 3    him up around 2 a.m. or 2:30.  He's asleep.  He's

 4    awakened.  Seems to be drowsy, but he's been asleep.

 5    It's 2:30 a.m. in the morning on Sunday June 1st.  On

 6    the way home, the child expresses an interest in

 7    something to drink.  They don't give him -- there's an

 8    energy drink in the car.  They don't give it to him,

 9    because it's an energy drink.  He seems to be whining,

10    because he wants something to drink, but appears to be

11    normal.  When they get home, he goes and puts himself

12    into bed.

13          He walks from the car to the apartment where

14    they have to walk upstairs -- I mean, let me start with

15    this.  Would walking upstairs be a very difficult thing

16    to do with free blood in your abdomen?

17    A     Again, free blood in the abdomen in the

18    peritoneal cavity is a very irritating substance and

19    movement of any sort causes great problems.

20          Because of the discomfort involved.  I mean,

21    someone that has that, whose not in shock, is going to

22    want to be as still as possible, and walking is not

23    something you're going to want to do.

24    Q     So you sure wouldn't be walking and acting

25    normal as a 2 year old?

1f7dcf3d-106b-4849-ad11-72cff9ac249a

 1      A    That is correct, sir.

 2      Q    The mother even asked him at one point, she

 3  hears something, a thump or a knock, and she says, are

 4  you okay, Kelynn, and he answers, yes -- I have "mommy",

 5  but I think it's actually, "mama" -- yes, mama.  About

 6  5:15, the mother -- he's still asleep.  The mother moves

 7  him to the couch, and the mother says he appears to be

 8  fine and asleep.

 9           9:15, the mother comes home.  He's still

10  appears to be asleep, and she stands over him for a few

11  minutes and he looks normal to her.

12           9:15, around that time, is the last time

13  anyone but the defendant sees the victim alive.

14           Now, the defendant says what's in red here.

15  Here's his statements to the police.

16           He says that at 11:30, the victim woke up.  He

17  ate a sandwich and maybe some cereal.  Knowing that the

18  child at 12:56 is cold, unresponsive, no heartbeat.

19  Would it be consistent that at 11:30, he would actually

20  wake up and eat a sandwich, do you believe?

21      A    The period of time from 11:30 to -- what was

22  the time that you said?

23      Q    12:56, the paramedics get there.  We know he's

24  dead by 12:56.  We don't know how long he's been dead?

25      A    That period of time is too short for the issue

1    of heat loss and for the issue of the injury having

2    occurred prior to that.  I mean, what you have is that

3    when the child is asleep, you don't know whether the

4    child has been injured or not, but once -- if you have

5    interaction such as feeding interaction or activity,

6    that is not consistent with these injuries that brought

7    about this death.

8            So either the story is wrong, or the injury

9    hasn't occurred yet, and that period of time is not

10   appropriate for the injury having occurred earlier.

11       Q    Right.  Because we know that he's dead at

12   12:56.  That's a given.  Do you believe that -- and if

13   he's dead at 12:56, him waking up at 11:30 wanting to

14   eat a sandwich, maybe some cereal is not consistent?

15       A    That is -- has to be a false story.

16       Q    Okay.

17       A    Not the least of which is the body temperature

18   issue.  You can't lose that much temperature unless the

19   child was placed in a refrigerator for that period of

20   time to have a core temperature of 91 degrees, I think

21   you said.

22       Q    Have you ever heard of vasoconstriction?

23       A    Vasoconstriction.

24       Q    Vasoconstriction.

25       A    Gives you your external temperature being low

1    and that can happen to someone who is alive.

2            But the core temperature, and I understood

3    that this was measured by a rectal thermometer, that's a

4    core temperature measurement, so that's a valid

5    measurement of the body's internal temperature.

6        Q    If are you in vasoconstriction?

7        A    Yes.

8        Q    Is the body trying to preserve heat or expel

9    heat?

10       A    Well, it depends on whether it's

11   vasoconstriction from a physiologic response or a

12   pathologic response.

13       Q    How about in this case.  I don't know which

14   one that would be?

15       A    But a physiologic means that your body is

16   responding to like cold outside and so you go into

17   periphery vasoconstriction, because you don't want to

18   lose excess heat to the cold.

19            If it's a pathologic response, then it can

20   associate with injury, both of which allow for a

21   conservation of heat, but with the pathologic response

22   it's not necessarily something that's helpful to your

23   body to be able to cut down on heat loss to the outside.

24       Q    So -- knowing that -- taking into account what

25   you just talked about with the vasoconstriction, do you

1    see any way that this child -- let me take it even

2    further.

3              According to the defendant, he says at 12:30

4    the victim, Kelynn Pinson, is enthusiastic to go

5    swimming.  He's wanting to go.  He seems normal.  He's

6    ready to go swimming?  He changes his clothes and

7    carries him to the pool.  And he gets down to the pool

8    and he puts him in the water and everything is going

9    great until the other child starts to cry.

10             The defendant then leaves Kelynn down at the

11   pool, you know, sometime in this timeframe and goes back

12   upstairs.  Let me start here.

13             Do you think it is that the child was alive at

14   12:30 wanting to go swimming with all you've looked at

15   in this case and knowing that he is dead for sure at

16   12:56?  Do you think that that's true that he was

17   enthusiastic about going swimming at 12:30?

18        A    The rapidity of death for this child has a

19   range and the range can be as short as less than an hour

20   or up to a few hours.

21             But the issue here is that the functionality

22   of this child is not appropriate for an injury having

23   occurred for a few hours beforehand.  Can't have an

24   injury like this and still be functional at the time

25   that it's said that this child is functional.

Page 80

1          If that story is to be believed -- and, again,
2     you can have a compressed process of less than an hour,
3     then the only person who is involved in the care is the
4     defendant as you're describing things.
5          So it's kind of like you can't have it both
6     ways.  If the child was preinjured, he's not shown signs
7     of that injury and the findings are not consistent with
8     an injury of over 4 hours, and if he's fully functional
9     up to this point, then he hasn't been injured yet and
10    then the injury is only -- can only take place under the
11    hands of the defendant.
12         It seems to me that the story of his having
13    activity at that point based on the timeframes involved
14    is not a valid story.
15         To me the only explanation is that this is a
16    bogus story to say that the child is in good condition
17    right up to the point where the child ends up going to
18    the pool.
19         That to me does not fit with what the evidence
20    shows.  But even if the timeframe is constricted like
21    that, to let's say less than an hour or even a half
22    hour, the only person with the child at that time is the
23    person who would be responsible for these injuries.
24    Q    Well, then if -- let me take it even further.
25         At the pool, he says when he comes back, he's

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    gone upstairs, taken the small child upstairs, he comes

2    back.  And Kelynn has actually fallen into the pool or

3    climbed into the pool and he is holding onto a ladder

4    kind of like this around the ladder, and he is

5    unresponsive.

6         And the defendant then rushes over, pulls him

7    out, with one impact to the chest, Kelynn then wakes up

8    and says that he's hungry, eat, eat, is what he says.

9    He's hungry.

10         So let me start with that.  Does that story

11   seem plausible to you?

12   A    The whole story about the child being in the

13   pool does not seem plausible.  And then what you're

14   describing does not seem plausible.  These injuries can

15   have been there for a few hours.  Even if they were

16   there for a short period of time, once the injury

17   occurred, this child would not be normally functional in

18   any stretch of reality.

19         So it's kind of like having, trying to have it

20   both ways.  If the injury preexisted, then the child

21   couldn't have done any of these things, and if the

22   injury didn't preexist, then the injury was inflicted at

23   some time during this story, which doesn't make sense to

24   account for the presence of the injury.

25   Q    Either way, if he is dead at 12:56, there is

1    no way that he is alive -- first of all, he would not,

2    with what you're saying with his injuries, he would --

3    his symptoms, the way he would be acting, is absolutely

4    inconsistent with wanting to go swimming, number one,

5    right?

6        A    Well, any -- if he had these injuries, he

7    would want to protect himself from any movement and any

8    activity.  The -- again, remember that the brain

9    swelling shows that he's been in a down condition for a

10   somewhat prolonged period of time.  Less than four

11   hours, but still he may have been down for an hour or

12   even two hours.

13       Q    Okay.  So his brain -- what should it be --

14   how do you measure the weight?  Is it pounds, ounces,

15   the weight of a brain?

16       A    In grams.

17       Q    In grams.

18            What is a normal weight for a 2 year old --

19   what is the normal weight of the brain?

20       A    For a 2 year old, it's about 1 kilo, so about

21   a 1000 grams or 1100 grams.

22       Q    1000 to a 1100 grams.

23            What was his?

24       A    His was about 1340.  Let me see exactly.  1340

25   was the exactly what it was.

1    Q    That doesn't sound like a whole lot, only a

2    couple of hundred?

3    A    But with the brain that's very significant.

4    It's proportional increase.

5    Q    It's only 20 percent?

6    A    20 percent increase in brain weight, that's

7    water in the brain.  There's a reason that it increases

8    is because of fluid and fluid is called cerebral edema

9    and when you have any swelling of the brain at all, the

10   brain becomes dysfunctional.  Even the small amounts of

11   cerebral edema is bad, and a 20 percent increase is a

12   significant amount of increase.

13   Q    So in that -- that alone tells you that there

14   has been a period of downtime, right?

15   A    That's right.

16   Q    When a person -- what is a stroke?  Does that

17   result in swelling of the brain?

18   A    A stroke has several meanings, but it's

19   usually when there's been a blood vessel that's ruptured

20   and the blood then has leaked into the brain.  The blood

21   itself is an irritant and the brain starts swelling in

22   response to that.

23        But, there's two types of strokes, bleeding

24   strokes and clotting strokes.  But the bleeding strokes

25   are the ones that actually can be the worse to manage,

1  because of the difficulty of continued accumulation of

2  blood.

3       Q    The swelling of the brain is what they're

4  concerned with there?

5       A    Right.  You have the initial injury from where

6  the bleeding occurred, but then the secondary injury

7  that makes the damage much worse is the swelling that

8  results from that event.  There was no stroke.

9       Q    No, I know.  I was just looking at -- the

10  swelling of the brain is always a concern, medically?

11      A    That is correct.

12      Q    In any amount?

13      A    That is correct.

14      Q    Let's talk a little bit about the defendant in

15  this case says that at some point, 12:30, that the

16  victim has white mucus coming out of his mouth.  He says

17  actually at sometime between 12:35 and 12:40, the victim

18  is drinking a soda, does that sound reasonable to you?

19      A    If the boy is able to drink and is functional,

20  he has not yet been injured.  And what I'm saying here

21  is, you can't have it both ways.  Either the boy was

22  injured beforehand and these are results of progression

23  of a problem, or the boy is injured sometime very close

24  to when emergency is called.

25               The evidence is that the boy was -- the

Page 85

1    medical evidence -- was injured for a period of time, a

2    few hours perhaps at the most, but injured such that his

3    brain swelled significantly, but not injured enough long

4    enough to accumulate a lot of blood in his belly.  So

5    the amount of bleeding time was more oozing-type

6    bleeding.  It still took time, but it was not a long

7    prolonged period of time.

8              This all comes down to a few hours, less than

9    four hours, just a few hours.

10        Q    So from the point of impact until death is

11   four hours or less?

12        A    Multiple impacts.

13        Q    Multiple impacts is four hours or less, right?

14        A    Right.

15        Q    So if he's dead at 12:56, you put the window

16   somewhere 9:00 on?

17        A    Right, that's correct.

18        Q    9:00 on.

19             So you put the point of multiple impacts that

20   results in his death as occurring at 9:00 a.m. on

21   Sunday, June 1st '08 or later?

22        A    But if there's any truth to the stories of his

23   functionality later in the morning, that means he hasn't

24   been injured yet by any means.

25        Q    So what you're saying is if the defendant was

1    telling the truth to law enforcement that at 12:30 he

2    wanted to go swimming, then one of two things is

3    happening.  The defendant is lying, or he hasn't been

4    injured yet?

5        A    Right.

6        Q    And based on the fact that he's dead at 12:56,

7    do you believe he would have been injured at 12:30?

8        A    With his body temperature and with the degree

9    of brain swelling and with the findings of the

10   compilation of findings here, that doesn't make sense.

11   To me, that's too short a period of time.

12           It may have been an hour before that or

13   something like that, but the story -- either story of

14   him being preinjured or just injured for just injured

15   for just a very short period of time doesn't work.

16   It's -- the truth is probably somewhere in between.  One

17   to two hours before he's discovered by medical

18   personnel.

19       Q    Now, the defendant never calls 9-1-1.  He says

20   in his statement, he's too shocked at what's going on to

21   call 9-1-1, but he does call the mother at Burger King.

22   He calls her at 12:40.  He says that the victim is

23   alive.  In other words, he still has a heartbeat, but

24   his eyes are rolling back in his head and he's rolling

25   side to side.

1          Before I get to that, let me back you.  The

2    white mucus, is it possible that the injuries could have

3    been inflicted, the child could be in trauma and had

4    white mucus coming from his mouth?

5          A    Sure.

6          Q    If I hit or kick somebody with great force or,

7    say, a child in the stomach with an object, could that

8    cause that child to, when I begin to strike those

9    impacts, to vomit?

10         A    Sure.

11         Q    Let's talk about the core body temperature --

12   before I get to that.

13         Is it your conclusion then that based on the

14   timing of the defendant's statements that what the

15   defendant is telling law enforcement that at 12:30, he

16   wanted to go swimming.  At 12:35 to 12:40, he's drinking

17   a soda.  At 12:35 he's holding onto the ladder.  He's

18   not responsive, but becomes responsive with an open palm

19   strike, and then the victim says eat, eat, I'm hungry.

20   Do you believe those are true?

21         A    No, I do not.

22         Q    The 91.1 degree rectal body temperature.  Tell

23   me some way, if you can, that he could have a core body

24   temperature of 91.1 if at 12:56 paramedics say he's dead

25   at that point and if he is drinking a soda, say at 12:35

1    or he's enthusiastic to go swimming at 12:30, how -- is

2    there any way that you could think of he could have a

3    rectal body temperature of 91.1 at 1:15?

4        A    He's been refrigerated.

5        Q    Absent some intervening thing like

6    refrigerating, is there any way vasoconstriction,

7    bleeding into the abdomen, shock, would any of those

8    cause him to have a core body -- a rectal body

9    temperature of 91.1 at 1:15?

10       A    That's the whole point of the rectal body

11   temperature.  I've already said that the external

12   temperature varies very dramatically, and that can be

13   low and not be a true reading of what his true

14   temperature is.

15            The fact that it's a core rectal temperature

16   says that he's been losing heat for two or three hours

17   at the point that that was done.  And, no, he doesn't

18   necessarily have to be dead for two or three hours, but

19   he's been injured and approaching death for that period

20   of time, because he's lost the ability to regulate heat

21   and losing that ability is one of the functions of --

22   that happens with brain trauma.

23       Q    Well, if another physician said that a rectal

24   body temperature is not a core temperature -- you don't

25   know Dr. Pustilnik?

1      A    No.   That's what rectal temperature is, is a

2   core body temperature.

3      Q    What is the core of a person?

4      A    The -- well, the core means something

5   internal, not on the skin.  So you're not measuring it

6   by feeling the skin with some temperature probe.  You're

7   getting inside the body cavity somewhere.

8      Q    Do you think the rectal body temperature is a

9   valid, a good way to measure core body temperature?

10      A    It's kind of the standard way that's it's

11   done.

12           I mean, that's why it's considered a guideline

13   if you want to know truly what someone's temperature is.

14   It's not done very much anymore, because there's so many

15   more convenient ways to do it, but that's what it's

16   purpose is.

17      Q    You could stick something into the liver,

18   could you not?

19      A    Then you're presuming that a person is dead.

20   I mean, before if you're going to do something like

21   that.

22      Q    That's true.

23           Also then you have put an injury into a body

24   that might be looked at for a homicide, which you don't

25   want to do, would you agree?

1        A    Right, right.

2        Q    Let me show you, do you believe the bruising

3   on Kelynn's body, do you believe this red bruising right

4   here is -- you say it's fresh, and I know you don't like

5   to time bruises, you agree with that?

6        A    Yes.

7        Q    But do you believe that these injuries that

8   you see on his stomach here and really on State's

9   Exhibit Number 213, it shows the same injuries.  It's a

10  different photocopy.  Do you believe those are the

11  result of impacts, multiple impacts that caused the

12  injuries to the mesentery?

13       A    Yes.  You have almost a direct line of force

14  relationship.  And as I mentioned before, the injuries

15  to the mesentery are caused by a compressive effect

16  between impact trauma to the surface of the belly and

17  compressing the belly structures with the backbone, and

18  that's what resulted in the tearing, those multiple

19  small tears present in the mesentery and the bleeding

20  associated with that.

21       Q    Let me ask you this.  If you a have forensic

22  pathologist and you are a pediatric pathologist, who is

23  more qualified to look into the body of Kelynn Pinson

24  and tell what the injuries are and give testimony as to

25  when they would have been inflicted and look at slides?

1      A     Well, what forensic pathology is, is the study

2   of nonnatural events.  That's what forensic pathology

3   training is.  What pediatric pathology is, is the study

4   of kids and understanding how kids' bodies respond to

5   things.  My answer to that is that the ideal situation

6   would be a collaborative effort between a forensic and

7   pediatric pathologist to provide answers and incites

8   into those type of questions.

9      Q     Is this a complicated case to look at and give

10  testimony on?

11     A     Actually, it's not very complicated in the big

12  sense, in that you have child who by history is doing

13  fine, and then he's suddenly and unexpectantly unwell

14  and dead, and you look to -- you find unexplained

15  trauma.  So you look to the story of what occurred or

16  did not occur.  Was he in a car accident?  Did he fall

17  from a building?  You don't have that information, so

18  therefore the unexplained trauma had to have been

19  inflicted on him in a relatively short period of time.

20          Before the trauma was inflicted, he was

21  functioning fine, and after the trauma is inflicted, he

22  lingered perhaps for a perhaps a couple of hours, but he

23  died as a result of the inflicted trauma.

24     Q     What is the fact that someone let Kelynn die

25  tell you about -- you don't like to comment on whether

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    something is intentional or not, do you?

2         A    No.  You know, a single blow event, you can

3    have some ideas about regarding maybe a loss of control

4    or some type of even circumstantial accident, but when

5    you have multiple sites of impact, this conveys a higher

6    level of intentionality.  It conveys there is --

7    something that has occurred in the environment to this

8    child that has occurred multiply.  You can't account for

9    this by any circumstance in the environment other than

10   another person's actions.  That means that you have

11   multiple blows, and the more multiple blows, the more

12   you do get into that realm of intentionality.

13        Q    Maybe it's me, but, how does common sense play

14   into this thing?  Is common sense something that

15   forensic pathologists, pediatric pathologists should

16   always apply -- let me back up.  Let me rephrase this

17   question.

18             Does it make sense, common sense-wise that a

19   child would be dead at 12:56 suffering the kind of

20   injuries that Kelynn Pinson suffered and with wanted to

21   go swimming at 12:30, shouldn't doctors look at that and

22   go, heck, that just doesn't make sense?

23             MR. THOMPSON:  Your Honor, I'm going to

24   object to the form of the question.

25             MR. BINGHAM:  Whether doctors can look at

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    something and tell if it makes sense?

2                THE COURT:  Overrule the objection,

3    Mr. Thompson.  Let him give his opinion.

4        Q    (By Mr. Bingham) Well, I mean, shouldn't

5    doctors be able to look at -- maybe it's me?  I'm no

6    doctor.  I promise you that.  But this looks something

7    like this and go, hmm, let me look at this for a second.

8    If he's dead at 12:56, this doesn't look like the

9    injuries someone would be enduring and wanting to go

10   swimming 26 minutes earlier, can't you just do that

11   medicine -- shouldn't doctors do that?  You understand

12   my question?

13       A    Of course the answer for a reasonable person

14   is, yes, doctors should do that.

15            I appreciate that the issue here is whether

16   there is a story to account for why this child is dead

17   and a story of a child being in good shape until the

18   last minute prior to his collapsing unexpectantly.  It

19   just doesn't make sense.  It doesn't make sense with the

20   pathology findings.  It doesn't make sense historically

21   but the reason stories like that don't make sense is not

22   because that the injuries are not explained.  It's

23   because the story doesn't account for them.

24            And this -- both by timing and by quantity,

25   here the only way to account for the multiple sites of

1f7dcf3d-106b-4849-ad11-72cff9ac249a

 1   bruising, the degree of injury in the belly and the fact

 2   that this child with these injuries would not have been

 3   functional is that the stories are bogus.  The story

 4   that's being given is bogus.

 5         Therefore with a bogus story, you to try to

 6   piece together things based on other information, and we

 7   have a timing window when other people saw this child

 8   being fine, and as long as the child is fine, he's not

 9   been injured.  And once the child is in someone's

10   exclusive care and he has unexplained injuries, the

11   logical conclusion has to be that those injuries were

12   inflicted by the person in that exclusive care.

13         One wants to have another explanation.

14   Believe me, nobody likes to think that someone is going

15   to do things to hurt a child.  But lacking an

16   explanation of this child being in a car accident or

17   falling from a building or some story that would account

18   for the types of injuries that we have here and the time

19   period in which this child went down, the conclusion has

20   to be that this was inflicted on this child and we're

21   not being given the truth.

22   Q    And then also backing that up is your

23   microscopic examination of slides and your explanation

24   to the jury that's consistent also with the timeframe of

25   him being in the exclusive care of the defendant?

1     A    Right.  This short duration.  I mean, "short"

2  in not more than just a few hours of when this injury

3  occurred.

4     Q    Now, maybe these injuries right here were

5  caused.  I know it's not a bony area.  I know the

6  abdomen is compressible, but maybe that's someone, CPR

7  did that, you think that's plausible?  The red, this

8  area, right here on State's Exhibit Number 88?

9     A    Well, even inappropriate CPR, certainly that

10  can be given to folks, it doesn't make sense that

11  someone would be -- I mean, these have to be from

12  punches and blows to the belly, that you would do

13  punches and blows to the belly for CPR.  I mean, that

14  this child just -- it's just not in part of what people

15  have in my view as a way to do CPR.

16     Q    In other words, these are -- even if you were

17  doing -- if you were doing CPR correctly, it wouldn't

18  cause it?

19     A    That's correct.

20     Q    If you were doing it incorrectly over the

21  abdomen with the correct amount of force, it wouldn't

22  cause that?

23     A    The only thing that people do as an abdominal

24  maneuver is the Heimlich maneuver, when you think that's

25  something that needs to be dislodged and that's a

Page 96

1    single, a few short pressure bursts to the belly to try

2    to expel some foreign body.

3              And theoretically that could leave some injury

4    to the belly, but that implies that there was something

5    that brought the child down like an obstructed airway

6    with a foreign body, and we don't have any information

7    to that.

8              (Reported by D. Keith Johnson, CSR:)

9      Q    What you have is the torn mesentery in the

10   severity that you've talked about, with these injuries

11   being consistent, overlaying the torn mesentery,

12   correct?

13     A    These injuries are consistent with blows to

14   the belly, and the story's consistent, especially with

15   the brain swelling of some duration, not more than a few

16   hours, but some duration of lack of medical attention.

17             And when you have an event like this that --

18   that's an accidental event, medical attention is sought

19   immediately.  When you have an event that is being

20   hidden, medical attention is delayed.  And the degree of

21   brain swelling and the fact that there is some

22   accumulation of blood and -- and these changes indicate

23   that there was a period of time of hiding things before

24   authorities were called.

25     Q    On State's Exhibit 10 up here, you saw the --

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    the bruising on Kelynn's -- without putting up every

2    photograph, the bruising on the back that like was

3    depicted in State's 82, the bruising on the hands that

4    you've seen in State's 91, and there's some other ones,

5    the bruising here in State's Exhibit 83 where he has

6    this bruising around the eye -- and you see this over

7    here on the head?

8         A    Okay.

9         Q    Yeah.  Was all of this bruising -- do you

10   think this bruising on his eye, the clavicle that you

11   saw, the hands, the back, the abdomen, are consistent

12   in -- in when they were inflicted?

13        A    Again, it -- it's hard to date timing on

14   bruises.  But the fact that all of them have a -- a

15   fresh appearance and that the bruising where we have

16   microscopic -- and that's the internal bruising around

17   the bowel, is also fresh.

18             Yes, one can say that the -- the vast majority

19   of the injuries that you see are contemporaneous,

20   meaning within the same timeframe.

21        Q    You can see the bruising on State's 83 on the

22   eye.  Let me show you State's Exhibit 10.

23             Do you see the bruising?  That's the one that

24   was taken at 9:30 on May 30th.  Does he have that

25   bruising on his eye there?

```
 1      A      No, he does not.
 2      Q      Have you taken into -- what's a -- have you
 3   ever heard -- well, have you taken into account flash
 4   photography and skin tone averages?
 5      A      No, no.
 6      Q      Okay.  Do you know what that is?
 7      A      Well, by -- by the nature of the way you're
 8   talking about that, the usual requirement for forensic
 9   photographs is to have a color scale in the photograph,
10   and so that when you take a picture, you adjust for what
11   the color appearance is by having the -- the color
12   standard.  And without that standard, there always is
13   concern over variations in color based on techniques
14   that are used.
15           But even so -- and that's a legitimate
16   criticism of photographs without a color scale with
17   them.  But even so, these bruises with these
18   photographs, going by reasonable interpretation of skin
19   coloration and other known color -- sort of standard
20   colors that are there, these pictures seem to be pretty
21   reasonable reproductions of what would expect as a real
22   life appearance.  And these bruises have a very fresh
23   look to them, the redness, and the locations are all
24   consistent with them being fresh bruises.
25      Q      Are they consistent with having occurred at
```

1    the same time?

2        A    In a timeframe that has some flexibility to

3    it.  I mean, you have to -- within the same one- or

4    two-hour time.  I -- I couldn't say that they were

5    within five minutes, but they're certainly less than

6    four hours' discrepancy between them.  So --

7        Q    So these --

8        A    -- you can't say with certainty that they're

9    within a very tight time range, but it's -- a few hours

10   is a reasonable thing to say.

11       Q    So they could have been inflicted at the same

12   time, they could be as far as a couple hours apart?

13       A    That's correct, yes.

14       Q    Okay.  How quick would a bruise appear?

15       A    Well, first of all, the heart has to be

16   beating.  The bruise is the presence of blood outside

17   the blood vascular system.  And then you have an injury

18   to the vessel that if you sever the vessel or open a

19   hole in the vessel, then the bruise appears right away.

20            If it's an injury because the vessel loses its

21   microscopic integrity, but is not physically torn, then

22   it can evolve over minutes, to some -- some bruises are

23   enhanced over a period of an hour or so as there's a

24   slow leak of blood.

25            Most of us have the experience with smaller

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    compressive injuries that -- damaged some capillaries,

2    that there's a slow leak, and then you know you bumped

3    yourself when you looked there an hour later, and you

4    didn't have a bruise immediately when the bump occurred.

5         Q    So if CPR is performed -- well, first of all,

6    you don't think those bruises occurred from CPR?

7         A    Now, which -- the ones --

8         Q    On the -- (indicating)

9         A    No, absolutely not.

10        Q    Okay.  What do you think about rigor mortis as

11   a dating tool?  What do you think?

12        A    Well, it's variable, depending on the muscle

13   mass, the external temperature and the physical

14   condition of the person when they died.  And, you know,

15   someone who is doing heavy exercise and has sudden

16   death, they'll get rigor mortis much more quickly.

17   Someone who has small muscle mass will have limited

18   rigor mortis.  But generally it's said that it takes

19   three or four hours to see the first signs of the -- the

20   contraction, the fixed contraction of muscles from rigor

21   mortis.

22        Q    Three to four hours for it to --

23        A    For the -- very earliest signs, yes.

24        Q    Could be more than that, could be less than

25   that?  That's a range?

1      A    Yeah.  Probably not a lot less.  But, yes,

2  that's a range.  And the very early signs are in some of

3  the smaller muscle masses.

4      Q    Let me show you State's -- let me see if I can

5  find it.

6             THE COURT:  Mr. Bingham, while you're

7  looking through the pictures there, I know trying to

8  find one, I believe we'll go ahead -- it's five till

9  12:00.  I believe we'll go ahead and take our noon

10  recess.

11             So, Ladies and Gentlemen, if you would

12  please be back in the jury room at one o'clock.

13             All rise for the jury.

14             (The jury left the courtroom.)

15             THE COURT:  All right.  We'll be in

16  recess till one o'clock.

17             (Lunch recess.)

18             THE COURT:  All right.  We're back on the

19  record in 241-1251-08, the State versus Demontrell

20  Miller.  The State and the defense counsel are present.

21  The defendant is before the Court.

22             Bring in the jury, Carleton.

23             (The jury entered the courtroom.)

24             THE COURT:  Be seated, Ladies and

25  Gentlemen.  Thank you.

1           All right.  Mr. Bingham.

2      Q    (By Mr. Bingham) Doctor, you said the -- I

3  think when we left, you said the onset of rigor mortis,

4  given or take, the range in a child is three to four

5  hours?

6      A    Right.  Depending on muscle mass and activity

7  of the child at the time of death.

8      Q    Okay.

9           MR. BINGHAM:  May I have one second,

10 Judge?

11     Q    (By Mr. Bingham) Let me show you --

12          MR. BINGHAM:  May I approach the witness?

13          THE COURT:  Yes, you may.

14     Q    (By Mr. Bingham) Let me show you State's

15 Exhibit 214.  Is this the article that you wrote along

16 with Dr. Kirschner?

17     A    Yes, it is.

18          MR. BINGHAM:  We'd offer 214.

19          THE COURT:  All right.

20          MR. BINGHAM:  We provided a copy to

21 defense previously.

22          MR. THOMPSON:  May I have the witness on

23 voir dire?

24          THE COURT:  Yes.

25          MR. THOMPSON:  Thank you.

Page 103

1                     VOIR DIRE EXAMINATION

2     BY MR. THOMPSON:

3          Q     Dr. Wilson, the article counsel is talking

4     about that's marked Defense Exhibit 214 --

5                     MR. BINGHAM:  State's Exhibit 214.

6          Q     (By Mr. Thompson) Yeah.  State's Exhibit 214.

7     I'm sorry.  Is -- let's see -- runs from page 467 to

8     page 511?

9                     A JUROR:  We can't hear you very well.

10    Sorry to interrupt.

11         Q     (By Mr. Thompson) The article that counsel is

12    referring to marked as 214 is a chapter in the book that

13    runs from page 467 to page 511, 40-something plus pages?

14         A     Yes, sir.

15         Q     Did you have a contribution to the entirety of

16    this article?

17         A     Yes, sir.

18         Q     And this was a collaborative effort between

19    you and Mr. -- is it Kirschner?

20         A     Dr. Robert Kirschner.

21         Q     Kirschner?

22         A     Yes.

23         Q     Okay.  So the individual page that Mr. Bingham

24    had taken out initially is not the entirety of the

25    article -- I mean, is not the entirety of your

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 104

1    contribution to this article; you had something to do

2    with the entire article?

3         A    Yes, sir.  It was a collaborative effort.

4    Yes.

5                   MR. THOMPSON:  Thank you.  We have no

6    objection.

7                   THE COURT:  What number is that --

8                   MR. BINGHAM:  It's State's Exhibit

9    Number 214.

10                   THE COURT:  All right.  State's Exhibit

11   Number 214 is admitted into evidence without objection.

12                   DIRECT EXAMINATION (CONTD)

13   BY MR. BINGHAM:

14        Q    And real quick, Page 511 is the -- the one

15   page that we pulled out before, because that was the

16   that you were referring to -- is -- just explain the

17   relevance of that table.  It's in evidence.  They can

18   read it.  But why is that in your article or your

19   chapter of this book that was published entitled

20   "Pathology of Fatal Abuse."  Why is that table in there?

21        A    The purpose of this table is to help

22   understand the thinking process that is essential to

23   analyzing why a child is dead, and especially why a

24   child is dead when there has been trauma that has

25   brought about the death of the child.  And the section

1    that would apply to this child in that table is under

2    Category 3, which is called "fatal injury."

3         Q    Okay.

4         A    This child died as the result of what was

5    evident to be blunt force trauma to the belly with

6    injury to the belly that led to the death.  And fatal

7    injury doesn't necessarily mean that someone murdered a

8    child.  But there's a process of evaluation that needs

9    to take place.

10            So an autopsy can determine that the child

11   died from injury, which is the case for this child.  But

12   then there's an investigation that takes place, and

13   that's the next section.

14        Q    Okay.  That middle section right here?

15        A    Yes.

16        Q    Okay.

17        A    In that investigation, if the investigation is

18   negative from a culpability point of view, you can say

19   that the injury is consistent with some sort of

20   accidental event, an accident in the general sense

21   meaning something that happened that could not have been

22   prevented, something that happened that in a sense is an

23   act of God, an act of circumstance, but an act of

24   circumstance where there's no negligence or infliction

25   involved.  It's something out of the blue that occurred.

1           If the investigation is inconclusive in terms

2    of finding is this something that was an accident or is

3    this something that was inflicted on the child, then the

4    conclusion is that this is an undetermined death.  It's

5    still a death from injury, but undetermined.

6           And if the investigation comes up positive in

7    the sense that the injuries involved that brought about

8    the death are injuries that, either by witness or

9    confession, are overtly inflicted -- in other words,

10   that you would have statements by people or even someone

11   who's being accused of doing the injuries, that they did

12   indeed do the injuries, then that's what man brought

13   about to man, or if the injuries are such for which

14   there is no compatibility between the story and the

15   death, then, again -- and that's where the injuries are

16   inconsistent with -- the story is inconsistent with the

17   injuries.

18          And that's really what we have in this case,

19   and that is that we have a story of a child who was

20   alive and well and functioning right up to the time

21   where he is found basically poorly responsive or

22   unresponsive, and he has these multiple injuries that

23   are not accounted for by the story in the setting of

24   being under the sole, exclusive care of an adult

25   caregiver.

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1           In that situation, where there is

2    inconsistency with the injuries -- in other words,

3    multi-site injuries, those injuries account for the

4    death, because it's the traumatic injury to the belly

5    which is what killed this child, that you have no story

6    to account for those injuries, then you have to conclude

7    that this is a homicide, from a medical classification

8    of homicide, which means what man did to man to bring

9    about death.

10          And we're not talking issues of intentionality

11   from the medical point of view.  We're talking about

12   where is the responsibility for why this child is dead.

13   We have fatal injuries.  They are injuries where the

14   story we have is inconsistent with the injuries.  And

15   the story of this child being well up to the point of

16   being in a swimming pool and then being found in

17   basically an unresponsive state in that swimming pool,

18   that doesn't make sense with the findings of the child.

19          So the conclusion by exclusion is that it's

20   what man did to man, what a person did to a child, and

21   we don't have the truth in the story about how that

22   occurred.

23          But because of the injuries, because they're

24   multimodal -- in other words, multi-site injuries,

25   because those injuries are there and they're not

Page 108

1    accounted for and they did not preexist someone else's

2    care, the only conclusion is that the adult who was with

3    this child during the period of time when those injuries

4    occurred was responsible for inflicting those injuries

5    on that child.

6                    MR. BINGHAM:  We'll pass the witness,

7    Judge.

8                    THE COURT:  Mr. Thompson.

9                    MR. THOMPSON:  Thank you, Your Honor.

10                   (Reported by Steve R. Awbrey, CSR:)

11                        CROSS-EXAMINATION

12   BY MR. THOMPSON:

13       Q    Hello, Dr. Wilson.

14       A    Good afternoon, sir.

15       Q    How are you doing?

16       A    I'm okay.  Tired, but thank you for asking.

17       Q    Do you need a minute?

18       A    No, I appreciate that.  I'm okay.

19       Q    Now, we have not had an opportunity to talk at

20   all about this case, have we?

21       A    No, sir, we did not talk together.

22       Q    As a matter of fact, I was informed by the

23   District Attorney's office that you didn't want to talk

24   to me?

25                   MR. BINGHAM:  That's not true.

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1      Q    (By Mr. Thompson)  -- unless he was present or

2    talk on the telephone; is that true?

3      A    Well, I don't know what he said to you.

4      Q    Let me rephrase the question.

5           Did you decline to speak with me concerning

6    this case unless I was with the District Attorney?

7      A    No, sir.  In fact my practice is, and I've

8    made this clear to this District Attorney and other

9    District Attorneys that I don't work for a side, but I

10   make myself available to people if they want to call me

11   and talk to me about a case.  I'm available.

12     Q    Okay.  Let me understand this very clearly.

13          It was never your position that you would not

14   talk to the defense unless the State was present or with

15   you on the telephone?

16     A    I like to have the State there, if that's

17   convenient, but I don't restrict myself to talking to

18   the defense without a representative from the State

19   being present.

20          So I would not have said that, that I cannot

21   be available if there's not someone from the District

22   Attorney's office available.

23     Q    Okay.  So it's your statement that you didn't

24   tell Mr. Bingham that?

25     A    I would have not said it that way.

1        Q    Well, you didn't say it or you didn't say it

2   that way?

3        A    No.  I would always be available to talk to

4   you.  If the prosecution is not available, I would still

5   be available to talk to you.  I probably -- if

6   there's -- I don't remember such a discussion, but in

7   other cases, I've always said, I would be glad to talk

8   to the defense.  I make myself available to talk to the

9   defense.  If the prosecution is available, that's good.

10  If not, I would still talk to the defense.  I didn't

11  operate any differently in that case than all of the

12  other cases where I've been helping out the prosecution.

13       Q    Okay.  How often do you testify for the

14  defense in cases such as this?

15       A    Overall where I actually go to trial and

16  testify maybe 20 percent of the time.  A lot of the

17  times I get involved with defense where they come to see

18  me and go over a case, and I tell them what the evidence

19  shows to me, help them understand the medical evidence,

20  and then because the medical evidence in their case is

21  damning of their client, they don't want me to testify

22  in court.  But I make myself freely available.  I don't

23  charge ever for that whether the defense or

24  prosecutor -- I'm just mentioning that.  I don't

25  discriminate on sides.  I make it a point to just to try

1    to help understand what the evidence shows about why a

2    child who should not be dead is dead.

3        Q    Okay.

4             You belong to -- you are a member of a

5    committee that reviews deaths of children in this State?

6        A    That is correct, sir.

7        Q    That's sort of a child advocacy program, or is

8    it part of the child advocacy program?

9        A    In our county, city and county, we function in

10   that review of death -- review of children's death in

11   the child advocacy center, so it's based there, yes.

12       Q    That's a statewide program?

13       A    Yes, it is.  And I actually participated in

14   helping set that up in Texas when I moved to Texas.

15       Q    And you-all reviewed the data -- I mean, the

16   program actually reviewed the data that would have been

17   reflected of this case?

18       A    No, not at all.  This is a private case for

19   me.

20             Now -- I'm going to make a presumption that I

21   don't know the facts of, but there should be a

22   comparable group for this area that at some point should

23   have gone over this case, but I've had no connection

24   with that group in this part of Texas related to this

25   case.

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 112

1        Q    So it's not like you've reviewed some data

2   that you received relative to this case and then called

3   the District Attorney's office and said, hey, I would

4   like talk to you?

5        A    Oh, not at all.  In fact, they cold called me

6   regarding is this case, which I get cold calls like that

7   on a regular basis throughout the week.

8        Q    How did they know you were available, do you

9   have any idea?

10       A    Because I've done this before in this

11  jurisdiction and jurisdictions all over Texas and in the

12  United States.

13       Q    You've testified in Smith County for

14  Mr. Bingham before?

15       A    Yeah, I believe I was involved in at least one

16  case in this county before a number of years ago.  I

17  don't remember the details of that case, but I mean

18  that's not an uncommon thing.

19       Q    And you don't remember how long ago it would

20  have been?

21       A    I've been in Texas for 15 years, 14 years,

22  now, so sometime in that timeframe, but you know maybe 5

23  or 8 years ago.  I really don't know.

24       Q    You can remember you testified in a case in

25  Smith County, but you don't remember how long it was?

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1        A     Right.

2        Q     And you don't recall the case?

3        A     I would with prompting recall the case.  It's

4    just, I get involved in reviewing a lot cases and try

5    not to keep them in my current memory.

6        Q     And 80 percent of cases that you deal with as

7    far as testimony is concerned that testimony is

8    generally for the State?

9        A     That is correct.

10        Q     Okay.  You are a pediatric pathologist?

11        A     That is correct.

12        Q     Okay.  You are not a forensic pathologist?

13        A     That is correct.

14        Q     Okay.  At what point do you do autopsies?

15        A     On a regular basis when a child dies in the

16    hospital, either at the hospital where I work, or I do

17    autopsies at the medical school for the county hospital.

18        Q     But are you board certified in anatomic

19    pathology?

20        A     Yes, sir.

21        Q     Clinical pathology?

22        A     Yes, sir.

23        Q     Pediatric pathology?

24        A     Yes, sir.

25        Q     And pediatric hematology?

1      A    It's actually heme oncology.

2      Q    One of those ologies?

3      A    Yes, sir, and pediatrics.

4      Q    And pediatrics?

5      A    Yes.

6      Q    But you're not board certified as a forensic

7    pathologist.

8      A    That is correct, sir.

9      Q    But you do autopsies?

10      A    Right.  Remember now anatomic pathology

11    includes autopsies, that's part of anatomic -- you have

12    to be an anatomic pathologist before you become a

13    forensic pathologist.

14      Q    Okay.  But you do autopsies for counties?  I

15    mean, when a Justice of the Peace in this state in a

16    county in this state refers a body to a medical

17    examiner, would you be one of the persons that they

18    would send the body -- I mean, do you work at one of the

19    places where they would send the body and expect an

20    autopsy and a finding similar to that of what you have

21    from Dr. Quinton?

22      A    Not now, but for several years I provided that

23    service on a volunteer basis to the El Paso County

24    Medical Examiner's Office.

25      Q    You were a volunteer pathologist, forensic

1    pathologist?

2        A    No, I was not -- I'm not boarded as a forensic

3    pathologist.  I'm a pediatric pathologist and help them

4    do a good number of their pediatric cases for a period

5    of time.

6        Q    So your autopsies would have been -- whatever

7    autopsies you've done, would have been limited to

8    pediatric autopsies?

9        A    Well, in the hospital -- for helping out the

10   medical examiner's office, and I used do that also in

11   Denver when I was there.  It would just be pediatric

12   autopsies, but in the practice that I have, in the

13   hospital where I work, I also do occasional adult

14   autopsies.

15           The things about autopsies, it's not a

16   procedure that a lot of pathologists want to be involved

17   in.  So if like me you have an interest in trying to

18   figure out why people die, you tend to be the person

19   that people ask to do the autopsies.

20       Q    You would be the person who would do like a

21   private autopsy?  If I wanted to know why somebody I was

22   related to died, I could hire you to do an autopsy?

23       A    Right.  I don't do autopsies for hire.  If a

24   child dies and people want information about that, and

25   actually there's a situation like this waiting for me

1    right now when I get back to El Paso.  There's a

2    question that a family wants to know why a child died,

3    and so they're going to bring the body to the hospital.

4    And when I get back, I'll be doing the autopsy, and you

5    can say maybe that's a private autopsy, but it's an

6    autopsy to help them understand what happened to their

7    child.

8         Q    But doesn't El Paso County have a medical

9    examiner's office?

10        A    Yes, they do, but --

11        Q    But isn't the medical examiner in El Paso

12   County a board certified forensic pathologist?

13        A    Yes.  And yes to both of those questions.

14        Q    Why do they need your help to do an autopsy?

15        A    Well, that's where the specialty of pediatric

16   pathology comes in, because the majority of deaths of

17   children even ones that go to a forensic facility, are

18   still due to natural causes.  That's where pediatric

19   pathology is involved in understanding natural deaths.

20        Q    And would it be your position that a skilled

21   forensic pathologist doesn't have enough where-for-all

22   to look at the tissues that you look at to look at the

23   slides that you look at and come to the conclusion that

24   this child died of bronchopneumonia or that this child

25   died of a gunshot wound or this child died -- they

1    couldn't do that, so they need you?

2         A    It is not my position as a general statement

3    that that can't be done.  But I can tell you that the

4    standard approach to trauma related deaths that applies

5    to adults in general, does not apply to children.

6         Q    Why?

7         A    Because it's a different world.  Children are

8    a different world.  Their tissues are different.  Their

9    development issues are different, and there are things

10   that bring about the death of children that are not

11   related to guns and knives.

12              And because of that, the standard forensic

13   pathology approach is not always the best approach to

14   look at why a child is dead.

15        Q    Well, I don't understand.  Are you telling me

16   that Dr. Quinton couldn't look at the iron stain on the

17   slide that you looked at and tell that was a date of

18   injury?

19        A    I'm not saying that about that specific point.

20        Q    Are you saying that Dr. Quinton couldn't look

21   at the stain on the slide from the bone cut that you

22   looked at and tell the same thing that you testified to

23   with respect to that?

24        A    No, I'm not saying that.

25        Q    Is it your position that Kelynn is a child and

1    Dr. Quinton does autopsies, I believe, on children.  He

2    did this one.  That Dr. Quinton could not look at the

3    same slide that you looked at which has the presence of

4    white blood cells as well as the red blood cells and

5    make the same analysis that you made?

6        A    I don't want to individualize it to this

7    particular doctor, but the process of analysis is one

8    where you take information, you put the information in

9    the context, and then you make an interpretation.  And

10   acquiring the information is a pretty standard process.

11   Putting that information into a context does somewhat

12   depend on your knowledge of the context, and with

13   children that knowledge, clues, issues of growth, and

14   development, and then making an interpretation can --

15   you can come up with a different result.

16            Since most deaths of children are not due to

17   standard forensic issues, but they're due to medical

18   issues, they're due to developmental issues.  They're

19   due to malformations.  There's a lot of range of

20   pediatric medicine that is not standard in the forensic

21   approach.  One has to have a balanced understanding of

22   those issues.

23            Where the forensic pathologist in general is

24   deficient is they're knowledge of basic pediatric

25   issues.  Pediatric developmental issues.  Where I am

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    deficient from a forensic point of view is that I'm not

2    a person that should do an autopsy on someone who has

3    had gunshot wounds, for instance, that's not something

4    that is in my training and experience to deal with

5    interpreting gunshot wounds, but for death where trauma

6    is involved, trauma that's inflicted at the hand of

7    another with a child, that's something that is very much

8    in the area of pediatrics and pediatrics evaluations.

9            That's why pediatricians are the ones that are

10   involved when children are alive in interpreting child

11   abuse.  That is done by folks with pediatric training.

12       Q    There were a lot of words spoken just then,

13   okay.

14           Let me see if I can filter out what that

15   means.

16           Does that mean that you have been able to see

17   something in your examination of the slides and autopsy

18   photographs because this is a child that Dr. Quinton was

19   not able to see?  That's a question in a few words.

20       A    What I have been able to do is to put the

21   death of this child in the context of the caretaking

22   setting in which the child existed when it died.

23       Q    Can we put a pause there?

24       A    Yes.

25       Q    What -- and if I understand what you just

Page 120

1    said, what you've been able to do is take the story and

2    put it in some kind of context, so that from your

3    perspective, it makes sense?

4        A    That's right.  The findings put in the context

5    of the story.  You're saying that very well.

6        Q    But, what you've testified to --

7             MR. THOMPSON:  May I approach?

8             THE COURT:  Yes.

9        Q    (By Mr. Thompson) -- was already put in this

10   extremely long context long before you arrived.  This

11   already existed.  All you did is sit here and confirm

12   what Mr. Bingham has already had written up on the

13   board.  What did you add to this scenario that wasn't

14   there previously?

15       A    Sir, the thinking on this case has been one of

16   exchanging ideas and talking about things.

17       Q    With counsel for the -- State's counsel?

18       A    That is correct.

19       Q    Right.

20       A    And I would like to think that I contributed

21   into the dynamics of that process of evolving this

22   perspective of this case.

23       Q    This whole story, this whole scenario, you

24   collaborated with counsel to come up with this story

25   that's outlined on these writings that he's put up on

1    the board?

2        A    I've had input into providing the perspective

3    of pediatric pathology on why a child that is injured

4    can function or not function in certain settings with

5    that injury, that is correct.

6        Q    And therefore there should be no surprise to

7    anybody that your story is consistent with what's

8    already on the paper, would that be fair?

9        A    Well, right, if there wasn't a consistency,

10   then I wouldn't be here testifying.

11       Q    You put great store in historical data.  You

12   believe it's extremely significant in understanding the

13   nature of injuries?

14       A    By "historical" you mean in the story about

15   what happened.

16       Q    The story?

17       A    Yes, that's important.

18       Q    What if the story is a lie?

19       A    Well, that's one of the things that one needs

20   to try to figure out.

21       Q    How would you figure that that out?

22       A    By relating what's known of the mechanism of

23   injury or disease to what is being said about the way

24   the child was.

25       Q    But you get the story secondhand?

Page 122

1       A     Everyone gets the story secondhand.

2       Q     Not everybody, not the people who go out an do

3   the investigation?

4       A     It's still secondhand, because it's from

5   interviews of the people involved.

6       Q     And you have to assume that the information

7   that the people are involved -- the information that the

8   people who are involved gives you is the truth, right?

9       A     I don't see that you assume that.  What you're

10  doing is that you're trying to have an open mind.

11      Q     Okay.

12      A     And you're collecting information is the way

13  to look at that.  And then you can sit down later when

14  you have different sources of information and try to see

15  what makes sense and what doesn't make sense.

16      Q     Let's assume, hypothetically, that we are --

17  we've got an open mind, hypothetically, our minds are

18  open?

19      A     Okay.

20      Q     We haven't reached conclusions about, you

21  know, the fact that somebody accused of a crime is the

22  perpetrator simply because he was the last one with the

23  child or that he was hiding stuff and that kind of

24  stuff.  We haven't reached those conclusions.  We've got

25  an open mind?

Page 123

1      A     Okay.

2      Q     Now, let's talk about the rib fracture, okay?

3      A     The rib fracture?

4      Q     Yes.

5      A     Yes, sir.

6      Q     I believe your testimony was that you believe

7   that the rib fracture was at least 14 days old or older,

8   the initial rib fracture?

9      A     Right, that is correct.

10     Q     And if you had information that this child was

11  in the presence of his grandparents 14 days prior to his

12  death what conclusion could you draw from that,

13  hypothetically?

14     A     Well, first of all, the 14 days is not a rigid

15  thing, but let's say if you had the information that the

16  person that was involved with the child at the time of

17  death had not been involved with the child prior to

18  that, let's just say that hypothetically, so that you

19  would say that that was a rib fracture that this child

20  got that was unexplained, but as an unexplained injury,

21  it raises a red flag.  But it could not have been done

22  by the person that was with the child when the child

23  died.  So that would allow you to conclude that, but I'm

24  not saying that this occurred exactly two weeks before

25  hand.

Page 124

1      Q     Right.  It just seems odd to me that we can

2   make pretty certain estimates, but if the estimate in

3   time points to somebody other than this person, then we

4   start fluffing off and saying things like, well, that's

5   not a hard-and-fast rule.  It could be less than 14

6   days, right?

7      A     I didn't make a rigid estimate --

8            MR. BINGHAM:  I object.  Ask that he be

9   allowed to finish.

10           THE COURT:  Let him finish, Mr. Thompson.

11     A     I'm sorry.  If I conveyed that, I did not mean

12  to convey that.  This is not a rigid point in time.  The

13  old rib fracture, the evidence of old rib fracture is a

14  range from several days to up to several weeks,

15  somewhere in there.  It's a range of time.  It's not an

16  exact dating and time.  And, in fact, that's one of the

17  issues with the fresh injuries, that's a range, too.

18  Instead of talking about days, we're talking about

19  hours.  But in pediatric cases, especially what becomes

20  important, is to relate the child's response and

21  functionality to when an event may have occurred.

22           And so with a rib fracture, you look for a

23  story of when this child had a period of time of

24  irritability or decreased activity and sensitivity over

25  the area where the rib was, and that would give you a

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    sense of when the injury might have occurred.

2         Q    If you're dating an injury like you've dated

3    this injury to put it within a range of time when my

4    client was alone with the child, if you are dating an

5    injury and your conclusion is that that injury could

6    have been 10 to 14 days old and you have evidence that

7    somebody other than my client was with the child, during

8    that period of time, why do we need to now say, well,

9    this could be anywhere from two or three days old to 10

10   or 14 days old or three or four weeks old.  Why do we

11   need to change that range of time, once we found out

12   that somebody other than the accused could have possibly

13   caused the injury --

14              MR. BINGHAM:   -- my only objection is --

15        Q    (By Mr. Thompson) -- If we're being objective?

16              MR. BINGHAM:   My only objection is to the

17   part of question is the statement that you dated the

18   injuries to put it when the defendant was alone with the

19   child.  That's not his testimony.  That's my objection.

20              THE COURT:   Just rephrase it

21   Mr. Thompson.

22              Just go back through it.  Just rephrase

23   it and that will take care of the objection and try to

24   get it the way he's testified to it like you did the

25   first time.

1       Q     (By Mr. Thompson) Is it your testimony now,

2   okay, that the old rib injury could be anywhere from

3   three days to three weeks old?

4       A     Well, it was never my intent to make my

5   testimony viewed as a rigid thing that it was a two-week

6   old injury.  It is my testimony that there's a range of

7   time.  It's had reactivity and the reactivity of several

8   days to a few weeks, yes.

9       Q     How long in your opinion does it take for that

10  calcium to form in the bone and that little rigid area

11  to appear, so you can make an approximate date to that

12  injury?  How much time has to elapse.

13      A     That's a good question.  The word is actually

14  "callous".

15      Q     I'm sorry.

16      A     It's a different meaning from personality

17  callous.  It's the actual term that applies to the

18  body's reaction to try to heal a fracture.

19            And that takes several days.  You know you

20  will start seeing changes in two or three days.  It gets

21  thicker and more supportive after a week, and it can

22  last actually once the bone is healed, but you can still

23  have the callous there for up to weeks or months

24  afterwards.  And there's some variability depending on

25  nutrition and age and activity and all of those things,

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    but it's a range of a few days to a few weeks somewhere

2    in there where this particular callous formation falls.

3         Q    Okay.  And the fresh blood that appears inside

4    the fracture which indicates refracture, would have

5    occurred when?

6         A    It's just that, fresh blood.  And it would

7    have occurred within a few hours to no more than a day.

8         Q    Could it have been minutes?

9         A    Yes.

10        Q    Could it have been within minutes after the

11   child died?

12        A    Well, once the heart is not beating, you're

13   not going to get blood outside the vascular system in a

14   site like that, but I mean -- you're thinking is

15   correct.  When the child is alive, and you have an old

16   fracture and if that fracture gets reinjured, you will

17   have fresh bleeding into that fracture site.

18        Q    And hypothetically, if you had information,

19   factual information based on testimony from the

20   firefighter himself who hit the child in the back trying

21   to clear his air passage, what would that tell you about

22   whether or not my client inflicted that injury?

23        A    Could you ask that question again, so...

24        Q    Hypothetically, if you had information, part

25   of your story?

Page 128

1      A    Yes.

2      Q    The correct story -- if you had information

3   that during the period of resuscitation, a firefighter

4   hit the child in the back in an effort to try to clear

5   his pathway, and you had -- I'm going add something?

6      A    Sure.  That's fine.

7      Q    That I didn't have in my previous question?

8      A    Yes.

9      Q    And you had information from the forensic

10  pathologist who did the autopsy.  Okay.  That in his

11  opinion that reinjury could have come from the attempts

12  to resuscitate the child.  Would that change your

13  conclusion at all with respect to whether or not my

14  client caused that rebreak?

15     A    With respect to?

16     Q    To whether or not my client caused that

17  rebreak?

18     A    I cannot say what caused that rebreak in terms

19  of who did that.  Let me just tell you that if blood is

20  circulating by CPR and there is impact at that site

21  during CPR, the heart was not beating, because we do

22  have EMS reports that they could not reestablish the

23  heartbeat.  But they were attempting to reestablish

24  circulation, which is separate from a heartbeat.  That's

25  the whole point of doing chest compressions, and if they

1    reestablished circulation and if the site was made

2    vulnerable by some type of impact or compressions, yes,

3    it would be possible to have some bleeding at that site

4    if they are getting circulation with their CPR.

5            So you're asking a legitimate question, and

6    can a site that gets sort of secondarily injured during

7    CPR that already had its vulnerability because it was a

8    healing site and you reestablished circulation, can you

9    get fresh blood looking like a new injury at that site,

10   the answer would be, yes, to what you're saying.

11   Q    What would your conclusion then be about the

12   possibility of my client having caused that reinjury?

13   A    Well, then you would say that old injury

14   became traumatized by the CPR and that there was enough

15   circulation established by the CPR, not by the child's

16   heart, so that there was bleeding at that site, and then

17   it would take that particular site as out of the picture

18   for related to injuries inflicted on this child around

19   it's death.

20           Now, let me just say that that site is not in

21   any way responsible for the child's death.  But you

22   raise an absolutely valid point about that if you

23   reestablish circulation partially with CPR and there's

24   trauma associated with the CPR that injures a previously

25   injured site in the bone, yes, you could have some

1   secondary bleeding that would be fresh bleeding there

2   that would occur, and it would look like it was part of

3   the overall trauma.  So I agree with what you're saying.

4        Q    Okay.  And in your story, hypothetically, if

5   you had information in the story that the child spent

6   more than 50 percent of his time with his grandparents.

7   They had him virtually all the time.  They had him a

8   week or so before his death?

9        A    Okay.

10       Q    Okay.  Would the people in that household have

11  had an equal opportunity to commit the incidents of

12  abuse that you've described here today?

13       A    Oh, of course, in terms of timing when care

14  and control of the child, they would have had that

15  opportunity, but by the timing of the injuries -- in

16  other words, these are acute injuries unless there's

17  something wrong with the story about your client being

18  the one being the one in sole care and control of this

19  child during that four-hour period of time or so when

20  these injuries occurred, that doesn't apply.

21            You're general statement is a valid statement,

22  but the injuries are not consistent with that statement.

23       Q    Well, let's talk about this.  You always seem

24  to come back to the timing, and when it puts my client

25  alone with the child so he could be the only person who

1    could have inflicted these injuries, the timing always

2    seems to be four hours or less?

3         A    Okay.

4         Q    But then we say that these are not

5    hard-and-fast times?

6         A    Okay.

7         Q    We say these times are variable?

8         A    But there's a range, yes, sir.

9         Q    There's a range in these times?

10        A    Yes.

11        Q    And one medical examiner might testify that

12   the range is 24 to 30 hours?

13        A    Well, I would disagree with that.  I mean, the

14   pathology evidence is not consistent with a range like

15   that.

16        Q    But then you're not a forensic pathologist?

17        A    No, I'm not a forensic pathologist.

18        Q    And another doctor who is a forensic

19   pathologist and who is the chief forensic pathologist at

20   the office which he works, might time the injuries as

21   long as and 24 to 48 hours.  You would disagree with

22   that?

23        A    I would disagree with that, yes, sir.

24             (Reported by D. Keith Johnson, CSR:)

25        Q    But then you're not a board certified forensic

Page 132

1   pathologist, are you?

2       A    That's correct.

3       Q    Right.

4            MR. THOMPSON:  May I approach?

5            THE COURT:  Yes.

6            MR. BINGHAM:  What page?

7            MR. THOMPSON:  Quinton, 46.

8       Q    (By Mr. Thompson) Have you seen this document

9   before?

10      A    Can I bring it closer to me?

11      Q    Sure.  I'm sorry.

12      A    It's a transcript of the -- an interview of

13  the doc. at the Medical Examiner's office.

14      Q    Yeah.

15      A    Yes, okay.

16      Q    Have you been provided with that?

17      A    Yes, I have seen it.

18      Q    And you've read that before?

19      A    I have.  I mean, I -- I'm not prepared to take

20  a quiz on it, but --

21      Q    Sure, I understand.  And I refer you to

22  Page 46 in that transcript, okay?

23           I believe in your testimony that -- let me

24  just give you a second and ask you to read this.

25      A    Okay.  I just have to bring it closer.

1              (Witness complies.)

2       Q    And would you read this.

3       A    Sure.

4       Q    This paragraph here.

5       A    Okay.  (Witness complies.)

6       Q    Okay.  And did you read this?  This paragraph?

7       A    Yes.

8       Q    Okay.  Now, I believe that you said that when

9    you examined -- you didn't examine the body, though, did

10   you?  You just looked at the pictures?

11      A    That's right, and the slides.

12      Q    And the slides.  Dr. Quinton examined the

13   body.

14      A    Yes.

15      Q    And were you aware of the fact that in the

16   course of his examination, he found that there was

17   organizational -- there were organizational changes in

18   the blood and in the body, you know, which reflected

19   inflammation?  Were you aware of that finding?

20      A    There are not organizational -- see, there's

21   evidence of old injury.  We've talked about that, the

22   old injury of the bone and then the area where there was

23   iron deposition in the belly of that section.  And those

24   are old injury sites.  But all the new injury sites

25   fresh, within a few hours.

1      Q     Well --

2      A     And so you would not apply the term

3   "organization" to the new injury sites.  You would apply

4   it to the old injury sites.

5      Q     So Dr. Quinton, who is a board certified

6   forensic pathologist, is mistaken with respect to the

7   statements he made in this --

8      A     Well --

9      Q     -- in his grand jury testimony?

10     A     Well, the issue here is superimposed old

11  injury and fresh injury.

12     Q     But he didn't talk about superimposed old

13  injury or fresh injury.

14     A     And I would consider that that was a mistake

15  on his part.

16     Q     Okay.

17     A     And let me just comment that it's not forensic

18  pathology but regular pathology that deals with the

19  process of evaluating injury.

20     Q     But how does the fact that you deal with

21  pediatric psychology --

22     A     Pathology.

23     Q     Pathology -- I'm sorry.

24     A     That's all right.

25     Q     -- equip you to make that assessment, when the

1    board certified forensic pathologist didn't see that?

2        A    You said it right.

3        Q    Is that because you are a pediatric --

4        A    Pathologist.

5        Q    -- pathologist?

6        A    And the answer to that is inherent in the

7    question that you asked, that children are not adults.

8    The processes of healing, the processes of injury are

9    not the same as in adults.  The timeframes are

10   different.  The reactive sequences have their

11   differences, and they're developmentally related, so

12   that what happens in a newborn is not the same as an

13   infant, which is not the same as a toddler.  There are

14   changes in these processes, and that's why there's a

15   whole discipline of pediatric pathology.

16       Q    And you wouldn't expect either Dr. Pustilnik

17   or Dr. Quinton to know, being medical doctors

18   themselves?

19       A    Okay.  Well, then, the same question would

20   apply to me dealing with the stuff that they're dealing

21   with.  The idea is -- yes, they would know that, but

22   they've not specifically studied that.

23       Q    So if both of those doctors concurred with

24   reflect -- with respect -- it's after lunch -- with

25   respect to the presence of inflammation, then they would

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    be wrong and you would be right?

2        A    I don't want to make it be so blatant.  But

3    the inflammation that occurs in infants is not the same

4    as in younger kids and it's not the same as in older

5    kids.

6            The cells involved are different, the

7    processes involved are different, because the -- the

8    tissues are different.  And that's why there's a

9    specialty of pediatric pathology.

10        Q    And moving on.  And if Dr. Quinton was of the

11    opinion that there was evidence of early healing type

12    changes and evidence of necrosis, which means that the

13    issue -- some tissue is dying, and that all of that

14    stuff takes time, okay, which would indicate that this

15    injury occurred at a much longer period of time, he

16    would be mistaken in reaching that conclusion?

17            MR. BINGHAM:  I'm going to object to

18    that.  That is not his testimony.  His testimony was it

19    could be consistent with.

20            MR. THOMPSON:  I didn't ask him about his

21    testimony.  I just asked him if that was his finding, if

22    that was his conclusion.

23            THE COURT:  Just a minute.  Are you

24    asking him about -- are you asking this witness what his

25    testimony is?

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 137

1              MR. THOMPSON:  No.  I'm asking this

2    witness if hypothetically, if that was Dr. Quinton's

3    conclusion, would he be correct or in his opinion, would

4    he be wrong?

5              THE COURT:  Okay.  Well --

6              MR. BINGHAM:  Well --

7              THE COURT:  Go ahead.

8              MR. BINGHAM:  Our objection is we would

9    like him to state Dr. Quinton's correct conclusion.

10             THE COURT:  Your objection is to the form

11   of the question of what you're stating Dr. Quinton --

12             MR. BINGHAM:  Yes, sir.

13             THE COURT:  You got his testimony.

14   Maybe -- maybe go to it when you get a chance.

15        Q    (By Mr. Thompson) Let me ask you a

16   hypothetical question.

17        A    Yes.

18        Q    If Dr. Quinton reached a conclusion, okay,

19   that there was evidence of necrosis and healing, and

20   that these processes after an injury within the body

21   take time and he related that to the timing of the

22   injury itself, would that be an incorrect conclusion, in

23   your opinion?

24        A    Yes and no.  And let me just tell you.  The

25   evidence that we've already talked about is that there

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1   is fresh injury in the belly with fresh blood and tissue

2   in which there's little to no reaction to the fresh

3   blood.  And that's the acute hemorrhage from a recent

4   injury of just a few hours' duration.

5          But superimposed on that in some areas is

6   evidence of reactivity, iron deposition, of old injury,

7   remote injury.  And what you've got, then, is this --

8   the superimposition of fresh and remote.  And when you

9   have that, it can be confusing.  If you say, "Oh, well

10  this has all been there for a long time," what this

11  child has is evidence that there has been injury in the

12  past.

13         We talked about the old rib fracture, and we

14  all acknowledged that.  And you just brought up the fact

15  that could you get fresh bleeding in that because of

16  something done during CPR, even with a stopped heart.

17  And that's a valid observation.

18         But the types of bleeding that is in the belly

19  is from acute hemorrhage and trauma that brought about

20  the death of this child, and that's not from anything

21  related to CPR or even false CPR.

22         So to say that because there's evidence that

23  this child was injured in the belly weeks or even a

24  month ago or several months ago, that there's not

25  evidence that the child was injured in the belly within

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 139

1   a few hours, is not a correct thing to say.  And so

2   that's what I'm saying about what you said doesn't make

3   sense.

4            It's a combination.  There's a -- one area of

5   old injury, or remote injury, but there's a wide area of

6   very fresh injury.

7       Q    So if it was Dr. -- hypothetically --

8   hypothetically, if it was Dr. -- if Dr. Quinton had an

9   opinion that the injury which caused the child's death

10  was at least a day old, based on your findings, that

11  would be an incorrect conclusion?

12           MR. BINGHAM:  And I'm going to object.

13  That is not the testimony of Dr. Quinton.

14           THE COURT:  I'm going to sustain that

15  objection, Mr. Thompson.

16           MR. THOMPSON:  I can read the -- the

17  thing from the transcript.

18           THE COURT:  Well, you're asking a

19  hypothetical.  If you've got something in front of you,

20  read it.

21           MR. THOMPSON:  Okay.

22      Q    (By Mr. Thompson) You said you've had an

23  opportunity to review this transcript, haven't you?

24      A    Yeah.  And you just gave me a refresher here.

25           THE COURT:  Why don't you give line and

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 140

1    page so I can save -- where are you?

2                MR. THOMPSON:  Page 46, line -- start

3    with line 2.

4                May I approach?  Because he doesn't have

5    a copy of the transcript.  I'd like for him to be able

6    to see it when I --

7                THE COURT:  Yes.

8        Q    (By Mr. Thompson) So here on page 46 of

9    Dr. Quinton's transcript, which you said you've already

10   seen and read?

11       A    Awhile back, yes.

12       Q    All right.  He says, "This is the type of

13   injury, abdominal injury -- this type of injury can

14   linger.  So you can live for hours."

15            Am I correct?

16       A    Both what you're reading is correct and --

17       Q    Okay.  Let me --

18                THE COURT:  Mr. Thompson, I'm sorry to

19   interrupt you.  But he's looking over at you, and the

20   microphone is over here.  So everybody on the jury can

21   hear --

22                MR. THOMPSON:  Okay.

23       Q    (By Mr. Thompson) Then he goes on to say,

24   "I've seen kids live for days."  And he's talking about

25   with this kind of injury.

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 141

1       A    I agree.

2       Q    You agree with that?

3       A    I agree.

4       Q    Okay.  "It just depends upon the injury, but

5   it's certainly not immediate."

6       A    I'm not quite sure what he means when he says

7   not immediate, if he's talking about this type of

8   injury, in terms of -- it's a little vague what's meant

9   by -- when he says it's not immediate.  I'm not sure

10  what the point is on that, but that's okay.

11      Q    Okay.  Let's skip down to line 9.  "I don't

12  think -- again, I don't think this is -- this is

13  immediate cause of death.  So I don't think he died

14  within minutes of the injury.  And yet it's possible,

15  not more than I would say a day or so."

16      A    Okay.

17      Q    Is that his testimony?

18      A    Yes.

19      Q    Okay.  And, of course, being the pathologist

20  who cut open the belly, who had an opportunity to look

21  at the blood, who had an opportunity to -- by the way,

22  you didn't -- was there a -- was there a -- was the

23  mesentery taken out and retained somehow so you could

24  actually look at the mesentery when you got there?

25      A    My understanding was that the -- that there

Page 142

1   was not gross tissue.  But no, I cannot answer that for

2   sure.  They would have retained some fixed tissue for

3   some period of time.  But whether that still exists or

4   not -- what was retained or what is retained is the

5   tissue that's in the blocks that are used to make the

6   microscopic slides.

7       Q    Okay.  So you didn't get a chance to look at

8   the mesentery --

9       A    At the gross --

10      Q    -- as it appeared to --

11      A    That's correct, yes.

12      Q    But the board certified pathologist who

13  performed the autopsy did get to look at it?

14      A    Yes, that's correct.

15      Q    And in his opinion, the injury would not be

16  more than a day.  Not four hours.  At least possibly a

17  day.  And in your -- your opinion, your conclusion is

18  that's -- your opinion is that's incorrect, because your

19  conclusion is this would have had to have happened

20  within four hours?

21               MR. BINGHAM:  Judge, I'm going to object.

22  That's not what the testimony says.  It says not within

23  minutes, no more than a day.  And at the very bottom --

24  I'm going to ask you to read the full part of it --

25               THE COURT:  Read it all out,

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 143

1    Mr. Thompson.

2                   MR. THOMPSON:  Judge, he gets to take the

3    witness on cross-examination.

4                   THE COURT:  Well, it's his witness.  He'd

5    have to take him on redirect.

6                   MR. THOMPSON:  I'm sorry.  Redirect.

7                   THE COURT:  Just go ahead -- if you've

8    got it right in front of you, let's go ahead and get it

9    read where we can go ahead and move on.

10    Q    (By Mr. Thompson) Well, okay.  The rest of his

11   testimony, which you've already said you disagree with,

12   is there's evidence -- well, he says "there's" -- and

13   then he says "There's evidence of early healing," okay?

14   Changes and evidence of necrosis, which necrosis meaning

15   dead tissue takes time.

16                   And you've already said you disagree with

17   that, right?  That evidence's not there?

18    A    Well, the evidence is not there in the slides,

19   yes.

20    Q    Okay.  Then it says like -- it's like a heart

21   attack.  If someone drops dead of a heart attack, if you

22   look at the heart at the moment, it actually looks fine,

23   because you haven't had time to have necrosis, okay?

24   Which means, I guess, that necrosis takes time to

25   develop, right?

Page 144

1     A     The tissue can be dead rapidly, but to show

2     changes, it does take time, that you see

3     microscopically.  There is some evolution of the -- of

4     what you see in the microscope, it takes awhile for the

5     tissues to -- to manifest that change.  But it -- it's

6     not long, but it does take time.

7     Q     Well, it would certainly be within three or

8     four hours, right?

9     A     Yes.  In three or four hours, you'd start

10    seeing changes of the -- the tissue that was dead.  When

11    you prepared the slides for microscopy, they would show

12    signs of having been dead for a few hours.

13          If the body were still alive -- see, the --

14    these evolution of changes occur in the context of dead

15    tissue in a live body.  Otherwise, if you have dead

16    tissue in a dead body, everything sort of gets frozen in

17    place, as long as the body is preserved appropriately.

18    And then if not, you get degenerative changes that

19    relate to the body as a whole.  So that's -- that's an

20    issue of preservation.

21    Q     Well, I believe you've already testified that

22    the loss of blood didn't kill the child.

23    A     That's correct, yes.

24    Q     Would it be correct to say that what killed

25    the child was the dying of the bowel?  You disagree with

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 145

 1   that, too?

 2        A    What killed the child was the swelling of the

 3   brain.

 4        Q    The autopsy report says what killed the child

 5   was the dead gut.

 6        A    Well --

 7        Q    You disagree with that?

 8        A    What killed the child was the swelling of the

 9   brain.

10        Q    Okay.  Let me ask you this:  If you inject

11   medication, chemicals into the body -- into a body

12   recently after the body is dead, do those medical

13   chemicals have an effect on the brain?

14        A    No.  I mean, unless you're using a

15   preservative, so it will affect it from deteriorating

16   further.  But if the brain is dead, you're not really

17   going to have any effect on -- I'm not quite sure

18   exactly what your question is.

19        Q    So --

20        A    You can -- you can always create an artifact

21   in the sense that you can inject something and cause

22   fluid accumulation or you can -- when you inject

23   fixatives, again, you kind of fix things at that point

24   when you've injected those.

25        Q    What kind of things other than hemorrhage

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    would cause the brain to swell?

2        A    Well, it's the -- fluid comes out of the

3    circulation and goes into the brain tissue when the

4    brain is injured.  And so it's actually fluid that is in

5    the body circulation that is getting into the brain,

6    which leads to brain swelling.  I mean, that's the

7    ultimate source of the fluid.

8        Q    And if you put in an IV and add fluids to the

9    body, those fluids, if they're circulating, are being

10   forced to circulate, wouldn't also go into the brain?

11       A    That's an interesting question.  It won't go

12   into the substance of the brain, because the -- and

13   usually what happens is -- when the brain is no longer

14   functional and swollen, you can't even get perfusion.

15   The blood vessels are clamped down.  And so even though

16   you're trying to run fluids into the brain -- I mean,

17   this comes up when you have somebody with a brain injury

18   that's alive and you're trying to shrink the brain with

19   some type of diuretic, you can't get the fluid to go to

20   the brain, because the pressure is so increased.

21       Q    Let me -- and I apologize for interrupting

22   you --

23       A    Yes.

24       Q    -- but you're making point that I'd like to

25   ask you a question about.

 1      A    Yes.  Yes, that's okay.

 2      Q    And the point is that you've already testified

 3  on direct examination that -- that it's possible to have

 4  a cardiac arrest and the brain still be functioning.

 5      A    No, no, no.  It's seconds --

 6      Q    Does the brain die when the heart stops?

 7      A    When circulation stops, the brain stops

 8  functioning within seconds.

 9           See, this is why CPR is so important, to not

10  interrupt heart pumping.  In fact, the new guidelines

11  for CPR is don't worry about ventilation but keep that

12  circulation.  And the reason is, lacking certain -- even

13  if you --

14      Q    I had it backwards, didn't I?

15      A    Even if you circulate blood with little to no

16  oxygen, you'll still help keep the brain alive if you

17  can get the toxins out of there with the circulation.

18  And there's always a little bit of oxygen in the blood.

19  But if you stop circulation, it's a matter of seconds,

20  the brain starts getting injured.

21      Q    Right.  I had it backwards, didn't I?  Because

22  you can be brain dead and still have a heartbeat.

23      A    Oh, yeah, that's --

24      Q    I had it backwards.

25      A    Okay.

1      Q    But the injection of fluids, if there's still

2    circulation going to the brain -- to the brain, that

3    would -- those fluids would also go to the brain?

4      A    That's what I'm saying, is that's a difficult

5    thing.  Because when the brain has suffered that type of

6    damage, and it's pressure damage -- and the brain's

7    response to injury is to have fluid accumulate in the

8    brain.  And because the brain is in a fixed compartment,

9    our skull, that creates pressure, and then the pressure

10   blocks circulation.

11         So you can reestablish circulation to the rest

12   of the body by pumping on the heart, but if someone has

13   had brain injury and the brain is swollen, you don't get

14   the circulation to go to the brain.  And that's one of

15   the big deficits of resuscitation procedures that --

16   only have available to them trying to get circulation by

17   pumping on the heart.

18     Q    I'm sorry.  I'm at that age that it seems like

19   when I lose that thought, it's just gone.

20     A    I think we all suffer from that to some

21   extent, sir.

22     Q    Well, let me just move to another area and

23   maybe I'll think of it later.

24              THE COURT:  Y'all need some air on?

25     Q    (By Mr. Thompson) Oh, I know where I was

1    going.

2        A    Good.

3        Q    You didn't get a chance to look at the

4    mesentery, other than in the photographs?

5        A    The photographs and then the sections.

6        Q    The sections?

7        A    That were available, yes, yes.

8        Q    Okay.  Were you able to make a determination

9    of where the tears were or the scattered lacerations

10   were in the mesentery?

11       A    Just -- as you said, just from the photographs

12   primarily.  I mean, that photo that we've all looked

13   at --

14       Q    Okay.

15       A    -- shows some of those tears, yes.

16       Q    And if I recall your testimony correctly, I

17   think your testimony was to the effect that the tears

18   involved small blood vessels.

19       A    The -- I think what I tried to imply was that

20   they were primarily veinous blood vessels.

21       Q    What's veinous blood vessels?

22       A    Okay.  I'm sorry, the circulation has three

23   major vascular components:  Arteries, veins and

24   capillaries.  And all tissue that gets injured will have

25   capillary damage.  Those are the tiniest blood vessels.

1      Q    Right.

2      A    But it's the arteries that take the blood from

3    the heart and the veins back to the heart.  And

4    generally the -- most vulnerable vessels, other than the

5    capillaries, are small veins.  And the veins are the

6    ones that kind of get torn.

7           When you have an artery that's severed, you

8    have a lot of blood and it accumulates fairly rapidly.

9    But when you have a vein that's severed, it's a slow

10   pressure bleed.  So if your injury is just capillaries

11   and veins, you will accumulate blood slowly.  If your

12   injury is arteries, you will accumulate blood rapidly.

13     Q    And the slow accumulation of blood, as far as

14   the volume is concerned, it would take a considerable

15   amount of time for the increased amount of volume?

16     A    And not defining considerable here, but with

17   veinous and capillary injury, the period of time is much

18   longer to accumulate blood.  If you've got a torn

19   artery, you accumulate blood, again, pretty fast.

20     Q    Did you find any evidence of torn arteries in

21   the mesentery?

22     A    Well, they -- they really didn't do a

23   dissection for that purpose.  But it's by inference that

24   this is bleeding that is capillary and veinous, because

25   it's a small amount of bleeding, but over presumably a

1    couple of hours.  So that would have to be

2    capillary/veinous blood, rather than arterial blood.

3         Q    So it's your belief -- it's your belief, based

4    on what you've seen, that even -- even with bleeding

5    with the small blood vessels, the amount of blood that

6    had accumulated in the belly as well as the amount of

7    blood which had been absorbed in the tissue -- by the

8    way you saw the tissue absorption, didn't you?

9         A    No.  The tissue absorption is what we're

10   talking about with the iron deposition.  I'm kind of

11   confused about what you're referring to on that.  We've

12   got fresh blood, and then we've got evidence of old

13   hemorrhage that's old, remote hemorrhage.

14        Q    You were aware of the fact that there was

15   freestanding blood in the belly?

16        A    Oh, yes.  That's the volume that we've talked

17   about.  I've made reference to that several times, that

18   that was about a 20th of the child's blood volume.

19        Q    Okay.  And then you -- you would have to

20   account for the amount of blood that had accumulated in

21   the surrounding tissue.

22        A    Oh, I see what you're saying.

23        Q    The fatty issue.

24        A    Infiltrated in the tissue.  That's a good

25   point.  And, yes, there is some blood there.  That's not

Page 152

1   the free blood.  That's infiltrated blood.  And, yes,

2   there would be some of that.

3        Q    And would it take -- would it take a -- in

4   your opinion, what amount of time would it take for that

5   blood to have been able to accumulate in the tissue

6   surrounding the injury in the volume that appears to be

7   there?

8        A    Well, again, the volume is low.  And that

9   blood is all fresh by histology.  So the amount of time,

10  again, is short.

11           There's no vital reaction to it.  There's no

12  inflammatory reaction.  There's no breakdown of the

13  blood products, except for that area that had the

14  evidence of the old hemorrhage.

15           You know, we've got a superimposed old

16  hemorrhage area of some type of traumatic event in the

17  past and then this -- this broad area of -- of new fresh

18  hemorrhage of just a few hours' duration.

19       Q    Okay.  And we are at least in agreement that

20  your assessment of -- of these things differs

21  significantly -- significantly from that of both

22  Dr. Pustilnik and Dr. Quinton?

23       A    So you're saying we agree to disagree?

24       Q    We agree that we disagree.

25       A    And to comment on that for pediatrics and

Page 153

1   evaluating pediatric issues, functionality becomes a

2   very important concept with timing, and so it's not just

3   the findings of whether there's been tissue reaction to

4   the blood that's there.  But it's the fact that a child

5   who is functional and not manifesting signs of

6   irritation -- not in a state of depression or -- or near

7   sleep or something like that -- that functionality is a

8   reflection of timing.

9            So that when someone gives a range based on

10  the presence or absence of blood, that range may have

11  some validity in a theoretical sense.  But then when you

12  have information about functionality on the part of the

13  child, that helps you narrow down that range.  And often

14  in pediatrics, you then rely on the functionality

15  information far more than you do on the theoretical

16  range of how long it takes blood to break down and stuff

17  like that.

18           And that's where I would say the business

19  saying up to a day is not appropriate, because we have,

20  by the statements already made on the record, evidence

21  that the child was functional, in a very good state,

22  very close to the time that the child was in an

23  irretrievable condition.

24       Q   So your position would be, if I'm correct,

25  that the story that people tell you -- the information

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1   that you get is more significant to you than the

2   microscopic finding and the examination of the body?  Is

3   that what you're saying?

4       A    There's some element of -- of truth to how you

5   just said it, but that's what I tried to show in that

6   chart, is that if you take the findings, you then take

7   the historical context of those findings, which is the

8   story, and then you come to some conclusion.  It's kind

9   of a three-step process.  So the findings, the story

10  behind the findings, and then you try to put them

11  together.

12          Now, in this case, the story that we

13  apparently are getting from your client is that this

14  child was fully functional, in fact, was eating and

15  active and so on and so forth.

16      Q    Let me correct you -- that's the story you got

17  from the State.

18      A    Oh, okay.

19          MR. BINGHAM:  That -- well, that's the

20  story that came from the -- from the CD's.

21          THE COURT:  His -- the statement of the

22  defendant is in evidence.  Maybe just refer to the

23  statement of the defendant in evidence.

24      Q    (By Mr. Thompson) Well, the statement from my

25  client is and the statement from the child's mother is

1    that the day before the child died, the child was not

2    eating normally.  Okay?

3         A    Okay.

4         Q    Subtle changes in the child -- as a matter of

5    fact, would you expect a child with a wound --

6              MR. BINGHAM:  Judge, my objection is

7    going to be, there is no statement like that from the

8    defendant anywhere in those audios -- I mean, those

9    video statements or audios --

10             THE COURT:  Isn't there a transcript --

11             MR. THOMPSON:  I thought I said the

12   child's mother.

13             MR. BINGHAM:  Well, you said the mother

14   and the father.

15             THE COURT:  You said the defendant and

16   then you went to the mother, and then you said "as a

17   matter of the fact" before he had a chance to answer the

18   first one.

19        Q    (By Mr. Thompson) Well, let me clear up.

20        A    Sure.

21        Q    We have testimony in the record from the

22   child's mother, okay?  We have testimony in the record

23   from Mr. Miller, by way of his recorded statement, that

24   on the morning before the child died, okay -- his

25   testimony which corroborates her testimony is that they

1    went to -- they went out to eat around twelve, one

2    o'clock, somewhere in that timeframe.

3         A    Okay.

4         Q    We have testimony from the child's mother and

5    the child's grandmother, Linda Franklin, that the

6    child -- and the child's father, Kelvin Arterberry, that

7    the child normally is a very hearty eater.  As a matter

8    of fact, I believe Mr. Kelvin Arterberry's testimony was

9    that he liked everything, okay?

10        A    Okay.

11        Q    Particularly fond of honeybuns and Cheetos and

12   stuff like that.

13        A    And so I'm clear, you're talking about the day

14   before the child's death?

15        Q    Yeah.  I'm just giving you a little

16   background.  So this child is a healthy eater, for this

17   hypothetical.  This child was a healthy eater.

18        A    Okay.

19        Q    The testimony of the child's mother, which

20   corroborates the recorded statement of my client, was

21   that on the morning -- on the morning before the child

22   died, they went out to eat, that the child -- they

23   ordered, I believe, french fries, mashed potatoes, she

24   gave the child some of her steak.  Normally he would eat

25   that stuff.  But on this particular morning, he didn't

1    eat.

2         A    Okay.

3         Q    No appetite to eat, okay?  Evidence that he

4    was thirsty -- by the way, in this kind of injury, would

5    you expect a person or a child to be thirsty?

6         A    Yes, you may have thirst, but you won't have a

7    good ability to tolerate input of any sort, oral input,

8    either drinks or solid.

9         Q    Okay.  So you --

10        A    Once you've had these injuries, you would not

11   tolerate food.

12        Q    So it's your -- it's your conclusion that --

13   that at the point of injury, at the point of injury --

14        A    Yes.

15        Q    -- you lose the ability to tolerate food?

16        A    Right.  Because what characterizes this

17   thing -- and you can see by the picture we've been

18   looking at.  But what characterized this as an extreme

19   irritation of the organs, and specifically the

20   intestines in the abdomen by the blood that is on the

21   surface -- and so there is not tolerance of oral input

22   at all, solid or liquid, and it's that irritation issue.

23             And this is why what you're saying -- that

24   would have some relevance from a historical point of

25   view, but then you have the next day and then you have

1   stories that the child was eating okay and, in fact, in

2   that period of time, under the care of your client, we

3   have the story of the child eating and drinking okay.

4        Q    Well, I -- and I can certainly understand how

5   you come to the conclusions you come to, if it's your

6   belief -- if it's your belief, okay, that this kind of

7   injury results in immediate inability to consume food.

8        A    Yes.  The type of injury that leaves tears in

9   the belly and free blood in the belly and blood in -- in

10  the mesentery is the kind of injury that will interfere

11  with any type of eating and activities around eating.

12       Q    So if that's the case, where Dr. Quinton

13  testifies before the grand jury, on that page in that

14  transcript that I showed you, that I have seen kids -- I

15  have seen some kids live for days, how would that be

16  possible if at the point of injury you're no longer

17  capable of consuming food or liquid?

18       A    They -- they live in a state of dwindles.  And

19  what happens in these cases -- and I agree with the

20  general observation that you've -- that kids that have

21  had abdominal trauma with injury and bleeding in the

22  abdomen can survive for a long period of time.  It's

23  unusual to go more than a day or so, but yes, that can

24  happen.

25            But they survive in a state of dwindling.

1    They're not eating.  They're not basically drinking.

2    They're pining away.  They're -- they're in a state of

3    suspension.  They're slowly going out of consciousness.

4            And one of the reasons when an event like that

5    occurs with this type of trauma that causes belly

6    injury, the acute pain from the trauma has worn off, but

7    now you have this -- the dwindles that come from not

8    being able -- not having activity, it hurts to move,

9    it -- it's a slow death.  It's a dwindling death.

10           And, yes, days might apply, but these are

11   someone who is hidden away in a bedroom so that no one

12   sees them up to the point that they become unconscious.

13   Q    It would be somebody who is hidden away in a

14   bedroom, wouldn't be children who might be walking away

15   in a flea market or engaging in other activity where

16   people would see them?

17   A    That's exactly correct, yes.

18   Q    So if -- if a board certified pathologist

19   testified to that scenario, you would certainly disagree

20   with that?

21   A    With belly trauma that resulted in blood and

22   tears, I would absolutely disagree with that, and that's

23   why you need pediatric input into this, both from

24   pediatric pathology and general pediatrics in terms of

25   understanding functionality of kids.

1      Q     By the way, Dr. Wilson --

2      A     Yes, sir.

3      Q     -- how many, in your practice, how many

4    children have you -- in your practice, your pediatric

5    practice, how many children have you treated with

6    mesentery tears?

7      A     I would say that I've really not treated

8    directly children with mesenteric tears.

9            If I may answer -- answer that question, the

10   part of pediatrics that I practice now is pediatric

11   emergency medicine in an outpatient clinic setting.  And

12   if someone I see has signs of abdominal trauma, I send

13   them to an emergency room in a hospital to be admitted.

14   So I would not participate in treating someone with

15   mesenteric tears.

16     Q     And during your surgical residency, how

17   many -- how many people have you operated on with these

18   kind of wounds to the belly?

19     A     Okay.  Now, I didn't do a surgical residency,

20   but I -- I didn't do much in the way of surgical --

21   direct surgical experience.  In other words, I rotated

22   in my medical school training, I rotated through surgery

23   rotation, but I didn't -- I have not and did not

24   practice pediatric surgery.

25     Q     Well, how many children have you referred

1    to -- have you looked at and treated and referred to

2    surgeons or other doctors because they had these kind of

3    wounds and you suspected that they may have been

4    mesentery tears?  How many of those children have you

5    seen?

6        A    I would say very few where I suspected

7    mesenteric tears.  I've certainly had children that have

8    had an acute abdomen, and I've referred them to surgeons

9    at the emergency room for evaluation of acute abdomen,

10   such as acute appendicitis and other things.  The issue

11   with acute abdomen in children is you don't know what it

12   is sometimes until you get in there.

13          Now, with imaging studies that are available

14   today, you can have better knowledge of whether you're

15   dealing with a ruptured appendix or a twisted bowel or

16   some other type of structural emergency.  But the main

17   thing that's incumbent upon the practicing pediatrician

18   and someone in a pediatric clinic is recognizing that

19   you've got an acute abdomen and it needs surgical

20   attention and you need to get them to the right place,

21   which is an emergency room where they have access to

22   emergency surgery.

23       Q    Okay.  And, again, that's -- that's a lot of

24   words.  But the bottom line is that you haven't seen

25   very many children with this kind of condition in your

Page 162

1    practice?

2        A    Not living children.  I've seen a lot of

3    children with problems of acute abdomen that I refer on,

4    but it's very rare to have the acute abdomen due to

5    multiple blunt force trauma as in this case.

6        Q    Can you tell us when was the last time you --

7    you diagnosed a mesentery injury --

8        A    I --

9        Q    -- in your pediatric practice?

10       A    Not in my -- you don't diagnose that in the

11   pediatric practice.  You diagnose that by surgery or by,

12   unfortunately, autopsy.

13       Q    Okay.  And, of course, you don't -- you don't

14   do surgery?

15       A    I don't do surgery, but I do a lot of

16   autopsies, yes.

17       Q    You said initially that you moonlight as a

18   pediatrician.

19       A    In a pediatric emergency clinic, yes, that's

20   correct.

21       Q    Where is that?

22       A    Well, it's a few blocks from the hospital.

23   It's called the West Side Pediatric Night Clinic.

24       Q    Okay.

25       A    And on Friday, Saturday and Sunday nights, I

Page 163

1    work from 6:00 to 11:00 or midnight, and in the

2    evenings, I can see anywhere from 30 to 40 kids.

3         Q    Is that like a free clinic or something, where

4    you're volunteering your time?

5         A    No, no.  I get paid for that.  And it's 75

6    bucks if you don't have coverage.  Most of our patients

7    are Medicaid patients.  But we have a -- a good number

8    of private pay patients.  But in El Paso, the majority

9    of children are under Medicaid.

10        Q    Okay.  Early on in your testimony, when you

11   began talking to Mr. Bingham, about the fact that you

12   don't charge any fees, I believe you said that you don't

13   charge any fees other than expenses for this kind of

14   testimony, and you're willing to review documents and

15   render opinions in these kind of cases for your own

16   perspective.

17             What is that perspective?

18        A    The -- I'm not -- for my own perspective, I'm

19   not quite sure.

20        Q    I may have written it down wrong.  But I

21   thought that's what you said, for your own perspective.

22        A    I -- I'm not quite sure.  I don't remember

23   saying it that way.  You're asking me what?

24        Q    Let me ask you a different -- what is the

25   reason why you do this for free?  Are you writing a

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    book?

2         A    No.

3         Q    You're not working on a book?

4         A    I mean, I -- you kind of got me there.  But I

5    guess I have a sense of payback.  I mean, I was -- I was

6    sent to medical school and graduate school under public

7    monies.  And so, in other words, the -- collectively,

8    the society -- the U. S. society paid for me to become a

9    doctor.  And my way of payback is to try to help the

10   legal system with pediatric medical problems.

11        Q    Uh-huh.

12        A    I mean, I was funded for seven years in

13   graduate school and medical school, both tuition and

14   living expenses, to be able to acquire my education.

15   And that --

16        Q    So you're not gathering materials to do

17   another book or another course study or any anything

18   like that?

19        A    No.  I mean, I've not written a book.  I

20   helped write that chapter, as we talked about, but no,

21   no, this is --

22        Q    And you're not working on anything presently?

23        A    No.  I moonlight to -- to support my -- my

24   family.  You know, I don't make the -- the -- I need the

25   extra money to be able to cover my living costs.

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1       Q    So when you -- when you help out doing --

2   doing pediatric autopsies, when you help the -- the

3   board certified forensic pathologist doing the pediatric

4   autopsies and stuff like that, you don't get paid for

5   that?

6       A    No, I don't get paid for that.

7       Q    All of this is volunteer?

8       A    I'm on the volunteer faculty of the medical

9   school.

10      Q    So --

11      A    But I do moonlight in an emergency clinic to

12  earn extra money, and it keeps my pediatric skills

13  sharp.  I mean, that helps me stay current with

14  pediatric -- pediatric practice.

15      Q    And when you just associate yourself with the

16  medical examiner's office, sort of helping around with

17  these autopsies and stuff that you do --

18      A    Yes.

19      Q    -- does that -- does that -- because you're

20  not board certified or you're not a forensic

21  pathologist, does that mean that you don't have to take

22  continuing education courses with respect to this area?

23      A    Well, I -- I do take courses and, in fact, I

24  teach courses.  On a regular basis, I'm a speaker at

25  national conferences on investigating pediatric death

1    and child abuse death and things like that.

2            I do that all the time.

3        Q    But my question is about pathology.  The -- do

4    you take continuing educational courses with respect to

5    doing autopsies?

6                (Reported by Steve R. Awbrey, CSR:)

7        A    No, I wouldn't say I take -- I participate in

8    conferences which are continuing education conferences,

9    and I present at those conferences, and you know, I also

10   attend.  When I'm there, I listen to what the other

11   people are doing, but I don't -- the advantage for me if

12   I'm a speaker, I don't have to pay for the conference,

13   so...

14       Q    What's the last conference you spoke at?

15       A    Oh, I mean, I speak at conferences all the

16   time.

17       Q    What's the last one you spoke at?

18       A    I'm trying to think of -- I did grand rounds

19   in the last month or so at the hospital where I am, I

20   mean, I really -- it's hard for me to keep track of

21   these -- I do a lot, sir, and I just don't keep track of

22   them well.

23       Q    Right.

24               THE COURT:  Let's take about a 10-minute

25   recess for the jury.

1              All rise for the jury.

2              (The jury left the courtroom.)

3              THE COURT:  We're back on the record in

4     Cause Number 241-1251-08.  The State is present.  The

5     defense is present.  The defendant is before the Court.

6     The witness is on the witness stand.

7              The jury is on their way back into the

8     courtroom.

9              (The jury entered the courtroom.)

10             THE COURT:  Be seated, Ladies and

11    Gentlemen.

12             Mr. Thompson, whenever you're ready,

13    Mr. Thompson.

14             MR. THOMPSON:  Thank you, Your Honor.

15             THE COURT:  Yes, sir.

16        Q    (By Mr. Thompson) Counsel spoke with you on

17    direct about this notion of the reliability of core body

18    temperatures as it relates to timing the death of an

19    individual.  You remember that?

20        A    Yes.

21        Q    And I believe that it was your testimony that

22    a rectal temperature was a core body temperature, first

23    of all?

24        A    Yes.

25        Q    And that it was -- and that the rectal

1   temperature would be reliable?

2        A    Well, it would be useful, yes.

3        Q    Okay.

4        A    More reliable than skin temperature, yeah.

5        Q    What's the difference between reliable and

6   useful?

7        A    Semantics, maybe.  I shouldn't have made that

8   distinction.

9             Reliable sounded like you wanted it to be for

10  certainty and useful meaning that it helps you with a

11  range.  Body temperatures are -- if you really want a

12  core body temperature, you literally have to go into the

13  core of the body, which would be into the central part

14  of the abdomen or some place like that deep in the body,

15  and you know, that's not a practical thing to be done on

16  the scene.

17            And then the measurement is a real thing, but

18  its significance can have variable meaning, because

19  sometimes when there's brain injury in someone who is in

20  the process of dieing, that brain injury itself whether

21  it's due to trauma or lack of oxygen can cause abnormal

22  regulation of body temperature.

23            And with that abnormal regulation, the

24  temperature can actually go up or down more than just by

25  heat loss.  In other words, by simple heat loss.  So if

Page 169

1    the person is still alive and has abnormal control of

2    body temperature because of brain injury, again, either

3    by trauma or lack of oxygen, the body temperature can be

4    variable and not be the timing thermostat that you want

5    it to be.

6          The point that we're talking about body

7    temperature is to have some idea of how long someone has

8    been dead, but if that person developed a high body

9    temperature before they died because their control

10   systems were messed up, it would make you think that the

11   duration in time was shorter.  Or if they had a low body

12   temperature before they actually died, you would think

13   the duration of time before death was longer.

14         So what I'm trying to say that while body

15   temperature is one piece of information that one tries

16   to use, it has a lot of potential variability there in

17   terms of its meaning.

18   Q    So it's not very reliable?

19   A    Well, it's reliable for a range, but it's

20   not -- you can't say someone was dead for three hours

21   and 20 minutes.  But the best way, as with other things

22   to time events is by direct observations.  The same

23   applies to the business of functionality for when a

24   child is injured.

25         The best way to know whether a child is

Page 170

1  injured is when did the child last behave normally and

2  when did the child behave abnormally.  And abnormal in

3  the way that reflects the effect of the injury.  That's

4  a far more reliable way of knowing when the injury

5  occurred than by trying to date it like by bruises or

6  other things.

7       Q    Okay.  And I understand the analogy that

8  you're drawing, but the question is --

9       A    Yes, sir.

10      Q    -- with respect to the reliability of taking a

11 rectal temperature that indicates a body temperature of

12 91.1, how reliable is that?

13      A    It's reliable to some extent, but it also

14 implies technique.  If you don't wait long enough, the

15 thermometer doesn't register accurately.  It depends on

16 whether it's an electronic thermometer or an old

17 fashioned mercury thermometer.  There's a lot things

18 that go into that.

19           But be that all said, a temperature of that

20 level, all things being equal, would indicate that the

21 person has been either dead or in a dysfunctional state

22 prior to death for several hours to have a temperature

23 that low, below normal body temperature.

24      Q    Okay.  And of course that assumes that there

25 was a normal body temperature at the point of death?

Page 171

1      A    Right.  And that's -- I tried to say that.  If

2   you have brain injury from lack of oxygen, if you have

3   brain injury and the brain is swollen, the regulation of

4   the body temperature will also often can be disturbed

5   again, either too hot or too cold.

6           In other words, the brain doesn't regulate

7   temperature right as it should.

8      Q    What would be some factors that would increase

9   body temperature so that the body would be too hot at

10  the time of death?

11     A    Brain injury.  Some response to brain injury

12  you become hypermetabolic.  The temperature actually

13  goes up.  That's why I'm saying -- that would throw off

14  an interpretation of whatever the temperature is because

15  of the error introduced in the temperature not being

16  normal at the time the child died.

17     Q    What would be a factor that could cause the

18  body temperature to be lower than 98.6 at the time of

19  death?

20     A    That the child was in a state of sort of

21  lingering prolonged dieing and in that state of

22  prolonged dieing, there was heat loss without good heat

23  generation, so that the body temperature is actually

24  lower before the child's heart stops beating.

25     Q    Would it be fair to say that without knowing

1    what the body temperature was at the time that the child

2    actually died, okay.  That you don't make an accurate

3    assessment with respect to body temperature from the

4    rectal -- from the rectal thermometer?

5        A    Well -- and here is a range of accuracy.  You

6    can make a judgment that there's been several hours time

7    pass, all things being equal, and all things being equal

8    on average with room temperature situations and a young

9    child's body losing about on average two degrees an

10   hour, with a temperature of 91, I think it was, one

11   could say that that might be on the range of three or

12   four hours, but it's not -- it's a range and you know it

13   could be shorter.  But during that period of time, the

14   child's body has lost heat.

15            Again, all things being equal, meaning that

16   the child was not in a lingering state of dieing for a

17   while so that the time of death would be closer to when

18   the child had that low body temperature, but was at a

19   state of 97, 96 for a period of time.

20       Q    Would the body temperature be so -- would the

21   body temperature be unreliable to a point that it could

22   lead somebody to a false conclusion with respect to the

23   time of death?

24       A    Theoretically, yes, it could especially if it

25   was hyper -- if the patient were hyperthermic from some

Page 173

1   type of brain affect of edema or trauma.  I'm not saying

2   this child had brain trauma.  This child had brain

3   edema, but hyperthermia can occur and that would in a

4   sense -- the word is fictitious, but in a fake way, fake

5   for interpretation, raise the body temperature so that

6   it would seem that the duration of time that the child

7   was dead was shorter than it really was.

8         Q    Okay.  And isn't it a fact that even in the

9   article that you assisted in having published, you-all

10  stated in that publication on page 474 that estimating

11  the time of death from body temperature also is subject

12  to sufficient error, that it may lead investigators

13  astray and one could be conservative in using such

14  measurements?

15        A    I couldn't have said it better, in fact, I

16  did.  I agree with that, yes.

17        Q    Which is very consistent what you just said?

18        A    Yes, that's correct.

19        Q    You cannot make a definitive determination of

20  the time of death from body temperature?

21        A    Yes, that's correct.

22        Q    Now, with respect to the so-called range that

23  you're talking about, when you try to fix the time of

24  death within a range, what you're really doing is --

25  you're estimating, based on what your findings are and

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    what the story is that you've been told about the time

2    of death?

3         A    Yes and yes.  And this is why the best way to

4    make a judgment about when someone has died is a direct

5    observation or reliable observation on functionality of

6    someone.

7              In other words, was that person walking,

8    talking and breathing at a certain point in time, then

9    you know they weren't dead at that point in time.  If

10   you had a good reliable statement, that trumps

11   everything else.

12        Q    And, of course, the story -- the reliability

13   of the story, if you're going to factor in the story --

14   I mean, the reliability of the conclusion that you make

15   if you're going to factor in the story, depends upon the

16   reliability of the story, doesn't it?

17        A    Yes.

18        Q    Kind of like computer science, you put junk

19   in, you're going to get junk out?

20        A    Yes.  One needs to take into account stories

21   and put them in the picture, but you also need to in a

22   sense have some way to independently verify the stories,

23   too.

24        Q    In looking at the photographs of the abdominal

25   bruising, I believe your statement was that the

Page 175

1    dark-colored bruising was a reflection of the liver

2    after the body had been dead for a period of time?

3        A    Yes, I believe so, sir, yes -- that was my

4    statement, and yes, I believe that to be the case, yes.

5                    MR. THOMPSON:  May I approach,

6    Your Honor?

7                    THE COURT:  Yes, you may.

8        Q    (By Mr. Thompson) Help me, if you would to

9    clarify something that's racing in my mind.  I won't be

10   able to sleep tonight?

11       A    I don't want that.

12       Q    Where is the liver in this photo?

13       A    Here is the liver.  This is the liver.

14       Q    This is the liver here?

15       A    Yes.

16       Q    And I believe you said there was the heart up

17   here?

18       A    That's the heart up there, yes.

19       Q    Now, when you get that kind of purple

20   coloration, is there something that like seeps down from

21   the liver that causes that purplish coloration across

22   the abdomen?

23       A    No, usually it's the liver when it's

24   congested.  The other thing that it can be, is the

25   presence of the blood itself that's there.  I mean, the

1    liver is a very bloody organ.

2        Q    And the reason I'm asking that question?

3        A    Yes.

4        Q    Is because the liver is up here, and I believe

5    you've already identified this as the breastplate

6    removed so that you're exposing the liver.  Up here and

7    you can see from the picture of the child, the ribcage

8    area, which is here.  The same as this on this picture,

9    the liver would be -- if I'm -- you know, I'm not a

10   doctor, but I mean, this would be kind of underneath

11   this ribcage here, right?

12       A    Right.

13       Q    A considerable distance from this

14   purple-colored bruising down here on the abdomen.  So

15   does something from the liver just kind of drifts down

16   there and turn it purple?

17       A    That's a very good point you're making.

18            There's two things here.  One is this appears

19   to have pulled up to be able to better demonstrate this

20   area of mesenteric hemorrhage.  That's part of what may

21   be going on.  The other thing that the bruising that's

22   seen -- not the bruising -- the discoloration that's

23   seen, may not necessarily be the liver, it may actually

24   be seeing this color of this part of the blood

25   accumulation.

1        I cannot tell directly from the photograph if

2    this has been pulled up.  This is a bit higher than one

3    usually sees in the diagram.  The diagram kind of comes

4    across like this, but you're making a good point, and

5    usually you see the liver extend.  It goes across the

6    midline and to the other side.  You usually see the edge

7    of the liver over this whole expanse.

8        But what I've got here is this hemorrhagic

9    mass, which is the mesentery, and I cannot tell from

10   this photograph if this has been kind of opened like a

11   book and folded back, which would then have the liver

12   still be part -- part of the liver still be behind this

13   or if what we're saying is actually hemorrhage into the

14   mesenteric mass.

15       Q    Well, if we have testimony that the

16   intestines, whatever that is large or small intestines,

17   has been folded back?

18       A    So they have been folded back?

19       Q    Yes.

20       A    Okay.

21       Q    But nothing about the liver -- you're saying

22   the liver would be pushed up?

23       A    It would be pushed up, but the part of the

24   liver that goes over here is maybe covered by this, but

25   it may well be that what that discoloration is, is

Page 178

1    actually the blood that was in this mass of mesenteric

2    tissue itself.

3        Q    Or it could be a bruise?

4        A    It's a very unusual bruise.

5        Q    But it could be a bruise?

6        A    Well, it could be.  That's the appearance more

7    of the translucency through the skin.

8        Q    Have you heard the term, back to front before

9    in your medical experience or front to back, either way?

10       A    I can't respond to that in context, without a

11   context, what do you mean?

12       Q    An experience where someone hits you on the

13   front and you bruise on the back, is that possible?

14       A    Now, are you talking about coup-contracoup

15   type of concept which occurs in the brain.

16       Q    I call it back to front.

17       A    Generally, that's a concept for the brain

18   where you have a fixed container, the skull, and if you

19   get hit on one side of the head, it sets the brain

20   moving inside the skull, and then you get a bruise on

21   the surface of the brain on the back side of the brain.

22       Q    But with respect to this part of the upper

23   body cavity, you do have a contained area, don't you?

24       A    Well, actually not.  It's a very loose area.

25       Q    It's contained within the confines of the rib

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    and the sternum?

2        A    Well, the chest is more -- the belly is not --

3    I think we've talked about that some.  The fact that

4    stuff moves around in the belly and that's why it's

5    harder to have impact injury cause problems except where

6    you have the midline and you compress it against the

7    backbone.

8        Q    Actually, you've got a contained area in the

9    upper part of your body which is protected by the

10   ribcage in the sternum; isn't that correct?

11       A    Well, that's the chest that you're describing.

12       Q    And the rib cage does not -- is not just

13   around here, it actually goes all the way around to the

14   back and extends downward, doesn't it?

15       A    That's correct.

16       Q    Sure.

17            So that's an enclosed area where you could

18   get a -- you could conceivably get a blow in the front

19   that produces a wound or bruise in the back?

20       A    Well, it's not quite the same thing as happens

21   with, again, the coup-contracoup, which is exactly what

22   you're saying.  The blow, counter blow business.

23            What you're describing is more that if you

24   have an impact say on the front of the body and the back

25   of the body is resting on something or hits something,

Page 180

1    then there could be a transmission of the injury that

2    way.  But it depends on external-type of relationships.

3    The internal one in the brain is where the brain is

4    captive inside the skull and then you get this -- the

5    brain sort of bounces from the front to the back in the

6    skull, and it has nothing to do with the external

7    surfaces that are being hit.  It has to do with the

8    internal arrangement.

9         Q    What if you've got -- you said it depends on

10   the kind of surface that you're on?

11        A    That's right.

12        Q    What if you've got somebody laying on a hard

13   concrete surface?

14        A    Yes.

15        Q    And you've got somebody pounding on their

16   chest trying to resuscitate, could you get a bruise on

17   your back.

18        A    Oh, yes, absolutely that can happen -- I'm

19   sorry.  I wasn't understanding exactly what you were

20   asking.

21        Q    And that's sort of what all of these scenarios

22   are about, a thorough understanding of what's going on?

23        A    Yes.

24        Q    I don't recall if I asked you this question or

25   not, but could you tell us the number of autopsies

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    you've actually participated in where you have seen

2    these kinds of mesentery tears?

3         A     Where I've actually done the autopsy with

4    mesentery tears?

5         Q     Yes, sir.

6         A     That would be -- less than five where I've

7    actually done the autopsy with mesentery tears.  In

8    reviewing autopsies with mesentery tears, it would be

9    significantly more than that.

10        Q     By reviewing, you mean looking at the pictures

11   and the photographs?

12        A     That's right, yes.

13        Q     When you testified earlier that the bleeding

14   from the mesentery had not been there long enough to

15   have a secondary reaction, what did you mean by that?

16        A     That there are a series of changes that occur

17   in response to blood in the belly, and ultimately

18   leading to the red cells breaking down and iron

19   accumulation, and we've talked about the iron in one of

20   the pictures from the old event of hemorrhage in the

21   belly.  But part of the reaction that occurs to blood in

22   the belly is you start getting secondary clot formation

23   with what's known as fibrin deposition and that's a

24   protein-type of material that accumulates and you start

25   getting cells, inflammatory cells that come and react to

Page 182

1    the red cells being in the wrong place at the wrong

2    time.  And there's none of that sort of secondary

3    reaction that's present.

4          Q    That you saw?

5          A    That I saw in the pictures, yes -- the slides.

6          Q    But if Dr. Quinton testified in his Grand Jury

7    that he saw signs of inflammation, he would have been

8    mistaken about that?

9          A    No, I don't want to say he would be mistaken,

10   it's just that -- one has to be careful when you say

11   inflammation to make sure that it's not just the white

12   cells that come with the red cells when you have

13   bleeding.  I mean "inflammation" refers to white cells

14   in the blood, and that it's a true vital reaction to the

15   presence of blood, which is in that location is a

16   foreign substance.  The blood shouldn't be there and the

17   body starts responding to that.

18              But at least in the slides that were taken at

19   autopsy, that wasn't there.  I mean, there's the old --

20   there's the old, that spot of old degenerative material

21   and iron.  That's the one I took a picture of, but

22   that's remote, that's not connected with the event of

23   the child dying.

24         Q    We'll deal with that in a minute --

25              MR. BINGHAM:  Was there a page reference.

Page 183

 1   I don't see the inflammation in the Grand Jury --

 2                MR. THOMPSON:  It was a hypothetical

 3   question.  It was a hypothetical question.

 4                THE COURT:  Mr. Thompson, you're not

 5   referring to what the doctor testified at Grand Jury?

 6                MR. THOMPSON:  I'm referring

 7   hypothetically if he saw signs, hypothetically?

 8        A    Okay.

 9        Q    (By Mr. Thompson)  If he saw signs of

10   inflammation at the time that he did the autopsy and,

11   hypothetically, if he were to testify to that, it would

12   be your opinion that he had made a mistake?

13                MR. BINGHAM:  I'm going to object to the

14   form of the question.

15                THE COURT:  I'm going to sustain it on

16   form.  You're asking him a question about

17   hypothetically.  It's not phrased in items of whether or

18   not he actually testified to that.

19                MR. THOMPSON:  If he testified

20   hypothetically, Judge.

21                THE COURT:  All right.  The objection is

22   sustained.  We'll leave it at that.

23        Q    (By Mr. Thompson) But then on the other hand

24   you have read the Grand Jury testimony from Dr. Quinton?

25        A    Yes, sir.

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1     Q    And you are familiar with the statement where

2  he says on page 46, so I say these injuries are within a

3  day.  I don't think there's more than that because there

4  would be a lot more organizational changes than

5  inflammation.

6         So he didn't see anything but the

7  inflammation, but then if he said he saw inflammation,

8  in your opinion, that would be incorrect?

9     A    And you're correct in what you're saying by

10  what you just read that that's implying that he saw

11  early inflammatory response to the blood that's there.

12  I did not appreciate that in the slides.  This is not a

13  gross observation.  This is a microscopic observation.

14  I did not appreciate that there was an inflammatory

15  response to the blood.  That it was fresh blood with

16  basically little to no reaction to the blood.

17     Q    So could there have been something there that

18  you didn't see?

19     A    That's always possible, yes.

20     Q    Isn't it true, Dr. Wilson, that the iron

21  produced in the blood cells as the result of an

22  injury -- I'm sorry.  Strike that -- let me ask you in

23  different way.

24         The iron that you see in the blood cells as a

25  result of the injury merely provides you a description

1   of the fact that the injury has some age?

2        A    Let me just clarify a little bit.

3             There is always iron in blood cells, but it

4   becomes of a form that appears different than in blood

5   cells that have degenerated.

6        Q    Right.

7        A    And when you appreciate that degenerative form

8   of iron, then you know that the blood cells have been

9   there and deteriorated over a period of time, so the

10  basic answer to your question is correct.

11       Q    And what you can tell from that is the fact

12  that you've got an aged injury, isn't that true?

13       A    That the blood has been there for a period of

14  time.  When you first started seeing that form of iron

15  that you can now recognize in the microscope after about

16  a day, and then that is correct.

17       Q    So it would take about 24 hours for that to

18  manifest itself, so that it can be identified?

19       A    Right.  For the first signs of seeing iron,

20  that's correct.  The iron is there -- I'm sorry, sir.

21  The iron is there.  It just becomes transformed into a

22  product that you can now see under the microscope.

23       Q    There's nothing about being able to see that

24  on a slide that tells you anything about a fresh injury?

25       A    About what?

Page 186

1       Q     A fresh injury?

2       A     Freshness is related to the integrity of the

3    red cells and the lack of seeing this degenerated form

4    of iron.

5       Q     And does it make a difference what part of the

6    body the cells come from?

7       A     Okay.

8       Q     Do the cells migrate throughout the body?

9       A     What cells are you talking about?

10       Q     The cells that produce this discernible iron

11    contact?

12       A     Those are our red blood cells, yes, that's

13    what keeps us alive.  They carry oxygen, and as you

14    know, they migrate everywhere in the body through the

15    bloodstream.

16       Q     If I've got an injury in my leg, and I've got

17    a fracture in my leg.  Okay.  At some point, you would

18    expect -- you would expect to see those kind of blood

19    cells even if you took blood from my arm?

20       A     That's a good question.

21             No, what we're talking about are the cells

22    that go out of the blood vascular system, so if you have

23    fracture in your leg, you've also torn blood vessels,

24    the cells would leak out into the area of the fracture.

25    They no longer circulate.  They degenerate the iron and

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 187

1    then undergoes it's transformation in the tissue where

2    the injury is.

3              So in a sense, they actually act as a marker

4    of an injury site, but no, you wouldn't see that

5    elsewhere because the other red cells that aren't

6    leaking out there continue to circulate, and they don't

7    degenerate.

8         Q    And the vascular system is a closed system

9    unless there's an open wound in one of the blood

10   vessels, which allows the blood to leak out?

11        A    That's correct, yes.

12        Q    So the cells which depict the injury are going

13   to be in the area of the injury.

14        A    That is correct, sir, yes.

15        Q    So if I've got a hairline fracture of my, for

16   lack of a better word, my leg?

17        A    Tibia.

18        Q    Let's just say leg?

19        A    Yes.

20        Q    And tomorrow on the weekend, I break it again,

21   okay.  I break it in the same area?

22        A    Yes, yes.

23        Q    Are you going to see those same -- that same

24   accumulation of blood cells in that area?

25        A    You will see a combination as we have in this

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    case.  I mean, you're describing this very well.

2         You will see a combination of cells from an

3    older injury or in this case the iron present from an

4    older injury, and then you will also see fresh red cells

5    that are from the new injury, so you will have that dual

6    affect from an old injury and a new injury.

7         Q    But after a period of 24 hours, you wouldn't

8    be able to make that distinction?

9         A    Well, but the changes are gradual, so you

10   would still see fresh red blood cells.  It's just that

11   the numbers are slowly going down as they're

12   deteriorating and the products are being released, so

13   it's not hard and fast at 24 hours, but the concept is

14   right the way you're seeing it.  There's a gradual

15   change from fresh appearing red cells to degenerated red

16   cells to iron accumulation.

17        Q    So by looking at those blood cells, a forensic

18   pathologist could pretty accurately within a range date

19   that injury?

20        A    Well, but see the problem comes when you've

21   got different injuries at different times at the same

22   place, that's where you get into trouble.

23        Q    What is it about that, that would allow you to

24   see the difference that wouldn't allow him to see the

25   difference -- either the blood cells you can identify

1   the iron content in the blood cells or you can't?

2        A    Okay.  It -- actually the iron that you see is

3   no longer in the blood cells.  It's leaked out of the

4   blood cells and undergone this transformation, so that

5   it now appears as a pigment in the tissue, and so you go

6   from having intact red cells with no pigment in the

7   tissues to no intact red cells and pigment in the

8   tissue.  The one that I took a photograph of is pigment

9   in the tissue with no intact red cells.  That's showing

10  a site of old prior injury, not fresh injury.

11       Q    What part of the mesentery did you examine

12  that allowed you to determine that there were -- that

13  the injury was fresh, where there's no iron in the

14  tissue?

15       A    Well, it was the part that they took in the

16  slide.  I mean, they describe as we see on the

17  photograph, areas of mesenteric hemorrhage, and they

18  take a sample on the slide and you see in the majority

19  of that area, it's all fresh blood.  And then there is

20  one area on one of the slides where there's this old

21  injury that's there.  But that's separate from all of

22  the fresh injury that's gone on.

23       Q    So if there's testimony in the record that all

24  of these injuries occurred at about the same time in

25  your opinion, that would be incorrect?

Page 190

1      A    That would be incorrect related to that --

2                 MR. BINGHAM:  I'm going to object to the

3      form -- which -- I think --

4                 MR. THOMPSON:  It's a hypothetical

5      question.

6                 MR. BINGHAM:  I think it's unfair to say

7      that when we're talking about multiple injuries to a

8      victim abdominally and then talk about an old rib

9      fracture and new ones.  Are we talking about the rib

10     fractures or the multiple injuries.

11                THE COURT:  Can you separate those?

12     Q    (By Mr. Thompson) Do you understand what I'm

13     talking about?

14     A    I do understand your question.

15                THE COURT:  Separate out the fractures in

16     terms of the tract --

17     Q    (By Mr. Thompson)  We're talking about the

18     mesentery?

19     A    The soft-tissue injury in the mesentery, and

20     there's a prominent area both by photograph and in the

21     slides of fresh injury with bleeding of just a few hours

22     duration, and then there's one area on one of the

23     slides, really separate from all of this fresh bleeding

24     that doesn't have any intact red cells, but has this

25     iron accumulation, and that says that that's a site that

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 191

1   had injury in the past in which now you have the marker

2   of residual iron from some event in the past.

3          So the belly has been injured before, and it's

4   been injured in around the same location as it's injured

5   now.

6       Q    But not around the same time?

7       A    But not around the same time.  And there's

8   much more extensive fresh injury where there was at

9   least from what was sampled, just one microscopic area

10  of old injury.

11             (Reported by D. Keith Johnson, CSR:)

12      Q    Okay.  But -- but hypothetically --

13      A    Yes.

14      Q    -- if the medical examiner's opinion is that

15  these injuries occurred around the same time, it's --

16      A    You mean the old, the new?

17      Q    Well, the injuries in the mesentery.  If it's

18  his testimony or his opinion, hypothetically, that these

19  injuries occurred about the same time, in your opinion,

20  that would be incorrect?

21             MR. BINGHAM:  I'm going to object to that

22  being an incorrect statement of his testimony.

23             MR. THOMPSON:  Judge --

24             THE COURT:  I'm going to let Mr. Thompson

25  go ahead.  Put it in the form of a hypothetical without

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1     leaving off any testimony.  You can come back on

2     redirect.

3             Go ahead.  If you've got a question --

4     say it again, Mr. Thompson.  Let's go ahead and get to

5     it.

6     Q    (By Mr. Thompson) If you have a medical

7     examiner -- this hypothetical medical examiner who

8     performed this autopsy and was -- had the hands-on

9     experience of looking at these injuries, this -- this

10    hypothetical board certified forensic pathologist, okay,

11    and it was his opinion that all of these mesentery

12    injuries occurred at or near the same time, in your

13    opinion, he would be incorrect?

14    A     He would be incorrect as it applied to this

15    microscopic focus of old, organized hemorrhage with this

16    pigment that's there at that one site only, based on

17    what was sampled.

18    Q     And if you were viewing -- hypothetically, if

19    you were reviewing microscopic slides that he had

20    prepared --

21    A     But these are the slides he prepared.

22    Q     Right, okay.

23    A     Okay.

24    Q     Then you would say that he missed that --

25    the -- the hypothetical board certified forensic

1    psychiatrist -- pathologist?

2         A    But he didn't miss it.  He sampled an area of

3    old injury with old hemorrhage.  I mean, he didn't miss

4    it.

5         Q    Okay.  Listen to my question, okay?

6         A    Okay.

7         Q    Despite the sample, okay, if it's his

8    testimony, hypothetically, if he has done this

9    examination and this testing and has reached a

10   conclusion that all of these injuries occurred to the

11   mesentery at or about the same time, then based on your

12   observation of the samples that he provided, that would

13   be incorrect?

14        A    It would be incorrect.

15        Q    Okay.

16        A    Because there is a focus of old injury there,

17   yes.

18        Q    I think I missed it.  I remember your

19   conversation with Mr. Bingham about the normal size of a

20   child's brain who's about two years old.  And what did

21   you say that range of normality would be?

22        A    And I'm going on my weight chart, which I

23   depend on for these things.  But for a child of this

24   age, the weight would be about 1100 grams.  And this

25   child's brain weight was -- well, I have the exact

Page 194

1    weight.  I just marked it on my -- is 1340 grams.  And

2    that's -- that's about a 20 percent increase.

3         Q    Could you see, from the autopsy photographs,

4    an abnormality in the brain?

5         A    There was no blood described.  And the

6    associated abnormality is brain swelling.

7         Q    Well, was there anything about the brain lobes

8    or the brain tissues that told you that there was

9    swelling in the brain?

10        A    The weight is your best way to know that the

11   brain is swollen.

12        Q    So it's -- it's your conclusion that every

13   two-and-a-half-year-old child has a brain mass -- or

14   brain weight of 1100 grams?

15        A    There's a little bit of range on that, but the

16   answer is yes.  If the child is of appropriate stature

17   for age, the brain weight will be in a range around that

18   weight, that's correct.

19        Q    What would the little bit of leeway be?

20        A    That's a good question.  Maybe up to five

21   percent.

22        Q    Up to five percent?

23        A    Yes.

24        Q    So half of the difference?

25        A    Not half.  A quarter of the difference.

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1        Q    A quarter of the difference.  What did you

2   say, 20 percent?  So a quarter of the difference?

3        A    Yeah.  But for brain, that's significant.

4        Q    Were there autopsy photos of the brain?

5        A    You know, when you were asking me that, I was

6   trying to remember.  And see, I don't have the -- the

7   photos with me, and I'm not remembering that.  So --

8        Q    Well, there's -- in the descriptive paragraph

9   that deals with -- you got a copy of the autopsy in

10  front of you?

11       A    Yes, I do have the report.

12       Q    In the descriptive information with respect to

13  the brain, there's nothing in that description that

14  indicates that there was a problem with the brain, is

15  there?

16       A    Right.  But that -- that's typical.  If the

17  brain doesn't have tearing or hemorrhage, then it would

18  not -- or if it's not malformed.  A lot of times the

19  appreciation of swelling is one based on weight rather

20  than appearance.

21       Q    But there's nothing, even in the descriptive

22  paragraph with respect to the brain, that even alludes

23  to swelling.

24       A    You're correct about that, sir, yes.

25       Q    So this would just be another area where you

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1   and Dr. Quinton disagree?

2        A    It's an issue of disagreement.  I would tell

3   you that in pediatric autopsy and pediatric pathology in

4   general, weights of organs and proportional weights of

5   organs, both proportional to age and proportional to the

6   other organs that are present are very important.

7   It's -- comparative organ weight is part of the

8   pediatric pathology assessment of organ growth and

9   development.

10            And for this child, the comparative organ

11  weights are all within range, except for the brain.  And

12  the brain is way out of range.  And it's significantly

13  heavy.  I mentioned that it falls on the scale of about

14  an eleven-year-old.  And that tells you that this brain

15  had too much weight.  And the way a brain in an

16  otherwise normal child has too much weight is that it's

17  swollen.  I mean, that's how the weight is acquired by

18  the brain.

19       Q    Okay.  But the report, on page 3 of the

20  report --

21       A    I have that.

22       Q    Despite your opinions about the weight --

23       A    Yes.

24       Q    -- the report says from the board certified

25  forensic pathologist who did this --

```
 1      A    Right, who is not a pediatric pathologist.

 2      Q    Right.

 3      A    Okay.

 4      Q    There are no epidural, subdural --

 5      A    Yes.

 6      Q    Sub --

 7      A    Subarachnoid, sir.

 8      Q    -- hemorrhages?

 9      A    Those are all different sites in the layers on

10  the surface of the brain, is what that refers to.

11      Q    The cerebral hemispheres are symmetrical --

12      A    Yes, sir.

13      Q    -- with an unremarkable?

14      A    Gyro.

15      Q    -- gyro pattern?

16      A    Yes, sir.

17      Q    The cranial nerves and blood vessels are

18  unremarkable.  The cerebral hemispheres, the brain stem,

19  and the cerebellum are unremarkable.

20      A    And those are all -- are regions in the brain.

21      Q    Yeah.  Nothing there that suggests that

22  they're a little oversized or out of whack or --

23      A    Or swollen.

24      Q    -- or swollen.  Nothing there to suggest that?

25      A    I agree with what you just said.  It's not in
```

Page 198

1    there.  But that's why the weight per child size and per

2    other organs become so important in making that

3    assessment.

4                    MR. THOMPSON:  May I have a moment, Your

5    Honor?

6                    THE COURT:  Yes.

7        Q    (By Mr. Thompson) Thank you, Dr. Wilson.

8                    MR. THOMPSON:  Your Honor, we'll pass the

9    witness.

10                    THE COURT:  Thank you, Mr. Thompson.

11                    THE WITNESS:  Thank you, sir.

12                    MR. BINGHAM:  I have a few questions.  It

13   will take just a minute.

14                    Approach the witness?

15                    REDIRECT EXAMINATION

16   BY MR. BINGHAM:

17       Q    The other thing on page 46 that wasn't read to

18   you was, "So I'd say these injuries are within a day,"

19   right?  This is Dr. Quinton's testimony right there.

20   You can see Dr. Quinton.  He's saying, "So I'd say these

21   injuries are within a day.  I don't think it's more than

22   that, because there would be a lot more organizational

23   change and inflammation.

24                    "But, again, is it within a minute?

25                    "No.

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1          Then I ask a question, "How about within three

2     hours?  Could that be possible?"

3          What does he say?

4     A     Well, it says, "It's possible."

5     Q     Let me talk about your --

6               MR. BINGHAM:  May I approach the witness

7     again?

8               THE COURT:  Yes.

9     Q     (By Mr. Bingham) Let me show you this.  You

10    see that has the same identifying tag on it -- see this

11    number down here, JP-1911-08?

12    A     Yes.

13    Q     Here's a photo of Kelynn.  He has the same

14    number?

15    A     Yes.

16    Q     So you know that to be a picture of this area

17    here before it's been moved around, right?

18    A     Yes, yes.

19    Q     I mean, this is what you were trying to

20    describe to the jury when you had State's Exhibit 115

21    up, right?

22    A     Yes.  Yes, sir.  This -- this makes the point

23    that what's happened is they've moved the bowel out of

24    the way and then flipped up the mesentery, yes.

25               MR. BINGHAM:  Tender State's Exhibit 216

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 200

1    to defense.

2                    MR. THOMPSON:  May I have the witness on

3    voir dire?

4                    THE COURT:  Yes.

5                    VOIR DIRE EXAMINATION

6    BY MR. THOMPSON:

7        Q    With respect to the exhibit that's sitting up

8    there on the board, it looks like a portion of the liver

9    has been removed?

10       A    Not removed, but -- but hidden by the -- the

11   mesentery that's flipped up.

12       Q    The fact that the mesentery has been flipped

13   up?

14       A    Yes.

15       Q    So that photograph is an accurate depiction of

16   this photograph prior to moving the organ around?

17       A    Right.  In other words, that one was first,

18   and then this is after -- the one up here is after

19   manipulation.

20                    MR. THOMPSON:  I -- no objections.

21                    THE COURT:  All right.  State's Exhibit

22   Number 216 is admitted into evidence with no objection.

23                    MR. BINGHAM:  Because it's small, can the

24   doctor be allowed to step down?

25                    THE COURT:  Yes, he can step down.  Hand

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 201

1    him the microphone.  I think he's got it up there.  Like

2    I said, he had it up there.  I think it's over here.

3                 Doctor, you may step down around in front

4    of the jury.  Just use the microphone where everyone can

5    hear you.  Thank you.

6                 REDIRECT EXAMINATION (CONTD)

7    BY MR. BINGHAM:

8         Q    That photo, just so they understand, the

9    mesentery is where on this, before everything's moved

10   around so you can see the injuries?

11                Come over here, Doctor.

12        A    Well, but you actually cannot see the

13   mesentery in that picture.

14        Q    Exactly.

15        A    The mesentery is in this picture.

16        Q    Correct.  And that's my point, is that in this

17   photograph, what is this up here?

18        A    That's the liver.  And I was describing the

19   fact that the liver extends from the right side over

20   past the midline, over to the left side.  And it's below

21   the margin of the ribs.

22        Q    Externally, where would the liver be in

23   this --

24        A    It would be where this bluish area is.

25        Q    So kind of like that right there?

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1        A       Well --

2        Q       Like this?

3        A       Yes.  I mean --

4        Q       And this photo in 215 is much -- is much

5    larger in size than 216?

6        A       Well, without a scale, you really have to be

7    careful about that.

8        Q       I understand.  But just to show that this

9    bruise is going across the abdomen -- and here's the

10   liver before they flip it up to show the mesentery.

11       A       Yes, yes.

12       Q       Okay.  Thanks, Doctor.

13               I'm going to skip a lot of these, because I

14   know your plane leaves in five minutes, so --

15               A JUROR:  I don't think he's going to

16   make it.

17       Q       (By Mr. Bingham) We changed it.  But it's the

18   last flight out today at 5:30, so you have to leave here

19   about 4:30.  So...

20               The last thing I'm going to ask you about is

21   brain weight.  You have with you a -- a weight -- a

22   chart, do you not, that you rely on.  What's that

23   called?  Talking about brain weight.

24       A       Well, this is -- what I'm looking at is an

25   organ weight chart.  And there's a number of them, but I

Page 203

1   like this one because it took a lot of data to create

2   this, the folks that did this.

3          Q    And it's a chart that you rely on, and that's

4   part of -- when you look at the brain weight, the doctor

5   has removed the brain and weighed it, because you have

6   that in your autopsy report, right?

7          A    That is correct, sir.

8          Q    Dr. Quinton does not mention anything about

9   this being abnormal in his report to a child, that you

10  see.

11         A    What he --

12         Q    I'm sorry.

13         A    Please explain what you're asking me.

14         Q    Does he mention anywhere in his report that

15  the brain -- talking about the brain weight is abnormal

16  to indicate swelling, to indicate that this was not an

17  immediate death?  Does he go through that analysis in

18  his report?

19         A    No, not at all.

20         Q    But that's significant to you as a pediatric

21  pathologist, is it not?

22         A    Yes, it is.  I mean, that's one of the things

23  that pediatric pathology pays a lot of attention to, is

24  not only the growth and development of the child as a

25  whole, but the growth and development of each organ,

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1   each part.  So you're trying to put all of that

2   together.  And in a normally growing, healthy child,

3   these things are proportional and predictable.  And when

4   there's something out of line in weight or developmental

5   features, then you need to explain why it's out of line.

6           And in this particular case, in the organ

7   weights, pretty much everything is in line except for

8   the brain, which is way out of line.

9       Q    Which is another reason that pediatric -- you,

10  as a pediatric pathologist -- that's another reason why

11  pediatric pathology is so important in dealing with

12  child deaths?

13      A    And it exists -- children are not small

14  adults.  They're developing adults, but they're not

15  small adults.

16      Q    And I'm going just going to touch on this

17  last.  Mr. Thompson talks a lot about board certified

18  forensic pathologists.  You, as a pediatric pathologist,

19  are -- well, you tell me.  I know you don't like to do

20  this kind of thing.  But are you actually more qualified

21  to conduct autopsies on children and determine --

22  interpret the injuries in these children than maybe a

23  forensic pathologist?

24      A    Sir, I would -- I would not agree with the

25  concept of more qualified.

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1      Q      How would you call it?

2      A      The way I would talk about this is that you

3   need to bring a combination of these disciplines to

4   understanding what is going on --

5      Q      Okay.

6      A      -- with a child.  And that means perspective

7   on developmental medicine and developmental issues along

8   with the forensic science of injury.

9             I mean, there is no question that forensics

10  involves understanding nonnatural events that happens to

11  people, whether adults or children.

12            But there are special issues that relate to

13  children, because the organ systems, the tissues, the

14  developmental stage, and as in this case, the

15  relationship of the organ weight, something as simple as

16  that, becomes very important to know that something is

17  out of kilter.

18            And for me, every autopsy I do on a child, I

19  have a standard set of weights -- or the predicted

20  weights of a child of a certain age and size.  And if an

21  organ is too big or too little, you have to account for

22  why that is.

23            And sometimes it's for developmental reasons;

24  sometimes for disease.  In this case, the organ of the

25  brain is too large because it is swollen in this child

1    before the child died.  And that tells you something

2    about the fact that the death was not an instantaneous

3    death nor was it even a rapid death, but it was a

4    lingering death, for it takes time for brain swelling to

5    manifest itself.

6        Q    And based on your interpretation of the -- the

7    sites of the slides, you believe that that was less than

8    four hours; is that correct?

9        A    The -- now, that's --

10       Q    From time of impact to death?

11       A    Yeah.  That -- well, we're talking multiple

12   impacts here.  But that's a process that is put into a

13   timeframe because of the tissue reactivity that has not

14   occurred.

15            In other words, there's blood, but there's

16   little reaction to the blood.  And the brain has had

17   time to swell, but the blood has not had time to

18   transform.  And so you use those things to put within a

19   time range.  And a time range of two to four hours is

20   not -- is not unreasonable in looking at what happened

21   to this child.

22       Q    Okay.  And one last --

23            MR. BINGHAM:  May I approach?

24       Q    (By Mr. Bingham) If we look at those slides --

25   just forgive me, but which slide was it that you were

Page 207

1   just talking about?  Was it this one right here?

2        A    No --

3        Q    That was talking about that they had not had

4   time to really react to the blood, what you just said.

5   Which slide -- I know these are different slides.  These

6   are of the mesentery and this is -- these are of the

7   ribs, right?

8        A    Well --

9        Q    State's Exhibit 212 and 211.

10       A    Right.  Now, that's the rib, and that's a

11  different issue that we've talked about.

12       Q    209 and 210?

13       A    Now, that's -- the -- the one with the iron is

14  a site of old hemorrhage for which there has been

15  prominent iron deposition, but you don't see that at

16  other places in the slides.  So that's the coexistent

17  old hemorrhage site in the mesentery.

18            But this is more the fresh hemorrhage in that

19  the cells are well preserved and there's -- there's not

20  the apparent presence of iron.

21            Now, we use an iron stain to turn iron blue,

22  but you don't need a blue iron stain to see iron.  It's

23  kind of a golden hue, and there's none of that in the

24  slide in which --

25       Q    In State's 209?

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1      A    Yes.

2      Q    In State's Exhibit 209, okay.

3           And this is where you look at -- you say

4    this -- that there is a new injury, multiple impacts

5    that for the mesentery occurred in a timeframe from

6    point of impact to death of somewhere between two and

7    four hours?

8      A    Now --

9      Q    As a range.

10     A    As a range.  But you have to understand that

11   the most important thing is the story.

12     Q    Sure.

13     A    And the verifiable historical events.  And if

14   you have a child who by multiple observers is functional

15   and not in a state of dwindles or a coma, then the

16   injury hasn't occurred yet.

17          And we have a story during this timeframe

18   also, these last four hours, given by one person.

19     Q    Talking about the defendant's statements?

20     A    Yes.

21     Q    Okay.

22     A    But the story of the child being functional,

23   if -- if that is to be believed, actually would state

24   that the child still hadn't been injured under -- under

25   this person's care.

1          Q     What the defendant is saying is either the

2     child's not been injured yet, which we know he's dead at

3     12:56 -- or he's been injured and the defendant's lying

4     about it?

5          A     That's correct.

6          Q     Okay.  Thank you.

7                MR. BINGHAM:  We'll pass the witness,

8     Judge.

9                THE COURT:  Okay, Mr. Bingham.

10               Mr. Thompson, anything else?

11               MR. THOMPSON:  Yes.

12               THE COURT:  Okay.

13                    RECROSS-EXAMINATION

14    BY MR. THOMPSON:

15         Q     So there's -- there's -- if I understand --

16    understood your earlier testimony, the injury that this

17    child suffered would have interfered with his ability to

18    eat or to consume food or to drink liquids and that

19    would have been almost immediately after injury?

20         A     That is correct, after this -- this beating

21    event occurred.

22         Q     Okay.

23               A JUROR:  Can you use the mic.?

24         Q     (By Mr. Thompson) And your opinion is -- let

25    me ask you this:  What if you had a story that during

1    the period of time that this child was injured, that he

2    was functioning normally?  In your opinion that,

3    wouldn't be possible?

4         A    That would be a bogus story with these

5    injuries.

6         Q    Are you talking about the extent of these --

7    are you talking about the extent of these injuries that

8    the child suffered in this case, or are you talking

9    about mesentery injuries in general?

10        A    No.  The injuries that this child has in this

11   case.

12        Q    What is it about these injuries that would

13   have prevented the child from functioning normally?

14        A    The irritation -- first of all, the trauma

15   itself that caused the tearing of the mesentery, the

16   blood that's there that causes the irritation.  Blood in

17   the peritoneal cavity is painful and irritating.  And

18   when this child received the blows that created this,

19   this child would have been down, would not have been

20   functional following that.

21        Q    Would never have been able to get up and

22   function in a normal manner?

23        A    Not -- not carrying the blood and the tears in

24   the mesentery that we see on these pictures.

25        Q    In the article that you coauthored on

1    page 484 -- do you have the book up there?

2         A    Yes, I do, sir.  Just one moment.  Okay.

3         Q    On the second -- well, actually it's the first

4    full paragraph on the right-hand column.

5         A    Okay.

6         Q    Where it says, "Unlike fatal head trauma, in

7    which significant symptoms develop immediately, a child

8    with an abdominal trauma may appear relatively symptom

9    free for several hours after injury.  An immediate

10   response to the pain of the infliction -- inflicted

11   injury will have occurred, but often will not be

12   reported.  The onset of serious abdominal symptoms may

13   be insidious, particularly in the preverbal child, and

14   is characteristic of injuries such as duodenal

15   perforation or other retroperitoneal injury.  The child

16   with an injury such as a small liver or mesenteric

17   laceration also may initially appear relatively

18   asymptomatic."

19            Doesn't "asymptomatic" mean that he would show

20   virtually no symptoms of injury?

21        A    Yes.  That is correct.

22        Q    Would persistent slow accumulation of blood

23   over a period of time -- a slow -- is that what slow

24   accumulation of blood means?

25        A    That's correct.

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 212

1      Q     Okay.  In the abdominal cavity until collapse

2   suddenly occurs due to -- what is that?

3      A     Due to shock.

4      Q     Okay.

5      A     A decreased blood volume related shock.

6      Q     Due to shock?

7      A     Yes.

8      Q     Okay.  And you're saying that the -- the

9   maximum period of time in a mesentery tear involving the

10  small blood vessels, such as this child sustained, would

11  be only four hours?

12     A     That's correct.

13     Q     And that he would be showing symptoms

14  immediately?

15     A     He would show symptoms immediately from the

16  effect of the trauma that brought about the tear and

17  then the effect of the blood itself, the blood being

18  very irritating and causing him not to be able to eat,

19  not to be able to function, having bowel discomfort,

20  maybe nausea and vomiting going along with that.

21     Q     And you would --

22     A     And it's the free blood that creates that

23  problem.

24     Q     And it would be your testimony -- well, all

25  mesentery -- do all mesentery tears result in free

1f7dcf3d-106b-4849-ad11-72cff9ac249a

 1   blood?

 2        A    Yes, by just the nature of being a tear, yes.

 3        Q    Okay.  And it's your testimony that all

 4   people -- all individuals, children or adults, who

 5   suffer this kind of injury, are going to react the same

 6   way?

 7        A    Well, there's clearly individual variation.

 8   And, you know, if you had -- the difference is that if

 9   you have a hematoma, where you have an injury and the

10   blood is confined, say, on the surface of the bowel,

11   that can have a more delayed effect.  But free blood in

12   the abdomen, as we have in this case, even in low

13   quantities, causes discomfort and irritation that can be

14   significant.

15            And this is one of the effects that women

16   under going ovulation experience.  There's actually a

17   term for the phenomena of having ovulation pain, which

18   really relates to the small release of blood into the

19   abdominal cavity.  And that can be very annoying and

20   disturbing to the person experiencing it.

21            It doesn't incapacitate them, but they're

22   aware that they have pain.  And when you have pain from

23   the trauma that -- that tore vessels that allows for

24   this slow leaking of blood in a young child, that's

25   going to make that child be out of sorts significantly

Page 214

1    once that tear has -- or tear sites have occurred.

2        Q    And every injury of this nature is going to

3    affect every child the same way?

4        A    No.  Again, you're right -- I mean, there's

5    individual variation.  Clearly that does occur, and some

6    people are more tolerant of pain than others.

7             But there's going to be the perception that

8    the child is no longer well, and that means not eating

9    and moaning and being --

10       Q    Whimpering?

11       A    Whimpering, yes.

12       Q    Clingy?

13       A    Yes, those things.

14       Q    Not eating -- not eating -- not a normal

15   eating pattern?

16       A    Yes.

17       Q    Not being as active as he normally would be?

18       A    Right.  And not --

19       Q    Even up until the time that he loses

20   consciousness?

21       A    That's correct, yes.

22       Q    Craving -- being thirsty, whether he

23   regurgitates or not after he drinks, but he would have

24   the feeling of thirst?

25       A    Yes.

1          Q     And because of the bloating in his stomach and

2     his abdomen area, he could have the feeling of hungry,

3     even though he doesn't eat?

4          A     Those -- those are reasonable descriptions,

5     yes.

6          Q     And it's your opinion that if a child suffered

7     this kind of injury and lives for days, as I think

8     Dr. Quinton said that he had seen cases of, then these

9     would be children who would be hidden out somewhere not

10    eating, not drinking for days, until -- and they would

11    be hid away in a closet somewhere -- or a room somewhere

12    until they just die?

13         A     Yes.

14         Q     These would not be children that would be out

15    in the public walking around?

16         A     That's correct, sir.

17         Q     Okay.

18              MR. THOMPSON:  That's all I have.  Pass

19    the witness.

20              MR. BINGHAM:  I've got two questions.

21                   REDIRECT EXAMINATION

22    BY MR. BINGHAM:

23         Q     The mesentery tear that may be asymptomatic is

24    not to the degree that Kelynn Pinson's mesentery tear

25    was?

1        A     Actually, in that case, it's not an issue of

2    mesenteric tear as a confined hematoma.

3        Q     Okay.

4        A     See, it's the issue of having free blood in

5    the abdomen that causes you problems.

6        Q     Okay.

7        A     And this is why I mentioned the experience

8    related to the menstrual cycle in women.  Because some

9    women are exquisitely bothered by ovulation with even

10   the small amount of free blood that gets entered into

11   the abdominal cavity.

12       Q     Because I think -- someone may ask, well, if

13   you're writing on page 484 that someone can have a

14   mesentery tear and may be asymptomatic, how come Kelynn

15   Pinson couldn't be asymptomatic?  Do you see what I'm

16   saying?

17       A     Right.  Yeah, but what I'm talking about there

18   is confined blood.  If there's -- mesenteric blues is

19   really what that would be referring to.

20       Q     Okay.  So when you're talking about may be

21   asymptomatic, you're referring to the type of injury

22   that is what?  I'm just not -- that it's like a --

23       A     A bruise and not overt bleeding, you know, in

24   the abdomen.

25       Q     Okay.  If you have free blood in the

Page 217

1    abdomen --

2        A    That's very irritating.

3        Q    Okay.  So that's -- let me -- do you have your

4    article?  Let me see it real quick.

5            Show me on here -- and I'm going to -- because

6    I have not actually had a chance to read your article.

7            Right here where it says -- where was he

8    reading from?

9        A    Page 484.

10       Q    Okay.  What does it say?

11       A    (Indicating.)

12       Q    Okay.  "A child with abdominal trauma may

13   appear relatively symptom free for several hours and

14   immediate response to the pain of the inflicted injury

15   will have occurred but often not reported."

16           Where does it get into the mesentery?

17       A    Well, I mean, it's talking about that it can

18   be much more insidious with the abdominal symptoms that

19   are there.

20       Q    Where does it talk in here -- where does it

21   say mesentery tear?  Where --

22       A    I mean, it's really duodenal perforation or

23   other retroperitoneal injury.  It's kind of covering

24   that.  But, see, one of the things that happens with

25   these injuries is that they evolve over time, and

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 218

1    especially if initially there's not blood, or there's

2    just confined blood, there can be a delayed effect as

3    the tissue breaks down and then either starts bleeding

4    or you get abdominal perforation that comes.

5            And so you can have an event which is

6    insidious in that there can be a delayed effect of more

7    significant organ injury.

8            But in this case, we have the rapid onset of

9    abdominal tearing -- of the tissue tearing.

10   Q    I see.  So if it is confined -- if you have

11   the free blood is where then you get -- you get into the

12   problems of not being able to function?

13   A    Free blood in the abdomen is -- is very

14   painful and very disturbing.

15   Q    Okay.  Let me ask you one other thing, because

16   this is -- before I let you go, I need to ask you -- say

17   the child went to -- you have children, do you not?  Do

18   you have children?

19   A    Four children, yes.

20   Q    Four children.  There are some times that

21   children are hungry or not.  Have you ever said to your

22   child, "This is dinnertime.  If you don't eat now,

23   that's it"?  Have you ever said that to your child?

24   A    I don't know about the "that's it" part.

25   Q    I really wasn't trying to trick you.

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1          Okay.  In other words, you want them to eat
2    then, right?
3         A    For -- let's say for our own convenience, yes.
4         Q    Yeah, for our own convenience.  Sometimes
5    children eat; sometimes they don't want to eat, right?
6    If you're hungry sometimes doesn't mean you're hungry
7    all the time, right?
8          Now, let's assume -- let's not even try to
9    attach a reason to it.  If the child doesn't eat here --
10   because sometimes not eating could be an indication of
11   abdominal trauma?
12        A    Absolutely, yes.
13        Q    Well, if he doesn't eat here, but then he goes
14   over here and he eats all of this, then where -- then
15   what?
16        A    Well, there's not free blood in the abdomen,
17   and he's not been punched in the abdomen.
18        Q    Right.  I mean, you can't -- you can't isolate
19   this incident and say, okay, he's not eating here and
20   disregard the future history, right?
21        A    I agree.
22        Q    And also at the later time right here, there's
23   no free blood in his abdomen right here, you can tell,
24   because -- what you're saying is, is he's eating, he's
25   walking to the mailbox, he's scooting himself on a Big

Page 220

1   Wheel, then -- and he has no signs of distress and he

2   takes a bath at 11:00, there's no bruise, everyone

3   thinks he's normal, then all of that is consistent with

4   him having no free blood in the abdomen?

5       A    His belly hasn't yet been battered.

6       Q    Thank you.  Thank you.

7           MR. BINGHAM:  We pass the witness.

8                   RECROSS-EXAMINATION

9   BY MR. THOMPSON:

10      Q    In the article that we were just talking about

11  on page 484 --

12      A    Yes, sir.

13      Q    -- in that paragraph --

14      A    Yes, sir.

15      Q    -- you do see where it talks about mesenteric

16  lacerations?

17      A    In that same paragraph?

18      Q    Yeah, in that same paragraph.  "The child with

19  an injury such as a small liver or mesenteric

20  laceration."  It doesn't say a bruise to the mesentery.

21  It doesn't say, you know, a -- it says "mesentery

22  laceration."

23      A    No.  You're correct, sir, yes.

24      Q    Okay.  A tear?

25      A    Yes.

1      Q     Where it's going to bleed?

2      A     Where it's going to bleed, right.

3      Q     Okay.  And then it says that may be

4  asymptomatic?

5      A     With the slow accumulation of blood.

6      Q     So based on your -- the conclusions you've

7  drawn, the person who wrote this part of this article --

8  obviously you didn't write this, right?  Because you

9  wouldn't have put it like that.

10     A     I -- I agree with this.  This is relating,

11  again, to the fact that initially, with a little amount

12  of blood, you -- you may not have major symptoms.  But

13  with the accumulation of blood and even the amount that

14  we have in this child, you would have major symptoms.

15  You would not --

16     Q     But didn't you just say a few minutes ago that

17  any amount of blood free flowing in the abdomen is going

18  to cause you irritation?

19     A     Yes.  But --

20     Q     That's why women feel so bad when they're

21  having their cycle.  I mean, despite the fact that women

22  go skiing, swimming, play tennis, you know, while

23  they're having their cycle -- some women do -- you know,

24  despite that, but any free-flowing blood in the

25  abdomen -- you didn't say a little bit of free-flowing

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 222

1    blood was okay.  You said any free-flowing blood in the

2    abdomen is going to incapacitate you to the point where

3    you can't do nothing, and you're just going to be laying

4    there dead or put away in a room somewhere not eating

5    for days until the child dies.

6        A    If I conveyed that, that's a little bit

7    extreme.  But any blood -- any blood in the abdomen is a

8    source of irritation to the person that has the blood.

9                    MR. THOMPSON:  That's all I have, Judge.

10                   THE COURT:  All right, Mr. Thompson.

11                   Mr. Bingham.

12                   MR. BINGHAM:  No, Judge.  Thank you.

13                   THE COURT:  And I take it that the doctor

14   may be finally excused as a witness?

15                   MR. BINGHAM:  Can I ask Mr. Thompson

16   something?

17                   THE COURT:  Sure.

18                   (Counsel confer.)

19                   MR. BINGHAM:  Judge, we -- we rest.  We'd

20   rest.

21                   THE COURT:  All right.  As far as the

22   doctor goes, may he be finally excused?

23                   MR. BINGHAM:  Sure.

24                   THE COURT:  Get him on the road to the

25   airport?  Finally excused?

Page 223

1                   MR. THOMPSON:  No objections.

2                   THE COURT:  Doctor, you're finally

3      excused as a witness.  Have a safe trip back.  Thank you

4      for being here.

5                   (The witness left the courtroom.)

6                   THE COURT:  All right.  Mr. Bingham, did

7      you just rest?

8                   MR. BINGHAM:  We did.

9                   THE COURT:  All right.  You rest, Mr.

10     Thompson, you rest and close now?

11                  MR. THOMPSON:  Defense closes.

12                  THE COURT:  All right.  Ladies and

13     Gentlemen, with both the State and defense having rested

14     and closed the cases, let me explain to you from a

15     procedural standpoint what takes place next.

16                      First of all, you're going to get to

17     leave.  But after -- that's the good part.  After you

18     leave, what we're going to be doing is working on what

19     we call the Charge of the Court.  We've already done

20     some work on it, but it really can't be finalized until

21     we finish all of the evidence in the case.  We'll be

22     working on the Charge of the Court for some time, for

23     some time here, and then also in the morning.

24                      When you come back in the morning -- I'm

25     going to give you a time in just a minute after I confer

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 224

```
 1   with counsel.  But when you come back in the morning --
 2   when you come in the courtroom, first thing that will
 3   take place is I will read the Charge of the Court to
 4   you.
 5             The Charge of the Court contains all of
 6   the instructions on the law that you will follow in
 7   deliberating the evidence and arriving at your verdict
 8   in the case.  But after I read the charge of the Court
 9   to you, which will be fairly lengthy, you're going to
10   hear final argument from the State, arguments from the
11   defense, and closing arguments from the State.  That
12   will take us a certain period of time, which we'll
13   decide on this evening.
14             After the charge is read and you hear
15   arguments from counsel, then the case will be submitted
16   to you for your deliberation.
17             I'm going to give you -- if you'll bear
18   with me just a moment, because this charge we're
19   working -- going to be working on after you leave.
20             Counsel, let me see you at the bench.
21             (Bench conference:)
22             THE COURT:  I mean, we're going to stay
23   this evening --
24             MR. BINGHAM:  Right.
25             (Counsel confer.)
```

Page 225

1                    MR. BINGHAM:  How about 10:00?  Well, I

2    mean --

3                    THE COURT:  We're going to have --

4                    MR. THOMPSON:  10:00, sure, would be

5    wonderful, Judge.

6                    THE COURT:  Sure would be wonderful,

7    but -- not always that way.

8                    (End of bench conference.)

9                    (Reported by Steve R. Awbrey, CSR:)

10                   THE COURT:  All right.  Ladies and

11   gentlemen, what I'm going to ask you to do and this is a

12   little bit later, but the reason is, where I can be sure

13   when you come in we'll be ready to charge and argue the

14   case.  I'm going to ask you in the morning to be back at

15   9:30.  Okay?

16                   And bear in mind all of the instructions.

17   We're getting down to the point where the case is going

18   to be submitted to you for your deliberations, and

19   verdict.  We'll see you at 9:30 in the morning in the

20   jury room.

21                   All rise for the jury.

22                   (The jury left the courtroom.)

23                   THE COURT:  We're back on the record in

24   Cause Number 241-1251-08; State Texas versus Demontrell

25   Miller.

1f7dcf3d-106b-4849-ad11-72cff9ac249a

Page 226

1          State's counsel is present.  Defense

2     counsel's present.  The defendant is present.  We're

3     outside the presence of jury on the charge conference.

4          Now, the charge the Court has capital

5     murder, all of the lesser included's requested,

6     obviously, the charge on capital murder.  This charge

7     that the Court has charges on murder under 19.02(2)

8     which is in paragraph 5.

9          Okay.  Let me get what Mr. Thompson -- go

10    ahead and put on the record what you are requesting on

11    the lesser included's.  We're on the record now.

12         MR. THOMPSON:  Judge, the only thing

13    we're asking as far as lesser included offenses are

14    concerned is felony murder 19.02(b)(2) and criminally

15    negligent homicide.

16         THE COURT:  What's the State's position?

17         MR. BINGHAM:  Judge, our position is we

18    will agree to include felony murder under 19.02(b)(2) as

19    a lesser included offense.  For the record under the

20    Lofton standard, Felder versus State, and Nelson

21    Aramando Paz versus State, we don't think they're

22    entitled to it, but we will agree to it.

23         We definitely disagree with criminally

24    negligent homicide, because of the standard set forth in

25    the Lofton case.  Lofton versus State, Court of Criminal

1f7dcf3d-106b-4849-ad11-72cff9ac249a

1    Appeals case 45 SW 3d 649.

2              That the defendant under the standard

3    whereby it says a defendant either presents evidence

4    that he committed no offense or presents no evidence,

5    and there's no evidence otherwise showing that he's

6    guilty only of the lesser included offense.

7              Additionally, there's a no evidence

8    establishing if the defendant is guilty, he's guilty

9    only of criminally negligent homicide.

10             Therefore, we will agree even though we

11   don't think he's entitled to it, we will agree to the

12   felony murder.  We object to criminally negligent

13   homicide for the reasons just set forth.

14             THE COURT:  All right, Mr. Thompson?

15             MR. THOMPSON:  We don't have anything

16   else, Judge.

17             THE COURT:  I'm sorry?

18             MR. THOMPSON:  We don't have anything

19   else.

20             THE COURT:  Okay.  Well, the Court is

21   going to deny your request for a lesser included offense

22   for a charge on the lesser included offense of

23   criminally negligent homicide.

24             Mr. Thompson, one of y'all, while we are

25   still on the record, since I'm going to submit the

1    19.02(2) which is in paragraph -- my question is there

2    any objection to how I have it in the charge in 5,

3    paragraph 5?  It's in 5, but if each of would you look

4    at it.

5                    MR. THOMPSON:  I don't see any problem,

6    Judge, with the way that is.

7                    THE COURT:  Let's see what they have to

8    say.

9                    If you want to, we can just get back down

10   here at 8:30 in the morning.  I know where I am in terms

11   of finalizing it.  If you want to go on, Ms. Lacy.  Why

12   don't you just go on.  Mr. Miller, you can go on, too.

13   Take him on back, and I'll finalize it at 8:30 in the

14   morning.

15                    Y'all be back at 8:30.

16

17                    (Recess for day.)

18

19

20

21

22

23

24

25

Page 229

1    STATE OF TEXAS  *

2    COUNTY OF SMITH *

3             We, STEVE R. AWBREY, CSR, Official Court

4    Reporter, and D. KEITH JOHNSON, CSR, RDR, CRR, Deputy

5    Official Court Reporter for the 241st Judicial District

6    Court in and for Smith County, Texas, do hereby certify

7    that the above and foregoing contains a true and correct

8    transcription of all of the portions of evidence and

9    other proceedings requested in writing by counsel for

10   the parties to be included in this volume of the

11   Reporter's Record, in the above-styled and numbered

12   cause, all of which occurred in open court or in

13   chambers and were reported by us.

14            We further certify that this Reporter's Record

15   of the proceedings truly and correctly reflects the

16   exhibits, if any, offered by the respective parties.

17            WITNESS OUR OFFICIAL HANDS this the 3rd day of

18   November, 2009.

19

     _____    _____

20   STEVE R. AWBREY                    D. KEITH JOHNSON

     TX CSR #3940                       TX CSR #3781

21   Expires: 12-31-09                  Expires:  12-31-09

     Official Court Reporter            Deputy Official Reporter

22

                     241st Judicial District Court

23                   Smith County Courthouse

                     Tyler, TX  75702

24                   (903) 590-1636

25