IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| DEMONTRELL MILLER, | § § | |
| Petitioner, | § § | |
| v. | § § § | Civil Action No. 6:15-cv-00535-MAC-ZJH |
| WILLIAM STEPHENS, Director, Texas Department of Criminal Justice, Correctional Institutions Division, | § § § § | |
| Respondent. | § § | |

**PETITIONER DEMONTRELL MILLER'S RESPONSE TO RESPONDENT DAVIS'S OBJECTIONS TO MAGISTRATE JUDGE HAWTHORN'S RECOMMENDATION TO STAY THESE PROCEEDINGS**

**I.     INTRODUCTION**

Mr. Miller moved to stay and abate these proceedings because he uncovered substantial, new scientific evidence that shows he is actually innocent of the murder for which he is convicted. Indeed, the sole evidentiary basis for Mr. Miller's conviction—the expert testimony of Dr. Wilson, the only witness whose testimony definitively excluded all other possible suspects or causes of Kelynn Pinson's death—has been eliminated because Dr. Wilson has since changed his testimony. Federal habeas counsel has also uncovered that the State withheld the fact that the medical examiner who performed the autopsy disagreed with the opinions rendered by Dr. Wilson. And Mr. Miller has, with his amended petition, come forward with testimony from five new experts all of whom agree that Kelynn Pinson's death could not have occurred in the manner argued by the State at trial. Based on this new evidence, Magistrate Judge Hawthorn correctly recommends that Mr. Miller's motion be granted.

1

At trial, the State introduced no direct evidence that Mr. Miller caused the death of his stepson, Kelynn Pinson. Instead, its entire case was predicated on the theory that Kelynn Pinson sustained his fatal injury in the three hours before his death on June 1, 2008, when he was in the sole custody of Mr. Miller. The State formulated this theory based on the initial opinions of Dr. Reade Quinton, the medical examiner who autopsied Kelynn Pinson. Dr. Quinton concluded that Kelynn Pinson died from a tear in his mesentery, which in turn cut off blood flow to his colon, which ultimately caused his death. But while Dr. Quinton initially told police that this injury could cause death in as little as two to three hours, at trial he substantially broadened the timeframe, saying that such injuries typically cause death in eight to twelve hours and could take as long as thirty hours, or as little as three hours—but only in extreme cases (which Dr. Quinton also admitted this was not, rating Kelynn Pinson's injury as a "7" out of "10"). And after hearing the testimony of the defense expert, Dr. Quinton changed his testimony even further, admitting that he could not be certain how much pain Kelynn Pinson was suffering prior to his death—and thus whether his injury would have been noticeable to the adults around him the days and hours before he died—and that Kelynn Pinson's injury could have been caused by any adult around him in the thirty hours before his death.

So the State turned to Dr. Harry Wilson, who it called for the first time in its rebuttal case—indeed, he was the last witness called in the guilt-innocence phase—to salvage its case. Dr. Wilson testified that, contrary to the testimony of Dr. Quinton (and, indeed, of every other medical expert who has testified in this case before or since), Kelynn Pinson died from brain swelling, and that this brain swelling would have cause death in as little as one but not more than four hours. In its closing argument, the State relied almost exclusively on Dr. Wilson's testimony to argue that Mr. Miller must have caused Kelynn Pinson's death, because he was the only expert

who definitively excluded all other possible suspects or causes. During deliberations, the jury requested the transcript of Dr. Wilson's testimony—and of no other witness. Plainly, Mr. Miller was convicted on the basis of the theory espoused by Dr. Wilson.

But it is now plain that Dr. Wilson's theory, as articulated at trial, was wrong. Dr. Wilson himself admits this, in a thoughtful, ten-page declaration submitted with Mr. Miller's amended petition for habeas corpus relief. Specifically, Dr. Wilson now believes, upon reexamining the facts, that Kelynn Pinson's injury could have been caused by Ceola Pinson, Kelynn Pinson's mother, several hours before his original estimate. Dr. Quinton also thinks Dr. Wilson's trial theory was wrong, though for different reasons. In correspondence with federal habeas counsel, Dr. Quinton stated that when performing Kelynn Pinson's autopsy, he examined the brain and saw no evidence of brain swelling—nor would he have missed something like that. Dr. Qinton's opinion on brain swelling was never disclosed by the State at Mr. Miller's trial. And federal habeas counsel has retained four expert forensic pathologists and a pediatric trauma surgeon, none of whom subscribe to Dr. Wilson's trial theory and instead conclude that Kelynn Pinson most likely sustained his injuries many hours if not days before his death.

Magistrate Judge Hawthorn correctly concludes that this new evidence both provides Mr. Miller with good cause for failing to exhaust his claims before the state courts and renders Mr. Miller's claims not plainly meritless. This new evidence excuses any failure of Mr. Miller to exhaust his claims before the state courts either because it shows he is actually innocent; because it was not previously available and, particularly with respect to the State's failure to disclose Dr. Quinton's opinion that there was no brain swelling, may amount to a *Brady* violation; or because it shows that Mr. Miller's state habeas counsel was inadequate for failing to assert any claim whatsoever regarding the medical science. And this new evidence—in particular, the changed

testimony of Dr. Wilson—is precisely the sort of evidence Texas courts have found warrant habeas relief, meaning Mr. Miller's claims are virtually by definition not plainly meritless. And as there is no suggestion that Mr. Miller has engaged in any delay tactics, Mr. Miller has satisfied all the requirements set out in *Rhines v. Weber* for a stay and abeyance, as Magistrate Judge Hawthorn correctly found in his report and recommendation.

The State's objections to the report should be overruled. First, the State in its objections attempts to turn *Rhines*'s "plainly meritless" standard on its head, by arguing that the new evidence does not conclusively prove Mr. Miller's innocence and therefore does not warrant a stay and abeyance. This is not what Mr. Miller is required to show to obtain a stay and abeyance—indeed, the very purpose of the stay-and-abeyance procedure is so that such "factual determinations" are "reserved in the first instance for factual and evidentiary development before the state courts." *Devoe v. Stephens*, Case No. 1:14-cv-151 (W.D. Tex. 2014). The State also ignores the fact that the Texas Criminal Court of Appeals has repeatedly found changed testimony by medical experts to be new scientific evidence warranting habeas relief, even in circumstances with much stronger evidence of guilt or without any alternative suspects. And the State completely fails to address the reality that now not a single expert who has reviewed the facts of this case, including Dr. Wilson himself, believes the medical theory on which Mr. Miller was convicted is correct.

Second, the State argues that Magistrate Judge Hawthorn erred in finding that Mr. Miller's failure to exhaust his claims was excused because it simply did not occur to Mr. Miller's state habeas counsel to raise them. But in so doing, the State ignores the second basis for Judge Hawthorn's ruling that Mr. Miller's failure to exhaust should be excused—namely, that because he has asserted a colorable actual innocence claim, it would work a "manifest injustice" to deny

him an opportunity to present this claim to the state courts. Doc. 64 at 5. The State also makes no mention of the fact that Mr. Miller's motion to stay and abate is based on evidence not previously available to him—including Dr. Quinton's opinion on brain swelling, which the State knew or should have known of at the time of trial and yet failed to disclose. And even if the sole excuse were state habeas counsel's failure, this is not a case, as the State contends, where counsel simply filed a sub-par petition—rather, counsel wholly failed to raise any claim relating to the medical theory that was the basis for Mr. Miller's conviction. Such a wholesale failure to present a meritorious claim is precisely the situation the Fifth Circuit has held excuses a failure to exhaust.

Accordingly, Mr. Miller respectfully submits that the Court should adopt Magistrate Judge Hawthorn's report and recommendation in full.

## II. ARGUMENT

### A. Mr. Miller's Claims Are Not Plainly Meritless

Mr. Miller has rebutted the medical theory on which he was convicted in three ways: through the new declaration of Dr. Wilson himself, who has changed his testimony to include Ceola Pinson as a suspect who cannot be excluded; through the new testimony of Dr. Quinton, who disputes Dr. Wilson's claim there was brain swelling; and through the testimony of Mr. Miller's five experts, all of whom agree that Dr. Wilson's trial theory was not correct. Additionally, Dr. Stephen Pustilnik, the expert called by the defense at trial (but who was sent home before Dr. Wilson testified) has submitted a declaration with Mr. Miller's habeas petition stating that he disagrees with Dr. Wilson's trial theory. And the emergency room physician who attended to Kelynn Pinson, Dr. Mark Anderson, testified at trial that he believed Kelynn died from a necrotic colon, as Dr. Quinton reported in his autopsy report. Meaning that, at present, no

5

medical expert, including Dr. Wilson himself, subscribes to the medical theory Dr. Wilson espoused at trial—and in reliance on which the jury convicted Mr. Miller.

Despite all of this new evidence, the State still contends that a stay and abeyance is not warranted. First, the State appears to argue that Mr. Miller's claims are meritless because there was other evidence adduced at trial that tended to support a conviction. But this is beside the point. The Texas Court of Criminal Appeals has repeatedly affirmed the granting of habeas relief to petitioners who present new scientific evidence that undermines the State's trial theory, even where there is far more other evidence of guilt than is present here. For example, in *Ex parte Henderson*, 384 S.W. 3d 833 (Tex. Crim. App. 2012), the court affirmed the grant of a new trial to the petitioner based on new scientific evidence showing the death could have been an accident despite an abundance of other evidence of guilt. Among other things, the petitioner in that case hid the body of her dead child in a wine cooler box, fled the state with her other children, and assumed a new identity. *See id.* At 855–86 (Keasler, J., dissenting). Likewise, in *Ex parte Robbins*, 478 S.W. 3d 678 (Tex. Crim. App. 2014), the court affirmed the grant of habeas relief based solely on the medical examiner changing her opinion on the cause of death from "homicide" to "undetermined," despite there being evidence that the petitioner had beaten the victim prior to her death. *See id.* at 680–81.

And in any event, the supposed other evidence of guilt is hardly that. The State attempts to rehabilitate Dr. Quinton by selectively citing to his direct testimony. The State notes that Dr. Quinton testified there was nothing inconsistent with Kelynn being injured after 9:15 a.m. on June 1, when he was alone with Mr. Miller. *See* Doc. 65 at 10. But this is not accurate because Dr. Quinton himself offered testimony inconsistent with this conclusion. Specifically, Dr. Quinton testified that Kelynn died between 10 and 11 a.m. on June 1, based on his body

temperature and the supposed onset of rigor mortis after he arrived at the emergency room. At the same time, Dr. Quinton was clear that Kelynn's death could not have occurred less than three hours after he was injured. Of course, an injury that takes three hours to cause death makes it impossible for Kelynn to be injured at 9:15 and dead by 10 or 11 a.m. Meaning that there was something inconsistent with Kelynn being injured after 9:15 a.m.—namely, Dr. Quinton's opinion that Kelynn was dead just one to two hours later.

The State also argues that Dr. Quinton opined Kelynn would have been in obvious discomfort after his injury, and that since no one noticed Kelynn being in any pain before 9:15 a.m. on June 1, his injury must have occurred afterwards. While Dr. Quinton did testify to this in the State's case-in-chief, on rebuttal Dr. Quinton admitted that it was impossible to say how much pain Kelynn was in, meaning that Kelynn's injuries could have gone unnoticed by his caregivers. Also on rebuttal, Dr. Quinton admitted that any adult—not just Mr. Miller—could have caused Kelynn's injuries in the thirty hours before his death. Thus, Magistrate Judge Hawthorn's conclusion that Dr. Quinton's testimony did not support the State's case is correct. Indeed, if anything, Dr. Quinton's testimony supported a judgment of acquittal because he could not exclude any of the numerous adults who were around Kelynn in the thirty hours before his death.[1]

Alternatively, the State argues that Dr. Wilson's changed testimony should not be believed. But the sort of credibility analysis to which the State devotes four pages of objections

---

[1] The State also argues that Dr. Mark Anderson, the emergency room physician who attended to Kelynn, offered testimony supporting the State's theory. But at trial, Dr. Anderson, who is not a forensic pathologist, simply adopted the findings of Dr. Quinton's autopsy report regarding the cause of death. And there is a good reason the State did not attempt to solicit an independent opinion from Dr. Anderson. Prior to trial, Dr. Anderson believed Kelynn had died as a result of sexual abuse. After Dr. Quinton disproved this hypothesis through his autopsy, the State never raised it again. It is telling that now, after Drs. Wilson and Quinton have provided new testimony, the State falls back on a witness as lacking in credibility as Dr. Anderson.

is precisely the sort of "factual determination" better "reserved" for the state courts. *See Devoe v. Stephens*, Case No. 1:14-cv-151 (W.D. Tex. 2014). The question presently before this Court, as Magistrate Judge Hawthorn correctly realized, is simply whether there is new scientific evidence that the state courts would consider a valid basis for habeas relief. And, as the Court of Criminal Appeals in *Robbins* made clear, a medical expert changing her opinion to admit other causes of death is new scientific evidence. *See* 478 S.W. 3d at 692 ("Her new opinion that the cause of death is 'undetermined,' which the applicant argues is the 'change in scientific knowledge,' is also an inference or assertion supported by appropriate validation based on the scientific method. Moore's revised opinion on the cause of death satisfies the requirements to be called 'scientific knowledge,' and thus falls within the language of article 11.073."). The State simply ignores this precedent.

Instead, the State criticizes Dr. Wilson for relying on "additional facts" about Ceola Pinson's interactions of Kelynn on the morning of his death. First, the State claims that Dr. Wilson should not be permitted to change his testimony because he was "told about Ceola's interaction that morning with Kelynn" at trial. Doc. 65 at 11 (citing 52 RR 76). To be clear, however, Ceola's interaction with Kelynn was mentioned to Dr. Wilson exactly once at trial, as part of a long, rambling question by the prosecutor that ultimately concluded by inquiring whether Dr. Wilson thought it likely Kelynn would have wanted to eat a sandwich:

> Q. The mother even asked him at one point, she hears something, a thump or a knock, and she says, are you okay, Kelynn, and he answers, yes—I have "mommy", but I think it's actually, "mama"—yes, mama. About 5:15, the mother—he's still asleep. The mother moves him to the couch, and the mother says he appears to be fine and asleep.
> 9:15, the mother comes home. He's still appears [*sic*] to be asleep, and she stands over him for a few minutes and he looks normal to her.

8

> 9:15, around that time, is the last time anyone but the defendant sees the victim alive.
> Now, the defendant says what's in red here. Here's his statements to the police.
> He says at 11:30, the victim woke up. He ate a sandwich and maybe some cereal. Knowing that the child at 12:56 is cold, unresponsive, no heartbeat. Would it be consistent that at 11:30, he would actually wake up and eat a sandwich, do you believe?

53 RR 76.

And the question of whether Dr. Wilson was fully apprised of all the relevant facts at trial is ultimately beside the point. In *Robbins*, the medical examiner changed her opinion on the cause of death from "homicide" to "undetermined" without reviewing *any* additional facts. *See* 478 S.W. 3d at 692. So if, as the State appears to suggest, Dr. Wilson really has not learned any additional facts, his revised opinion *itself* constitutes new scientific evidence of the sort that the Texas state courts will consider. *Id.*

Bizarrely, immediately after criticizing Dr. Wilson for not relying on actually additional facts, the State criticizes him for relying on additional facts. Specifically, the State asserts there is no record evidence that Ceola had a history of abusing Kelynn. But there is a record—an extensive record—of Ceola Pinson's history of abuse that has been developed in this proceeding, supported by numerous declarations of percipient witnesses, none of which the State seriously disputes. While this evidence was not presented at trial, the failure of defense counsel to do so is currently the subject of one of Mr. Miller's pending ineffective assistance claims. In any event, the question of whether this additional evidence is an acceptable basis for Dr. Wilson to revise his testimony is, again, a factual determination best reserved for the state courts.[2]

---

[2] In a similar vein, the State suggests that Dr. Wilson's revised testimony is "more" speculative than the speculative opinion he offered at trial because it is based on evidence not in the record. But again, there is evidence in the record of this proceeding that Ceola Pinson had a history of abusing Kelynn. More importantly, the question of whether Dr. Wilson's revised testimony is

Alternatively, the State appears to argue that Dr. Wilson's revised testimony makes no difference because Dr. Wilson still does not believe Mr. Miller's statements to the police are correct. But even if Mr. Miller's statements are false, that does not make him guilty of anything other than lying to the police. Especially because Dr. Wilson's revised testimony means that there is now no expert who endorses the State's theory or who can, using reliable scientific principles, exclude all alternative suspects or causes of Kelynn's death. The credibility of Mr. Miller's statements to the police does not change the fact that the primary basis for his conviction has now been eliminated.

For this reason, the State's focus on whether or how Mr. Miller could have stood by the truth of his statements to police is ultimately a sideshow. None of the other evidence adduced at trial, scientific or otherwise, excludes other suspects or causes of Kelynn's death. At the same time, the evidence Mr. Miller has provided with his amended habeas petition points to his innocence, because it shows Kelynn's injury was most likely sustained a full day or more before he died. Indeed, at this juncture, Mr. Miller's statements to police make more sense, and are more consistent with the scientific evidence, than the theory the State offered at trial. For these reasons, Mr. Miller's claims are not plainly meritless.

### B.     Mr. Miller Has Shown Good Cause for Any Failure to Exhaust

The State argues that state habeas counsel's failure to advance any claims regarding the medical science that formed the primary basis for Mr. Miller's conviction does not excuse Mr. Miller's failure to exhaust those claims. To begin, this simply ignores Magistrate Judge Hawthorn's additional finding that Mr. Miller's actual innocence claim—which, as explained above, it not plainly meritless—operates to excuse his procedural default. *See* Doc. 64 at 5

---

based in sound science is a question for the state courts to resolve in a successive habeas proceeding. *See Robbins*, 478 S.W.3d at 692.

(noting that an actual innocence claim may excuse failure to exhaust because allowing such a claim to be procedurally barred would work a manifest injustice). On this basis alone, Magistrate Judge Hawthorn's report and recommendation should be adopted.

The State also ignores the fact that Mr. Miller's motion to stay and abate is predicated upon new evidence not previously available to him. In particular, it would have been impossible for Mr. Miller to assert any claims arising from Dr. Wilson's revised testimony previously, because Dr. Wilson revised his testimony less than a year ago. With respect to Dr. Quinton's opinion on brain swelling, the State never disclosed that Dr. Quinton disagreed with Dr. Wilson's theory. Even though the State knew, or should have known, that Dr. Quinton and Dr. Wilson had radically different theories about the cause of Kelynn Pinson's death. And by calling Dr. Wilson last, after Dr. Quinton had been completely excused from testifying, the State ensured the jury would not hear what he had to say about Dr. Wilson's theory. These facts form the basis for Mr. Miller's claim that the State violated its disclosure obligations under *Brady v. Maryland*. The State should not now be permitted to use its failure to disclose this potentially exculpatory evidence sooner to bar Mr. Miller from returning to state court to exhaust his claims.

And the State mischaracterizes the state of the law in the Fifth Circuit by suggesting that ineffectiveness of state habeas counsel is not good cause at the motion to stay and abate stage.[3] To make this argument, the State relies principally on *Hall v. Thaler*, 504 F. App'x 269, 284 (5th Cir. 2012). However, as the State notes, even in that case, the Fifth Circuit suggested that when state habeas counsel submits a petition that is so defective it is tantamount to not filing a petition

---

[3] The State also argues that the *Martinez-Trevino* doctrine limit when federal courts may directly review unexhausted claims. But Mr. Miller is not seeking that at this time—rather, he is seeking to stay and abate this proceeding so he may exhaust his claims in state court. Accordingly, the appropriate inquiry is whether he has shown good cause under *Rhines*, which, as the State admits, is not the same standard as is required to obtain direct federal review.

11

at all, that ineffectiveness may excuse a failure to exhaust. In such a circumstance, as the Fifth Circuit noted occurred in *Ex parte Medina*, 361 S.W. 3d 633 (Tex. Crim. App. 2011), Texas state courts would grant petitioners a "mulligan" and allow them to submit a successive petition. Accordingly, in the years since *Hall*, courts in this Circuit have repeatedly stayed and abated federal habeas proceedings so that the state courts could first decide consider whether ineffectiveness of state habeas counsel excuses a failure to exhaust. *See, e.g.*, *Alvarez v. Thaler*, No. 09-CV-03040 at *4 (S.D. Tex. 2013) ("The Court of Criminal Appeals should have the first opportunity to consider whether [state habeas counsel]'s alleged incompetency falls within the purview of *Medina* [holding that defective state habeas petitions do not bar unexhausted claims] before this Court decides whether *Trevino* authorizes *de novo* federal review."); *Neathery v. Stephens*, 746 F.3d 227, 229 (5th Cir. 2014) (remanding defaulted ineffectiveness claims to the district court, noting that the district court retained the discretion to stay the federal proceeding and allow the petitioner to exhaust his claims in state court) *Trevino v. Stephens*, 740 F.3d 378, 378 (5th Cir. 2014) (same); *Rayford v. Stephens*, 552 F. App'x 367, 367 (5th Cir. 2014) (same).[4]

State habeas counsel's ineffectiveness in this case is just as bad, if not worse, than that which occurred in *Medina*. Here, habeas counsel did not simply fail to find the best experts, or articulate a challenge to the medical science with insufficient eloquence. State habeas counsel did not raise any issue with respect to the medical science that formed the primary basis for Mr. Miller's conviction at all. He essentially failed to present a petition on these issues. And this failure was not motivated by any strategy—it simply did not occur to him to raise any such

---

[4] The State also faults Magistrate Judge Hawthorn for citing to state court decisions regarding ineffectiveness of state habeas counsel. But as the State notes, federal law on good cause is far from settled, and the state courts have considered precisely this issue on a number of occasions, so their opinions are appropriate persuasive authority. And in any event, Magistrate Judge Hawthorn plainly grounds his decision on *Hall* and the applicable Fifth Circuit law.

claims. That is the sort of failure the Fifth Circuit has held excuses failure to exhaust. At the very least, the state courts should be permitted to make this determination in the first instance, as the courts in this circuit routinely allow them to do.

## III. CONCLUSION

Magistrate Judge Hawthorn's report and recommendation makes no errors of law and correctly finds that Mr. Miller has asserted claims that are not plainly meritless. Indeed, Mr. Miller has come forward with new evidence that shows he is actually innocent. For these very reasons—that the evidence is new and shows he is innocent—Mr. Miller's failure to exhaust should be excused. Mr. Miller respectfully requests that the Court adopt Magistrate Judge Hawthorn's report and recommendation in full and grant the motion to stay and abate.

Respectfully submitted,

*/s/ Boyd Cloern*
Boyd T. Cloern
STEPTOE & JOHNSON LLP
1330 Connecticut Ave. NW
Washington, DC 20036
Phone (202) 429-3000
Fax (202) 429-3902
mkammerud@steptoe.com
***Pro Bono Counsel for Petitioner***

**CERTIFICATE OF SERVICE**

I hereby certify that on February 23, 2018, a true and correct copy of the foregoing has been served by CM/ECF upon counsel for Respondent:

>Erich Dryden
>P.O. Box 12548, Capitol Station
>Austin, Texas 78711
>(512) 463-2141
>Erich.dryden@texasattorneygeneral.gov

>*/s/ Boyd Cloern*
>Boyd Cloern