## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

DEMONTRELL MILLER,      §
     §
     Petitioner,      §
v.      §      No. 6:15-cv-00535-JDK
     §      *DEATH PENALTY*
ERIC GUERRERO,[1]      §
DIRECTOR TDCJ-CID,      §
     §
     Respondent.      §

## MEMORANDUM OPINION AND ORDER OF DISMISSAL

Petitioner Demontrell Miller, a death row inmate confined in the Texas prison system, filed an amended petition for a writ of habeas corpus pursuant to 28 U.S.C. §§ 2241 & 2254. Docket No. 49. In 2009, Petitioner was convicted in Texas state court for the murder of two-year-old Kelynn Pinson.

As explained below, Petitioner's petition is denied because he fails to demonstrate that he is entitled to federal habeas relief.

## I.    PROCEDURAL HISTORY

Petitioner was indicted, convicted, and sentenced to death in Smith County, Texas, for the June 1, 2008 capital murder of two-year-old Kelynn Pinson, the son of Petitioner's girlfriend. 1 CR 4 (Indictment); 3 CR 430–34 (Judgment).[2] In an

---

[1] Eric Guerrero replaced Bobby Lumpkin as the Correctional Institutions Division Director of the Texas Department of Criminal Justice and is substituted as the Respondent in this case under Rule 25(d) of the Federal Rules of Civil Procedure.

[2] "CR" refers to the clerk's record, preceded by volume number and followed by page number(s). "RR" refers to the reporter's record of transcribed trial proceedings, preceded by volume number and followed by page number(s). "SX" refers to the State's exhibits, followed by exhibit number. "SHCR1" refers to the state habeas clerk's record for Petitioner's first state habeas proceeding, preceded by

unpublished opinion, the Texas Court of Criminal Appeals ("CCA") affirmed his conviction and sentence. *Miller v. State*, No. AP-76270, 2012 WL 1868406 (Tex. Crim. App. May 23, 2012) (not designated for publication). Petitioner did not seek certiorari review in the United States Supreme Court.

While his direct appeal was pending, Petitioner filed his first state habeas application in the state trial court. 1 SHCR1 1. The trial court later entered findings of fact and conclusions of law recommending that relief be denied. Supp. SHCR1 6–19. Based upon these findings and conclusions and its own review of the record, the CCA adopted the trial court's recommendation and denied habeas relief. *Ex parte Miller*, No. 81,581-01, 2015 WL 1756860, at *1 (Tex. Crim. App. Apr. 15, 2015) (per curiam) (not designated for publication), *reh'g denied* (May 20, 2015) ("*Miller I*").

On April 13, 2016, Petitioner filed a federal habeas petition. Docket No. 22. More than a year later, on April 28, 2017, he filed an amended habeas petition. Docket No. 49. His Amended Petition is the operative pleading in this case. *See Clark v. Tarrant Cnty., Tex.*, 798 F.2d 736, 740 (5th Cir. 1986) (an amended pleading supersedes an original pleading). The Amended Petition includes twenty-two claims, several of which were not presented to the CCA.

Petitioner then moved to stay and abate these proceedings so that he could exhaust the unexhausted claims in state court. Docket No. 56. The Court granted

---

volume number and followed by page number(s). "Supp. SHCR1" refers to the supplemental state habeas clerk's record for Petitioner's first state habeas proceeding, followed by page number(s). SHCR2 refers to the state habeas clerk's record for Petitioner's second state habeas proceeding, preceded by volume number and followed by page number(s). For these documents not hosted on ECF, the page number refers to the bolded PDF number located on the lower right side of the page.

the motion.  Docket Nos. 64; 67.  Petitioner returned to state court and filed a second habeas application.  1 SHCR2 20–300.  The CCA dismissed the application as an abuse of the writ without considering the merits.  *Ex parte Miller*, No. 81,581-02, 2021 WL 2674516, at *1 (Tex. Crim. App. Jun. 30, 2021) (per curiam) (not designated for publication) ("*Miller II*").  Petitioner then returned to this Court, which lifted the stay and ordered the Respondent to respond to Petitioner's amended petition.  Docket Nos. 83; 87; 88.

The Respondent filed his Response on November 2, 2022.  Docket No. 101. Petitioner filed his Reply on September 7, 2023.  Docket No. 109.

## II.    CLAIMS FOR RELIEF

Petitioner brings the following claims for habeas relief:

1.    **(Claims 1, 2, & 3)**: The prosecution:

   A.    introduced expert testimony that was false, unreliable, contradictory, and presented in a manner to surprise and prevent challenge by the defense, violating his due process rights under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Chambers v. Mississippi*, 410 U.S. 284 (1973) (Claims 1 & 2); and

   B.    failed to disclose potentially exculpatory evidence that Dr. Quinton found no evidence of brain swelling, violating Petitioner's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963) (Claim 3).

2.    **(Claim 4)**:   Absent the State's false, misleading, and unreliable expert medical testimony, the remaining medical evidence at trial establishes that Petitioner is innocent.

3.    **(Claims 5, 6, 7, & 8 (IATC))**: Trial counsel were ineffective at the guilt-innocence phase for failing to adequately prepare Dr. Pustilnik, the defense's medical expert (Claim 5), challenge the prosecution's experts (Claim 6), investigate and present

3

alternative suspects and causes of Kelynn's injuries (Claim 7), and prepare Dr. Compton to testify (Claim 8).

4.  **(Claim 9)**:  The trial court violated Petitioner's constitutional rights by refusing to submit an instruction to the jury on the lesser-included offense of felony murder.

5.  **(Claims 10–17)**:  Petitioner was deprived of a fair trial because:

    A.  the prosecution improperly invoked "the rule on witnesses" to exclude his supporters from the courtroom, in violation of his right to a public trial and due process, and his trial counsel were ineffective for not objecting (Claims 10 & 11-IATC);

    B.  the prosecution injected race into the trial violating his Fourteenth Amendment right to due process, and trial counsel were ineffective for failing to object, and/or appellate counsel was ineffective for failing to raise these issues on appeal (Claims 12 & 13-IATC);

    C.  the State suppressed admissible testimony from mitigation witnesses, and trial counsel were ineffective for failing to object (Claims 14 & 15-IATC); and

    D.  the prosecution made impermissible statements during its closing arguments at both the guilt and punishment phases of the trial in violation of his due process rights, trial counsel were ineffective for failing to object, and the cumulative effect of the prosecution's misconduct denied him due process (Claims 16 & 17-IATC);

6.  **(Claims 18, 19, & 20)**:  The prosecution's use of witness summaries violated Petitioner's Fourteenth Amendment due process rights and the Confrontation Clause, and trial counsel were ineffective for failing to object on the basis of the Confrontation Clause (Claims 18, 19, & 20-IATC).

7.  **(Claim 21 (IATC))**:  Trial counsel were ineffective for failing to investigate and present mitigating evidence and for failing to object to false and misleading testimony from the prosecution's prison expert.

8. **(Claim 22)**: His death sentence is comparatively disproportionate to sentences imposed in similar or even substantially more aggravated capital cases involving child or infant deaths.

## III.    STATE COURT PROCEEDINGS

### A.    Facts of the Crime

The CCA summarized the facts of the crime as follows:

At 12:56 p.m. on Sunday, June 1, 2008, emergency responders were dispatched to an apartment where [Petitioner] lived with his girlfriend, Ceola Pinson; their infant son, Jakayden ("Ty"); and two-year-old Kelynn, who was Ceola's son from a previous relationship. Paramedics noted that Kelynn was cold, non-responsive, and had no heartbeat. His underwear contained bloody stool. Kelynn was taken by ambulance to the hospital, where he was pronounced dead at 1:35 p.m. The doctor who pronounced him dead noted that Kelynn's core body temperature was 91.1 degrees Fahrenheit and his body was in rigor mortis. [Petitioner] was charged with intentionally or knowingly causing the death of Kelynn Pinson, an individual younger than six years of age, by striking him with his hand, foot, and unknown hard and blunt objects, and by striking him against unknown hard and blunt objects.

Kelynn's paternal grandmother, Linda Franklin, testified that Kelynn had stayed with her family the week before he died, and he was fine when she and Kelynn's father, Kelvin Arterberry, took him back to Ceola's apartment on Friday night. Kelynn spent about half of every month with Linda. During a previous visit a couple of weeks earlier, Linda noticed that Kelynn was sore in the area of his rib cage under his arm when she tried to pick him up. When she asked him what had happened, he said that [Petitioner] threw him into a wall. She asked Kelynn where his mother was when that happened, and Kelynn said that she was on the floor.

Ceola acknowledged in her testimony that Kelynn was sore in the area of his rib cage under his arm when she tried to pick him up a few weeks before his death, but she denied knowing how it had happened. Ceola also testified that she had told [Petitioner] not to spank Kelynn anymore after she discovered red welts on Kelynn's body. On another occasion, Kelynn's shoulder was sore, and he had trouble lifting his arm, but Ceola thought that these symptoms were caused by his sliding down into the space between the bed and the wall while he was sleeping.

Linda testified that Kelynn often cried when she took him home, especially if Ceola was not there. To stop Kelynn from misbehaving at her house, Linda sometimes threatened to take him home, and Kelynn would become fearful and say, "No." Ceola also acknowledged that Kelynn would become fearful if she threatened to tell [Petitioner] that he was misbehaving. She stated that Kelynn did not "take to" [Petitioner] in the way he took to others, and she acknowledged that she once asked Kelynn why he did not like [Petitioner]. In his second statement to police, [Petitioner] denied that Kelynn was afraid of him, but he admitted that Kelynn knew not to come into the room or interrupt when [Petitioner] was watching TV or playing video games.

During Kelynn's week-long stay with Linda shortly before his death, Linda bathed him every day, and she did not notice any bruising or injuries except for some scratches on his legs that he got from running through her neighbor's rose bushes. Kelynn's father, Kelvin, also testified and confirmed that Kelynn had been fine when they dropped him off at Ceola's apartment on Friday night. Kelvin identified a photograph of him and Kelynn together that he had taken with his cell phone on Friday morning. In that picture, Kelynn was smiling and did not have any visible bruising.

Ceola also testified that Kelynn had been fine when Linda and Kelvin dropped him off with her on Friday night. She stated that she and the children spent a quiet evening at home. She and Kelynn sat on the couch and read books together. [Petitioner] was not there for most of the evening. When [Petitioner] returned from a club around 3:00 a.m., he called Ceola to unlock the front door for him, and he went to bed. The family went out to eat after [Petitioner] woke up between 1:00 p.m. and 2:00 p.m. on Saturday. [Petitioner] and Ceola decided to go to Dallas with some friends that afternoon and left the children with Ceola's friend, Dakeidra Choice. Dakeidra testified that she babysat Kelynn many times. On that evening, Kelynn seemed to have a normal appetite, and she did not notice anything wrong with him. Kelynn rode a "Big Wheel" around the apartment and walked to the mailboxes with Dakeidra and her children.

Two other adults who were present in Dakeidra's apartment that evening also testified that Kelynn seemed fine. Sometime after supper, Kelynn asked for and was given a snack, which he ate. Dakeidra did not notice any injuries or bruises when she gave Kelynn a bath and put him to bed after 10:00 p.m. Kelynn and Ty were sleeping when Ceola and [Petitioner] came by around 2:00 a.m. on Sunday to pick them up.

Ceola testified that on the way home, Kelynn woke up and complained that he was thirsty, but he went back to sleep after they got home. She heard a thump while she was taking a bath and she called out to Kelynn, who said that he was all right. Before she left for work around 5:30 a.m. on Sunday, Ceola saw Kelynn asleep in his bed. She checked his pull-up, which was clean, and she moved him to the couch so that when he woke up, he could watch cartoons without disturbing [Petitioner]. Kelynn did not wake up, but he squirmed to get comfortable on the couch. When Ceola stopped by the apartment around 9:00 a.m. to drop off baby formula for Ty, Kelynn was still asleep on the couch, and she did not notice anything wrong with him. She spoke with [Petitioner] for a few minutes and then went back to work.

At 12:40 p.m., Ceola received a telephone call from [Petitioner], telling her to come home right away because something had happened to Kelynn. She told [Petitioner] to call 9-1-1, and she started for home. When she arrived, the front door was locked, and she yelled for [Petitioner] to open it. After [Petitioner] opened the door, Ceola and her neighbor, Yolanda Williams, entered the apartment. Kelynn was lying on the living-room floor. Ceola asked [Petitioner] whether he had called 9-1-1, and then without waiting for an answer, she called 9-1-1 herself. Yolanda attempted to revive Kelynn by performing cardiopulmonary resuscitation ("CPR"). At that point, Ceola observed a bruise developing around Kelynn's eye. Paramedics arrived about four minutes after Ceola called 9-1-1, and Yolanda carried Kelynn outside to them. Ceola accompanied Kelynn in the ambulance, but he never regained consciousness. A friend who met her at the hospital testified that while they were waiting, Ceola was hysterical, and she kept asking [Petitioner] questions, but [Petitioner] hung his head and did not say very much.

In [Petitioner's] statements to police, he acknowledged that Kelynn seemed fine on Saturday afternoon, and Kelynn was still fine when they picked him up from Dakeidra's apartment. [Petitioner] heard Ceola leave for work around 5:30 a.m. on Sunday morning, but he stayed in bed and went back to sleep. Around 7:00 a.m., he woke up to give Ty a bottle. He then went back to bed. Later, when Ceola called, he told her that they were out of baby formula. Kelynn was still asleep when Ceola dropped off the formula, and [Petitioner] went back to bed after she left. Around 11:30 a.m., [Petitioner] got out of bed and woke Kelynn up because he thought Kelynn might be hungry. [Petitioner] fixed Kelynn a sandwich and some cereal with milk, which Kelynn ate. Kelynn asked [Petitioner] to take him swimming, and [Petitioner] told him no. However, after [Petitioner] went back into his bedroom to watch

television, he changed his mind and told Kelynn they could go swimming.

To get him ready to go to the pool, [Petitioner] removed Kelynn's orange shirt and dirty pull-up and used two "wet wipes" to clean Kelynn before dressing him in underwear and plaid shorts. [Petitioner] placed the used wipes, together with the dirty pull-up, inside a cereal box in the trash. [Petitioner] did not notice any injuries on Kelynn's body except for one bruise on his left shoulder. Kelynn was in a good mood and was excited about going swimming when [Petitioner] took him and Ty to the pool.

[Petitioner] related that after they had been at the pool for a few minutes, Ty started crying, so [Petitioner] told Kelynn to sit in a chair by the pool while he carried Ty back to their second-floor apartment to get a baby bottle. [Petitioner] left Kelynn alone for only a couple of minutes but when he looked outside, he could not see Kelynn. He stepped out onto the breezeway and loudly called Kelynn's name twice, but he received no response, so he left Ty in the apartment and hurried down to the pool.

When [Petitioner] returned to the pool, he saw that Kelynn was holding onto the pool ladder and floating with his face in the water. He thought that Kelynn was dead. However, after [Petitioner] pulled Kelynn out of the water and delivered a single open-handed blow to his chest, Kelynn jumped up, opened his eyes wide, and asked for something to eat. [Petitioner] carried him back to the apartment because Kelynn was too sluggish to walk up the stairs by himself. Kelynn coughed up a white mucus-like substance onto [Petitioner's] shoulder. When they got back into the apartment, [Petitioner] wiped the substance off with a black shirt. [Petitioner] sat Kelynn down on the couch and gave him Sprite in a sippy cup and then went to look for some dry clothes to change him into. When [Petitioner] next looked at Kelynn, he saw that his eyes were rolling back in his head. Kelynn's breathing and heartbeat were not normal, so [Petitioner] began performing CPR. He stopped to call Ceola, who told him to call 9-1-1, but he did not call 9-1-1 because he was scared and trying to do CPR. He was still administering CPR when he heard Ceola at the front door. [Petitioner] got up to let her in, and their neighbor "Yawny" accompanied Ceola into the apartment and began performing CPR on Kelynn while Ceola called 9-1-1.

[Petitioner] added or changed some details in his second statement to police. Specifically, in his second statement, [Petitioner] related that, after Ceola dropped off the baby formula for Ty, [Petitioner] went to the

bedroom and watched an 80-minute movie before Kelynn woke up. [Petitioner] also stated that Ceola did not tell him to call 9-1-1 when he told her that something had happened to Kelynn. [Petitioner] further added that Kelynn coughed something up onto the carpet while [Petitioner] was attempting to perform CPR, and [Petitioner] turned him over to try to let the substance drain out of Kelynn's mouth. [Petitioner] moistened a towel and used it to wipe the mess. He had used the same towel earlier when Kelynn coughed up a white substance on their way back from the pool.

In both his statements to police, [Petitioner] failed to mention that he had a phone conversation with his cousin, Antron Gardner, that day. However, Gardner testified that he and [Petitioner] spoke on the telephone around noon, and they talked about the good-looking girls they had seen when they were at a club together on Friday night. Gardner's phone records, which were introduced into evidence, indicated that [Petitioner] called Gardner's number three times around 11:58 a.m., and they spoke at 12:34 p.m. in a call that lasted 50 seconds. Gardner testified that he did not answer [Petitioner's] initial calls because he was sleeping, but he called [Petitioner] back when he woke up. After they talked for a few seconds, [Petitioner] told him he needed to go because he had left Kelynn at the pool. Gardner testified that [Petitioner] sounded calm during that conversation, but when Gardner saw him at the hospital around 4:00 p.m., [Petitioner] cried and stated that he was "going to hell." Ceola testified that, after that day, she never asked [Petitioner] what had happened, and [Petitioner] never told her, but he did tell her that Kelynn's "blood was on [his] hands." She acknowledged that she later told a psychologist that Kelynn would still be alive if she had left [Petitioner]. She testified that she did not know why she said that.

Deputy Sheriff Clifton Hunter, the apartment complex's courtesy officer, testified that he unlocked the gate to the pool at 12:30 p.m. on Sunday and saw no evidence that anyone was there or had been there. He also testified that he received a call on his cell phone as he was leaving the pool area, and he stayed outside on the breezeway in front of his second-floor apartment for several minutes while he was talking on the phone. His cell-phone records confirmed that he received a call at 12:31 p.m., and he testified that the call lasted for about three minutes. He had a view of the pool from the breezeway in front of his apartment. [Petitioner's] apartment also faced onto the breezeway and had a view of the pool. Deputy Hunter testified that he would have been able to see anyone going back and forth between [Petitioner's] apartment and the pool, but he did not see anyone. In addition, he would have been able to

hear a noise at the pool if someone fell in, and he would have heard anyone who called out from the breezeway to someone in the pool area. However, he did not see or hear anything like that while he was outside. Officer James Holt, who secured the pool area after he responded to the 9-1-1 call, testified that he saw no evidence that anyone had been at the pool that day.

Casey DuPont, a forensic scientist, testified about blood tests and DNA analyses that she had conducted on items that had been recovered from Kelynn and from the apartment following Kelynn's death.  Kelynn's orange tank top had multiple areas of red staining, which tested presumptively positive for blood. DuPont conducted a deoxyribonucleic acid ("DNA") analysis on a stain near the neck area and obtained a DNA profile that matched Kelynn's.  The plaid shorts and underwear that Kelynn was wearing when he was taken to the hospital contained a large amount of fecal matter as well as a large amount of brown staining that tested presumptively positive for blood.  DuPont could not obtain a DNA profile because DNA would be degraded by the presence of fecal matter.

A cereal box containing two "wet wipes" had been found in the trash. One wipe had dark material that resembled the fecal matter found on Kelynn's shorts.  The other wipe had lighter stains.  Both wipes tested presumptively positive for blood.  DuPont did not obtain a DNA profile because it appeared that the majority of the dark stain was fecal matter, with blood as a minor component.

A black T-shirt that purportedly belonged to [Petitioner] was tested.  It had a white stain that appeared to be of biological origin and did not test presumptively positive for blood.  However, a DNA profile obtained from the stain was consistent with Kelynn's, indicating that the substance was fluid from Kelynn's body.

A section of carpet that had been cut from the living room floor had a large reddish-brown stain that tested presumptively positive for blood, and DuPont obtained a partial DNA profile that was consistent with Kelynn's.

A white towel recovered from the living room floor had eighteen areas of red staining on the towel that tested presumptively positive for blood. DuPont conducted a DNA analysis on one area and obtained a DNA profile that was consistent with Kelynn's.

Dr. Reade Quinton, the Dallas County Medical Examiner who performed the autopsy, described the condition of Kelynn's body and the numerous

bruises and internal injuries that he had sustained. Kelynn's stomach contained only dark brown fluid, which was not consistent with his having eaten any food on Sunday morning unless he vomited afterward. The bruises on Kelynn's body probably would have been visible within half an hour, and certainly no later than a couple of hours, after the impacts that caused them. Dr. Quinton opined that Kelynn's internal abdominal injuries were inflicted by multiple blunt-force impacts which most likely occurred around the same time, although the injuries could have been inflicted over the course of several hours or even over the course of a day. Kelynn sustained a number of tears to the mesentery that were probably inflicted within thirty hours of death, including a severe tear that was probably inflicted within three hours of death. This tear would have been immediately followed by active bleeding into the abdominal cavity, which would have caused severe pain. Kelynn's distress would have been readily apparent to his caregivers and most likely would have prevented him from engaging in ordinary activities like eating and playing. Kelynn's injuries would have produced immediate symptoms that would have grown continually worse until he died. Although in some cases a child might live for several days with a torn mesentery, Dr. Quinton was unaware of any child who had lived that long after suffering injuries as extensive as Kelynn's.

Dr. Quinton opined that Kelynn would not have died immediately. If Kelynn was non-responsive when emergency responders reached him at 12:56 p.m., then his abdominal injuries were present before 11:30 a.m. "Based on the way the injuries looked," Dr. Quinton doubted that Kelynn would have been very communicative by 11:30 a.m., and certainly he would not have been hungry. Dr. Quinton opined that [Petitioner's] account of events, in which Kelynn was alert and wanting to go swimming around 11:30 a.m., became unconscious in the water but quickly revived, was asking for something to eat and was drinking from a sippy cup around 12:35 p.m. or 12:40 p.m., but then suddenly went into distress and was non-responsive by 12:56 p.m., was not medically likely.

Dr. Quinton further testified that, based on the location and severity of Kelynn's abdominal injuries, they were not the result of CPR or efforts to revive him. In addition, the autopsy revealed a previously fractured rib that had begun healing but had been broken again within thirty hours of Kelynn's death. Based on the unusual posterior location of the fracture and the fact that Kelynn incurred the same injury twice in the same unusual location, it was very unlikely that this injury was accidental.

11

Dr. Stephen Pustilnik, the Chief Medical Examiner for Galveston County, testified for the defense. He acknowledged that Kelynn's injuries were dramatic, but he believed that some of them were at least twenty-four hours old and that the mesenterial tearing was inflicted a day or more before Kelynn's death. On cross-examination, he acknowledged that he had told Dr. Quinton that he thought the mesenterial tearing was inflicted at least eight hours before death. He also acknowledged that bruises like those seen on Kelynn's skin would probably become apparent within thirty minutes of the impacts that caused them.

Dr. Harry Wilson, a pediatric pathologist, testified for the State. He had reviewed the autopsy results and observed that Kelynn's brain was swollen, which indicated that Kelynn did not die immediately after he was injured and that he had probably gone into shock. Dr. Wilson also opined that, based on the coloring of some of Kelynn's abdominal tissues, he had suffered a previous internal abdominal injury that was roughly a week old. The new mesenteric tears were probably inflicted between one and four hours before his death. Dr. Wilson opined that Kelynn would have been in obvious pain and distress because of the blood pooling in his abdomen, and he would have lost consciousness as a result of his brain swelling. Kelynn's distress from these injuries would have been apparent to his caregivers. Dr. Wilson also testified that if Kelynn's caregivers on the Friday and Saturday before his death observed that he seemed normal and that he did not have any noticeable bruising, then Kelynn did not have these injuries when he was with them. Dr. Wilson opined that [Petitioner's] account of events leading up to Kelynn's death had to be false.

*Miller v. State*, No. AP-76270, 2012 WL 1868406, at *1–6 (Tex. Crim. App. May 23, 2012).

## B.    Facts Relating to Punishment

The CCA summarized the facts relating to punishment as follows:

The jury had before it the medical evidence of Kelynn's numerous and extensive injuries. There was expert testimony that, after two-year old Kelynn was fatally injured, he would not have died immediately, and his distress would have been obvious to his caregivers. Yet [Petitioner] failed to seek help for Kelynn. Instead, he spoke with his cousin, Gardner, on the phone and told him that he had left Kelynn alone at the

pool.  The evidence recovered from the apartment included Kelynn's blood-stained shirt, "wet wipes" stained with blood and fecal matter, a section of the living-room carpet stained with Kelynn's blood, and a towel with multiple blood stains.  Kelynn's underwear and shorts contained blood and fecal matter.  The jury could reasonably infer from this evidence that, after [Petitioner] fatally injured Kelynn, he attempted to set the stage for the story he had concocted.  [Petitioner] called Ceola and told her to come home but did not call 9-1-1.  Additionally, [Petitioner] gave two separate false statements to the police about the circumstances in which Kelynn was fatally injured.

Further, the jury had before it evidence of [Petitioner's] prior violent conduct.  There was evidence that [Petitioner] had physically injured Kelynn on previous occasions, including breaking his rib by throwing him into a wall and spanking him so hard that red welts rose on his skin, and that Kelynn was afraid of [Petitioner].  Although Ceola denied that [Petitioner] had physically abused her, her downstairs neighbors testified that they heard loud noises that sounded like domestic disturbances coming from her apartment several nights a week.  The noises included banging, crashing, children crying, and the sound of someone being hit and thrown around while a woman screamed and yelled for it to stop.  On one occasion, they called 9-1-1 and reported hearing an adult man, an adult woman, and children yelling and crying. They reported that they heard sounds of things slamming and banging and a woman screaming, "You've broken my ear drum, it's bleeding." The neighbors called the police that night because the sounds were so bad that they were afraid that the man was going to kill the woman. When the police arrived, [Petitioner] was uncooperative and refused to identify himself.  Ceola recalled that episode when she testified.  She denied that [Petitioner] had physically assaulted her but acknowledged that [Petitioner] had locked her out of their bedroom, keeping their infant, Ty, in the room with him because he was angry that Kelynn wanted to stay at the apartment with her instead of going to the store with [Petitioner].  She admitted that he had been throwing things around and slamming doors and that she had asked [Petitioner's] mother to come to their apartment to help her.

In addition to evidence of [Petitioner's] prior violent conduct toward Kelynn and Ceola, the jury had before it evidence that [Petitioner] had committed violent assaults against others with little or no provocation. In high school, [Petitioner] once confronted and fought with another student after his cousin told him that the student had said something rude to her.  [Petitioner], who was 6' 4" and 240 pounds, would also join in with others to attack a single, smaller victim.  For example, the year

13

after he graduated from high school, [Petitioner], Gardner, Terrance, and another friend assaulted a seventeen-year-old student at a local high-school dance. The victim, Deandre Oliver, testified that he and Terrance had been "dance-battling" when Terrance pushed him. [Petitioner] then punched him in the face, causing him to fall down. Then, Gardner hit him with a chair. Deandre testified that he was kicked several times as he lay on the ground. He did not know why [Petitioner] punched him because the two of them had never had a problem.

In another incident that occurred about two months before the present offense, [Petitioner] and Joshua accompanied [Petitioner's] sister, Chineyere, to an apartment complex where Dramon Green, the father of her child, lived. [Petitioner] drove them there in his mother's van at 2:30 a.m., ostensibly to pick up some clothes and toys for Chineyere's baby.

When they arrived at the apartment complex, however, they saw that Dramon and his other girlfriend, Chelsea Chimney, were sitting in Chelsea's parked car with the windows rolled down. [Petitioner] parked his van directly behind Chelsea's car so that it was blocked in. Chineyere then walked over to the car, opened the passenger door, and told Dramon to get out. He started to get out, and Chineyere appeared to be walking back to the van, but then Chelsea heard [Petitioner] say, "Go get that bitch." Chineyere then turned around and approached the driver's side door of Chelsea's car, yelling at Chelsea to get out. As she continued yelling, Chineyere reached in through the open window and poked Chelsea on the head. Chelsea told Chineyere that she was not going to fight her and asked her to get away from the car and move the van so she could leave, but Chineyere continued yelling and poking at her. Chelsea put her car into reverse, but Chineyere would not get away from her and [Petitioner] would not move the van.

Eventually, Chelsea put her car back into park and got out to fight with Chineyere. After a couple of minutes of fighting, Chelsea knocked Chineyere down, got on top of her, and started hitting her. [Petitioner] then jumped in and punched Chelsea in the face, causing her to fall down. [Petitioner] repeatedly kicked and kneed Chelsea as she lay on the concrete. She managed to get away from him and ran to the sidewalk where there were onlookers, but no one came forward to help her. Chineyere followed Chelsea and continued fighting with her until the police arrived. The responding officer who spoke with [Petitioner] after the fight testified that [Petitioner] explained that he had punched and kicked Chelsea because he "wasn't going to let his sister get whooped."

14

Finally, there was evidence that [Petitioner] had disciplinary problems in jail following his arrest, including an incident in which he repeatedly disobeyed a guard and then grabbed for his hand, so that another guard had to intervene to resolve the situation.

*Miller*, 2012 WL 1868406, at *20–22.

## C.  **The Defense's case**

In addition to the facts of the crime and the facts as to future dangerousness as presented by the CCA, the Respondent summarizes the Defense's case as follows:

Pinson was the first witness called by the defense.  55 RR 181.  She told the jury that the police came to her apartment in February 2008, because the neighbors downstairs had called the police.  55 RR 182. Pinson denied that she and Petitioner had been in a physical confrontation that evening.  *Id.*  Instead, the argument was over Petitioner not wanting her to sleep in the same room with him, and he had locked her out of the bedroom.  *Id.*  Pinson said that Petitioner never injured her.  55 RR 208.

On cross-examination, Pinson stated that she and Petitioner had "quite a few" arguments in the four months they lived at the Hidden Springs Apartments.  55 RR 185–86.  Petitioner associated with persons who smoked marijuana.  55 RR 188–89.  Petitioner would go to Shreveport to gamble about once a week, usually on Saturdays while Pinson stayed home with the children.  55 RR 193–94.  In addition to gambling trips, Petitioner would go out with friends approximately "two or three" nights during the week and would stay out until "almost 5:00 in the morning." 55 RR 197–98.  Petitioner's refusal to stay home and help with the kids was a source of constant argument between him and Pinson.  55 RR 197. Petitioner also lied to her about calling another woman with Pinson's cell phone.  55 RR 199–200.

Officer John Crawley testified that he responded to a domestic dispute at Petitioner's apartment on February 22, 2008.  55 RR 249.  A black female, who refused to identify herself, answered the door and reported that she and her boyfriend had a verbal argument, but the officer did not see any signs of physical violence.  55 RR 251.  Officer Crawley said that the lack of cooperation he received from the persons in Petitioner's apartment caused him to be unable to investigate whether a physical assault had taken place.  55 RR 252–54.

Officer Marvin Ballard said that he responded to an assault call on April 2, 2008.  56 RR 6.  He took pictures of Chelsea Chimney, who was assaulted by Petitioner and his sister in April of 2008.  *Id.*  The pictures depicted somewhat minor injuries.  56 RR 8–10.  However, the officer agreed that such injuries constitute an assault under the law.  56 RR 11–13.  Brandon Owens told the jury that he and Petitioner were good friends in school.  56 RR 19–20.  He testified that Petitioner was "like a father figure" in his family and a "care giver" and "backbone."  56 RR 23; 26.  On cross-examination, Owens, who was a probation officer, testified that he sat with Petitioner's family outside the courtroom during the trial and had contributed money to Petitioner's jail account.  56 RR 28–29.

Joshua Smith testified that he and Petitioner had been close friends since his sophomore year of high school.  56 RR 67–68.  He told the jury about his trip to Six Flags with Petitioner and another couple the weekend Kelynn was killed.  56 RR 71.  He said that Pinson was jealous of his relationship with Petitioner.  56 RR 74.  Smith said that he and Petitioner would go to Shreveport to gamble "three or four" times a month.  *Id.*  He was shocked to hear Petitioner had been arrested for capital murder because that was not in his character.  56 RR 78.

Smith admitted on cross-examination that he told Petitioner during a jail phone call that the "white folks" did not like "all our folks down there."  56 RR 84–85.  He told the jury that he was wearing a purple shirt because Petitioner's mother told him to and because it was the color of royalty.  56 RR 89–90.  He further said that he bought four pairs of shoes from Britney Collins knowing that she had stolen the shoes, and Petitioner was in the car with him when he did that.  56 RR 91–94.  Petitioner took some shoes as well.  *Id.*  He visited Petitioner twice a week in jail and contributed money to Petitioner's jail account.  56 RR 113.

Reverend Allen Dotson testified that he is a pastor at the Miracle Center Church of Tyler.  56 RR 126–28.  He had known Petitioner since he was born, and Petitioner's grandmother and Rev. Dotson's father were siblings. 56 RR 129.  He claimed that Petitioner was very respectful and "mannerable" and had a great relationship with his grandmother and mother.  56 RR 134; 137–38; 141.  However, Rev. Dotson thought Petitioner had a good relationship with his father.  56 RR 139, 148–49.

Ruby Miller, Petitioner's grandmother, testified that she knew Kelynn and kept him on occasion.  56 RR 190–192.  Petitioner was a very active

child and was normal growing up. 56 RR 193–194. He was again described as "mannerable," and the jury learned that his grandfather was the father figure in his life. 56 RR 195–96. She testified that the news that Petitioner killed Kelynn was a shock to her because Petitioner "just loved children" and such an act would be out of character for Miller. 56 RR 202–03. She also said that Petitioner was not the kind of person to hit a girl. 56 RR 206, 217–18.

Terrance Green testified that he is Petitioner's cousin and had known Petitioner since fifth grade. 56 RR 255. He spent the night at Petitioner's house and visited on a weekly basis while growing up. 56 RR 256. According to Green, Petitioner was the person everyone wanted to be around, and he was like a big brother to Green. 56 RR 257–58. He told the jury about the fight at a step contest where Petitioner stood up for him when he was pushed by another contestant. 56 RR 259–61. Petitioner was a role model for Green. 56 RR 266.

On cross-examination, Green admitted that he violated the witness rule by talking to everyone in his family about the case after being sworn in. 56 RR 279. He also stated that when he was fighting with Deandre Oliver at the dance competition, he was winning and that Petitioner struck Deandre because Deandre's friends were "fixing to step in." 56 RR 294.

 Latoya Johnson testified that Petitioner was a friend of hers since she was seven and that during an incident when her mother was shot, Petitioner risked his life to try to restrain the shooter. 56 RR 318–21. On cross-examination, Johnson was confronted with Petitioner's police statement in which he said that when the shooting started, he put his hands up and then ran and hid in the bushes. 56 RR 329–33. She agreed that it was not fair to characterize Petitioner as trying to restrain the shooter when he ran like everyone else present. 56 RR 334. But he did later tell the shooting victim to stay on the ground and kept her calm until EMS took care of her. 56 RR 342.

Lorrielle Taylor testified that she was a former girlfriend of Petitioner's. 57 RR 6–8. She met him in ninth grade and dated him for approximately six months. 57 RR 8. She told the jury that Petitioner loved his family very much and was "very good with children." 57 RR 9–10. She said Petitioner was very respectful to her when they dated, and she was not worried for her safety around him. 57 RR 11. Petitioner was playful with Kelynn, and Kelynn did not exhibit fear around Petitioner. 57 RR 14.

17

Setina Erwin told the jury that she is Petitioner's cousin and had been friends with him her whole life. 57 RR 30–32. She and her boyfriend, Joshua Smith, traveled to Dallas with Petitioner and Pinson the day before Kelynn was murdered. 57 RR 33–35. She described Petitioner as "very family oriented," and she said she could talk to him about her problems. 57 RR 36–37. She recalled that Petitioner got into a fight with a boy in school who was "talking a lot of noise" to her. 57 RR 37–38. She also said that Petitioner was a "father figure" to Kelynn before the murder. 57 RR 45.

Erwin admitted on cross-examination that she violated the witness rule by speaking with Petitioner in a recorded jail phone call about the testimony of Angela Montgomery, a witness during the punishment phase of trial, and about another witness. 57 RR 48–50. She was also uncooperative with the police. 57 RR 53–54.

Dale Bowser testified that Petitioner is his nephew by marriage, and he had known him all of his life. 57 RR 84–87. He said that Petitioner was very respectful and "mannerable" as a child. 57 RR 87. Petitioner was around constantly when he was growing up, 57 RR 90, and was very helpful to his grandfather once he became sick. 57 RR 92. He had never seen any children act afraid of Petitioner, including Kelynn, and Petitioner was not the type to ever hurt anyone. 57 RR 98–102. However, Bowser was twice convicted of theft and served time in the Smith County jail shortly before the start of the trial. 57 RR 110–11. He also said that Petitioner did not tell him that he was failing in college. 57 RR 122–27.

Dortheia Taylor testified that she was one of Petitioner's teachers in the eighth grade. 57 RR 161–63. She said that Petitioner was an excellent student, never gave her any trouble, and she "love[d] him dear." 57 RR 163–64. Petitioner was very protective of his little brother, Dexter, who is apparently mentally challenged in some manner. 57 RR 165–66. She did not believe that Petitioner could kill a baby. 57 RR 169.

Tanger Wesley testified that she taught Petitioner in kindergarten. 57 RR 191–92. She described Petitioner as a "loving and caring little boy" whom she personally loved as a student. 57 RR 193. She told the jury that Petitioner displayed concern for his younger brother, Dexter. 57 RR 196–97. Even after he passed kindergarten, Petitioner continued to help the teachers at school. 57 RR 198.

Demetra Miller, Petitioner's cousin, stated that Petitioner had always been close to her. 57 RR 216. She described Petitioner as "the most

loving, he is the most generous . . . one of the most caring and compassionate people I know." 57 RR 218. Petitioner was "like a magnet for children" and very playful around kids. 57 RR 220. She had never seen a child be afraid of Petitioner. 57 RR 222. Demetra stated that she was convinced that Petitioner was "wrongfully convicted" and did not murder Kelynn because he would never hurt a child. 57 RR 223.

Janeka Forward told the jury that she met Petitioner in grade school and had known him for almost ten years. 57 RR 247–48. She characterized Petitioner's relationship with his younger "special needs" brother as a "father and son" relationship. 57 RR 251. She had never seen Petitioner be violent and held him in high esteem. 57 RR 252; 256.

Sammy Thompson, III, testified that he played football with Petitioner in school. 57 RR 296–99. He used to live at Petitioner's house when he was a senior in high school. 57 RR 300–01. He testified that Petitioner was a "daddy" to his siblings and was unselfish. 57 RR 304–05.

Anthony Erwin testified that he is married to Petitioner's aunt and had known Petitioner his entire life. 58 RR 6–8. According to Erwin, Petitioner's family is very close, and Petitioner was nice and "kind of quiet and mannerable." 58 RR 9; 11. He said that Petitioner was very helpful to his grandfather who was suffering from Alzheimer's disease. 58 RR 12. He thought that Petitioner and Kelynn had a good relationship. 58 RR 13. The jury's verdict of guilt in this capital murder "only made him love [Petitioner] more." 58 RR 15. He claimed that when he and his daughter, Setina, slammed the door on an investigator, it was because the investigator was persisting in asking questions about things he did not want to talk about. 58 RR 16. He felt that it would be a vicious thing for a person to beat a child to death, but that Petitioner had been wrongly convicted. 58 RR 23–24; 27.

He told the jury that Petitioner had been in fights in high school and at Arkansas Tech. 58 RR 27–28. He took responsibility for his daughter refusing to talk to police on the phone because he felt that the police got the information they wanted and did not need to be asking more questions about Kelynn's death. 58 RR 28–31.

Chineyere Jordan testified that she is Petitioner's sister. 58 RR 35. Their father left when she was in grade school, and Petitioner and her mother raised her. 58 RR 36. Their mother was away and worked a lot, so Petitioner was the person primarily responsible for the siblings. 58 RR 37. Petitioner took care of all the children, made sure they were clothed, got them off to school, and made sure they ate. 58 RR 37–38. Petitioner was basically Jordan's brother and father, he took on that role

when he was still in middle school, and Jordan had a lot of respect for him. 58 RR 38. Petitioner did not discipline the kids by hitting them and was overly protective of his brother Dexter, who is mentally slow. 58 RR 39. The family is very "close knit," including those in their extended family. 58 RR 39–40. Jordan stated that Petitioner was a "role model" to children and had never abused any child in her presence. 58 RR 40–41. Kelynn was also "like a nephew" to her and was playful, happy, and active. 58 RR 41.

Jordan then described the fight she had with Chelsea Chimney. 58 RR 42–55. She stated that Petitioner got Chimney off of her and did not strike Chimney. 58 RR 51–52. She did not believe that Petitioner killed Kelynn because Kelynn loved Petitioner and they were together a lot because Pinson worked. 58 RR 56. She never observed Petitioner being abusive to Kelynn. 58 RR 57.

On cross-examination, Jordan told the jury that she did not know how many times her mother was arrested while she was young, and when confronted with at least five arrests, she denied having knowledge of any of them. 58 RR 64–68. The jury also heard a jail phone conversation where Jordan told Petitioner that his investigator had told her "everything" that was being testified to in the courtroom in violation of the witness rule. 58 RR 86–87. She denied that Petitioner ever touched Chimney when he was breaking up the fight with her, even though Petitioner told police that he had in fact kicked and hit Chimney. 58 RR 90.

Dr. Kristie Compton was the last defense witness presented to the jury in this case. She is a licensed psychologist, and approximately seventy-five percent of her case work involves forensic psychology. 58 RR 134. The basis of her testimony was that it is not possible to make an accurate predication of whether any capital murder defendant will in fact commit future acts of criminal violence while in prison. 58 RR 144–50. She told the jury that studies show certain factors can contribute to a greater risk of future violence in prison, such as age, level of education, gang membership, and length of sentence. 58 RR 144–46. She interviewed several members of Petitioner's family and determined that the only risk factor applicable to Petitioner was his young age. 58 RR 155. She testified that convicted capital offenders are less likely to commit future acts of violence than other offenders. 58 RR 156.

On cross-examination, Dr. Compton admitted that she intentionally did not interview Petitioner before she testified. 58 RR 161. As a result, she was not telling the jury that Petitioner had a very low probability for

20

committing violent acts of aggression. 58 RR 163. She also said that she found some of the testimony of Petitioner's family members to be "uncredible," 58 RR 165, and nothing in her interviews of family members indicated to her that Petitioner was mentally ill, 58 RR 167. She admitted that she was not provided evidence that Petitioner may have had some gang ties. 58 RR 168–70; 172–74.

Dr. Compton further acknowledged that a "majority" of the studies regarding the ability to predict future dangerousness in prison eliminate minor assaults or acts of violence that do not require more than rudimentary first aid, 58 RR 194–95, and they fail to account for the fact that many acts of violence in prison are never reported, 58 RR 196. A study of convicted murderers in Texas showed that capital murder defendants commit more acts of violence than other murderers while incarcerated. 58 RR 198–200. She also characterized the beating of Kelynn by Petitioner as a "pretty aggressive act," and it would be "cold and callous" to then sit by and let him die in agony from his injuries. 58 RR 221–23.

Docket No. 101 at 14–23. Having reviewed the Reporter's Record, the Court

determines that Respondent's summary is accurate.

### D.        Findings of Fact and Conclusions of Law

In addition to reviewing the evidence presented during Petitioner's capital

trial, the Court reviews the Findings of Fact, Conclusions of Law, and Order of the

241st District Court of Smith County, Texas, in Petitioner's state habeas case, *Ex*

*parte Miller*. The pertinent findings are relevant to the issues of exhaustion and

ineffective assistance of counsel. In relevant part, the state habeas court found:

8.    On January 10, 2012, the defendant filed this, his first Art. 11.071 application for a Writ of Habeas Corpus under the above-numbered cause and has alleged generally that:

   (a) The defendant was denied due process when the State improperly invoked "The Witness Rule;" which effectively excluded thirty-three of Applicant's friends and family members from the courtroom;

   (b) The defendant was denied due process and the effective assistance of

counsel under the Sixth Amendment when the trial counsel either assisted the State's efforts to improperly invoke "The Witness Rule," which effectively excluded thirty-three of Applicant's friends and family members from the courtroom, or, at a very minimum, took no steps to prevent the State from doing so;

(c) The defendant was denied effective assistance of counsel when trial counsel failed to adequately prepare a case in mitigation of the death penalty and/or to prepare a defensive punishment theory;

(d) The defendant was denied due process by the "10-12" Rule of Article 37.071 § 2(d)(2) and § 2(f)(2), Texas Code of Criminal Procedure; and

(e) The defendant's rights under the Eighth and Fourteenth Amendments to the U.S. Constitution were violated by the Texas death penalty scheme as the jury's assessment of the death penalty is not subject to Judicial review.

[9].    The Court takes judicial notice of all prior proceedings, the files and the evidence at both phases of trial. Specifically, the Court takes judicial knowledge of the following:

(a) The basis of the defendant's first ground regarding invocation of the witness rule is that the State had subpoenaed several persons who were family members or supporters of the defendant and then invoked the rule to deny the defendant a public trial where the State's subpoenaed witnesses were excluded from the courtroom during the testimony of other witnesses and were ultimately not called to testify. The defendant alleges that thirty-three people were subpoenaed by the State but were never called to testify. (Writ App. at 5). This is inapposite to the record, however, as the defendant's list also includes a Mr. Frederick Sewell [sic] and Ms. Angela Montgomery. *Id.* Mr. Frederick Suell testified in the guilt/innocence phase for the State. (RR 44: 305-30). And Ms. Angela Montgomery just as clearly testified for the State during the punishment phase. (RR 54: 184-209). Consequently, there were actually thirty-one people who were sworn-in as witnesses for the State who did not testify, and not thirty-three people as sworn to by the defendant's writ attorneys. Of these thirty-one witnesses, the defendant has established through affidavits that just eight of them were actual supporters of his: (Julia Jordan Williams, Devontae Jordon, Tikara Pinson, Metria Pinson, LaTonya Miller, Dedtrick Miller, Dexter Jordan, and Gary Ates). And, with the exception of the defendant's mother, Julia Jordan Williams, none of these other affiants claim a familial relationship to the defendant in their respective affidavits. However, each does swear

under oath that they "had no evidence to give but was a supporter of [the defendant] and wished to attend the trial to show support for him.

The Court finds and concludes that the defendant's claim that he was denied a public trial is completely unsupported by the record. The Court takes judicial notice that the entire trial in this case was held in the 241st District Court of Smith County, Texas, which is located in the Smith County Courthouse, which is a public building open to all members of the public during business hours. The Court further finds and concludes that during the course of the entire trial the defendant had many family members, friends and other supporters present, many of whom were wearing the color purple to show support for the defendant. In fact, the courtroom was filled to capacity throughout the trial. At no time during the trial of this case was any individual, who was not a potential witness placed under the rule, excluded from the courtroom.

The Court finds and concludes that the affidavits of the eight supporters of the defendant named above are inconsistent with the record where the State has provided documentation showing a good faith basis for placing these individuals under subpoena as potential trial witnesses. Their affidavits, being inconsistent with the record, are therefore not credible where each alleges that they "had no evidence to give" at the defendant's trial.

The Court finds and concludes that the trial of the defendant was a public trial held in an open 241st District Courtroom with extensive media coverage, spectators, and supporters of the defendant filling the courtroom. The Court finds and concludes that no person other than potential witnesses sworn in by the Court and properly instructed on the "Rule of Witnesses" were excluded from the Courtroom.

The Court finds and concludes that thirty-one people were sworn in as potential witnesses by the Court instructed and placed under the "Rule of Witness[es]" who were not called to testify by the State.

The Court finds and concludes that of these thirty-one individuals sworn in as potential witnesses by the Court instructed and placed under the "Rule of Witnesses," that the Applicant has provided only eight (8) affidavits even though Applicant alleges "a subtle yet intentional State targeting of Applicant's family members and other supporters for exclusion from the Courtroom."

The Court further finds and concludes that of the eight (8) affidavits provided by Applicant from people sworn in and placed under the "Rule

of Witnesses" that all eight (8) were properly sworn in and placed under the "Rule of Witnesses" and excluded from the Courtroom.

The Court further finds and concludes Applicant has not provided any other affidavit from any other person among the thirty-one (31) potential witnesses sworn in and placed under the "Rule of Witnesses" even though Applicant claims they were Applicant's "family members and other supporters."

The Court finds that the sworn affidavit of lead trial counsel A. M. Thompson, Jr., filed on August 20, 2012, which the Court considers credible evidence, states in part as follows in response to Applicant's allegation that he did not have the benefit of a public trial:

"Trial Counsel would show the Court that with very few exceptions the 241st District Courtroom was filled to capacity during the course of this trial. Many of the people present were friends and family members of Applicant who were not sworn and placed under the rule, as well as observers from the community who were just interested in the trial. Further, witnesses who were placed under the rule who had concluded their testimony and were excused were allowed to return to the courtroom."

"There was never a day, to the best of counsel's memory, where your Applicant did not have some family or friends inside the Courtroom."

The Court finds that the sworn affidavit of trial counsel LaJuanda Lacy, filed February 8, 2013, which the Court considers credible evidence, states in part as follows:

". . . The Sixth Amendment guarantees criminal defendants the right to a trial that is open to members of the public. This trial attorney submits that Applicant's trial satisfied Sixth Amendment requirements."

The Court finds and concludes there is no credible evidence before the Court that the State intended to or did deny the defendant a public trial by placing the eight potential witnesses under subpoena.

The Court further finds and concludes that there is no credible evidence that the defendant was denied his right to a public trial when the State did not call all of the witnesses that it had placed under subpoena to testify.

The Court finds and concludes that the State did not improperly invoke "The Witness Rule."

The Court finds and concludes that the defendant was not denied due process when the State invoked "The Witness Rule."

The Court thus finds and concludes that the defendant has failed to establish that he is entitled to habeas relief for the reasons alleged under his first ground for relief.

(b) The defendant alleges under his second ground for relief that his trial attorneys were ineffective where they failed to object to the State's placing his supporters under subpoena and having them excluded from the trial as potential witnesses.

The Court finds and concludes that there is no merit to this allegation where the defendant's attorneys could have no way to determine at the time the Witnesses Rule was invoked which witnesses the State would actually call for trial. Further, the defendant has not provided the Court with any legal authority which establishes that his trial attorneys had a legal basis for an objection or that the State could be made to divulge its trial strategy deciding which people to subpoena as witnesses. Nor does the record establish that the State had an improper intent in placing the eight persons named above under subpoena.

The Court finds and concludes the defendant was not denied effective assistance of trial counsel when counsel did not prevent the state from "improperly" invoking "The Witness Rule." The Court finds and concludes the State did not improperly invoke "The Witness Rule." Further the Court finds and concludes that trial counsel had no valid legal objection to the State invoking "The Witness Rule."

The Court further finds and concludes there is absolutely no evidence to support the assertion by Applicant that trial counsel assisted the State to improperly invoke "The Witness Rule."

The Court thus finds and concludes that the defendant has failed to establish that his trial attorneys were ineffective for failing to object to the State's subpoenas of the eight persons named above or that he is entitled to habeas relief for the reasons alleged under his second ground for relief.

(c) Under a third ground, the defendant alleges he was denied effective assistance of trial counsel where counsel failed to adequately prepare a

25

case in mitigation of the death penalty and/or to prepare a defensive punishment theory. Under this single ground for relief the defendant alleges several different arguments regarding counsels' trial preparation. The Court finds that the defendant's third ground for relief is multifarious and generally error is waived when a multifarious point of error or ground for review is presented. *Euziere v. State,* 648 S.W.2d 700 (Tex. Crim. App. 1983). Nevertheless, it has been the practice of the Court of Criminal Appeals to address multifarious contentions in cases where the death penalty has been assessed because of the severity of the sentence. *See Macias v. State,* 733 S.W.2d 192 (Tex. Crim. App. 1987). Accordingly, the Court will address this ground.

The record of this case shows, and the Court finds that the defendant presented twenty different witnesses during the punishment phase of his trial. Included in this long list of witnesses the Court finds was [sic] Dr. Kristie Compton, a mitigation specialist employed by the defense team to help prepare the case for trial. Dr. Compton interviewed many witnesses and also advised the defense team to not have her interview the defendant in order to avoid the State's experts having an opportunity to interview the defendant pursuant to the holding of *Soria v. State,* 933 S.W 2d 46, 62 (Tex. Crim. App. 1996), *cert. denied,* 520 U.S. 1253 (1997). Thus, the Court finds and concludes the decision to not have Dr. Compton personally interview the defendant prior to testifying was a reasonable, strategic decision made by counsel, and one that is reasonably supported by the law.

The record shows further and the Court finds that the defendant's attorneys sought and were granted the services of a court-appointed forensic psychologist, Dr. Paul Andrews, who interviewed the defendant and conducted a battery of tests which indicated that the defendant was of average intelligence, had a high level of executive functioning, did not suffer from any brain dysfunction, damage or diseases, and was not mentally retarded. The Court finds both Dr Andrews and the defendant's trial counsel were prepared to conduct further investigation into the defendant's mental and psychological background had the tests conducted by Dr. Andrews indicated a need therefore; however, the tests did not indicate that the defendant had any mental defect or disease which required further study.

The record shows the Court finds that the defendant's attorneys further requested and were granted the services of an investigator, Mr. Jace Walker, to assist the defense team in its trial preparation.

Based on the affidavits of trial counsel, the Court finds the defense team and its experts spoke with many potential witnesses and extensively explored the defendant's life history, scholastic background, childhood and other avenues of mitigating evidence. According to records obtained by the defense team, the Court finds the defendant did well academically in both grade school and high school. The investigation further developed evidence that the defendant was a fairly gifted football player who was given a scholarship to play football for Arkansas Tech University.

At the punishment phase, the Court finds the record reflects that the defense presented testimony intended to refute or mitigate the State's aggravating evidence of unadjudicated acts of criminal violence perpetrated by the defendant against smaller and weaker persons. The record further reflects, and the Court finds that the defense presented testimony from several witnesses which established the potentially mitigating evidence that the defendant was a loving family member who served as a father figure to his siblings and who maintained employment when he was not attending college. The Courts finds the evidence at trial showed also that the defendant did well in school until he left town to attend college in Arkansas.

The defendant alleges that his trial counsel were ineffective for failing to obtain medical records showing that he suffered migraine headaches during his childhood, injured his knee in college, and was knocked unconscious once while playing football. Trial counsel establish in their affidavits, and the Court finds that they were aware of this evidence, but did not believe, after consultation with the defense team and the defendant, that obtaining documentation of these matters was necessary. The Court finds counsel further was of the opinion and made the strategic decision that these areas of evidence would be better presented to the jury through the testimony of the defendant's friends and family members. The Court finds that the record is consistent in that regard with counsels' affidavits where it shows that such witnesses provided the jury with a wealth of information regarding the defendant's childhood, education and other background evidence.

Regarding the [d]efendant's claim that counsel was ineffective for failing to call his mother, Ms. Julia Jordan Williams as a witness, the Court finds and concludes, based on the credible evidence that Ms. Williams purposely made herself unavailable to defense counsel at trial after being told that a warrant had been issued for her arrest. The Court further finds and concludes, based on the record and the credible evidence, that the trial court's schedule was in no way related to the

defendant's mother not being called to testify before the jury by the defense.

The Court finds and concludes that the affidavit of Ms. Williams attached to this writ application does not constitute credible evidence where Ms. Williams has been arrested and/or convicted several times for theft, a crime of moral turpitude.

The Court finds that the sworn affidavits ordered by the Court and filed by A.M. Thompson, Jr., lead counsel, on August 20, 2012, and LaJuanda Lacy, trial counsel, on February 8, 2013, both constitute credible evidence.

The Court takes judicial notice that both Mr. Melvin Thompson and Ms. LaJuanda Lacy are each well-experienced in the preparation for and the trial of capital murder cases. The Court takes judicial notice that both of these attorneys have properly represented other capital murder defendants at trial.

The Court finds and concludes that the defendant's trial counsel fully complied with the guidelines established by the Texas State Bar regarding the preparation of a defense team in a capital murder case, which included lead and second chair counsel, a forensic psychologist, a mitigation expert and a private investigator.

The Court finds and concludes that the defendant's trial attorneys were adequately prepared and had and executed a punishment strategy of showing the defendant was loving and caring individual who did well in school, who was a star athlete and team leader, and who was admired and respected by many of his family, friends, teachers and peers. In short, the defense team was able to call twenty punishment witnesses who presented the jury with a wealth of potentially mitigating evidence regarding the defendant's life.

The Court further finds and concludes that the record shows that defense counsel properly investigated and were fully prepared for the trial of the punishment phase in this case. That counsel was unable to overcome the weight of the State's aggravating evidence, including but not limited to the horrendous facts of the offense itself, the defendant's extraneous criminal acts of violence against women and weaker individuals, his inability to conform his behavior to the rules while incarcerated, and his disrespect for law enforcement, is not an indictment of counsel's trial preparation or presentation of punishment evidence.

28

The Court finds that the defendant was not denied effective assistance of trial counsel because counsel, as claimed by Applicant, failed to adequately prepare a case mitigation of the death penalty and/or to prepare a defensive punishment theory. The Court finds and concludes trial counsel adequately prepared a case in mitigation of the death penalty which met the standards for effective assistance of counsel and effectively presented that case to the jury at sentencing. The Court finds and concludes trial counsel provided effective assistance of counsel by adequately preparing a defensive punishment theory.

The Court finds and concludes that trial counsel provided effective assistance of counsel to the defendant at both the guilt and sentencing phases of the trial.

The Court finds and concludes beyond a preponderance of the evidence that the outcome of the punishment phase in this case would not have been any different but for the failure of the defendant's defense attorneys to present supplemental documentation that he suffered from migraine headaches in childhood; that he was once knocked unconscious while playing high school football; or that he suffered a knee injury while playing college football.

The Court further finds and concludes that the record is consistent with trial counsel's credible affidavits stating that they fully intended to call Ms. Julia Jordan Williams as their last punishment witness but were unable to do so after she fled the courthouse to avoid arrest.

The Court further finds and concludes that the defendant has failed to establish either prong of his two-part burden under *Strickland v. Washington*, 466 U.S. 668 (1984)[,] by showing deficient conduct on the part of trial counsel and a prejudice that resulted from the alleged acts of ineffectiveness.

The Court finds and concludes that the defendant was represented by counsel who provided effective assistance of counsel and there is no credible evidence before the Court that the defendant's trial attorneys provided ineffective assistance of counsel at the punishment phase of his trial.

(d) The defendant alleges under the fourth ground for relief that he was denied due process by the "10-12 Rule" found under Article 37.071, Sections 2(d)(2) and 2(f)(2) of the Code of Criminal Procedure. The record shows that the defendant raised this complaint to the Court of Criminal

Appeals during his direct appeal and said complaint was subsequently rejected by the Court. *Miller v. State,* No. AP-76,270, 2012 Tex. Crim. App. Unpub. LEXlS 549 at *63 (Tex. Crim. App. May 23, 2012). The Court of Criminal Appeals long ago decided that "the Great Writ should not be used in matters that have been raised on appeal." *Ex parte Banks,* 769 S.W.2d 539, 540 (Tex. Crim. App. 1989). Even a constitutional claim is forfeited under a habeas application if the defendant had the opportunity to raise the issue on appeal. *Ex parte Gardner,* 959 S.W.2d 189, 191 (Tex. Crim. App. 1998). Therefore, any contention which was raised and rejected on direct appeal, generally cannot serve as the basis for habeas relief. *Id.*

Moreover, the Court finds and concludes that the defendant's fourth ground raises an issue that has been repeatedly rejected by the Court of Criminal Appeals. *See Bible v. State,* 162 S.W.3d 234, 250 (Tex. Crim. App. 2005) (citing *Allen v. State,* 108 S.W.3d 281, 285 (Tex. Crim. App. 2003), *cert. denied,* 540 U.S·1185 (2004)).

The Court thus finds and concludes that the defendant has failed to establish that he is entitled to habeas relief for the reasons alleged under his fourth ground for relief.

(e) Under a fifth ground for review, the defendant alleges that his rights were violated by the Texas death penalty scheme [because] the jury's assessment of the death penalty is not subject to meaningful appellate review. The record shows that the defendant raised this complaint to the Court of Criminal Appeals during his direct appeal and said complaint was subsequently rejected by the Court. *Miller v. State,* No. AP-76,270, 2012 Tex. Crim. App. Unpub. LEXIS 549 at *67–68 (Tex. Crim. App. May 23, 2012). The Court of Criminal Appeals long ago decided that "the Great Writ should not be used in matters that have been raised on appeal." *Ex parte Banks,* 769 S.W.2d 539, 540 (Tex. Crim. App. 1989). Even a constitutional claim is forfeited under a habeas application if the defendant had the opportunity to raise the issue on appeal. *Ex parte Gardner,* 959 S.W.2d 189, 191 (Tex. Crim. App. 1998). Therefore, any contention which was raised and rejected on direct appeal, generally cannot serve as the basis for habeas relief. *Id.*

Additionally, the Court finds and concludes that the defendant's fifth ground raises an issue that has been repeatedly rejected by the Court of Criminal Appeals. *See Bible v. State,* 162 S.W.3d 234, 250 (Tex. Crim. App.2005) (citing *Allen v. State,* LOS S.W.3d 281,285 (Tex. Crim. App, 2003), *cert. denied,* 540 U.S. 1185 (2004)).

The Court thus finds and concludes that the defendant has failed to establish that he "is entitled to habeas relief for the reasons alleged under his fifth ground for relief.

10.    The Court finds and concludes that the legal procedures in these cases were proper and as provided by the Constitution and Texas law.

11.    The Court finds and concludes that the complaint contained in this Application for Writ of Habeas Corpus are not well taken and the Court recommends that they should in all things be **DENIED**.

12.    The Court, after review of the application for habeas relief, any answer, and the file, finds and determines that there are no controverted previously unresolved facts material to the legality of the defendant's confinement.

Supp. SHCR 10–23.  The CCA subsequently denied the application for a writ of habeas corpus "based upon the trial court's findings and conclusions as well as our own review of the record."  *Ex parte Miller*, No. 81,581-01, 2015 WL 1756860, at *1 (Tex. Crim. App. Apr. 15, 2015) (per curiam) (not designated for publication), *reh'g denied* (May 20, 2015) ("*Miller I*").

As discussed more fully below, this Court must defer to the state court's findings and conclusions, as instructed in 28 U.S.C. § 2254(d), and presume the state court's factual findings to be correct unless Petitioner rebuts the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  State-court decisions must be given "the benefit of the doubt."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citation omitted).

## IV.    STANDARD OF REVIEW

### A.    Section 2254 Standards

"The federal habeas statute, as amended by the Antiterrorism and Effective

Death Penalty Act of 1996 (AEDPA), imposes important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases." *Shoop v. Hill*, 586 U.S. 45, 48 (2019). In addition to overcoming procedural hurdles, a state prisoner must meet exacting substantive standards to obtain habeas corpus relief.

AEDPA "requires a state prisoner seeking federal habeas relief first to 'exhaus[t] the remedies available in the courts of the State.'" *Kernan v. Hinojosa*, 578 U.S. 412, 413 (2016) (per curiam) (alteration in original). State court adjudication requires review under § 2254(d). *Harrington v. Richter*, 562 U.S. 86, 98–99 (2011). This provision "imposes a highly deferential standard of review for evaluating state court rulings and demands that state court decisions be given the benefit of the doubt," *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per curiam) (quotation omitted), and "is limited to the record that was before the state court . . . ." *Cullen,* 563 U.S. at 181.

A federal court may not grant habeas corpus relief with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The standard under § 2254(d) is highly deferential and difficult to meet. *Pinholster*, 563 U.S. at 181. It "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute

for ordinary error correction through appeal." *Richter*, 562 U.S. at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)).  State courts are presumed to know and follow the law, *Woods v. Donald*, 575 U.S. 312, 316 (2015), and § 2254(d) "demands that state-court decisions be given the benefit of the doubt." *Pinholster*, 563 U.S. at 181 (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

The statute therefore "restricts the power of federal courts to grant writs of habeas corpus based on claims that were 'adjudicated on the merits' by a state court." *Shinn v. Kayer*, 592 U.S 111, 112 (2020) (per curiam) (citation omitted).  "When a state court has applied clearly established federal law to reasonably determined facts in the process of adjudicating a claim on the merits, a federal habeas court may not disturb the state court's decision unless its error lies 'beyond any possibility for fair-minded disagreement.'" *Id.* (quoting *Richter*, 562 U.S. at 103).

Further, "[u]nder § 2254(d)," the reasonableness of the state court's decision—not whether it is correct—"is 'the only question that matters.'" *Id.* at 124 (quoting *Richter*, 562 U.S. at 102); *accord Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was *incorrect* but whether that determination was *unreasonable*—a substantially higher threshold."); *Hughes v. Vannoy*, 7 F.4th 380, 387 (5th Cir. 2021) ("A merely incorrect state court decision is not sufficient to constitute an unreasonable application of federal law.  Instead, the state court decision must be 'so lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility for fair minded disagreement.'" (citation modified)).

A state court adjudication on direct appeal is due the same deference under § 2254(d) as an adjudication in a state post-conviction proceeding. *See, e.g., Dowthitt v. Johnson*, 230 F.3d 733, 753–57 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001) (holding that a finding made by the CCA on direct appeal is an "issue . . . adjudicated on the merits in state proceedings," to be "examine[d] . . . with the deference demanded by AEDPA" under 28 U.S.C. § 2254(d)). Nothing "in AEDPA or [the Supreme] Court's precedents permit reduced deference to merits decisions of lower state courts." *Shinn*, 592 U.S. at 121 n.2 (citing 28 U.S.C. § 2254).

Beginning with § 2254(d)(1), a state court decision is "'contrary to' clearly established federal law if it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir. 2004), *cert. denied*, 541 U.S. 1087 (2004); *see Lopez v. Smith*, 574 U.S. 1, 2 (2014) (per curiam) (finding that "[w]e have emphasized, time and again, that [AEDPA] prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established.'"). For example, in *Will v. Lumpkin*, the Fifth Circuit explained:

> A state court unreasonably applies clearly established Supreme Court precedent when it improperly identifies the governing legal principle, unreasonably extends (or refuses to extend) a legal principle to a new context, or when it gets the principle right but "applies it unreasonably to the facts of a particular prisoner's case."

978 F.3d 933, 940 (5th Cir. 2020), *cert. denied*, 142 S. Ct. 579 (2021) (quoting *Williams v. Taylor*, 529 U.S. 362, 407–08 (2000)) (citation omitted).

The Supreme Court has further explained that "[e]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks omitted).  "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Id*. at 102.

"Under § 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fair minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court."  *Id*.; *see Evans v. Davis*, 875 F.3d 210, 216 (5th Cir. 2017), *cert. denied*, 139 S. Ct. 78 (2018) (recognizing that § 2254(d) tasks courts "with considering not only the arguments and theories the state habeas court actually relied upon to reach its ultimate decision but also all the arguments and theories it could have relied upon" (citation omitted)).

Turning to § 2254(d)(2)'s reference to "an unreasonable determination of the facts," the Supreme Court explained that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  *Wood v. Allen*, 558 U.S. 290, 293, 301 (2010).  Indeed, federal habeas relief is precluded where the state court's factual determination is

reasonably debatable.  *See id.*  Under this standard,

> it is not enough to show that a state court's decision was incorrect or erroneous.  Rather, a petitioner must show that the decision was objectively unreasonable, a substantially higher threshold requiring the petitioner to show that a reasonable factfinder *must* conclude that the state court's determination of the facts was unreasonable.

*Batchelor v. Cain*, 682 F.3d 400, 405 (5th Cir. 2012) (brackets and internal quotation marks omitted).

Federal courts must presume that a state court's factual determinations are correct and can find those factual findings unreasonable only where the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  This presumption applies not only to explicit findings of fact but also "to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact."  *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001), *cert. denied*, 537 U.S. 883 (2002); *see Ford v. Davis*, 910 F.3d 232, 234–35 (5th Cir. 2018) (Section 2254(e)(1) "'deference extends not only to express findings of fact, but to the implicit findings of the state court.'  As long as there is 'some indication of the legal basis for the state court's denial of relief,' the district court may infer the state court's factual findings even if they were not expressly made."  (footnotes omitted)).

Moreover, mere error is not enough; the state court's decision must be "*based on an unreasonable factual determination* . . . .  In other words, [habeas relief is not warranted where] even if the [state court] had gotten [the disputed] factual determination right, its conclusion wouldn't have changed."  *Will*, 978 F.3d at 942.

### B.     Ineffective Assistance Claims under *Strickland*

Petitioner contends his trial counsel provided ineffective assistance of counsel in eleven out of his twenty-two main federal habeas claims, in violation of *Strickland v. Washington*, 466 U.S. 668 (1984).  *Strickland* provides a two-pronged standard, and the petitioner bears the burden of proving both prongs.  466 U.S. at 687.

Under the first prong, the petitioner "must show that counsel's performance was deficient."  *Id.*  To establish deficient performance, he "must show that counsel's representation fell below an objective standard of reasonableness," with reasonableness judged under professional norms prevailing at the time counsel rendered assistance.  *Id.* at 688.  The *Strickland* court explained:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.

*Id.* at 689 (citations omitted).  "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id.* (internal quotation marks omitted).

Under the second prong, the petitioner must show that his attorney's deficient performance resulted in prejudice.  *Id.* at 687.  To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. An ineffective assistance of counsel claim fails if a petitioner cannot satisfy either the deficient performance or prejudice prong; a court need not evaluate both if a petitioner makes an insufficient showing as to either. *Id.* at 697.

The Supreme Court discussed the difficulties associated with proving ineffective assistance of counsel claims as follows:

> "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky,* 559 U.S. 356, 371 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland,* 466 U.S. at 689–90. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. . . . The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland,* 466 U.S. at 690.

*Richter*, 562 U.S. at 105; *see also Premo v. Moore*, 562 U.S. 115, 122 (2011) (citing *Strickland*, 466 U.S. at 690) (same). In the context of § 2254(d), the deference due to counsel's representation must be considered in tandem with the deference that must be accorded to state court decisions, which has been referred to as "doubly" deferential. *Richter*, 562 U.S. at 105. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is *any reasonable argument* that counsel satisfied *Strickland*'s deferential standard." *Id.*

(emphasis added).

## C.    Exhaustion of State Remedies and Procedural Default

The resolution of Petitioner's amended petition concerns procedural issues involving exhaustion of state remedies, procedural default, and whether Petitioner can overcome the procedural default via *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013).  Specifically, Respondent contends that twenty-one of Petitioner's twenty-two federal habeas claims are procedurally defaulted.

The AEDPA "requires a state prisoner seeking federal habeas relief first to 'exhaus[t] the remedies available in the courts of the State.'"[3]  *Kernan v. Hinojosa*, 578 U.S. 412, 413 (2016) (alteration in original).  To exhaust properly, a state prisoner must "fairly present[]" all of his claims to the state court.  *Picard v. Connor*, 404 U.S. 270, 275 (1971).  In Texas, all claims must be presented to and decided on the merits by the Texas Court of Criminal Appeals.  *Richardson v. Procunier*, 762 F.2d 429, 432 (5th Cir. 1985).

In *Coleman v. Thompson*, 501 U.S. 722 (1991), the Supreme Court announced the procedural default doctrine as a necessary corollary to the exhaustion requirement.  The Court explained the doctrine as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of

---

[3] State prisoners bringing federal habeas petitions are required to exhaust their state remedies before proceeding to federal court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1).

the alleged violation of federal law or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* at 750. As a result of *Coleman*, unexhausted claims that would now be procedurally defaulted in state court are ordinarily dismissed as procedurally barred. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir.), *cert. denied*, 515 U.S. 1153 (1995); *see Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). This includes unexhausted claims that would be barred by Texas's abuse-of-the-writ rules.[4] *Fearance*, 56 F.3d at 642.

This procedural bar may be overcome by demonstrating either: cause and prejudice for the default or that a fundamental miscarriage of justice would result from the court's refusal to consider the claim. *Id.* (citing *Coleman*, 501 U.S. at 750–51). "Cause" means that "some objective factor external to the defense impeded [the petitioner's] efforts to comply with the State's procedural rule." *Tabler v. Lumpkin*, No. 22-70001, 2023 WL 6892183, at *4 (5th Cir. Oct. 19, 2023) (citation omitted). An external factor is one that "cannot fairly be attributed to" the petitioner. *Id.* (quoting *Coleman*, 501 U.S. at 753). To establish "actual prejudice," a petitioner must show not merely a substantial federal claim, such that the errors at trial created a possibility of prejudice, but rather that the constitutional violation worked to his actual and substantial disadvantage." *Id.* (quoting *Shinn v. Ramirez*, 596 U.S. 366, 379–80 (2022) (citation modified and citation omitted in *Tabler*)).

---

[4] Dismissals pursuant to abuse of writ principles have regularly been upheld as a "valid state procedural bar foreclosing federal habeas review." *Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008); *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008), *cert. denied*, 556 U.S. 1239 (2009); *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343 (2007).

Ordinarily, state habeas counsel's "ignorance or inadvertence" does not establish "cause" to excuse procedural default because the petitioner bears the risk of attorney error. *Id.* (quoting *Shinn*, 596 U.S. at 380 (citing *Coleman*, 501 U.S. at 753)). But the Supreme Court carved out a "narrow exception" to this rule in *Martinez*. *Id.* The Court held "that ineffective assistance of state postconviction counsel *may* constitute 'cause' to forgive procedural default of a trial-ineffective-assistance claim." *Id.* (quoting *Shinn*, 596 U.S. at 380) (emphasis added).

The *Martinez* exception applies if the procedurally defaulted claim is an ineffective assistance of trial counsel claim (IATC) and "if the State's judicial system effectively forecloses direct review of trial-ineffective-assistance claims." *Id.* (citing *Trevino*, 569 U.S. at 428, and *Martinez*, 566 U.S. at 16). To establish "cause" under *Martinez*, the Fifth Circuit applies the familiar *Strickland* test. *Id.* (citation omitted). Accordingly, the petitioner must show habeas counsel's performance was (1) "deficient" and (2) "prejudiced" his defense. *Id.* (quoting *Strickland*, 466 U.S. at 687).

## V.   DISCUSSION

### A.   Petitioner's New Evidence

Petitioner relies on forty-five new exhibits that were never presented to the state court to support his arguments for federal habeas relief.[5] The Court cannot consider these documents.

---

[5] The forty-five exhibits are: (1) Ex. 17 (Docket No. 23-2) Declaration of Julia Jordan (Miller's mother), (2) Ex. 18 (Docket No. 23-3) Declaration of Chineyere Jordan (Miller's sister), (3) Ex. 19 (Docket No. 23-4) Declaration of Jace Walker (defense investigator), (4) Ex. 20 (Docket No. 23-5) Declaration of

"AEDPA restricts the ability of a federal habeas court to develop and consider new evidence." *Shoop v. Twyford,* 596 U.S. 811, 819 (2022). "Review of factual determinations under § 2254(d)(2) is expressly limited to 'the evidence presented in the State court proceeding.'" *Id.* "[R]eview under § 2254(d)(1) is+ [also] limited to the record that was before the state court that adjudicated the claim on the merits."

---

Cliff Carpenter (defense investigator), (5) Ex. 21 (Docket No. 23-6) Declaration of Melvin Thompson (lead trial counsel), (6) Ex. 22 (Docket No. 23-7) Declaration of Melvin Thompson second declaration, (7) Ex. 23 (Docket No. 23-8) Declaration of Keith McArthur (new investigator), (8) Ex. 24 (Docket No. 23-9) Declaration of Derrick Miller (Miller's uncle), (9) Ex. 25 (Docket No. 23-10) Declaration of J. Brett Harrison (outside attorney), (10) Ex. 26 (Docket No. 23-11) Declaration of Reginald Clark (Smith County Deputy Sheriff), (11)Ex. 27 (Docket No. 23-12) Declaration of Setina Erwin (Miller's first cousin), (12) Ex. 28 (Docket No. 23-13) Declaration of Chineyere Jordan second declaration, (13) Ex. 29 (Docket No. 23-14) Declaration of Ben Bryan (federal habeas investigator), (14) Ex. 30 (Docket No. 23-15) Declaration of Devontae Jordan (Miller's brother), (15) Ex. 31 (Docket No. 23-16) Declaration of Demetra Miller (Miller's first cousin), (16) Ex. 32 (Docket No. 23-17) Declaration of Dorotheia Taylor (Miller's eighth-grade teacher), (17) Ex. 33 (Docket No. 23-18) collection of cases where the State did not seek death penalty (18) Ex. 34 (Docket No. 23-19) Declaration of Dr. Stephen Pustilnik (defense's medical expert), (19) Ex. 35 (Docket No. 23-20) Declaration of Antron Gardner (Miller's first cousin), (20) Ex. 36 (Docket No. 24-1) Declaration of Shelli Schade Smith (trial mitigation specialist), (21) Ex. 37 (Docket No. 24-2) Declaration of Steve Mullins (Arkansas Tech football coach) (22) Ex. 38 (Docket No. 24-3) Declaration of Brian Stewart (trial attendee), (23) Ex. 39 (Docket No. 24-4) Declaration of Cheryl Davis (hospital worker), (24) Ex. 40 (Docket No. 24-5) Declaration of Delbert Simpson, Jr. (father of Pinson's other child); (25) Ex. 41 (Docket No. 24-6) Declaration of Allen Dotson (Miller's mother's cousin), (26) Ex. 42 (Docket No. 24-7) Declaration of Anthony Erwin (Miller's uncle by marriage); (27) Ex. 43 (Docket No. 24-8) Declaration of Keith McArthur second declaration, (28) Ex. 44 (Docket No. 24-9) Declaration of Latonya Miller (Miller's first cousin), (29) Ex. 45 (Docket No. 24-10) Declaration of Dr. Andrew Baker (federal habeas expert), (30) Ex. 46 (Docket No. 24-11) Declaration of Dr. Mark Shuman (federal habeas expert), (31) Ex. 47 (Docket No. 24-12) Dr. Michael Baden (federal habeas expert), (32) Ex. 48 (Docket No. 24-13) Dr. Davis Posey (federal habeas expert), (33) Ex. 49 (Docket No. 24-14) Dr. Jonathan Kohler (federal habeas expert), (34) Ex. 50 (Docket No. 24-15) Janet Vogelsang (federal habeas mitigation specialist), (35) Ex. 61 (Docket No. 24-24) ISIS (proposed follow-up on mitigation), (36) Ex. 92 (Docket No. 28-2) Keith McArthur third declaration, (37) Ex. 93 (Docket No. 49-2) Susan Klein (outside attorney), (38) Ex. 94 (Docket No. 49-3) Shelli Schade Smith second declaration; (39) Ex. 96 (Docket No. 49-5) J. Brett Harrison amended declaration, (40) Ex. 97 (Docket No. 49-6) Dr. Jonathan Kohler supplemental report , (41) Ex. 98 (Docket No. 49-7) Tremayne Norris (federal habeas attorney), (42) Ex. 99 (Docket No. 49-8) Dr. Andrew Baker supplemental report/analysis, (43) Ex. 100 (Docket No. 49-9) Davis Shulman (state habeas counsel), (44) Ex. 101 (Docket No. 49-10) Dr. Harry Wilson (State's expert), and (45) Docket No. 39-2, Dr. Reade Quinton e-mail.

*Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  As such, "evidence later introduced in federal court is irrelevant."  *Id.* at 184.  Although Petitioner claims that most of his evidence was part of the state court record, Docket No. 109 at 13–15, he fails to identify which exhibits were allegedly misidentified and reviewed by the state court in *Miller I*, 2015 WL 1756860, at *1.  To the extent Petitioner is asserting that his forty-five exhibits were reviewed by the state court in *Miller II*, 2021 WL 2674516, at *1, his state habeas petition was denied as an abuse of the writ, and thus his new evidence was not reviewed on the merits.  The finding of an abuse of the writ by the state court prevents this Court from reviewing this new evidence.  *See Shinn v. Ramirez* ("*Shinn*")*,* 596 U.S. 366, 381 (2022).

The only exceptions are set forth in § 2254(e)(2), which permits a petitioner to present new evidence in a federal habeas proceeding only if (A) the claim relies on a new rule of constitutional law expressly made retroactive or (B) the claim relies on a factual predicate that could not have been previously discovered through due diligence.  28 U.S.C. § 2254(e)(2)(A); *see also Shinn*, 596 U.S. at 381 (Under § 2254(e)(2), where the petitioner has "failed to develop the factual basis of a claim in state court proceedings, a federal [habeas] court may hold an evidentiary hearing on the claim only if the claim relies on (1) a 'new' and 'previously unavailable' 'rule of constitutional law' made retroactively applicable by [the Supreme] Court, or (2) 'a factual predicate that could not have been previously discovered through the exercise of due diligence.'") (quoting §§ 2254(e)(2)(A)(i); (ii)).  The facts underlying the claim, moreover, must be "sufficient to establish by clear and convincing evidence that but

for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *Id*. § 2254(e)(2)(B); *see also Shinn*, 596 U.S. at 381 (The petitioner must then "show that further fact finding would demonstrate, 'by clear and convincing evidence,' that 'no reasonable fact finder' would have convicted him of the crime charged." (quoting § 2254(e)(2)(B)).

Petitioner fails to satisfy these narrow exceptions. Petitioner does not rely on new constitutional rulings, and any of his claims that rely on "a factual predicate that could not have been previously discovered through the exercise of due diligence" were foreclosed by inaction. 28 U.S.C. § 2254(e)(2)(A). Even if Petitioner succeeded on one of the above conditions, moreover, he has not demonstrated that his new evidence establishes his actual innocence for the reasons addressed below, 28 U.S.C. § 2254(e)(2)(B).

To be sure, *Mullis v. Lumpkin* held that "evidence outside the state record is admissible in *Martinez* claims for the limited purpose of establishing an excuse for procedural default, even in the wake of [*Shinn*] and *Twyford*." 70 F.4th 906, 911, (5th Cir. 2023). But Petitioner does not identify which of his new exhibits would be admissible for this limited purpose. *See* Docket No. 109.

Finally, the Court addresses Petitioner's declarations from two outside attorneys, J. Brett Harrison (Docket No. 49-5) and Susan Klein (Docket No. 49-2), who directly speak to the merits of Petitioner's claims. These two exhibits do not overcome the hurdles of § 2254(d)(1) or (2) § 2254(e)(2). But additionally, the Fifth Circuit has consistently rejected such legal opinions as evidence because they invade

the jury's role as trier of fact.  *See United States v. Thomas*, 847 F.3d 193, 206 (5th Cir. 2017); *Johnson v. Quarterman*, 306 F. App'x 116, 128–29 (5th Cir. 2009); *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997); *Salas v. Carpenter*, 980 F.2d 299, 305 n.4 (5th Cir. 1992).  For these reasons, the Court cannot consider these two declarations.

## B.    Claims 1–3: Prosecutorial Misconduct Regarding the Medical Experts and the Timing of Death

Petitioner contends that the prosecution committed misconduct by presenting medical expert testimony that was inconsistent and contradictory regarding the timing of Kelynn's death in the guilt/innocence phase of his trial.

In Claims 1–3, Petitioner raises allegations pertaining to the prosecution's three medical experts.  He states:

> [M]uch of the expert testimony offered by the [S]tate was in fact false, including the claims that it is possible to date bruises, time of death can be reliably determined from body temperature or the onset of rigor mortis, or mesenteric tears are always extremely painful.

Docket No. 49 at 24.[6]  Petitioner challenges the State's three medical experts and concludes that "the false testimony the State suborned at trial violates [ ] [Petitioner's] due process rights under *Napue*[.]"[7]  *Id.*

_____

[6] In citing documents on ECF, the Court uses the page number of the document, as opposed to the page number automatically generated by the Court's electronic filing system.

[7] *Napue v. Illinois*, 360 U.S. 264 (1959), created a claim for when a State denies a criminal defendant due process when it knowingly uses false evidence at trial or allows untrue testimony to go uncorrected.

Petitioner claims that "the portions of the State's experts' testimony which were not outright false were nonetheless based on unreliable, non-scientific methodologies." *Id*. Examples include the testimony "that there could be two separate injuries, that the presence of hemosiderin-laden macrophages does not indicate an injury that is at least many hours old, or the notion that fatal brain swelling could be caused by 'splanchnic bed vasodilation.'" *Id.* at 24–25. In addition, Petitioner attacked "the State's decision to call Dr. Wilson for the first time on rebuttal, depriving [ ] Petitioner of an opportunity to meaningfully rebut or challenge Dr. Wilson's testimony." *Id*. "Collectively, this distortion of the adversarial process rendered the trial fundamentally unfair in violation of *Chambers*[.]"[8] *Id.*

Last, Petitioner claims that information that Drs. Quinton and Wilson disagreed about Kelynn's injuries violated *Brady v. Maryland*, 373 U.S. 83 (1963).[9]

The Court rejects Petitioner's claims for several reasons. Petitioner's claims are time-barred, defaulted, and have no merit.

### 1. Claims 1–3 are time-barred.

Petitioner's *Napue*, *Brady*, and *Chambers* claims are barred by the one-year statute of limitations of § 2244(d)(1)(A). The one-year limitation period shall run "from the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).

---

[8] *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), recognized that the "right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."

[9] *Brady* proscribes "the suppression by the prosecution of evidence favorable to an accused." *Id.* at 87.

Here, Petitioner's conviction became final on August 21, 2012, and his state habeas petition became final on May 20, 2015, yet he did not raise his *Napue*, *Brady*, and *Chambers* claims until he filed his amended petition in this Court on April 28, 2017. Although the limitations period was tolled during a portion of this delay, tolling does not save him.

As noted above, the CCA affirmed Petitioner's conviction and sentence on May 23, 2012. *Miller I*, 2012 WL 1868406. Ninety days later, on August 21, 2012, Petitioner still had not filed a petition for writ of certiorari, and his conviction became final. *Gonzales v. Thaler*, 565 U.S. 134, 149 (2012); Sup. Ct. R. 13.1. On January 10, 2012, Petitioner filed a state habeas application, 1 SHCR1 1, which tolled the one-year limitations period under § 2244(d)(2). The state habeas application remained pending until May 20, 2015, when the CCA denied Petitioner rehearing after denying him habeas relief. *Miller I*, 2015 WL 1756860, at *1. The limitations period therefore started to run only on May 20, *see Fierro v. Cockrell*, 294 F.3d 674, 679 (5th Cir. 2002), giving Petitioner until May 20, 2016, to present all claims to this Court, *see Lawrence v. Florida,* 549 U.S. 327, 329 (2007).

Petitioner, however, did not file his *Napue*, *Brady*, and *Chambers* claims (Claims 1–3) in this Court by May 20, 2016. To be sure, Petitioner filed his first federal habeas petition on April 13, 2016. Docket No. 22. But Petitioner did not raise the *Napue*, *Brady*, and *Chambers* claims in the first habeas petition. Rather, it was not until April 28, 2017, when Petitioner filed the instant amended petition, that he raised the claims at issue. Docket No. 49. To the extent Petitioner was hoping that

47

his first habeas petition would toll the limitations period, he is incorrect. *See Duncan v. Walker*, 533 U.S. 167, 181–82 (2001). Claims 1, 2, and 3 are therefore untimely.

Petitioner argues that these claims "relate back to the original petition." Docket No. 109 at 14. Under the "relation-back" provision of Federal Rule of Civil Procedure 15(c)(2), a later petition in a habeas proceeding may be timely if it relates back to a timely petition. *Mayle v. Felix*, 545 U.S. 644 (2005). But "relation back depends on the existence of a common 'core of operative facts' uniting the original and newly asserted claims." *Id.* at 659. Relation back does not occur "when the new claims depend upon events separate in 'both time and type' from the originally raised episodes." *Id.* at 657 (quoting *United States v. Craycraft*, 167 F.3d 451, 457 (8th Cir. 1999)). And here, Petitioner's amended petition depends on events that are separate in both time and type from those raised in the original petition.

In his original petition, Petitioner framed his challenge to the expert witness testimony regarding the cause of Kelynn's death as an evidentiary challenge to the reliability of the testimony. Docket No. 22 at 34–64. Petitioner's original claim was that the court erroneously admitted the evidence—akin to the reliability and scientific grounds for a challenge under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). *Id.* at 18–21, 34–61. Petitioner also asserted that his trial counsel were ineffective for failing to move to exclude the experts or the expert witness testimony. *Id.* at 61–64. In contrast, in his amended petition, Docket No. 49 at 52–53, Petitioner primarily frames the claim as an issue of prosecutorial misconduct—knowing presentation of false testimony in violation of *Napue*, *id.* at 37–50, and

suppression of evidence in violation of *Brady, id.* at 68–70. He frames the evidentiary issue as violating *Chambers. Id.* at 50–68. However, Petitioner did not even cite *Napue*, *Brady*, or *Chambers* in his original petition. Docket No. 22 at 18–47. The amended petition thus does not relate back to the original petition. *See Mayle*, 545 U.S. at 650 (An amended habeas petition "does not relate back . . . when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.").

Petitioner also argues that, even if his claims are time-barred, the untimeliness of his claims is excused because he has made a substantial showing of actual innocence. Docket No. 109 at 18; *see McQuiggin v. Perkins*, 569 U.S. 383, 386–92 (2013). "Petitioners prove actual innocence by revealing new, vindicating evidence, like 'exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence.'" *Outlaw v. Lumpkin*, 2021 WL 5774325, at *2 (N.D. Tex. Aug. 31, 2021) (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). Evidence does not qualify as "new" if "it was always within the reach of the petitioner's personal knowledge or reasonable investigation." *Hancock v. Davis*, 906 F.3d 387, 390 (5th Cir. 2018) (citing *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008)); *Herrero v. Lumpkin*, 2020 WL 5232995, at *11 (S.D. Tex. Sept. 2, 2020). The *Schlup* standard is "demanding" and seldom met. *House v. Bell*, 547 U.S. 518, 538 (2006). The evidence must be "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error." *Perkins*, 569 U.S. at 401.

Petitioner fails to meet this exacting standard, providing evidence that is at best duplicative rather than new.  Furthermore, his new evidence does not show that he is actually innocent.  *United States v. Jones*, 172 F.3d 381, 384 (5th Cir. 1999) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)) ("Actual innocence means 'factual innocence and not mere legal insufficiency.'").  As explained herein, the Court finds Petitioner has not shown actual innocence to overcome his claims being time-barred.

Finally, Petitioner fails to demonstrate that he is entitled to equitable tolling. A petitioner is entitled to equitable tolling "'only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.'" *McQuiggin*, 569 U.S. 391 (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)).  Equitable tolling is available only in cases presenting "rare and exceptional circumstances."  *Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998).  It is "not intended for those who sleep on their rights."  *Manning v. Epps*, 688 F.3d 177, 183 (5th Cir. 2012).  Equitable tolling applies where the plaintiff is "actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights."  *Flores v. Quarterman*, 467 F.3d 484, 487 (5th Cir. 2006) (quoting *Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999), *abrogated on other grounds by Richards v. Thaler*, 710 F.3d 573, 578–79 (5th Cir. 2013)).  A "garden variety claim of excusable neglect," however, does not support equitable tolling.  *Lookingbill v. Cockrell*, 293 F.3d 256, 264 (5th Cir. 2002) (citation omitted).

50

Moreover, "[i]n order for equitable tolling to apply, [Petitioner] must diligently pursue his § 2254 relief." *Coleman*, 184 F.3d at 403. "Where [petitioner] could have filed his claim properly with even a modicum of due diligence, we find no compelling equities to justify tolling." *See Rashidi v. Am. President Lines*, 96 F.3d 124, 128 (5th Cir. 1996); *see also In re Wilson*, 442 F.3d 872, 875 (5th Cir. 2006); *Fisher v. Johnson*, 174 F.3d 710, 715 (5th Cir. 1999). Petitioner bears the burden of proving that equitable tolling is justified. *Phillips v. Donnelly*, 216 F.3d 508, 511 (5th Cir. 2000). Here, in his reply to the Respondent's amended answer, Petitioner does not assert, much less demonstrate, that he is entitled to equitable tolling for his time-barred claims. Docket No. 109. Petitioner is therefore not entitled to equitable tolling for Claims 1, 2, and 3.

The limitations period for habeas petitions serves to advance the finality of criminal convictions. *See Mayle*, 545 U.S. at 662 ("Congress enacted AEDPA to advance the finality of criminal convictions."). Because Claims 1, 2, and 3 were not presented within the statutory limitations period, the claims are untimely. As such, Claims 1, 2, and 3 are dismissed for this reason alone.

### 2. Claims 1–3 are defaulted.

"A federal habeas claim is barred by procedural default when the state court has rejected the claim pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim." *Garza v. Stephens*, 738 F.3d 669, 675 (5th Cir. 2013) (citing *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008)). Here, the state court rejected Petitioner's Claims 1, 2, and 3 because he

raised them for the first time in a second state habeas application, which the court dismissed for abuse of the writ. *See* 1 SHCR1 19–150; 1 SHCR2 72–154, 161–68; *Miller II*, 2021 WL 2674516, at *1. And the Fifth Circuit "has consistently held that such a dismissal in Texas is an independent and adequate state ground for the purpose of imposing a procedural bar in federal habeas cases." *Garza*, 738 F.3d at 675. Accordingly, Claims 1, 2, and 3 are dismissed for the additional reason that they are defaulted.

Although Petitioner does not expressly concede these claims are defaulted, he does not mount much of a defense. Rather, Petitioner argues that "any procedural default by Mr. Miller is excused" under the "miscarriage-of-justice exception" because he has made a "showing of actual innocence." Docket No. 109 at 4–6. As noted above and explained herein, however, Petitioner has not shown actual innocence to overcome a procedural default. *See* Sections V.B.1, V.C.2, *infra*.

Petitioner also argues that "any procedural default of [his] *Brady* claim is [] excused because [he] has demonstrated cause and prejudice." Docket No. 109 at 11. *See also Coleman v. Thompson*, 501 U.S. 722, 750 (1991) ("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."). Petitioner claims that "the elements of the *Brady* claim itself establish cause and prejudice sufficient

to excuse procedural default." *Id.* (citing *Stickler v. Greene*, 527 U.S. 263, 283 (1999)). But to show cause with a defaulted *Brady* claim, Petitioner must prove "suppression" and "materiality" under *Banks v. Dretke*, 540 U.S. 668, 691 (2004). [10]  And, as explained further below, Petitioner has not established either element here.

### 3.    Claims 1, 2, and 3 are meritless.

*Claim 1.*    Our federal and state laws forbid prosecutors from using perjured testimony and put the onus on prosecutors to correct their testimony if perjury is known.  *Napue*, 360 U.S. at 269.  A petitioner bringing a habeas claim for perjured testimony must show (1) the testimony was false, (2) the testimony was material, and (3) the prosecutor knew the testimony was false.  *Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001).  "[C]ontradictory trial testimony" and "inconsistencies in witnesses' testimony at trial," however, are not evidence of perjured testimony.  *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990); *Little v. Butler*, 848 F.2d 73, 76 (5th Cir. 1988).  Rather, contradictory trial testimony "establishes a credibility question for the jury," and inconsistent testimony is "to be resolved by [the] trier of fact."  *Id.*  The Court finds that Petitioner's examples of perjury fall into these latter categories.  As Respondent thoroughly explains in its answer, none of the testimony from the State's witnesses could be called anything more than testimony that was at times

---

[10] To establish a *Brady* violation, Petitioner must show that (1) the prosecution suppressed evidence, (2) that evidence was favorable to the defense, either as exculpatory or impeaching evidence, and (3) the evidence was material to either guilt or punishment. *Banks*, 540 U.S. at 691. Evidence is material only if there is a reasonable probability that, had it been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 684 (1985). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *Id.* at 678, 684. Nor does a violation arise where the evidence was discoverable through the exercise of due diligence. *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002).

inconsistent or contradictory.  That does not amount to false testimony sufficient to support a claim under *Napue*, but rather are the typical discrepancies decided by juries in every trial.

Further, the Court finds that Petitioner fails to demonstrate that the prosecution knowingly presented evidence it knew to be false.  *Kinsel v. Cain*, 647 F.3d 265, 273 (5th Cir. 2011) ("Kinsel ultimately does not allege a constitutional error at all given that the prosecutors did not knowingly present false testimony at his trial.").  Petitioner's argument does little more than make a conclusory statement that, once inconsistent testimony was presented, the prosecution should have corrected the record.  "Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue . . . to be of probative evidentiary value." *Ross v. Estelle*, 694 F.2d 1008, 1011–12 (5th Cir. 1983).  Claim 1 thus fails on the merits.

***Claim 2***.  Petitioner argues that the State's expert testimony "was profoundly unreliable and largely junk science."  Docket No. 49 at 50–51.  He contends that under *Chambers*, such testimony "deprive[d] him of the 'fundamental fairness the Due Process Clause guarantees." *Id*. (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).  The Court disagrees.

As an initial matter, *Chambers* is inapplicable here.  *Chambers* held that a defendant has a due process right to cross-examine the state's witnesses and to present his own defense witnesses.  410 U.S. at 294.  A state evidentiary rule could not preclude a defendant from exercising these key due process rights. *Id*. at 294–98,

302.   Petitioner, in contrast, has not argued that he was prevented from cross-examining any witnesses or from presenting his own witnesses.  In fact, Petitioner had full opportunity to cross-examine the State's experts and to present his own expert to rebut the State.  Additionally, as Respondent observes, the Supreme Court has never applied *Chambers* "to discretionary evidentiary decisions under rules that are themselves constitutional." *Lucio v. Lumpkin*, 987 F.3d 451, 474 (5th Cir.), *cert. denied*, 142 S. Ct. 404 (2021).  *Chambers* is simply not the right case to bring this claim.

Petitioner's real complaint is that the State's expert testimony should not have been admitted.  Docket No. 49 at 50–68.  But such challenges are not cognizable on federal habeas review.  *See Swarthout v. Cooke,* 562 U.S. 216, 219 (2011) (federal habeas review is limited to constitutional violations).  As the Fifth Circuit explained in *Gonzales v. Thaler*, a petitioner "must first show that his state-court proceedings involved a 'violation of the Constitution or laws or treaties of the United States.'" 643 F.3d 425, 429 (5th Cir. 2011) (emphasis in original).  He may not rely on a state-law evidentiary violation "as the basis for his federal habeas application." *Id.*; *see also McGuire,* 502 U.S. at 67–68.  Federal habeas review on such matters is proper only to determine "whether the state court's evidentiary ruling was sufficiently egregious to render the trial fundamentally unfair or violate an explicit constitutional right." *Peters v. Whitley,* 942 F.2d 937, 940 (5th Cir. 1991) (citing *Edwards v. Butler*, 882 F.2d 160, 164 (5th Cir. 1989).

Petitioner fails to show how any state evidentiary error rendered his trial fundamentally unfair or violated a constitutional right. He argues that the experts did not satisfy *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), Docket No. 49 at 52, but *Daubert* governs the screening of experts in a federal court pursuant to the Federal Rules of Evidence. *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 356 (5th Cir. 2007). Although the Texas Rules of Evidence imposes a "virtually identical" standard as the one set out in *Daubert*, *Lucio* 987 F.3d at 458 n.3, Petitioner does not show how that standard was violated here. Further, a trial does not surpass the high bar of "fundamentally unfair" when a petitioner had an opportunity to cross-examine all the experts and present rebuttal testimony, as Petitioner did here. *See Story v. Collins,* 920 F.2d 1247, 1255–56 (5th Cir. 1991); *see also Stevenson v. E.I. DuPont De Nemours and Co.,* 327 F.3d 400, 407 (5th Cir. 2003).

Regardless, the Court concludes that the trial court did not err in admitting the State's expert testimony. Courts should admit experts when their specialized knowledge will assist the jury in understanding the evidence or determining a fact in question. Tex. R. Evid. 702; *Duckett v. State,* 797 S.W.2d 906, 910 (Tex. Crim. App. 1990), *disapproved of on other grounds, Cohn v. State,* 849 S.W.2d 817 (Tex. Crim. App. 1993). Texas's "Rules of Criminal Evidence favor the admission of relevant expert testimony." *Ortiz v. State*, 834 S.W.2d 343, 347 (Tex. Crim. App. 1992), *overruled on other grounds*, *Ellison v. State*, 201 S.W.3d 714 (Tex. Crim. App. 2006).

Petitioner did not show that Drs. Anderson, Quinton and Wilson were not qualified experts under this standard. As Respondent observes, these witnesses were

highly trained and skilled physicians with specialized knowledge. Docket No. 101 at 73. Their testimony was relevant, based on sufficient facts or data, was the product of reliable principles and methods, reflected a reliable application of the principles and methods to the facts of the case, and helped the jury to understand the evidence. Petitioner, moreover, had an opportunity to cross-examine each expert and present his own expert (Dr. Pustilnik) in rebuttal. Dr. Wilson, who was cross-examined by Petitioner's counsel, 52 RR 110–98, 209–15, 220–22, even admitted under questioning that Dr. Quinton's autopsy report mentioned nothing about Kelynn's brain being abnormal in any manner, let alone that Kelynn died from a swollen brain. 52 RR 195–98. The defense rightfully brought up in its closing argument that two of the State's experts disagreed as to cause of death and argued that this created reasonable doubt. 53 RR 79–80. That the jury, the finder of fact, did not agree with Petitioner's argument does not amount to a due process violation. Certainly, the trial court did not violate Petitioner's due process rights by admitting these experts' testimonies. *See Spence v. Johnson*, 80 F.3d 989, 1000 (5th Cir. 1996) (denying a hearing on petitioner's challenge to the admission of the State's expert testimony did not violate "fundamental fairness" when the evidentiary issue "was fully and competently aired in the state courts," and petitioner "is simply trying to relitigate this aspect of his defense eleven years too late").

Petitioner argues that the State's presentation of Dr. Wilson on rebuttal and Wilson's new theory about Kelynn's death amounted to a surprise witness and deprived him of due process. Docket No. 49 at 65–68. As noted above, this claim is

time-barred because Petitioner did not raise the issue in his original complaint. *See* Docket No. 22 at 18–50. The claim is also defaulted because Petitioner raised it only in the state habeas application that was dismissed for abuse of the writ. 1 SHCR2 145–48. This claim is also just another state evidentiary issue, which is not cognizable on federal habeas review unless there is a due process violation. And there was no due process violation in part because Dr. Wilson was on the State's witness list and his presence as a witness was therefore not a surprise. Docket No. 49 at 67. *Martinez v. State*, 867 S.W.2d 30, 39 (Tex. Crim. App. 1993) (en banc) (a witness is subject to a bad faith analysis only when they do not appear on the State's witness list). Finally, since Petitioner had "ample opportunity" to cross-examine Dr. Wilson, Petitioner has not shown that the admission of Dr. Wilson's testimony rendered the trial "fundamentally unfair" and violated his due process. *Story*, 920 F.2d at 1255–56. Claim 2 also fails on the merits.

***Claim 3***. Petitioner claims that the "State did not disclose the fact that Dr. Quinton had uncovered no evidence of brain swelling during the autopsy and did not believe that brain swelling was the cause of Kelynn's death." Docket No. 49 at 69. Petitioner contends that this failure to disclose violates *Brady*.

The Court disagrees. "There are three components of a true *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (U.S. 1999). "[E]vidence is not suppressed

if the defendant knows or should know of the essential facts that would enable him to take advantage of it" and "[t]o have been suppressed, the evidence must not have been discoverable through the defendant's due diligence." *Brown*, 650 F.3d at 588 (internal quotation and citation omitted).

In addition to being time-barred and defaulted, as noted above, Petitioner's *Brady* claim fails because no evidence was suppressed.  Suppression involves "information which had been known to the prosecutor but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103 (1976).  And here, Petitioner must have known that Dr. Quinton found no evidence of swelling during the autopsy because Petitioner's own counsel tried to impeach Dr. Wilson with Dr. Quinton's autopsy report and its absence of swelling or abnormalities.  52 RR 195–98.  Additionally, one of Petitioner's experts, Dr. Baker, referred to the lack of evidence of brain swelling in Dr. Quinton's autopsy report.  Docket No. 49-8 at 11–12.  Petitioner's actual knowledge of the evidence is a complete bar to a suppression finding.

Petitioner's *Brady* claim also fails because there was no prejudice.  As noted above, Petitioner's counsel asked about the absence of swelling during the autopsy, and his expert referred to it in his testimony.  Further, the absence of brain swelling in Dr. Quinton's report did not alter the credibility of Drs. Quinton or Anderson or challenge the rest of Dr. Wilson's conclusions.  As Respondent observes, evidence around brain swelling was not the focal point of the State's case against Petitioner. The Court therefore finds that the allegedly undisclosed evidence cannot "reasonably

be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

## C.    Claim 4: Actual Innocence

Petitioner alleges that, absent the State's "false, misleading, and unreliable expert testimony," the remaining evidence establishes that he is actually innocent of capital murder. Docket No. 49 at 70. Petitioner's claim is premised on the new expert testimony he has provided, which was addressed above. Docket No. 49 at 70–72. Petitioner's actual innocence claim, however, is time barred, procedurally defaulted, not cognizable on federal habeas review, and meritless.

First, Petitioner did not raise a claim of actual innocence in his original federal petition. *See generally* Docket No. 22. For the reasons addressed in Section V.B.1., *supra*, this claim is barred by 28 U.S.C. § 2244(d)(1)(A). Petitioner, moreover, has not made a substantial showing of actual innocence to overcome this statutory bar, *see McQuiggin v. Perkins*, 569 U.S. 383, 386–92 (2013), which the Court explains further below. Nor has Petitioner demonstrated that he's entitled to equitable tolling, *see id.* at 391; *Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998). Petitioner's Claim 4 fails for this reason alone.

Second, Petitioner raised this claim only in his abusive state habeas application. 1 SHCR2 172–74. Thus, for the reasons addressed in Section V.B.2., *supra*, the claim is defaulted. Petitioner cannot overcome his default by showing a fundamental miscarriage of justice, *Coleman v. Thompson*, 501 U.S. 722, 750 (1991),

because he is not actually innocent. Nor does he demonstrate cause for the default and actual prejudice, *see id*. Claim 4 thus fails for this additional reason.

Third, in this Circuit, claims of actual innocence are not cognizable on federal habeas review. *Reed v. Stephens,* 739 F.3d 753,766 (5th Cir. 2014); *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006). Petitioner recognizes as much, conceding that "the Fifth Circuit does not currently recognize the viability of actual innocence as a standalone claim." Docket No. 109 at 27. Indeed, the Supreme Court has never "resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence," *McQuiggin*, 569 U.S. at 392, thus, the claim is barred under the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288, 310 (1989).

Fourth, Petitioner has not demonstrated that he is actually innocent. "Actual innocence means 'factual innocence and not mere legal insufficiency.'" *United States v. Jones*, 172 F.3d 381, 384 (5th Cir. 1999) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)). "To establish actual innocence, [a] petitioner must demonstrate that, 'in light of all the evidence,' 'it is more likely than not that no reasonable juror would have convicted him.'" *Bousley*, 523 U.S. at 623 (quoting *Schlup v. Delo*, 513 U.S. 298, 328 (1995)). As explained above, such a claim requires a petitioner to support his allegations with new reliable evidence not presented at trial, "whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, [or] critical physical evidence." *Schlup*, 513 U.S. at 324. Even if a "truly persuasive" showing of

actual innocence would warrant federal habeas relief, the threshold for such a claim would be "extraordinarily high." *Herrera v. Collins*, 506 U.S. 390, 417 (1993).

Petitioner has not made this showing here and does not cross the high threshold required for relief. Rather, Petitioner's claim relies on evidence that was presented to—and rejected by—the jury. He states: "All five of the experts retained by federal habeas counsel agree that, based on reliable forensic science techniques, it is impossible to say that Kelynn's injury must have occurred between 9:15 a.m. and 12:40 p.m. on June 1, 2008." Docket No. 49 at 70. But similar evidence was offered at trial. Defense expert Dr. Pustilnik testified that Kelynn's injuries were at least twenty-four-hours old. The opinions from Petitioner's new doctors repeat what Dr. Pustilnik told the jury—that Kelynn died slowly over the course of at least a day, that his symptoms would have been vague, that he would not have been in much pain and could have functioned relatively normally up until he started to lose consciousness, that Petitioner's story was consistent with his opinion, and that the State's timeline was inaccurate based on his scientific findings.

The Court agrees with Respondent that Petitioner's new evidence is simply meant to bolster Dr. Pustilnik's trial testimony and impeach the State's witnesses, which fails to demonstrate actual innocence. As the Fifth Circuit explained in similar circumstances, "what [petitioner] puts forth is actually not 'newly discovered' evidence" sufficient to show actual innocence where the petitioner "presented the substance of the affidavits at his trial." *Dowthitt v. Johnson*, 230 F.3d 733, 742 (5th Cir. 2000) (finding that petitioner's "proffered evidence . . . fails to raise a substantial

doubt as to his guilt"); *see also Lucas v. Johnson*, 132 F.3d 1069, 1075 n.3 (5th Cir. 1998) (requests for relief based on newly discovered evidence must demonstrate that the evidence is newly discovered and unknown to the defendant at the time of trial and that the evidence is not merely cumulative or impeaching) (citing *United States v. Freeman*, 77 F.3d 812, 816–17 (5th Cir. 1996)).

Petitioner also contends that Dr. Wilson "changed his testimony in light of additional facts supplied to him for the first time by federal habeas counsel." Docket No. 49 at 71. But the only "additional facts" supplied to Dr. Wilson was Petitioner's claim that Pinson beat Kelynn the morning of his death. There is no evidence in the record that Pinson in fact beat Kelynn that morning. Rather, as Petitioner acknowledges, "Dr. Wilson now believes it is at least equally plausible that Kelynn was injured by Ceola Pinson" that morning *if* Pinson had been upset by Kelynn's bed wetting and *if* Pinson had in fact beat Kelynn. *Id.* Evidence that Pinson beat Kelynn is not only completely absent, it is also undermined by the trial record that Petitioner abused Kelynn. Further, Dr. Wilson's claimed changed testimony does not overcome the other, overwhelming evidence of Petitioner's guilt.

In sum, Petitioner's Claim 4 is time barred, defaulted, not cognizable, and meritless. Accordingly, the Court denies habeas relief on this claim.

### D.    Claims 5–8: Ineffective Assistance of Trial Counsel at the Guilt/Innocence Phase

Petitioner alleges that trial counsel were ineffective at the guilt/innocence phase of trial for (1) failing to adequately prepare Dr. Pustilnik; (2) failing to challenge the State's experts; (3) failing to investigate and present alternative

suspects; (4) failing to present evidence of accidental causes of death; and (5) failing to prepare Dr. Kristi Compton to testify.  Docket No. 49 at 72–90.  Respondent contends that Plaintiff's claims are defaulted and meritless.  The Court agrees with Respondent.

### 1. Petitioner's IATC claims are defaulted unless he can satisfy the exception.

Petitioner did not raise these claims in his original state habeas petition.  *See* 1 SHCR1 19–150.  Where a petitioner fails to raise an IATC claim in his state habeas proceeding, the claim is procedurally defaulted unless he can show that his underlying IATC claims are "substantial" and that his initial state habeas counsel was objectively unreasonable for failing to present the claims in his application.  *Martinez v. Ryan*, 566 U.S. 1, 14 (2012); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013).  In determining the reasonableness of counsel's representation, the Court considers "whether counsel's assistance was reasonable considering all the circumstances."  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

"Once a [petitioner] meets this standard, the [petitioner] must also show that [he or she] was prejudiced by counsel's failure to raise their [IATC] claim."  *Ramey v. Davis*, 942 F.3d 241, 255–56 (5th Cir. 2019).  "Proving 'actual prejudice' requires a prisoner to 'establish not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'"  *Id.* (quoting *Hernandez v. Stephens*, 537 F. App'x 531, 542 (5th Cir. 2013)).  *See also Strickland*, 466 U.S. at 687–88; 690 (A petitioner's claim that he was denied constitutionally effective

64

assistance requires him to affirmatively prove both that (1) counsel rendered deficient performance and (2) Counsel's actions resulted in actual prejudice.).

To demonstrate deficient performance, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," *i.e.*, "prevailing professional norms." *Strickland*, 466 U.S. at 689–90. Judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effect of hindsight." *Id.* at 689–90; *Richter v. Harrington*, 562 U.S. 86,105 (2011). Even if deficient performance can be established, a petitioner must prove prejudice that is "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. A petitioner must therefore prove that, but for counsel's deficiencies, the result of the proceeding would have been different. *Id.* at 694. As explained by the Supreme Court, the question in analyzing prejudice "is *not* whether a court can be *certain* counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Richter*, 562 U.S. at 111 (emphasis added and citations omitted). Rather, "[t]he likelihood of a different result must be *substantial*, not just conceivable." *Id.* at 112 (emphasis added) (citation omitted).

As shown below, Petitioner cannot satisfy this exception because he has not presented a substantial IATC claim and has not shown that he was prejudiced by counsel's failure to raise such a claim. Thus, Petitioner's IATC claims (Claims 5–8) fail for this reason alone.

### 2. Petitioner's IATC claims are meritless.

The Court applies the *Strickland* standard to determine whether Petitioner's trial counsel were ineffective. Under *Strickland*, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone,* 535 U.S. at 698; *Strickland,* 466 U.S. at 690. As explained below, Petitioner has not satisfied the *Strickland* standard.

### a. Failure to adequately prepare Dr. Pustilnik.

Petitioner first claims that trial counsel failed to adequately prepare his expert Dr. Pustilnik to testify. Docket No. 49 at 75–76. To support this claim, Petitioner provides a declaration from Dr. Pustilnik stating how he would have challenged the State's expert testimony or assisted counsel in challenging the testimony if he had been asked. *Id.* at 76; Docket No. 23-19. As Respondent thoroughly demonstrates, however, the information in Dr. Pustilnik's new declaration was already presented to the jury during trial. Docket No. 101 at 87–88.

First, Petitioner states that Dr. Pustilnik would have characterized Dr. Quinton's time-of-death range as false and misleading because Quinton allegedly ignored that rigor mortis occurs faster in children than adults. Docket No. 49 at 59. But Dr. Pustilnik testified at trial that body temperature is unreliable to assess time of death and that rigor is variable and different between adults and children. 51 RR 77; 79–80; 91; 140–43; 165; 202; 204. Dr. Pulstinik also testified that Kelynn's

temperature would have likely been lower at death due to vasoconstriction.  51 RR 199; 201.

Petitioner next states that "Dr. Pustilnik would have testified that Dr. Quinton engaged in borderline malpractice by failing to take microscopic samples of Kelynn's bruises," which is "the sine qua non of how the forensic pathologist dates and ages bruises."  Docket No. 49 at 77 (citing Docket No. 23 Ex.19 at 6–7).  Dr. Pustilnik testified at trial, however, that he believed Kelynn's bruises were either inflicted more than twenty-four hours before he died or just before his time of death *based on their color.*  51 RR 112–21.  Dr. Pustilnik simply disagreed with Dr. Quinton's testimony about the bruising, a dispute about which the jury already heard.

Next, Petitioner claims Dr. Pustilnik would have testified that "any medical school graduate" should have known that Kelynn's injuries were not immediately painful; that "hemosiderin-laden macrophages . . . only appear after twenty-four hours"; that "[t]he notion that the hemosiderin identified in the actual rupture tissue of the mesentery was present due to an older injury is 'comical'"; and that "Dr. Quinton's narrowing of the timeframe of Kelynn's injury based on a photograph of him appearing normal on May 30 is an egregious example of 'pseudoscience.'"  Docket No. 49 at 77–78 (citing Docket No. 23 Ex.19 at 8, 10–11, 17).  But Dr. Pustilnik did in fact testify about these issues.  Specifically, Dr. Pustilnik testified that Kelynn's injuries would not have been painful, 51 RR 86–87; 107–10; 138–39; 167, 224; 284; 291–92; that the injury was not new but was twenty-four to forty-eight-hours old, 51 RR 105–06; 121; 168–70; 217; that hemosiderin in the mesentery indicated the injury

was at least forty-eight-hours old, 51 RR 97; 263–64; that it takes eight hours for white blood cells to move into injured tissue, which is what he found, 51 RR 262–63, 277; and that the photograph of Kelynn was no evidence of Kelynn's condition, 51 RR 261–62.

Petitioner next states that "Dr. Pustilnik would have also critiqued Wilson's attempt to suggest there were two injuries in Kelynn's mesentery." Docket No. 49 at 78. Dr. Pustilnik testified at trial, however, that while he saw an injury to Kelynn's mesentery that was at least forty-eight hours old, he conceded that there could have been a more recent injury. 51 RR 96–97. Notably, Petitioner does not show how demonstrating that there was only one injury as opposed to two would have benefited his case, especially considering the testimony from the State's other experts.

Dr. Pustilnik's criticisms of Dr. Quinton asserted in his declaration merely echo his testimony from trial. His claims discuss the same differences of expert opinion regarding pain levels, time of injury and death, dating bruises, iron and white blood cell levels, the severity of the mesenteric tear, microscopic review of the injuries, Kelynn's pre-mortem behavior, the Friday photograph, and inconsistencies in Dr. Quinton's timeline. *See* Docket 23-19, at 10; 13; 16–18; 21–23.

Dr. Pustilnik also asserts in his declaration that Kelynn's injury could have been caused by a horse while Kelynn was staying with his father. Docket No. 23 Ex.19 at 22–23. Dr. Pustilnik states that, if he had been aware of this fact, he would not have testified that this case "involved a homicide." *Id.* But Petitioner provides no evidence that Kelynn was kicked by a horse. Dr. Pustilnik also fails to account for

the numerous other injuries observed on Kelynn's body.  *See* SX 198 (autopsy report). And on cross-examination during trial, Dr. Pustilnik agreed without hesitation that the act causing Kelynn's injuries was intentional when he could have opined, as he does now, that an accident possibly caused them.  51 RR 253.

Finally, Dr. Pustilnik states that he was recently provided with a CPS report stating that a neighbor told police she witnessed Petitioner pounding on Kelynn's stomach to "get the water out."  Docket No. 23-19 at 23.  Dr. Pustilnik claims that this report "would have been helpful support to my testimony on a key issue," to account for the "fresh abdominal bruises."  *Id.*  But Dr. Pustilnik already testified that he believed much of the bruising was caused by CPR.  51 RR 113–21; 173; 189; 245.  This report merely confirms what Dr. Pustilnik has already testified about.

### b.  Failure to challenge the State's experts.

In Claim 6, Petitioner alleges that his trial counsel were ineffective for failing to seek the exclusion of the State's expert witnesses, Dr. Anderson, Dr. Quinton, and Dr. Wilson.  Docket No. 49 at 79–82.  This claim fails on the merits for several reasons.

First, Petitioner relies on an affidavit from J. Brett Harrison, who claims that "there is no conceivable justification for failing to challenge the expert witnesses…when their testimony was the core of the State's case….".  Docket No. 49 at 79–82.  But, as noted above, the Court cannot consider this evidence.  *See United States v. Thomas*, 847 F.3d 193, 206 (5th Cir. 2017); *Johnson v. Quarterman*, 306 F. App'x 116, 128–29 (5th Cir. 2009); *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997); *Salas v. Carpenter*, 980 F.2d 299, 305 n.4 (5th Cir. 1992).

Second, Petitioner cites a declaration from his trial attorney, Melvin Thompson, stating that in hindsight, after having "spoken with federal writ counsel," Thompson "now understand[s] and agree that there was a valid basis to move to exclude Dr. Quinton's testimony under the Daubert standard." Docket No. 23-6; *see also id*. (same regarding Drs. Anderson and Wilson). The Court cannot rely on Mr. Thompson's 2017 declaration (Docket No. 23-6) as it was never presented to the state court below. *See* Sec. V.A, *supra*. At the time of trial, Thompson thought the discrepancies between the experts were "merely a difference of opinion." *Id*. But now, he claims, he "understand[s] that the medial literature shows [their testimony] to be incorrect." *Id*. But "relying on 'the harsh light of hindsight' to cast doubt on a trial that took place over 15 years ago is precisely what *Strickland* and AEDPA seek to prevent." *Richter*, 562 U.S. at 107 (quoting *Bell v. Cone,* 535 U.S. 685, 702 (2002)); *see also Martinez v. Quarterman*, 481 F.3d 249, 257 (5th Cir. 2007) ("To fault counsel for not asking [ ] particular questions is to engage in the kind of hindsight second-guessing that *Strickland* warned against.").

Indeed, applying the objective standard under *Strickland*, the Court finds that not moving to exclude the State's experts does not rise to the level of ineffective assistance of counsel. The Court has "conduct[ed] an objective review of [counsel's] performance, measured for 'reasonableness under prevailing professional norms,' . . . which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (quoting *Strickland*, 466 U.S. at 689). Here, excluding testimony from the emergency

70

room treating physician (Dr. Anderson) and the Dallas County Medical Examiner (Dr. Quinton) would have been futile, and the Fifth Circuit has "made clear that counsel is not required to make futile motions or objections." *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990); *Ortiz v. State*, 834 S.W.2d 343, 347 (Tex. Crim. App. 1992), *overruled on other grounds*, *Ellison v. State*, 201 S.W.3d 714 (Tex. Crim. App. 2006). Both witnesses, moreover, were plainly qualified, and their testimony satisfied the requirements of expert testimony. Further, as Respondent asserts, trial counsel met with Dr. Quinton before trial, vigorously cross-examined him, and obtained a number of concessions from Dr. Quinton that were helpful to the defense. 48 RR 149.

As for Dr. Wilson, Petitioner claims that trial counsel should have accepted the trial court's invitation to conduct a Rule 705 hearing before Wilson's testimony. Docket No. 49 at 81. Trial counsel's decision was not objectively unreasonable. Dr. Wilson, like Drs. Anderson and Quinton, was amply qualified to testify as an expert, and his testimony was appropriate. During Dr. Wilson's testimony, moreover, trial counsel objected that Wilson was presenting new evidence as a rebuttal witness, which the trial court correctly overruled. 52 RR 58–59. Under these circumstances, seeking to exclude Dr. Wilson would have been futile. *See Koch*, 907 F.2d at 527. Petitioner suggests that trial counsel should have asked for a continuance so that he could consult with Dr. Pustilnik regarding Dr. Wilson's testimony. Docket No. 49 at 82. In essence, Petitioner claims that trial counsel would have "learned that Dr. Quinton rejected Dr. Wilson's theory." *Id*. But, as already noted, trial counsel

obtained several concessions from Dr. Wilson during his cross-examination, including that Dr. Wilson's opinion about brain swelling was not shared by Dr. Quinton. A continuance would therefore not have benefited Petitioner's case.

Finally, Petitioner claims that failing to exclude Dr. Wilson was "prejudicial" because "the State relied heavily on Dr. Wilson to support [its] theory that Kelynn died [with]in an hour after his injury and [Petitioner] waited hours before calling for help." Docket No. 49 at 82. By failing to rebut Dr. Wilson, the last witness, Petitioner claims, trial counsel "all but ensured his testimony would be fresh in the juror's minds without any significant impeachment or response by any other witness." *Id.* To establish prejudice, Petitioner must prove that "there is a reasonable probability but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 691. Petitioner cannot make that showing here. The jury in this case relied on other expert testimony—not just Dr. Wilson's. Because the Court must consider "the proceedings as a whole, giving due consideration to the weight of the evidence supporting the verdict and evaluating the alleged failings of counsel in that total setting" this claim also fails. *Moore v. Johnson,* 194 F.3d 586 (5th Cir. 1999).

### c. Failure to investigate and present alternative suspects.

Petitioner next alleges that trial counsel provided "ineffective assistance of counsel by failing to investigate and present any other potential suspects or causes of Kelynn's injuries." Docket No. 49 at 82–90. The Court addresses each of Petitioner's theories in turn.

*Ceola Pinson.*  Petitioner claims that trial counsel should have investigated and presented Kelynn's mother, Ceola Pinson, as "a viable alternative suspect." Docket No. 49 at 83–86.  Petitioner again quotes from trial counsel's post-trial affidavit, in which he states that he believed Pinson "was the most likely person to have inflicted the injuries to Kelynn that [led] to his death," should have established during cross-examination her "unstable and violent history."  *Id.* at 83.  This claim fails for several reasons.

First, trial counsel's declaration states that Petitioner "forbid [him] from conducting an investigation which had the aim of establishing that Ms. Pinson was the perpetrator of the crime."  Docket No. 23-6 at 4.  This included prohibiting counsel from "going after [Pinson] on cross-examination to establish her unstable and violent history, which involved instances of excessive physical discipline to Kelynn."  *Id.*  This alone forecloses Petitioner's claim.  "A defendant cannot raise a *Strickland* claim based on counsel's compliance with his instructions."  *Shore v. Davis*, 845 F.3d 627, 633 (5th Cir. 2017).  Thus, "[i]f a defendant instructs his attorney not to present mitigation evidence, the failure to present this evidence does not give rise to a *Strickland* claim."  *Id.  See also United States v. Masat*, 896 F.2d 88, 92 (5th Cir. 1990) (A defendant cannot "avoid conviction on the ground that his lawyer did exactly what he asked him to do."); *Autry v. McKaskle,* 727 F.2d 358, 361 (5th Cir. 1984) ("By no measure can [a defendant] block his lawyer's efforts and later claim the resulting performance was constitutionally deficient.").  Petitioner claims that these cases are inapposite because they involved defendants who "made a knowing or informed

decision" in instructing their attorneys. Docket No. 198 at 32. But here, Petitioner's own evidence states that trial counsel "shared [his] belief with [Petitioner] that Pinson "was the most likely person to have inflicted the injuries to Kelynn" and that Petitioner nonetheless "forbid" counsel from "establishing that Ms. Pinson was the perpetrator." Docket No. 23-6 at 5. In light of Petitioner's confirmation that he "forbid" trial counsel from investigating and establishing Pinson as an alternative suspect, he cannot now use his instruction as a ground for an IATC claim.

Second, Petitioner's claim fails because it is mere speculation. To present evidence of an alternative perpetrator under Texas law, the defendant "must show that his proffered evidence . . . is sufficient to establish a nexus between the crime charged and the alleged 'alternative perpetrator.'" *Wiley v. State*, 74 S.W.3d 399, 406 (Tex. Crim. App. 2002). "[E]vidence of third party guilt is inadmissible if it is mere speculation that another person may have committed the offense." *Roderick v. State*, 494 S.W.3d 868, 875 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (quoting *Dickson v. State*, 246 S.W.3d 733, 739 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). The criminal defendant must offer evidence that connects the alleged alternative perpetrator to the specific offense. *Caldwell v. State*, 356 S.W.3d 42, 47 (Tex. App.—Texarkana 2011, no pet.) (citing *Dickson*, 246 S.W.3d at 741). Notably, alternative perpetrator evidence must also satisfy the Rule 403 balancing test, in which the trial court will admit evidence only if its probative value outweighs its tendency to confuse the issues or mislead the jury. *See Wiley*, 74 S.W.3d at 405–06; Tex. R. Evid. 403.

Petitioner fails to satisfy these standards. He contends that trial counsel should have asked about or investigated Pinson's "contradictory statements about why she moved Kelynn to the couch the morning of his death, where she initially stated it was so he could watch TV when he woke up, but subsequently indicated it was because he wet his bed, which had previously been a 'whooping' offense." Docket No. 49 at 83–84. Had trial counsel investigated these issues, Petitioner claims, "they would have discovered a persistent pattern of abuse inflicted upon Kelynn by Ms. Pinson, as has now been attested to by numerous family members." *Id.* But Petitioner offers no evidence that Pinson abused Kelynn the morning of his murder and thus has not sufficiently established a "nexus" between Pinson and Kelynn's murder. Evidence that Pinson *might have* responded to Kelynn's bed wetting with a "whooping" severe enough to kill him is both speculative and unsupported.

Further, even if trial counsel had developed evidence that Pinson had previously been abusive, it would have improperly confused the jury and run afoul of Rule 403. Admitting such evidence would have forced the State to disprove the "nebulous allegation" that Pinson was responsible, despite any evidence to suggest she was responsible. *Wiley*, 74 S.W.3d at 407. Presenting Pinson as a suspect would have "led the jury astray, turning the focus away from whether [Petitioner]—the only person whose actions were on trial"—murdered Kelynn. *Id.*

An applicant "must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'" *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (quoting *United States v. Green,* 882 F.2d 999, 1003

75

(5th Cir. 1989)).  Petitioner provides no support that an investigation of Pinson would have connected her to Kelynn's murder.   Without such specific evidence, Petitioner's claim fails.

*Kelvin and Anthony Arterberry.*   Petitioner also claims that trial counsel "was equally ineffective for failing to investigate and present evidence that Kelvin Arterberry (Kelynn's biological father) and Anthony Arterberry (Kelvin's cousin) [were] potential suspects."  Docket No. 109 at 34; Docket No. 49 at 86–88.  Petitioner claims that Kelvin was "a violent, quick-tempered drug dealer with a long history of abusing his girlfriends," including Kelynn's mother.  Docket No. 49 at 86.  Regarding Anthony, Petitioner states that he "took Kelynn to play with the Franklins' dog and the neighbor's horses in the evening of May 30," and was so distraught at Kelynn's funeral that "he tried to climb into Kelynn's casket," and then he hung himself after being subpoenaed to testify.  *Id.* at 88.  Petitioner states that Anthony's "suicide is highly suspicious and should have led any reasonable counsel to conduct further investigation."  *Id.*

This claim is even more speculative and attenuated than the claim about Pinson.   As Respondent notes, Kelvin's and Anthony's interactions with Kelynn occurred days before he died.   Further, there is no evidence that either Kelvin or Anthony had ever been violent toward Kelynn, let alone that they attacked Kelynn at or near the time of his death.   There is therefore no evidence "to establish a nexus between the crime charged" and the alleged alternative perpetrator.  *Wiley*, 74 S.W.3d at 406.   Rather, Petitioner's proposed claim is mere speculation that does not support

76

an alternate-suspect theory.  *See Roderick*, 494 S.W.3d at 875.  Further, any evidence about Kelvin's alleged propensity for violence against others or Anthony's strange behavior would have been inadmissible at Petitioner's trial for a number of reasons.

Accordingly, Petitioner cannot demonstrate ineffective assistance on this basis. *See Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) ("This Court has made clear that conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding.").

### d. Failure to present evidence of potential accidental causes.

Petitioner alleges that trial counsel were ineffective for failing to investigate accidental causes.  Petitioner, however, presents no evidence that Kelynn's injuries were accidental.  The trial evidence detailed above, moreover, demonstrates that the injuries were *not* an accident.  Petitioner's own expert Dr. Pustilnik, for example, agreed without hesitation that the act injuring Kelynn was intentional.  51 RR 253. Furthermore, the accident theory does not account for the numerous other injuries observed on Kelynn's body.  *See* SX 198 (autopsy report).  This claim is therefore only speculative.  *Miller*, 200 F.3d at 282.

### e. Failure to prepare Dr. Kristi Compton to testify.

Last, Petitioner claims that trial counsel "failed to prepare its other expert witness, Dr. [Kristi] Compton, who was excluded for this very reason."  Docket No. 49 at 90.  Petitioner states that "Dr. Compton is a licensed psychologist who was going to testify about how people act in stressful situations," but her testimony was excluded because "she did not have any evidence as to what [Petitioner] would

actually do in a stressful situation." *Id*.  Petitioner alleges that "the exclusion of this witness was prejudicial to [Petitioner] because the jury was unable to hear how someone, such as [Petitioner], would have acted in a stressful situation like the day Kelyn died, and why he might not have called 9-1-1 immediately." *Id*.

"To prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *Gregory*, 601 F.3d at 352 (citing *Alexander v. McCotter,* 775 F.2d 595, 602 (5th Cir. 1985)).  Claims based on witnesses who did not testify "are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative."  *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).  This is especially true where "the claim is unsupported by evidence indicating the witness's willingness to testify and the substance of the proposed testimony.  *See Gregory*, 601 F.3d at 352.

Here, Petitioner fails to show that Dr. Compton would have testified, the content of her proposed testimony, or how it would have been favorable to him.  He asserts only that the exclusion of her testimony "was prejudicial" because "the jury was unable to hear how someone [like him] would have acted in a stressful situation." Docket No. 49 at 90.  Petitioner's "conclusory statements regarding the content" of Dr. Compton's testimony are "insufficient to demonstrate ineffective assistance." *Gregory*, 601 F.3d at 352.

### E.    Claim 9: Availability of a Lesser-Included-Offense Instruction

Petitioner alleges that the trial court erred in "refus[ing] to submit an instruction to the jury on the lesser included offense of felony murder, violating [his] right to due process and against cruel and unusual punishment."  Docket No. 49 at 93–109.  Petitioner states that "evidence presented at [his] trial supported a finding by the jury that [he] could have caused Kelynn's death without the intent necessary to convict him of capital murder," and yet the trial court "refused to instruct the injury as to any lesser included offense."  *Id.* at 90–91.  As explained below, however, Petitioner was not entitled to a lesser-included instruction because there was no evidence to support it.

#### 1.    The law on lesser-included-offense instructions.

Both sides agree on the law, citing *Beck v. Alabama,* 447 U.S. 625, 637–38 (1980), and subsequent cases extending *Beck* to other circumstances.  *Beck* held that state law cannot bar a trial judge from giving a lesser-included-offense instruction in a capital case where the evidence would have supported a finding of guilt on the lesser-included offense.  447 U.S. at 637–38 .  "Although *Beck* itself was limited to a statute that barred the trial judge from giving the requested instruction, [the Fifth Circuit] has extended the rationale of *Beck* to cases in which a trial court refuses to give an instruction that is available under state law."  *Fearance v. Scott*, 51 F.3d 1041 (5th Cir. 1995) (citing cases).  In a capital trial, a defendant is constitutionally entitled to instructions on lesser-included offenses only if a "rational juror, given all the facts,

[could acquit him] of capital murder and convict[ ] him of a lesser included offense." *Andrews v. Collins*, 21 F.3d 612, 629 (5th Cir. 1994).

The parties also agree that, under Texas law, a lesser-included-offense charge must be given when "(1) the lesser-included offense is included within the proof necessary to establish the offense charged; and (2) there is some evidence that would permit a rational jury to find that the defendant is guilty of the lesser offense but not guilty of the greater." *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App. 1993). *See also Paz v. State*, 44 S.W.3d 98, 101 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (Texas has a two-step process for determining whether a trial court should have submitted a lesser-included-offense instruction, the first being whether the lesser-included offense is included within the proof necessary to establish the offense charged.); *Threadgill v. State*, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004) (The second step "requires that the record contain some evidence that would permit a rational jury to find that the defendant is guilty only of the lesser offense. . . The evidence must establish the lesser-included offense as a valid rational alternative to the charged offense.").

Finally, the parties agree that felony murder is a lesser-included offense of capital murder under Texas law. *Rousseau*, 855 S.W.2d at 673; *Threadgill*, 146 S.W.3d at 665 . The intent to kill distinguishes capital murder from felony murder. *Rousseau*, 855 S.W.2d at 673; *Threadgill*, 146 S.W.3d at 665. "Felony murder is an unintentional murder committed in the course of committing a felony while capital murder includes an intentional murder" committed in the course of the underlying

felony. *Threadgill*, 146 S.W.3d at 665; *Rousseau*, 855 S.W.2d at 673 ("The only difference between the two offenses is the culpable mental state of the offender. Capital murder requires the existence of an intentional cause of death, while in felony murder, the culpable mental state for the act of murder is supplied by the mental state accompanying the underlying felony.") (internal quotations and citations omitted).

As noted above, "due process requires that a lesser[-]included[-]offense instruction be given *only* when the evidence warrants such an instruction." *Hopper v. Evans*, 456 U.S. 605, 611 (1982). "[I]t is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense. Rather, there must be some evidence directly germane to a lesser included offense for the factfinder to consider before an instruction on a lesser-included offense is warranted." *Dowthitt* v. *Johnson*, 230 F.3d 733, 757 (5th Cir. 2000) (internal quotations and citation omitted). "This necessarily requires a showing that the facts of the case and the laws of the State warrant such an instruction." *Hill v. Black*, 920 F.2d 249, 251 (5th Cir. 1990), modified, 932 F. 2d 369 (5th Cir. 1991).

Thus, to be entitled to an instruction on felony murder here, there must be some evidence that would permit a rational jury to find that Petitioner had the intent to commit an underlying felony but not to cause Kelynn's death. *Threadgill*, 146 S.W.3d at 665. The CCA rejected this claim on direct appeal because it found that Petitioner "fail[ed] to identify any evidence in the trial record that affirmatively

81

shows that he did not intentionally or knowingly cause Kelynn's death." *Miller I*, 2012 WL 1868406 at *12.

It is this last point about which the parties disagree.

### 2. The evidence does not support a lesser-included-offense instruction here.

As a threshold matter, this claim is time-barred because Petitioner did not raise this issue in his original federal habeas petition. For the reasons stated in Section V.B.1., *supra*, it is dismissed as untimely. Further, the claim is meritless.

Petitioner argues in his amended petition that he could be found guilty "for felony murder for child abuse that later resulted in the child's death without being guilty of capital murder." Docket No. 49 at 92. Petitioner asserts that there was "sufficient evidence at trial to support an inference that [Petitioner] did not possess the requisite intent to cause Kelynn's death." Docket. No. 109 at 38. Specifically, Petitioner argues that the expert testimony regarding the nature of the injury and the length of time that it took for the death to result supports a lesser-included instruction. *Id.* He now suggests, moreover, that the experts did not agree that Kelynn's injuries were the result of an intentional killing. *Id.* at 39.

Petitioner misinterprets the evidence. The evidence at trial did not support a lesser-included instruction for at least two reasons. First, the expert testimony established that Kelynn's injuries were the result of an intentional homicide by multiple blunt-force trauma, including the defense's own expert Dr. Pustilnik. When asked on cross-examination whether he agreed that Kelynn died by homicide, Dr. Pustilnik replied "yes." 51 RR 253. When asked the same question on direct, Dr.

Wilson answered "yes." 52 RR 29. Dr. Pustilnik further agreed Kelynn's injury "was intentionally inflicted by someone else," 5 RR 253, and that the injury to Kelynn's mesentery was "pretty dramatic," 51 RR 101. Dr. Quinton, moreover, testified that Kelynn had contusions and bruises across his upper body, including to the abdomen, eye, back, arms, hands, and a re-fractured rib. 51 RR 304–306. Both Drs. Quinton and Wilson explained that a bruise to the abdomen is caused only by soft tissue being forced against a hard object, and the only object hard enough to cause bruising in the abdomen is the spine. 48 RR 62–66; 52 RR 53. As Respondent notes, the medical testimony further revealed that Kelynn's injury was not the result of a single blow, such as a fall from a significant height, "but rather from multiple forceful impacts possibly including defensive wounds." Docket No. 101 at 107.

In sum, the medical evidence at trial undermined, rather than supported, a finding that Petitioner was guilty only of felony murder. *See Salinas v. State*, 163 S.W.3d 734, 742 (Tex. Crim. App. 2005) (holding that strapping a child into her car seat in tall grass fifteen feet from a road was not an act merely dangerous to human life but showed the intent to kill and, thus, did not raise the issue of felony murder); *Williams v. State*, 294 S.W.3d 674, 681 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (lesser-included-offense charge not required where medical evidence demonstrated that the acts causing injury to the child had to be intentional); *Martin*, 246 S.W.3d at 250, 266–67 (lesser-included charge not warranted where expert testified that baby's injuries were like those caused by a high speed car crash "or being hit with a baseball bat" and "were intentionally inflicted," and that the killer

would have immediately known the child was severely injured); *Paz*, 44 S.W.3d at 99–102 (lesser-included charge not warranted where baby died from blunt-force trauma to the head and expert made it clear the act was not unintentional).

Second, the trial court rejected Petitioner's request for a lesser-included instruction because it was inconsistent with Petitioner's prior statements and his defense theory.  53 RR 15, 19–20.  Petitioner's prior statements to police "neither acknowledges [n]or admits committing any act that caused any injury to the child that [led] to the child's death." *Id*.  And Petitioner's defense theory was that someone else—not Petitioner—must have struck Kelynn severely enough to kill him.  53 RR 70–71; 86–88; 98; 124.  Indeed, as Respondent argues, Petitioner's trial counsel stated to the jury in closing that "[t]here is one absolute, I suggest to you, Demontrell Miller didn't kill this baby.  Demontrell Miller told you the truth when he spoke to you through the statement he gave to Detective Mathews.  'I didn't do it.  I didn't do it.  I promise you I didn't do it.'"  53 RR 124–25.  Instructing the jury that it could find Petitioner guilty of felony murder under these circumstances would have been both unsupported by the trial record and contrary to it.

In fact, if the jury had accepted Petitioner's theory at trial, it would have had to acquit Petitioner, not convict him of felony murder.  Under similar circumstances, courts routinely hold that a lesser-included-offense instruction is unwarranted.  *See, e.g., Williams*, 294 S.W.3d at 681 (instruction would have been improper where appellant's evidence, "if believed by the jurors, would have supported only an acquittal, not a conviction for a lesser included offense injury to a child"); *Martin v.*

*State*, 246 S.W.3d 246, 267 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (lesser-included-offense instruction improper where "appellant's defense at trial was that she did not commit the acts against her baby"); *Lofton v. State*, 45 S.W.3d 649, 652 (Tex. Crim. App. 2001) ("A defendant's own testimony that he committed no offense, or testimony which otherwise shows that no offense occurred at all, is not adequate to raise the issue of a lesser-included offense.").

In sum, Petitioner has not presented clear and convincing evidence to rebut the state habeas court's finding that "there was no evidence showing that [Petitioner] was guilty [only] of the lesser offense" of felony murder. *Dowthitt*, 230 F.3d at 757–58. He thus fails to demonstrate that reasonable jurists would debate the propriety of not granting an instruction of a lesser-included offense. Accordingly, the CCA's decision regarding Petitioner's request for a lesser-included-offense charge was not objectively unreasonable.

### 3. Petitioner's other arguments are without merit.

Petitioner's arguments largely misinterpret the evidence. First, he argues that his case "is similar to *Saunders v. State*," 840 S.W.2d 390 (Tex. Crim. App. 1992), in which the court found evidence to support a lesser-included-offense instruction. Docket No. 49 at 38 (discussing *Saunders*). But the facts in *Saunders* were very different than those here. Nothing in *Saunders* indicates that the defendant had denied injuring the decedent at all, as Petitioner did here. And thus, giving a lesser-included instruction would not have been inconsistent with the defendant's evidence and theory, as it would have been here. In fact, *Saunders* reiterated the general

principle that, if a defendant "denies commission of the offense," then "the charge on the lesser offense would not be required." 840 S.W.2d at 392. Further, in *Saunders*, there was no evidence of the severity of the injury; whereas here, there was substantial evidence (documented elsewhere in this opinion) about the severity of the conduct necessary to cause the injuries observed in Kelynn. Indeed, in *Saunders*, the defendant had squeezed the back of an infant's neck, which a jury could reasonably conclude was done with an intent to injure, not kill, the infant. 840 S.W.2d at 392. No such evidence exists here.

Second, Petitioner continues to argue that there was evidence that Kelynn's fatal injury was sustained "at least 24 hours before his death, and possibly longer." Docket No. 49 at 97. But, as Respondent points out, this "does not work to [Petitioner's] benefit" because Kelynn was in the care of others, not Petitioner, during that period. Docket No. 101 at 113. Thus, if believed, this evidence would have only justified an acquittal, not a lesser-included offense. Petitioner also contends that the evidence supports different "levels of pain" felt by Kelynn in the period before his death, and that this would support a finding that Petitioner did not intend to kill Kelynn. Docket No. 49 at 99. But the State's experts all testified that Kelynn would have experienced noticeable pain or distress. *See, e.g.*, 48 RR 240, 51 RR 310. Even Dr. Pustilnik, who testified that Kelynn would not have been in obvious pain, conceded that the injuries were inflicted intentionally. 22 RR 253.

Finally, Petitioner argues that his claim "that he did nothing wrong is irrelevant to whether the instruction would have been appropriate. Docket No. 109

at 39 (citing *Valdez v. State*, 993 S.W.2d 340, 344 (Tex. 1999)).  But even Petitioner concedes that this is true only if there is some evidence to permit a "rational jury to find that [Petitioner] was guilty of the lesser offense but not guilty of the greater." Docket No. 109 at 39.  And, as detailed above, there was no such evidence here. Rather, the evidence was that Kelynn's injuries were severe and significant and could only have been intentionally inflected by another person.

**F.      Claims 10–17: Prosecutorial Misconduct Claims**

Petitioner next makes charges of prosecutorial misconduct: improper invocation of the witness rule, injection of race into the trial, suppression of admissible testimony from mitigation witnesses, and improper argumentation during closing argument of both stages of trial.  Docket No. 49 at 110–40.  He also claims his own counsel were ineffective for failing to object to this misconduct.  *Id*. at 109.  As explained below, the state court reasonably rejected these claims, and many of the claims are procedurally defaulted and, alternatively, meritless.

**1.  Petitioner's claims based on the prosecution's invocation of the "witness rule" fail for multiple reasons.  (Claims 10-11)**

*Claim 10.*  Petitioner first claims that the State improperly invoked "the rule on witnesses" to exclude thirty-one of his supporters during trial in violation of his right to an open and public trial.  Petitioner contends that the prosecution placed these individuals on its witness list without any intention of calling them as witnesses to exclude them from the courtroom.  Docket No. 49 at 110–12.  Petitioner further claims that his trial counsel were ineffective "for failing to object to the improper and pretextual exclusion of these witnesses."  *Id.* at 112–13.

As an initial matter, Petitioner raised these claims on state habeas review, and the state court thoroughly evaluated and reasonably rejected them. After reviewing Petitioner's evidence, the court concluded that Petitioner's claim of being denied a public trial "is completely unsupported by the record." Supp. SHCR1 9–10. In fact, the courtroom was open to the public, numerous of Petitioner's friends and family members attended the trial, the courtroom was filled to capacity every day, no individual who was not subject to the rule was excluded from the courtroom, and there was no evidence that the State invoked the rule as pretext to exclude Petitioner's supporters. *Id*. at 9–11. The state court also rejected Petitioner's claim that his trial counsel were ineffective for failing to object to the State's use of the rule. As the state court explained, trial counsel had no way of knowing at the time the State invoked the rule which witnesses would actually be called during trial, and thus there would have been no basis to object at that time. Supp. SHCR1 12.

The state court's findings and conclusions were reasonable because Petitioner's claims are unsupported by the record. Here, the State invoked the rule at the outset of the trial because, under Texas law, the rule properly prevents witnesses from influencing each other. *See Webb v. State*, 766 S.W.2d 236, 239 (Tex. Crim. App. 1989). Although Petitioner claims that the State invoked the rule as pretext to remove his supporters from the courtroom, he provides no evidence to support this assertion. Nor does Petitioner cite any authority that the State's failure to call every witness on its list can amount to misconduct. Petitioner contends that the excluded witnesses were all friends and family, but his only evidence for this claim is a

88

declaration from his sister, which the Court cannot consider under *Cullen v. Pinholster*, 563 U.S. 170 (2011).    Suspicions and conclusory allegations of prosecutorial misconduct are insufficient to merit relief.  *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990) ("Although Koch reiterates his prior allegations as to the collusive agreement between the sheriff and his trial counsel and as to the perjured testimony of the sheriff and of the investigators, Koch fails to point to any form of prosecutorial overreaching."); *United States v. Jones*, 614 F.2d 80, 82 (5th Cir. 1980).

In his reply, Petitioner clarifies that his argument about the rule is not asserting prosecutorial misconduct but is based on his right to a public trial.[11]  Docket No. 49 at 110–11.  He invokes *Waller v. Georgia*, but *Waller* involved a complete closure to the public of a suppression hearing.  467 U.S. 39, 42–44, 46–49 (1984).  And here, Petitioner does not dispute that every individual not on the witness list was welcome to attend the trial.  Indeed, as noted above, the record demonstrates that the courtroom was filled every day of trial, and many of those in attendance supported Petitioner.  *See* 5 SHCR1 1119–20.  There is no Supreme Court authority holding that the right to a public trial means that anyone who wants to attend must be accommodated.  *See, e.g., Aaron v. Capps*,  507 F.2d 685, 687 (5th Cir. 1975) ("The

---

[11] Petitioner also cites a Tennessee case in which a prosecutor committed "blatant abuse of the trial court's subpoena power for the exclusive purpose of removing the relatives from the courtroom," thus "violat[ing] the appellant's constitutional right to a public trial."  *State v. Sams*, 802 S.W.2d 635, 637 (Tenn. Ct. Crim. App. 1990).  But as the court explained, "the statements made by [prosecution] made it crystal clear that he used the subpoena power of the trial courts as a subterfuge for excluding the appellant's relatives from the courtroom."  *Id*.  In addition, "[the prosecution] had no intention of calling these individuals as witnesses."  *Id*.  No such evidence exists here.  Further, Petitioner's reliance on a Tennessee state case is neither controlling nor persuasive.

fact that some members of the public were barred from the courtroom does not necessarily mean that a denial of a public trial has occurred; the 'decision must turn on the particular circumstances of the case, and not upon . . . a[n] abstract and absolute right to a 'public trial.'") (quoting *Levine v. United States*, 362 U.S. 610, 616–617 (1960)); *see also United States v. Osborne*, 68 F.3d 94, 98–99 (5th Cir. 1995) (a "partial closure" of a courtroom does not "implicate the same fairness and secrecy concerns as total closures," but require only a "substantial reason.").

Finally, Petitioner cites a Texas case where use of "the rule" was used to spontaneously remove an appellant's friends from the courthouse. *Addy. v. State*, 849 S.W.2d 425, 429 (Tex. App.—Houston [1st Dist.] 1993, no pet.). But in that case the State claimed the right to "identify any spectator as a witness and have that person removed from the courthouse" and removed the spectators with "no knowledge as to who they were or what, if anything, they knew about the facts of this case." *Id.* That is not what happened here.

Accordingly, the Court concludes that the State did not improperly invoke the rule, and Petitioner's constitutional rights were not violated by the rule's invocation.

***Claim 11.*** Petitioner next argues that his trial counsel were ineffective for failing to object to the State's invocation of the rule. This claim is time-barred, and the state court reasonably rejected it on the merits.

Claim 11 is time-barred because Petitioner did not raise it in his original federal habeas petition. Rather, in that petition, Petitioner stated only in a footnote that "[t]rial counsel did not object to the State's tactic of swearing in 30 witnesses

90

who never testified but merely made a remark about it during a sidebar with the trial court." Docket No. 22 at 105 n.20. To the extent this vague footnote relates to the instant IATC claim, it is insufficient to raise the claim because, among other reasons, it was made only in a footnote. *See White Glove Staffing, Inc. v. Methodist Hosp. of Dall.*, 947 F.3d 301, 308 (5th Cir. 2020) ("Arguments subordinated in a footnote are insufficiently addressed in the body of the brief and thus are waived."). Because this claim is raised in Petitioner's amended petition filed after the limitations period expired, it is untimely for the reasons addressed in *supra* Section V.B.1.

The state court also reasonably rejected this claim. The state court found that trial counsel could not have known at the time the State invoked the rule which witnesses it would call—and thus that trial counsel were not ineffective for failing to object. Petitioner states: "Although trial counsel would not know which witnesses the prosecution would ultimately call when the rule on witnesses was invoked at the beginning of trial, trial counsel were nevertheless on notice of the impropriety of the prosecution's actions based simply on the sheer number of witnesses excluded." Docket No. 49 at 112. Petitioner then asserts that trial counsel were ineffective when they did not object to the exclusion. *Id.* at 112–13. An objection would have "caused the prosecution to explain (1) what relevant information these witnesses had that was not cumulative, and (2) established that 46 witnesses is on its face abusive as the schedule for the trial could not possibly have accommodated so many witnesses." *Id.*

91

Petitioner's arguments fail.  First, even if trial counsel believed that the State could not possibly call all the witnesses on its list, Petitioner does not explain which witnesses his trial counsel should have objected to.  *See also* 5 SHCR1 1118.  Any objection by trial counsel at that point would have been pure speculation.  And, as the Fifth Circuit has held, "[c]lairvoyance is not a required attribute of effective representation."  *United States v. Fields*, 565 F.3d 290, 294 (5th Cir. 2009) (internal quotations and citations omitted).  Nor could counsel have asserted a global objection to the rule because it is a normal part of a criminal trial in Texas.  TEX. R. EVID. 614.  Counsel is not required to make futile objections.  *Koch*, 907 F.2d at 527.

Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.  A federal habeas court must presume the underlying factual determination of the state court to be correct, unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  *See* § 2254(e)(1); *see also Miller–El v. Cockrell*, 537 U.S. 322, 330–31 (2003).  Petitioner fails to meet his burden under § 2254(e)(1).  He also fails to establish with clear and convincing evidence that the state habeas court was incorrect in its findings.  His claim for ineffective assistance of counsel is meritless.

Second, Petitioner has not shown prejudice.  When a defendant raises a public-trial violation via an IATC claim, "*Strickland* prejudice is not shown automatically."  *Weaver v. Massachusetts,* 582 U.S. 286, 301 (2017).  Rather, the defendant must "show either a reasonable probability of a different outcome in his or her case or . . .

that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair." *Id*. In other words, even if Petitioner could show he was deprived of a public trial, he still bears the burden to show his trial was fundamentally unfair or would have changed but for the alleged public-trial violation.

Petitioner fails to make this showing. He states in his reply in conclusory terms that there was "a reasonable probability of a different result." Docket No. 108 at 43. But conclusory allegations of ineffective assistance fail to raise a constitutional issue. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000).

### 2. Petitioner's claims about "race" being "interjected" into the trial fail for multiple reasons (Claims 12–13).

Petitioner claims that:

> [t]he State improperly injected race into the trial by creating a racially charged atmosphere, both inside and outside the courtroom, in an effort to prejudice the nearly all white jury against [ ] Miller, his supporters, anyone who testified for Miller, and [ ] Miller's lawyers (all of whom were African American).

Docket No. 49 at 114. Respondent asserts that Petitioner's claim and the related IATC claim are both defaulted and lack merit.

With one exception addressed below, Petitioner raised these claims in his abusive state habeas application. 1 SHCR2 175–95. And, as explained above, a federal habeas claim is barred by procedural default "when the state court has rejected the claim pursuant to a state procedural rule that provides an adequate basis for the decision, independent of the merits of the claim." *Garza v. Stephens*, 738 F.3d 669, 675 (5th Cir. 2013). To overcome this default, Petitioner must demonstrate

cause and prejudice, and he has failed to do so here. The Court is therefore barred from considering these claims.

Alternatively, Claims 12–13 are meritless.

***Claim 12***. Petitioner complains about "the prosecution's repeated and egregious injection of race throughout his trial" in violation of his due process rights. Docket No. 109 at 44; Docket No. 49 at 115–30. As explained below, after reviewing the record, including the specific incidents Petitioner complains about, the Court concludes that there was no misconduct or error and that this claim is without merit.

Petitioner alleges that the prosecution "created a racially charged atmosphere in the hallway outside the courtroom through which the jurors were walked, under guard." Docket No. 49 at 116. Petitioner claims that "this theater outside the courtroom allowed the prosecution to foster an 'us versus them' atmosphere inside the courtroom to create tension between the white people on the prosecution's side and the black people on the side of the defendant." Docket No. 49 at 116–17. But Petitioner's argument in this regard is largely based on his claim that his supporters were improperly excluded from the courtroom and were "forced to wait in a small, cramped hallway." *Id*. at 116. As explained above, the record fails to support that claim. Further, Petitioner's argument is largely a complaint about court administration, not prosecutorial misconduct. *Id*. at 116–17. And under Texas law, "the discretion vested in the trial court over the conduct of a trial is great." *Dow Chemical v. Francis*, 46 S.W.3d 237, 240–41 (Tex. 2001) (per curiam) (citations omitted). A trial court may properly intervene to maintain control in the courtroom,

expedite the trial, and prevent what it considers to be a waste of time. *Id.* at 241 (citations omitted); *see also id.* at 240 ("A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune."). Petitioner has provided no reason to second-guess these decisions here. Finally, Petitioner fails to explain how these events deprived him of due process or a fair trial. The notion that tense circumstances surrounding a trial must mean a defendant suffered a constitutional violation is wholly speculative and conclusory. *Ross v. Estelle*, 694 F.2d 1008, 1011–12 (5th Cir. 1983).

Petitioner also alleges that the prosecution "made derogatory, racially-charged comments" about his supporters who wore purple during the trial. Docket No. 49 at 117–19.[12] Petitioner claims that these comments were

> . . . meant to intimidate and marginalize the group of African American supporters, and it provided a way for the prosecution to identify them by race without actually referring to their race.

*Id.* Petitioner's claim is conclusory and speculative; he offers no support that the prosecution's references to purple had anything to do with race or affected Petitioner's right to a fair trial. Certainly, none of the references "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*,

---

[12] Petitioner referenced "purple" on state habeas review, but only regarding his claim that the prosecution invoked "the rule" to exclude his supporters from the courtroom. 1 SHCR1 22–30. Petitioner is now claiming that the prosecution used "purple" to inject race into the trial, which is a separate claim raised only in his abusive habeas application. 1 SHCR2 186, 192.

416 U.S. 637, 643 (1974)).  Petitioner cites specifically a comment by the prosecution during the punishment phase about a witness wearing purple.  Docket No. 49 at 119. The comment was not improper because the prosecution was reciting what the witness had said about the color and was directing the jury to the witness's conduct undermining his credibility.  "[I]t is well established that a prosecutor may recite to the jury those inferences and conclusions he wishes them to draw from the evidence so long as those inferences are grounded upon the evidence." *United States v. Loney*, 959 F.2d 1332, 1343 (5th Cir. 1992); *see also Andujo v. State*, 755 S.W.2d 138, 144 (Tex. Crim. App. 1988).  Further, Petitioner fails to show how this comment deprived him of a fair trial.

Next, Petitioner claims the prosecution "continuously made racially-charged comments about Mr. Miller and his appearance during trial."  Docket No. 49 at 119. Petitioner states that "[t]he prosecution noted on multiple occasions that [Petitioner] had dreadlocks on the day Kelynn died" and "juxtaposed the dreadlock-wearing [Petitioner], to the clean cut [Petitioner] who appeared at trial and argued that [Petitioner's] appearance at trial was deceptive."  Docket No. 49 at 119–20.  Petitioner misinterprets the record.   In the examples cited by Petitioner, the prosecution referenced Petitioner's different appearance because a witness who had responded to the scene when Kelynn died did not recognize Petitioner in the courtroom.  Docket No. 22-6 at 108–10.  Because Petitioner's appearance had changed between the crime and his trial, the prosecution was not prohibited from referencing those differences. *See, e.g., Moore v. State*, 424 S.W.2d 443, 445 (Tex. Crim. App. 1968) ("Nor do we

know of any law which prohibits state's counsel from pointing to a defendant in the courtroom and referring to his physical appearance in the presence of witnesses."). The references certainly did not deprive Petitioner of a fair trial.[13]

Petitioner next alleges that the prosecution "made other racially charged and derogatory comments about [him] and his supporters." Docket No. 49 at 121. In particular, Petitioner alleges that:

> The prosecution also made irrelevant comments that suggested that black people are violent. The prosecution intimated to the jury that because Mr. Miller watched a movie called "Killa Season," he was a violent person. Ex. 16, RR Vol. 60 at 130. The State pointed out that Mr. Miller living [sic] in low-income housing, which was not pertinent to any of the issues at trial. See Ex. 16, RR Vol. 60, at 41. The State also made disparaging remarks about Mr. Miller's family, including that Mr. Miller's sister had to visit her "baby's daddy" and referring to another woman as a "baby's mama," both derogatory terms used to describe black children conceived outside of marriage.

*Id.* As an initial matter, this claim is time-barred because Petitioner did not raise these issues in his original federal habeas petition. Further, having reviewed each of these specific comments, the Court concludes that they were neither "racially-charged" nor improper. Rather, each comment was a summary of the evidence, a reasonable deduction from the evidence, or made in response to the defense's case. The reference to "Section 8 housing," 59 RR 41, for example, is not racially charged

---

[13] Petitioner claims that an alternate juror spoke to an investigator after the trial and made a negative comment about Petitioner's pretrial appearance. Docket No. 49 at 120. Such evidence is inadmissible hearsay and barred by Federal Rule of Evidence 606(b). Further, the statement is by an alternate juror and, even if true, is an "offhand comment" that does not indicate racial bias or hostility. *See Pena-Rodriguez v. Colorado*, 580 U.S. 206 (2017).

but was made to demonstrate that Petitioner's housing costs were low and he therefore had the funds to "build[] a life together" with Pinson. *See id.*

Petitioner alleges that, years after his trial, a juror used "the 'N' word" to describe Petitioner. Docket No. 49 at 124. This claim is based on hearsay and a claimed statement by a former juror that is also inadmissible under Federal Rule of Evidence 606(b). Further, even if true, the comment does not demonstrate prosecutorial misconduct. Docket No. 101 at 137.

Finally, Petitioner alleges that "the prosecutor introduced evidence that a witness testifying for [Petitioner], Joshua Smith, stated during a phone call to [Petitioner] that 'white folks don't like it, all our folks being there,' meaning [Petitioner's] African American supporters in the hallway." Docket No. 49 at 122. Petitioner states: "There was no reason for the introduction of this portion of the phone call, nor was there a reason to ask [ ] Smith follow-up questions, other than to inject race into the trial and suggest possible prejudice by [Petitioner] and his supporters against white individuals like 11 of the 12 jurors." *Id.* at 123. Petitioner raised this allegation on direct appeal, and the state court thoroughly discussed and reasonably rejected it. *Miller*, 2012 WL 1868406, at *13.

Petitioner claims that the CCA erred in rejecting this claim by applying a harmless-error analysis rather than a "hybrid error" standard. Docket No. 49 at 125–26. But the cases cited by Petitioner on this point support, rather than undermine, the CCA's holding. *Id.* (citing *United States v. Pratt*, 807 F.3d 641 (5th Cir. 2015)); Docket No. 109 at 47 n.26 (citing *United States v. Bowen*, 799 F.3d 366 (5th Cir.

2015)).  Those cases suggest that a harmless error analysis might be unnecessary where the error was "deliberate and especially egregious . . . or one that is combined with a pattern of prosecutorial misconduct" in a way that "so infect[s] the integrity of the proceeding." *Pratt*, 807 F.3d at 646 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 n.9 (1993))  Nothing like that occurred here.  The CCA's rejection of Petitioner's claim was thus reasonable and not contrary to clearly established federal law.

*Claim 13*.    Petitioner also claims that his trial counsel were ineffective for failing to object to these instances of alleged misconduct.  Docket No. 49 at 130.  But this claim is time-barred because Petitioner did not raise it in his original federal habeas petition.  For the reasons addressed above, *see supra,* Section V.B.1., the claim is therefore dismissed as untimely.  Further, the claim is defaulted because Petitioner did not raise it in either of his state habeas petitions, and he cannot satisfy the *Martinez/Trevino* exception.  *See Martinez v. Ryan*, 566 U.S. 1, 14 (2012); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013).  He cannot satisfy the exception because trial counsel's failure to object to meritless claims of prosecutorial misconduct does not fall below an objective standard of reasonableness.  And even if the misconduct claims had merit, Petitioner has not shown that the failure to object "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 687–90 (1984).  Nor has Petitioner shown that any failure to object prejudiced him.  *See id.* at 687, 694.

To the extent Petitioner is also asserting that his appellate counsel were ineffective for failing to raise this claim, it too is defaulted and based solely on

Petititoner's vague and conclusory allegation.  Further, in any event, appellate counsel could not have been ineffective for failing to raise meritless claims.  *See Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("appellate counsel who file a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal").

### 3. Petitioner's claims about the prosecution suppressing testimony from mitigation witnesses fail for multiple reasons (Claims 14–15).

Next, Petitioner claims that the prosecution "improperly suppressed admissible testimony from mitigation witnesses in violation of the Due Process Clause" (Claim 14), and trial counsel "were ineffective for failing to properly object" to the alleged misconduct (Claim 15).  Docket No. 49 at 131.  In particular, Petitioner states that the prosecution asked improper questions of his sister, Chineyere Jordan, regarding their mother to suggest to the jury that their mother "had violated her probation."  *Id.*  Petitioner also claims that Chineyere was arrested following her testimony for "writing a $20 bad check," and that all of this was done "to intimidate potential witnesses and try to paint the witnesses testifying on behalf of [Petitioner] as criminals."  *Id.* at 131–32.  Petitioner claims that his trial counsel told his mother, Julia Jordan, they would not call her to testify because she would be arrested for violating her probation.  *Id.*

Both Claim 14 and Claim 15 are procedurally defaulted because Petitioner did not raise them on direct appeal or state habeas review.  Although Petitioner raised the prosecutorial-misconduct claim below, he did so only in his abusive habeas

application, and he has not demonstrated that he can satisfy any exception. Further, as the CCA held on direct appeal, the prosecution's questioning of Chineyere about their mother's criminal history was to correct the false impression that their mother was always at work, when in fact "their mother was often not at home because she was in jail." *Miller*, 2012 WL 1868406 at *16–17. Regarding Julia Jordan's fear of arrest, Petitioner cites no evidence that the State told Julia that she would be arrested if she appeared at court or in any way attempted to prevent Julia from testifying. The case cited by Petitioner, *United States v. Thompson*, 130 F.3d 676 (5th Cir. 1997), thus undermines his claim because the prosecution's alleged conduct here was no different than the conduct upheld in *Thompson*. Further, as Respondent notes, Julia feared being arrested for breaking the law outside of the courtroom, and she could have been arrested anywhere at any point. Her testimony would not necessarily have led to her arrest, which means that any fear she felt cannot be attributed to the prosecution. Docket No. 101 at 149.

Claim 15, the IATC claim based on the alleged misconduct, also fails because it is time-barred. Petitioner did not raise this claim in his original federal habeas petition, and for all the reasons stated in Section V.B.1. above, it is dismissed as untimely. To the extent Petitioner asserts that he is entitled to excuse the untimeliness of this claim pursuant to *Martinez*, that claim fails. *Martinez v. Ryan*, 566 U.S. 1 (2012), has no applicability to the statutory limitations period prescribed by AEDPA. *See Moody v. Lumpkin*, 70 F.4th 884, 892 (5th Cir. 2023). The narrow exception in *Martinez* is limited to procedural default. *Id.*

To the extent Petitioner is also making an ineffective assistance of appellate counsel (IAAC) claim, it is both untimely and procedurally barred because Petitioner failed to raise this claim on state habeas review.  Further, any failure to object to the alleged misconduct or to raise it on appeal does not "[fall] below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 687–90 (1984).

### 4. Petitioner's claims about "improper closing arguments" fail for multiple reasons (Claims 16–17).

Petitioner alleges that, during closing argument, the prosecutor "injected name-calling, unfounded allegations of other bad acts, impermissible attacks on opposing counsel, improper calls for jurors to put themselves in the place of the victim, emotional bating, and requests to replace legal judgment with moral judgment in violation of [Petitioner's] Due Process rights under the Fourteenth Amendment."  Docket No. 49 at 133.  These claims are both defaulted and meritless.

The claims are defaulted because they were raised only in the state habeas application that was dismissed for abuse of the writ, and Petitioner fails to satisfy an exception.  *See supra*, Section V.B.2.

The claims lack merit because nothing in the prosecutor's closing "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 182 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  As *Darden* held, the "appropriate standard of review for such a claim [of prosecutorial misconduct during closing] is the 'narrow one of due process, and not the broad exercise of supervisory power.'" *Id.* (quoting *DeChristoforo*,

416 U.S. at 642).  The Court addresses the claims as Petitioner has grouped them (*see* Docket No. 109 at 50–51):

- **"Name-calling."**  Petitioner claims that the prosecutor improperly referred to him as "a piece of trash," a "monster," "sinister," "vicious and calloused," a "coward," a "big man on campus," "superhero," and "his own sorry self."  Docket No. 49 at 134.  These terms were used by the prosecution during the punishment phase while describing how Petitioner beat two-year-old Kelynn to death—which the jury had already found Petitioner guilty of doing.  5 RR 19, 112, 127, 131–33.  Viewed in context, the names used by the prosecution did not violate Petitioner's due process rights.  Indeed, in *Darden*, the prosecution had referred to the defendant as an "animal" during closing, and the Supreme Court concluded that the comment (among others) "did not deprive petitioner of a fair trial."  *Darden*, 477 U.S. at 181.  Other names, like "superhero," were used to respond to defense arguments that Petitioner had risked his life to restrain a shooter, 56 RR 318–21, 329–34.  *See Darden*, 477 U.S. at 182 (objectionable content that is responsive to defense argument is less likely to cause a due process violation).

- **"Appeals to Racial Prejudice."**  Petitioner alleges that the prosecution "emphasized racially-tinged and otherwise irrelevant facts to the jury during closing."  Docket No. 49 at 134.  The Court has already explained that these remarks did not violate Petitioner's due process rights to a fair trial.  *See supra*, Section V.F.2.  Petitioner also complains that the prosecution told the jury that, if it "disregard[s] the medical evidence, all of it, there is no other person."  Docket No. 49

at 134.  As Respondent argues, a claim based on this remark is time-barred as it was not raised in Petitioner's original federal habeas petition.  It's also meritless because a summation of the evidence is proper.  *See Darden*, 477 U.S. at 182 (closing argument that "did not manipulate or misstate the evidence" did not violate the petitioner's right to a fair trial).

- ***"Bad Acts Not in Evidence."***  Petitioner alleges that, during the punishment-phase closing argument, "[t]he prosecutor also improperly suggested in its closing argument that Mr. Miller had committed bad acts not admitted into evidence."  Docket No. 49 at 135.  Specifically, the prosecution presented evidence of other specific bad acts and then stated that "these are the ones we know about."  *E.g.*, 16 RR 60.  Petitioner claims that the prosecution implied there may be other bad acts that "we [don't] know about."  Docket No. 49 at 135.  Petitioner, however, cites no cases in which such a statement justified granting a writ of habeas corpus.  *Cf. Darden*, 477 U.S. at 181–82 (concluding that a prosecutor's improper argument at closing "did not deprive petitioner of a fair trial" justifying habeas relief).  The Court agrees with Respondent, moreover, that the phrase "the ones we know about," which is a far cry from referencing a specific act not in evidence, is too vague and unclear to amount to a due process violation.

- ***"Impugning the Integrity of Counsel."***  Petitioner claims that the prosecutor "impugned the integrity of defense counsel with personal attacks."  Docket No. 49 at 136.  Petitioner provides three examples, *see id.*, and argues that "[t]hese attacks on defense counsel were baseless and improper."  The first comment, however,

was a proper response to the defense's case about Petitioner and Pinson "building a life together," which the Court addressed above. *See supra*, Section V.F.2.; *see also Darden*, 477 U.S. at 182 (rejecting due process claim regarding "objectionable content" that was "invited by or was responsive to the opening summation of the defense"). The second and third comments likewise responded to remarks by the defense and thus do not give rise to a due process violation. *See Darden*, 477 U.S. at 182. Certainly, none of these remarks "manipulate[d] or misstate[d] the evidence" or "implicate[d] other specific rights of the accused." *Id.*

- ***"Improper Calls for [the] Jury to Impose Death Penalty Based on Emotion."*** Petitioner alleges that the prosecutor's statement that jurors "don't have to" "leave your emotions aside," as the defense had suggested, runs afoul of *Gardner v. Florida*, 430 U.S. 349, 358 (1977). Docket No. 49 at 136. But *Gardner* involved the imposition of a death sentence "on the basis of information which [the accused] had no opportunity to deny or explain." *Gardner*, 430 U.S. at 362. That did not occur here, and that is not what the prosecution was urging the jury to do. Further, as Respondent observes, the Supreme Court in *California v. Brown* held that a jury may consider sympathy or emotion that is "rooted in the aggravating and mitigating evidence introduced during the penalty phase." 479 U.S. 538, 542–43 (1987). The prosecution's comment was thus not improper and did not violate Petitioner's due process rights.

- ***"Improper Calls for the Jury to Put Themselves in the Place of the Victim."*** Next, Petitioner alleges that the prosecution's call for "justice for Kelynn"

and an invitation for jurors to "put themselves in the place of Kelynn" were impermissible jury argument warranting a mistrial. Docket No. 49 at 136–37 (citing examples). As noted above, however, a jury is not required to set aside emotion rooted in the evidence. *Brown*, 479 U.S. at 542–43. In *Cartwright v. Dretke*, moreover, the Fifth Circuit held that a prosecution's statement during the punishment phase that the jury should "[i]magine what the victim was thinking" as he was brutally murdered was not improper but "instead focused the jury's attention on a traditional factor for determining future dangerousness–the vicious and heartless attitude of the killers and their lack of concern for the victim." 103 F. App'x 545, 551–52 (5th Cir. 2004). *See also Torres v. State*, 92 S.W.3d 911, 922 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) ("Here, the jury was asked to make reasonable deductions from the evidence regarding the degree of terror and pain experienced by the complainant shortly before his death. This is entirely appropriate."). The prosecutor's statements did not violate Petitioner's due process rights.

- ***"Improper Opinions as to Moral Blameworthiness."*** Finally, Petitioner argues that "the prosecutor repeatedly urged the jury that the defense's evidence was not mitigating because it did not lessen [Petitioner's] 'moral blameworthiness' for the crime." Docket No. 49 at 139. "This argument," Petitioner urges, "was improper and prejudicial." *Id.* But, just as the defense was permitted to argue—and did argue—that the mitigating evidence "warrant[ed] a life sentence in this case," 59 RR 106, the State was permitted to argue that the evidence justified the death penalty. *See Darden*, 477 U.S. at 186. The CCA previously rejected this type

of argument.  *Milam v. State*, No. AP-76379, 2012 WL 1868458, *19–20 (Tex. Crim. App. May 23, 2012) (where prosecutor argued that defendant's moral blameworthiness was not lessened because there was no evidence defendant had been "horribly abused as a child," the argument "was a fair rebuttal to defense counsel's argument" that appellant was the reason a guilty verdict for capital murder does not automatically warrant a death sentence) (not designated for publication).

Petitioner argues that the above remarks should be considered in their "totality," as required by "the standard [set] out in *Darden*."  Docket No. 109 at 49–50, 52.  Viewed in their totality, the Court finds that the prosecution's remarks in closing did not violate Petitioner's due process right to a fair trial.  Like the comments in *Darden*, the comments here did not "so infect[] the trial with unfairness as to make the resulting [sentence] a denial of due process."  477 U.S. at 182.

Petitioner also asserts an ineffective assistance of counsel claim based on his trial counsel's failure to object to the above comments during closing argument and his habeas counsel's failure "to raise the issue as well."  Docket No. 49 at 139.  As stated above, this claim is defaulted, and Petitioner fails to satisfy an exception.  The claim is also time-barred because Petitioner did not raise this argument in his original federal petition.  The claim also fails on the merits because the underlying comments by the prosecution were not improper and/or did not rise to the level of a due process violation.  *See Dretke*, 103 F. App'x at 551–52 (counsel "did not render deficient performance by failing to object" to a prosecutor's statement during closing argument where "reasonable jurists would not find debatable or wrong" an

interpretation that the prosecutor's argument was permissible).  Indeed, counsel is not required to make futile objections.  *Koch*, 907 F.2d at 527.

### G.    (Claims 18–20) The Admission of Witness Summaries at Trial

Petitioner alleges that his constitutional rights were violated by the admission of eight "witness summaries" during trial.  Docket No. 49 at 140–45; Docket No. 109 at 52–55.  The summaries are SX 117, 118, 130, 175, 199, 202, 206, and 208.  *See* Docket Nos. 25-8; 25-9; 25-10; 25-11; 27-1; 27-2; 27-3; 27-4 (Ex. 76–83).  Petitioner asserts that these exhibits were not "in fact [] summaries of any witness's testimony," but rather "were handwritten notes of the prosecution that selectively highlighted testimony that was helpful to the State."  Docket 109 at 52.  Claim 18 asserts that the witness summaries violated Petitioner's due process rights; Claim 19 alleges that they violated the Confrontation Clause; and Claim 20 contends that his trial counsel was ineffective for failing to object on the basis of the Confrontation Clause.  Docket No. 49 at 140.

Petitioner's challenges to the summaries are procedurally defaulted, not cognizable under federal review, and meritless.

### 1.    The claims are defaulted.

Regarding five of the exhibits—SX 117, 118, 130, 206, and 208—Petitioner did not challenge them on direct appeal.  His claim regarding these exhibits is therefore unexhausted and procedurally barred.  *See, e.g.*, *Aguilar v. Dretke*, 428 F.3d 526, 532–33 (5th Cir. 2005).  Regarding the remaining three exhibits—SX 175, 199, and 202—the CCA declined to review Petitioner's challenges to these exhibits because they

were inadequately briefed and inadequately preserved below.  *See Miller*, 2012 WL 1868406, at *8–10.  Both of the CCA's grounds for declining to review these exhibits constitute an adequate procedural bar to federal habeas review.  See *Buntion v. Lumpkin*, 982 F.3d 945, 949 (5th Cir. 2020), *cert. denied*, 142 S. Ct. 3 (2021); *Roberts v. Thaler*, 681 F.3d 597, 607–08 (5th Cir. 2012); *Hughes v. Johnson*, 191 F.3d 607, 614 (1999); *see also Garza v. Stephens*, 738 F.3d 669, 675 (5th Cir. 2013).

Petitioner, moreover, fails to establish that he's entitled to an exception.  He argues that his appellate counsel was ineffective for failing to properly raise these challenges on direct appeal.  Docket No. 49 at 144.  But an IAAC claim must itself be exhausted before it can excuse default.  *See Hatten v. Quarterman*, 570 F.3d 595, 605 (5th Cir. 2009) (citing *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986); *Edwards v. Carpenter*, 529 U.S. 446, 451–53, (2000)).  And here, Petitioner failed to raise an IAAC claim until his amended federal habeas petition, when he asserted it for the first time.  Petitioner's IAAC claim is therefore time barred  and procedurally defaulted.  *See Hatten*, 570 F.3d at 605 ("[B]ecause [petitioner] did not exhaust his ineffective appellate counsel argument, it is procedurally barred from review in this court and cannot furnish the basis for cause and prejudice enabling federal review of the underlying unexhausted habeas claims.").

### 2.    The claims are also not cognizable and meritless.

As an initial matter, Petitioner's  challenges to the witness summaries are not cognizable on federal habeas review.  *See supra*, Section V.B.  The Court has already explained that a federal habeas petitioner may not rely on a claimed state-law

evidentiary violation "as the basis for his federal habeas application." *Gonzalez v. Thaler*, 643 F.3d 425, 429 (5th Cir. 2011). Rather, habeas review on such matters is proper only to determine "whether the state court's evidentiary ruling was sufficiently egregious to render the trial fundamentally unfair or violate an explicit constitutional right." *Peters v. Whitley,* 942 F.2d 937, 940 (5th Cir. 1991) (citing *Edwards v. Butler*, 882 F.2d 160, 164 (5th Cir. 1989)).

Petitioner fails to make that showing here. The Fifth Circuit has held that similar witness summaries may be admitted under the Federal Rules of Evidence where the summaries "were drawn from competent evidence before the jury, which was available to the defendants at trial and was subject to cross-examination" and where "the jury was properly instructed concerning use of the [summaries] and the limitations thereof." *United States v. Solis*, 299 F.3d 420, 442 (5th Cir. 2002). Petitioner does not allege that any of the eight exhibits fail to satisfy that standard here. Further, after reviewing each of the exhibits, the Court concludes that the state court's evidentiary ruling was not sufficiently egregious to render Petitioner's trial fundamentally unfair or violate an explicit constitutional right:

- *SX 117* and *118* are timelines introduced with Dr. Anderson, who agreed with their contents. *See* Docket No. 22-6.[14] Petitioner's counsel was permitted to cross-examine Dr. Anderson regarding the exhibits, and the

---

[14] Dr. Anderson's testimony is in Volume 46 of the reporter's record, which appears to have been omitted from the record on appeal. Petitioner has, however, attached this volume to his petition as Exhibit 6.

trial court admitted them because they were based on Dr. Anderson's testimony.

- **SX 130** was admitted during the testimony of Dr. Armstrong and is a "reflection of a document that's already been introduced into evidence," 46 RR 38.  Defense counsel was permitted to cross-examine Dr. Armstrong about the exhibit.  *See* 46 RR 40–47.

- **SX 199** was admitted during Dr. Quinton's testimony and reflects Dr. Quinton's conclusions.  48 RR 215–16.  Defense counsel then cross-examined Dr. Quinton regarding these conclusions.  *See* 48 RR 149–208; 51 RR 313–21, 327–33.

- **SX 175** is Detective Matthews's notes regarding his interviews of Petitioner.  49 RR 26–27.  The notes were made during trial by Detective Matthews while the jury was listening to the audio/video recordings of the interviews.  *See* 47 RR 72–73, 46–52.  Defense counsel then thoroughly cross-examined Detective Matthews about the interviews.  *E.g.*, 49 RR 58–94.

- **SX 202** is a timeline of events made while the prosecution examined Pinson, which Pinson signed and dated.  50 RR 89, 116, 206.  Defense counsel later had the opportunity to cross-examine Pinson about SX 202.

- **SX 206** is very similar to SX 202—a document reflecting Pinson's testimony, which Pinson signed and dated.  50 RR 170–75, 209.  The defense then thoroughly cross-examined Pinson.  50 RR 211–79, 321–25.

- And **SX 208** documents the daily hours Petitioner spent with Kelynn in the months leading up to his murder, which Pinson also signed and dated. 50 RR 328–29.

In sum, the eight exhibits are summaries of trial testimony or other evidence, and Petitioner's counsel was permitted to cross-examine witnesses about the summaries. Petitioner contends in his reply that the exhibits are "the prosecution's selective, misleading compilations that include several conclusions made by the prosecution itself, not the witness whose testimony they purported to summarize." Docket No. 109 at 55. But Petitioner also concedes that the summaries were "clearly cumulative." Docket No. 49 at 142. And he acknowledges that "[e]ach of the witnesses for which a summary was admitted testified live in front of the jury." *Id.* Petitioner does not explain how such evidence can be "crucial, critical, and highly significant" when he admits the prosecution "summarized the exact same testimony and presented it as additional evidence for the jury to consider." *Gonzales*, 643 F.3d at 430; Docket No. 49 at 142. The Court thus concludes that the admission of these summary-exhibits did not violate Petitioner's due process right to a fair trial (Claim 18).

Claim 19 alleges that the admission of the summaries violated the Confrontation Clause of the Sixth Amendment. Docket No. 49 at 143. "They are nothing more than summaries of what the prosecutor, not the witnesses, found important," and Petitioner "did not have the opportunity to cross-examine the prosecutor." *Id.* In addition to being procedurally defaulted as set forth above, this

claim is meritless.  The Confrontation Clause guarantees a defendant the opportunity to cross-examine "witnesses against him."  U.S. Const., amend. VI.  A prosecutor violates that right when it introduces "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination."  *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004).  The witness summaries do not run afoul of the Confrontation Clause because they were not the prosecutor's statements, but rather were the statements of various witnesses who were subject to cross-examination.

Further, any error was harmless.  *See Atkins v. Hooper*, 979 F.3d 1035, 1045, 1049 (5th Cir. 2020), *cert. denied*, 142 S. Ct. 481 (2021) (Confrontation-Clause claims are "subject to harmless-error analysis").  "In federal habeas review, the error must have 'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Id.* (quoting *Brecht*, 507 U.S. at 623) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  Petitioner fails to satisfy this standard because the summaries were simply summaries or duplicative of other testimony, and the witnesses were subject to cross-examination.

Claim 20 alleges that Petitioner's trial counsel were ineffective for failing to object that the summaries violated the Confrontation Clause.  Docket No. 49 at 141. This claim is unexhausted and procedurally barred because Petitioner did not raise it in the state court and cannot satisfy the *Martinez/Trevino* exception.  *Newbury v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014) (prisoner must show a reasonable probability that he would have been granted state habeas relief had his habeas

counsel's performance not been deficient).  It is also time-barred because Petitioner did not raise the claim until his amended federal habeas petition.  *See supra*, Section V.B.1.  Further, the claim is meritless because the summaries did not violate the Confrontation Clause, as explained above, and trial counsel were not ineffective for failing to make a futile objection.  *See Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) ("This Court has made clear that counsel is not required to make futile motions or objections.").  Finally, to the extent Claim 20 also asserts an IAAC claim, it is likewise unexhausted and procedurally defaulted and lacks merit for the reasons stated herein.

## H.   Claim 21: Failure to Investigate and Present Mitigating Evidence

In Claim 21, Petitioner alleges that his trial counsel were ineffective in the mitigation phase of the trial because they "failed to conduct an adequate investigation into mitigating circumstances," "failed to prepare for the mitigation phase of the case by failing to develop a narrative or deliver an opening statement," and "failed to put [Petitioner's] mother and brother on the stand, who could have testified how [Petitioner] held the family together."  Docket No. 49 at 145, *id*. at 145–166.

As an initial matter, the evidence Petitioner cites for this claim was not presented to the state court and is therefore barred by *Cullen v. Pinholster.*  563 U.S. 170, 181 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").

In addition, the state court's denial of this claim was not objectively unreasonable.  As explained elsewhere, "[f]ederal habeas relief may not be granted

for a claim subject to § 2254(d) unless it is shown that the earlier state court's decision was contrary to [clearly established] federal law," "involved an unreasonable application of such law," or "was based on an unreasonable determination of the facts." *Harrington v. Richter*, 562 U.S. 86, 100–01 (2011) (quotations omitted). In reviewing a state court's findings regarding an ineffective-assistance of counsel claim, a federal habeas court must determine "whether the state court's application of the *Strickland* standard was unreasonable." *Id.* "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

Here, the state habeas court found that: Petitioner's trial counsel "presented twenty different witnesses during the punishment phase," including "Dr. Kristie Compton, a mitigation specialist"; reasonably decided "to not have Dr. Compton personally interview [Petitioner]"; "sought and were granted the services of a court-appointed forensic psychologist, Dr. Paul Andrews, who interviewed [Petitioner] and conducted a battery of tests," which did not show any mental defect or disease; "requested and were granted the services of an investigator, Mr. Jace Walker, to assist the defense team in its trial preparation"; "spoke with many potential witnesses and extensively explored the [Petitioner's] life history, scholastic background, childhood and other avenues of mitigating evidence"; "presented testimony intended to refute or mitigate the State's aggravating evidence of unadjudicated acts of criminal violence perpetrated by [Petitioner]"; "presented testimony from several witnesses which established the potentially mitigating

evidence that the defendant was a loving family member who served as a father figure to his siblings and who maintained employment when he was not attending college"; and were not ineffective for "failing to call [Petitioner's] mother" where his mother "purposefully made herself unavailable to defense counsel." Supp. SHCR1 13–15.

The state court thus concluded that trial counsel "fully complied with the guidelines established by the Texas State Bar"; "were adequately prepared and had and executed a punishment strategy of showing the [Petitioner] was a loving and caring individual who did well in school, who was a star athlete and team leader, and who was admired and respected by many of his family, friends, teachers, and peers"; "was able to call twenty punishment witnesses who presented the jury with a wealth of potentially mitigating evidence regarding the [Petitioner's] life"; and "properly investigated and were fully prepared for the trial of the punishment phase of this case." *Id*. at 14–15. Petitioner thus failed to show deficient performance or prejudice under *Strickland*. Supp. SHCR1 16–17. The CCA affirmed these findings and denied Petitioner habeas relief based on its own review. *Ex parte Miller*, 2015 WL 1756860, at *1.

The state court's rejection of Petitioner's claim was not unreasonable. As the state court found, trial counsel presented numerous witnesses testifying to Petitioner's "good character." *See, e.g.*, 56 RR 23, 26 (Brandon Owens testifying that Petitioner was "like a father figure" and "care giver"); 56 RR 78 (Joshua Smith testifying that capital murder was not in Petitioner's character); 56 RR 134, 137–39, 141, 148–49 (Reverend Allen Dotson testifying that Petitioner was respectful and

"mannerable"); 56 RR 194–96, 202–03, 206–18 (Petitioner's grandmother Ruby testifying that Petitioner was "mannerable" and "loved children"). Petitioner's sister Chineyere also testified that Petitioner took care of her and their siblings during childhood, was not abusive, was protective of their brother Dexter, and was a "role model" to children. 58 RR 36–41. Petitioner's proposed new evidence (even if the Court were not barred from considering it under *Pinholster*) is thus duplicative of the evidence trial counsel already presented. And the failure to present cumulative evidence is not ineffective assistance. *See, e.g., Trottie v. Stephens*, 720 F.3d 231, 248 (5th Cir. 2013) (affirming denial of habeas claim because, "although the jury may not have had all of the facts [petitioner] now wishes it had, [petitioner's trial] counsel did offer meaningful information regarding [petitioner's] childhood and how it may have impacted [petitioner's] decisions."); *Blanton v. Quarterman*, 543 F.3d 230, 239 (5th Cir. 2008) ("While in hindsight, it is easy to say that trial counsel could have done more, we find the state habeas court reasonable in its conclusion that trial counsel performed reasonably based on the context and circumstances at the time of the representation.").

Petitioner alleges that trial counsel were deficient for failing to call his mother, Julia Jordan, to testify. Docket No. 49 at 154. But as the state habeas court found, Jordan "purposefully made herself unavailable to defense counsel." Supp. SHCR1 15. Petitioner presents Jordan's declaration stating that she "desperately wanted" to testify but agreed not to do so only because she feared arrest, which "would not look good for [Petitioner's] case." Docket No. 23-2 ¶¶ 8–9. The Court is barred by

*Pinholster* from considering this evidence, which was not presented to the state court. In addition, Jordan's declaration is inconsistent with the affidavits of Petitioner's trial counsel on state habeas review, both of whom testified that Jordan left the courthouse, refused to testify, and "became an unwilling witness." 5 SHCR1 1126–27, 1153–54. The state court reasonably resolved this dispute against Petitioner, which is not reviewable here. *Pippin v. Dretke*, 434 F.3d 782, 792 (5th Cir. 2005) ("A trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are virtually unreviewable by the federal courts.") (internal quotations and citations omitted).

Complaints about uncalled witnesses, moreover, "are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Nelson v. Davis*, 952 F.3d 651, 669 (5th Cir. 2020) (internal quotations and citation omitted). To prevail on such claims, a petitioner must show that the witness was willing and available to testify, describe the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense. *Id.* Petitioner cannot make that showing here because Jordan refused to testify and voluntarily left the courthouse. Jordan's proposed testimony, moreover, would have been duplicative of the extensive mitigating evidence presented at trial on Petitioner's behalf.

Petitioner further alleges that trial counsel were ineffective for failing to investigate and present evidence about Petitioner's "severe childhood trauma,"

including that Petitioner "was the victim of extensive physical, psychological and sexual abuse; domestic violence; rejection and abandonment by his father and other relatives; poverty and neglect; mentally and emotionally unstable care-givers; and an unstable, unsafe, and unpredictable homelife." Docket No. 49 at 150. Petitioner, however, again relies solely on evidence the Court is barred from considering under *Pinholster*. *See* Docket No. 24-15 ("Biopsychosocial Assessment of Demontrell Miller" by Janet Vogelsang). Further, as Respondent points out, the Vogelsang affidavit consists largely of hearsay, lacks evidentiary support, and is contradicted by other evidence presented by Petitioner. *See* Docket No. 101 at 184–85. The Court cannot consider it for this additional reason. *See, e.g., Hogue v. Johnson*, 131 F.3d 466, 505 (5th Cir. 1997) (holding that investigator's affidavit of what others said to investigator "is hearsay and is not substantive evidence of anything").

Petitioner repeatedly claims that his trial counsel were ineffective for failing to conduct a "reasonable mitigation investigation." *E.g.*, Docket No. 49 at 148–50. This claim likewise relies on affidavits the Court is barred from considering under *Pinholster*. Further, the evidence contradicts much of Petitioner's evidence on state habeas review, where his lead trial counsel Melvin Thompson set forth the work he undertook to prepare for the mitigation phase of the trial. *See* 5 SHCR1 1122–28; *see also* 5 SHCR1 1147–49 (co-counsel La Juanda Lacy testifying that Petitioner's claim about the failure to investigate "could not be further from the truth"). Indeed, as Respondent notes, Petitioner's trial counsel presented fifteen character witnesses, as well as an expert witness (Dr. Kristie Compton), who spoke to many of Petitioner's

119

family members.  58 RR 153, 163–64.  Petitioner, moreover, fails to demonstrate that a different mitigation investigation would have resulted in specific, substantial mitigating evidence that was not already presented.  Rather, the allegations are vague and conclusory and lack the specificity necessary to show that trial counsel were deficient, especially considering the numerous witnesses and subject areas trial counsel did present.

Finally, Petitioner's complaint that trial counsel were ineffective for failing to present an opening statement during the punishment phase fails.  Such decisions are not unreasonable and are considered well within counsel's discretion in employing effective trial strategy.  *See King v. Davis*, 883 F.3d 577, 593 (5th Cir. 2018).

In conclusion, "[h]aving reviewed the affidavits and trial court record, and considering the deference owed to the state court, [the Court concludes that] there is no debate that the state court's decision was reasonable."  *Trottie*, 720 F.3d at 248.

Further, even if trial counsel had been deficient, the state court reasonably found that Petitioner suffered no prejudice.  As noted above, much of the evidence Petitioner says should have been presented would have been duplicative of the evidence already presented.  Also as noted above, the complaints about trial counsel's deficiencies lack the specificity necessary to show that a better presentation would have "altered the outcome."  *See Trevino v. Davis*, 829 F.3d 328, 338 (5th Cir. 2016) ("An applicant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.") (quotations omitted).  Rather, the evidence at

trial showed that Petitioner had abused Kelynn and Pinson, had injured Kelynn on prior occasions, had assaulted others, and had brutally beat Kelynn to death. *See supra*, Section III. The presentation of the proposed mitigating evidence would not have led to a different result at the punishment phase. *See United States v. Bernard*, 762 F.3d 467, 476 (5th Cir. 2014) ("[G]iven the horrific nature of the crime, reasonable jurists could not debate that the additional, cumulative evidence would in reasonable probability have influenced the jury's balancing of aggravating and mitigating factors."); *Miniel v. Cockrell*, 339 F.3d 331, 347 (5th Cir. 2003) (holding that petitioner was not prejudiced "[w]hen we compare [his] violent history including the cruel manner in which he killed [the victim] with the potential testimony of his family members that centered on his childhood abuse and substance abuse").

Furthermore, Petitioner fails to show that the state court's determinations were contrary to, or involved an unreasonable application of, *Strickland* or were an unreasonable determination of the facts based on the evidence in the record. A federal court must presume the underlying factual determination of the state court to be correct, unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. *See* § 2254(e)(1); *see also Miller–El*, 537 U.S. at 330–31. Petitioner fails to meet his burden under § 2254(e)(1). He fails to establish with clear and convincing evidence that the state habeas court was incorrect in its findings. His claim for ineffective assistance of counsel is meritless.

Petitioner also alleges that his state habeas counsel was deficient for failing to present his mitigating-evidence claim. Docket No. 49 at 158–62. But, as Respondent

observes, the state court adjudicated this claim on the merits. And a "freestanding claim" that state habeas counsel was ineffective is not cognizable. Docket No. 101 at 194; *see also* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); *Beazley v. Johnson*, 242 F.3d 248, 271 (5th Cir. 2001).

Finally, Petitioner claims that his trial counsel were ineffective for "failing to object to demonstrably false and misleading testimony from prosecution 'prison expert' A.P. Merillat." Docket No. 49 at 162. First, this claim is procedurally defaulted because Petitioner raised it in the state habeas petition dismissed for abuse of the writ, and he cannot satisfy the exception. *See supra*, Section V.B.2. The claim is also meritless. Having reviewed Merillat's testimony, the Court finds that it was not false and misleading. Rather, Merillat's comments about an inmate who kills another in prison were based on a real-life example and were accurate, which Petitioner acknowledges. *See* Docket No. 49 at 163. Petitioner's claims about the effects of Merillat's testimony, moreover, are speculative, and trial counsel's decision not to object was reasonable. Indeed, trial counsel are not ineffective merely because they did not object and clarify every time a witness said something that *possibly* could be misinterpreted. *United States v. Fields*, 565 F.3d 290, 294 (5th Cir. 2009) ("Clairvoyance is not a required attribute of effective representation.") (internal quotations and citations omitted).

In sum, Claim 21 is meritless.

# I.      Claim 22:  Comparatively Disproportionate

In his final claim, Petitioner alleges that his death sentence is "comparatively disproportionate to sentences imposed in similar or even substantially more aggravated capital cases involving child or infant deaths."  Docket No. 49 at 166–70. Petitioner states that his death sentence, when compared to similar Texas cases, is "grossly disproportionate to his culpability" and violates the Eighth Amendment.  *Id.* at 168–70.

This claim is procedurally defaulted because he raised this claim in the state habeas petition that was dismissed as abusive, and he has not shown he is excused from default.  *See supra*, Section V.B.2.  The claim is also without merit.  Relying on Supreme Court precedent, the Fifth Circuit has repeatedly held that there is no constitutional right to "proportionality review" of a capital sentence.  *Martinez v. Johnson*, 255 F.3d 229, 241 n.17 (5th Cir. 2001) (citing *Pulley v. Harris*, 465 U.S. 37 (1984)); *see also Harris*, 465 U.S. at 50–51 ("There is thus no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death sentence is imposed, and the defendant requests it."); *Hughes v. Johnson*, 191 F.3d 607, 622 (5th Cir. 1999) (a claim that a defendant's death-penalty sentence is disproportionate to "other Texas capital defendants" is "barred by *Harris*").

In his reply, Petitioner, argues that he is not seeking a new rule of constitutional law, only to exercise his existing right to have a proportionality review under *Enmund v. Florida*, 458 U.S. 782, 798 (1982).  Docket No. 109 at 60.  He also

contends that he is not asking for a proportionality review compared to other Texas cases (not required under *Harris*, 465 U.S. 37) but rather a proportionality review based on specific facts, such as the kind used in *Enmund*. *Id.* *Enmund* is distinguishable. In that case the Court vacated the death penalty where the defendant had been convicted of accomplice liability and felony first-degree murder. *Enmund*, 458 U.S. at 782. The Court based its holding on "[s]ociety's rejection" of the death penalty under such circumstances. *Id.* at 794. But no such facts exist here, and Petitioner cites no authority for "society's rejection" of the death penalty for the murder of a two-year old child.

Petitioner has failed to demonstrate a violation of a constitutional right. This claim is meritless.

## VI.    CONCLUSION

For the reasons set forth above, Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. §§ 2241 and 2254 is **DENIED**.

So **ORDERED** and **SIGNED** this **26th** day of **September, 2025.**

_____
JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE

124